Andrew G. Dietderich
Brian D. Glueckstein
Benjamin S. Beller
Noam R. Weiss
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Proposed Counsel to the Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

―――――――――――――――――――――――――x
:
In re                                                            :     Chapter 11
:
GARRETT MOTION INC., *et al.*,[1]             :     Case No. 20-12212 (MEW)
:
Debtors.                                      :     Jointly Administered
:
:
―――――――――――――――――――――――――x

## SUPPLEMENTAL DECLARATION OF SEAN DEASON
## IN SUPPORT OF THE DEBTORS' DIP FINANCING

Sean Deason, being duly sworn, states the following under penalty of perjury:

1.  I am the Chief Financial Officer of Garrett Motion Inc. ("Garrett Motion"

and, together with its direct and indirect subsidiaries, the "Company"). I was appointed Chief

Financial Officer of Garrett Motion in June 2020. I am generally familiar with the day-to-day

operations, financial affairs, business affairs and books and records of Garrett Motion and each

---

[1] The last four digits of Garrett Motion Inc.'s tax identification number are 3189. Due to the large number of debtor entities in these Chapter 11 Cases, for which the Debtors have requested joint administration, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://www.kccllc.net/garrettmotion. The Debtors' corporate headquarters is located at La Pièce 16, Rolle, Switzerland.

of the other above-captioned debtors and debtors-in-possession (each, a "Debtor," and collectively, the "Debtors").

2.  I previously submitted the *Declaration of Sean Deason in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [D.I. 15] and the *Amendment to Declaration of Sean Deason in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [D.I. 46] (together, the "First Day Declaration"). I submit this supplemental declaration (the "Supplemental Declaration") in further support of the *Debtors' Motion for Entry of Interim and Final Orders, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, 507 and 552, (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing and (VI) Granting Related Relief* [D.I. 17] (the "DIP Motion")[2].

3.  Except as otherwise indicated, all facts set forth in this Supplemental Declaration are based upon my personal knowledge, my review of relevant documents or information provided to me, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial affairs. I am over the age of 18 and authorized to submit this Declaration on behalf of each of the Debtors. If called upon to testify, I would testify to the facts set forth herein.

4.  In my business judgment, as Chief Financial Officer of the Debtors, it is critical that the Debtors obtain approval of the commitment to finance, and access to financing, provided by the DIP Facilities as detailed in the DIP Motion. Specifically, the Debtors require

---

[2] Capitalized terms used but not defined herein have the meaning ascribed to them in the DIP Motion.

immediate access to the Initial Borrowing of $100 million to be followed by the Second Borrowing of $150 million.

5. Given the nature of the Debtors' business and normal fluctuations in liquidity over the course of a month, the Debtors require significant cash on hand. It is also critical that the Debtors have excess cash to not only pay obligations as they come due and to maintain minimum cash of $150 million or more, but also to the address immediate loss of credit, vendor contraction experienced due to the macroeconomic environment and the Debtors' chapter 11 cases, and to be able to absorb unforeseen volume fluctuations in the coming months due to the ongoing COVID-19 pandemic.

6. My judgment, based on my knowledge of the Debtors' businesses, is that failure to obtain immediate access to the $100 million Initial Borrowing could result in significant disruptions in the Debtors' operations that would cause irreparable harm to the Debtors.

7. As detailed in my First Day Declaration and the *Declaration of Scott M. Tandberg, Director at AlixPartners, LLP, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [D.I. 16] and the *Supplemental Declaration of Scott M. Tandberg, Director at AlixPartners, LLP, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [D.I. 51] (together, the "Tandberg First Day Declaration"), the Company maintains a highly complex cash management and financing system. The Company operates globally and has bank accounts in 29 different countries. To deal with cash needs across different jurisdictions, the Company uses cash pooling systems to fund its subsidiaries. Historically, the Company has used zero balance accounts ("ZBAs") to fund its operations as efficiently as possible and to ensure cash is not trapped in any jurisdiction. The Company typically also has access to a revolving credit

facility under its prepetition credit agreement, as well uncommitted overdraft facilities for various operations, such as foreign exchange, purchase of the Company's receivables by banks from the Company's suppliers, and standard lines of credit, all of which are no longer available.

8.  Prior to the Petition Date, the Company's primary banking partners notified the Company that it would no longer have access to its ZBAs. As a result, the Company has now agreed with its banks to either set up target balancing arrangements, leaving sufficient cash in the individual jurisdictions to avoid overdraft at all times, or much make all cash transfers on a manual basis. The Company also no longer has access to its €430 million revolving credit facility and approximately $65 million of overdraft facilities that were in place prior to the Petition Date. These changes require the Company to maintain an even greater liquidity cushion because the Company now has to manually transfer cash to each subsidiary without the guarantee that excess cash will automatically transfer back to the Company's primary cash pool. Under ordinary circumstances, the Company must maintain a cash balance of approximately $100 million across its various cash pools. With these additional restrictions on the movement of cash throughout the system, however, in my opinion, the Company must now maintain a minimum of at least $150 million in cash on hand to avoid disruptions to its operations.

9.  In addition to the cash management restrictions, the Company no longer has the benefit of some of its prior liquidity enhancements that are detailed in the Tandberg Declaration. Typically, the Company uses factoring facilities for its supplier payable accounts or uses promissory notes issued by banks to extend its supplier payment terms. These Chapter 11 Cases have caused certain of the Company's factoring partners to require cash collateralization of its factored supplier payables. The Company also expects a decrease in promissory note

availability and an acceleration of payment terms to certain vendors. These changes have already and will continue to result in pressure on the Company's liquidity.

10. As a result, even the minimum cash position of $150 million is a floor and is not enough to protect operations, permit the Company to maintain customer confidence in sourcing business, and appropriately address unforeseen decreases in revenue that could result at any time from an industry shut-down or disruption from a second-wave of COVID-19, similar to the crisis experienced in the second quarter of 2020.

11. During these Chapter 11 Cases, the necessary adjustments to the tools available to manage cash require the maintenance of additional liquidity at all times. Securing approval of the binding commitment of the DIP Facilities and drawing the first $100 million Initial Borrowing is critical to projecting stable and sufficient liquidity necessary for maintaining normal relationships with the Company's customers and credit terms with its suppliers and other partners.

12. As set forth in my First Day Declaration, the Company estimated cash on hand as of the Petition Date of $280 million, subject to reconciliation, and the actual balance after reconciliation was determined to be $297 million, which is reflected in the Updated DIP Budget annexed to the *Declaration of Scott M. Tandberg, Director at AlixPartners, LLP, in Support of the Debtors' Motion for Entry of Interim and Final Orders, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, 507 and 552, (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing and (VI) Granting Related Relief* (the "Tandberg DIP Declaration").

13. But that cash position fluctuates substantially in the ordinary course of business. This is illustrated in the DIP Budget annexed to the Tandberg DIP Declaration, which shows significant estimated cash outflows in each of the next three weeks, with a closing liquidity amount of approximately $143 million the week of October 10 before net cash inflows driven by customer receipts in the following weeks. The DIP Budget contemplates access to the committed DIP Financing to facilitate maintenance of operations in the ordinary course as the Debtors proceed through chapter 11.

14. In my opinion, maintaining the contemplated liquidity cushion is essential to maintaining ongoing operations in the ordinary course of business, which, in turn is critical to the success of the Debtors' competitive process for the sale or restructuring of the Company, including the Stalking Horse Transaction or any feasible alternative that might be presented to the Debtors.

15. The Company anticipated its needs during these Chapter 11 Cases, including appropriate cash and working capital under the circumstances. The maintenance of normal business operations and maximizing value for stakeholders requires access to the DIP Facility, including the immediate $100 million Initial Borrowing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information and belief.

Dated: September 27, 2020                    Respectfully submitted,

                                             */s/ Sean Deason*
                                             Sean Deason