**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————x
In re                                          :        Chapter 11
                                               :
GARRETT MOTION INC., et al.,[1]                :        Case No. 20-12212 (MEW)
                                               :
                          Debtors.             :        Jointly Administered
                                               :
———————————————————————x


# DEBTORS' JOINT PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Andrew G. Dietderich
Brian D. Glueckstein
Alexa J. Kranzley
Benjamin S. Beller

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

*Counsel to the Debtors*


Dated:  January 8, 2021

---

[1]   The last four digits of Garrett Motion Inc.'s tax identification number are 3189.  Due to the large number of debtor entities in these Chapter 11 Cases, which are being jointly administered, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://www.kccllc.net/garrettmotion.  The Debtors' corporate headquarters is located at La Pièce 16, Rolle, Switzerland.

4820-5709-6917 v.6

**TABLE OF CONTENTS**

1.   INTRODUCTION .................................................................................................................1

2.   DEFINITIONS AND RULES OF INTERPRETATION ...............................................................2
    2.1   Definitions.............................................................................................................2
    2.2   Rules of Interpretation .......................................................................................19
    2.3   Computation of Time ..........................................................................................20
    2.4   References to Monetary Figures ..........................................................................20

3.   ADMINISTRATIVE EXPENSE CLAIMS, PROFESSIONAL FEE CLAIMS, DIP CLAIMS, PRIORITY
    TAX CLAIMS AND STATUTORY FEES...............................................................................21
    3.1   Administrative Expense Claims...........................................................................21
    3.2   Professional Fee Claims......................................................................................22
    3.3   DIP Claims..........................................................................................................23
    3.4   Treatment of Priority Tax Claims .......................................................................23
    3.5   Ad Hoc Lender Group Expenses .........................................................................24
    3.6   Statutory Fees Payable Pursuant to 28 U.S.C. § 1930 ........................................24

4.   CLASSIFICATION AND TREATMENT OF OTHER CLAIMS AND INTERESTS............................25
    4.1   Deemed Substantive Consolidation ....................................................................25
    4.2   Summary of Classes and Treatment of Claims Against and Interests in the
        Debtors................................................................................................................25
    4.3   Treatment of Claims and Interests ......................................................................26

5.   ACCEPTANCE OR REJECTION OF THE PLAN ....................................................................33
    5.1   Voting of Claims or Interests...............................................................................33
    5.2   Acceptance by Impaired Classes .........................................................................33
    5.3   Elimination of Vacant Classes ............................................................................33
    5.4   Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code....................33

6.   IMPLEMENTATION OF THE PLAN.....................................................................................34
    6.1   Operations Between the Confirmation Date and Effective Date ...........................34
    6.2   Purchase of New Common Stock by Plan Sponsor..............................................34
    6.3   Rights Offering ...................................................................................................34
    6.4   Sources of Cash for Plan Distributions................................................................34
    6.5   Dilution of New Common Stock After the Effective Date....................................35
    6.6   Acceleration of Outstanding Equity Awards: Outstanding Cash
        Performance Units ..............................................................................................36
    6.7   New GMI Securities ............................................................................................36
    6.8   Exemption from Registration...............................................................................36
    6.9   Exit Facilities .....................................................................................................37
    6.10   Organizational Existence ...................................................................................38
    6.11   Plan Administrator.............................................................................................38
    6.12   Retention of Professionals .................................................................................39

i

6.13    Cancellation of Existing Interests, Existing Indebtedness and Related
        Agreements ...................................................................................39
6.14    Additional Implementing Transactions.................................................40
6.15    Section 1146 Exemption from Certain Transfer Taxes and Recording Fees.........40
6.16    Insurance Policies ...........................................................................41
6.17    Preservation of Causes of Action........................................................41
6.18    Effectuating Documents and Further Transactions.................................41

7.   PROVISIONS REGARDING GOVERNANCE OF THE REORGANIZED DEBTORS.........................43
     7.1    Organizational Action .................................................................43
     7.2    Organizational Documents...........................................................43
     7.3    Directors and Officers of the Reorganized Debtors.............................44

8.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES................................................45
     8.1    Assumption and Rejection of Executory Contracts and Unexpired Leases ..........45
     8.2    Objections to and Cure of Defaults for Assumed Executory Contracts and
            Unexpired Leases......................................................................45
     8.3    Modifications, Amendments, Supplements, Restatements or Other
            Agreements .............................................................................46
     8.4    Claims Based on Rejection of Honeywell Agreements..........................46
     8.5    Contracts and Leases Entered Into After the Petition Date ..................46
     8.6    Indemnification and Reimbursement Obligations ..............................47
     8.7    Reservation of Rights..................................................................47

9.   PROVISIONS GOVERNING DISTRIBUTIONS.......................................................48
     9.1    Distribution Agents ....................................................................48
     9.2    Timing and Delivery of Distributions.............................................48
     9.3    Manner of Payment Under Plan....................................................51
     9.4    Undeliverable Distributions ........................................................52
     9.5    Reversion .................................................................................53
     9.6    Claims or Interests Paid by Third Parties .......................................53
     9.7    Setoffs .....................................................................................54
     9.8    No Post-petition Interest on Claims...............................................54
     9.9    No Payment Over the Full Amount ...............................................54

10.  CLAIMS ADMINISTRATION PROCEDURES .........................................................55
     10.1   Administration Responsibilities....................................................55
     10.2   Estimation of Claims...................................................................55
     10.3   Expungement and Disallowance of Claims or Interests .....................55
     10.4   Amendments to Proofs of Claim...................................................56
     10.5   No Distributions Pending Allowance ............................................56
     10.6   Distributions After Allowance .....................................................56

11.  EFFECT OF CONFIRMATION .........................................................................57
     11.1   Vesting of Assets .......................................................................57
     11.2   Compromise and Settlement of Claims and Controversies .................57
     11.3   Subordinated Claims...................................................................57

ii

11.4      Release of Liens ................................................................................58
11.5      Discharge ...........................................................................................58
11.6      Term of Injunction or Stays ..............................................................58
11.7      Release by the Debtors........................................................................58
11.8      Exculpation ........................................................................................59
11.9      Third-Party Release ...........................................................................60
11.10    Injunction ...........................................................................................60
11.11    Scope of Releases ..............................................................................61
11.12    Preservation of Causes of Action.......................................................61

12.   CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN..............63
12.1      Conditions to Effectiveness ...............................................................63
12.2      Waiver of Conditions to Confirmation or Effectiveness ....................64

13.   MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN ..........................................65
13.1      Plan Modifications..............................................................................65
13.2      Effect of Confirmation on Modification ..............................................65
13.3      Revocation or Withdrawal of the Plan and Effects of Non-Occurrence of
             Confirmation or Effective Date .........................................................65

14.   RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT .............................................67

15.   MISCELLANEOUS ..............................................................................................70
15.1      Expedited Tax Determination ............................................................70
15.2      Plan Supplement ................................................................................70
15.3      Additional Documents ........................................................................70
15.4      Exhibits; Schedules; Plan Supplement................................................70
15.5      Claims Against Other Debtors ............................................................70
15.6      Nonseverability...................................................................................70
15.7      Governing Law ...................................................................................71
15.8      Dissolution of Committees .................................................................71
15.9      Binding Effect.....................................................................................71
15.10    Notices ................................................................................................71
15.11    Reservation of Rights..........................................................................74
15.12    No Stay of Confirmation Order ..........................................................74
15.13    Waiver or Estoppel .............................................................................74
15.14    Post-Effective Date Service ................................................................74

4820-5709-6917 v.6

## 1.    INTRODUCTION

Garrett Motion Inc., a Delaware corporation ("GMI"), and its debtor Affiliates, as debtors-in-possession in the above-captioned Chapter 11 Cases (together with GMI, the "Debtors"), propose the following joint plan of reorganization (including the Plan Supplement and all other exhibits and schedules hereto and as may be modified, amended or supplemented in accordance with the terms hereof, the "Plan") pursuant to section 1121(a) of the Bankruptcy Code.  Each Debtor is a proponent of the Plan for purposes of section 1129 of the Bankruptcy Code.

**2.     DEFINITIONS AND RULES OF INTERPRETATION**

2.1     Definitions

Except as otherwise provided herein, each capitalized term used in the Plan shall have the meaning set forth below:

2.1.1     "510(b) Claim Share Equivalent" means, with respect to any Allowed GMI Common Stock 510(b) Claim, a number equal to a fraction, the numerator of which equals such Allowed GMI Common Stock 510(b) Claim (net of any cash payments received or recoverable from an Insurance Policy on account of any portion of such Allowed GMI Common Stock 510(b) Claim), *divided by* such reference price for such Allowed GMI Common Stock 510(b) Claim as may be stipulated by the Debtors or determined by the Bankruptcy Court.

2.1.2     "510(b) Claim Share Recovery" means, with respect to a Holder of an Allowed GMI Common Stock 510(b) Claim, the Total Stockholder Distribution Value *multiplied by* a fraction, the numerator of which is such Holder's 510(b) Claim Share Equivalent, and the denominator of which is the aggregate number of 510(b) Claim Share Equivalents of all Holders of Allowed GMI Common Stock 510(b) Claims *plus* the number of outstanding shares of Existing Common Stock as of the Effective Date.

2.1.3     "Additional Purchaser Cash Consideration" has the meaning set forth in the Subscription Agreement.

2.1.4     "Ad Hoc Lender Group" has the meaning set forth in the Restructuring Support Agreement.

2.1.5     "Ad Hoc Lender Group Expenses" means, collectively, all reasonable and documented fees and expenses of (i) Gibson, Dunn & Crutcher LLP, as counsel to the Ad Hoc Lender Group, (ii) PJT Partners LP, as financial advisor to the Ad Hoc Lender Group and (iii) any other professional retained by the Ad Hoc Lender Group in accordance with the Final DIP Order.

2.1.6     "Adjustment Escrow Account" has the meaning set forth in the Subscription Agreement.

2.1.7     "Adjustment Escrow Amount" has the meaning set forth in the Subscription Agreement.

2.1.8     "Administrative Expense Claim Bar Date" means the date that is 30 calendar days after notice of entry of the Effective Date, which notice shall set forth such deadline and be served on all parties known by the Debtors to hold or to potentially hold Administrative Expense Claims.

2.1.9     "Administrative Expense Claim" means any Claim for the costs and expenses of administration of the Chapter 11 Cases pursuant to section 327, 328, 330, 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including:  (i) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving

the Estates and operating the businesses of the Debtors, (ii) Professional Fee Claims, (iii) all fees and charges assessed against the Estates pursuant to sections 1911-1932 of chapter 123 of title 28 of the United States Code, and (iv) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4) and (5) of the Bankruptcy Code to the extent such request is granted by the Bankruptcy Court.

2.1.10   "Affiliate" has the meaning set forth in section 101(2) of the Bankruptcy Code.

2.1.11   "Allowed" means, with respect to any Claim or Interest, except as otherwise provided herein:  (i) a Claim or Interest arising before the Effective Date (a) as to which a proof of claim has been filed in the Chapter 11 Cases, which has not been withdrawn and as to which no objection has been filed by the applicable deadlines set forth in the Plan, the Bankruptcy Code, the Bankruptcy Rules or as determined by the Bankruptcy Court or (b) that is allowed or determined by a Final Order of a court of competent jurisdiction, (ii) any Claim or Interest that is agreed to, compromised, settled or otherwise resolved pursuant to the authority of the Debtors or the Plan Administrator, as applicable, or (iii) any Claim or Interest expressly allowed in the Plan or by Final Order of the Bankruptcy Court, or (iv) any Interest registered in the ownership register or otherwise on the Debtors' books and records, maintained by, or on behalf of, the Debtors as of the Confirmation Date; *provided*, *however*, that notwithstanding the foregoing, the Debtors or the Plan Administrator, as applicable, shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan (including, for the avoidance of doubt, Administrative Expense Claims not paid prior to the Effective Date).  "Allow" and "Allowance" shall have correlative meanings.

2.1.12   "ASASCO Debtors" means ASASCO, the Borrowers, Garrett LX I S.à r.l. and any other Debtors who are direct or indirect Subsidiaries of ASASCO.

2.1.13   "ASASCO Residual Value" means the amount determined by the Debtors and included in the Plan Supplement equal to the value of the assets of ASASCO (including its equity interests in Subsidiaries) for Plan purposes net of claims against ASASCO other than the Honeywell Plan Claims, subject to adjustment pursuant to any applicable claims estimation, valuation or purchase price allocation determinations by the Bankruptcy Court in the Chapter 11 Cases.

2.1.14   "ASASCO" means Garrett ASASCO Inc.

2.1.15   "Avoidance Action" means any and all avoidance, recovery, subordination or other claim, action or remedy that may be brought by or on behalf of the Debtors or their Estates or other authorized parties-in-interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544, 545, 547 through and including 553 and 724(a) of the Bankruptcy Code or under similar local, state, federal or foreign statutes and common law, including fraudulent transfer laws.

2.1.16   "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. § 101 *et seq*.

3

4820-5709-6917 v.6

2.1.17   "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases.

2.1.18   "Bankruptcy Rules" means the Federal Bankruptcy Rules and the general, local and chambers rules of the Bankruptcy Court as applicable to the Chapter 11 Cases and as amended from time to time.

2.1.19   "Bendix Subordinated Indemnity Documents" means the Honeywell Indemnity Agreement together with the Bendix Subordinated Indemnity Guarantee Agreement, and any related documents thereto, as each may be amended, restated, supplemented or otherwise modified from time to time prior to the date hereof.

2.1.20   "Bendix Subordinated Indemnity Guarantee Agreement" means that certain Indemnification Guarantee Agreement, dated September 27, 2018, by and among Honeywell ASASCO 2 Inc., ASASCO and the other Guarantors party thereto, as may be amended, restated, supplemented or otherwise modified from time to time prior to the date hereof.

2.1.21   "Borrowers" means Swiss Borrower, TLB Borrower and Co-Borrower.

2.1.22   "Business Day" means any day other than a Saturday, a Sunday, a "legal holiday" (as defined in Bankruptcy Rule 9006(a)) or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

2.1.23   "Cash" means the legal tender of the United States of America or equivalents thereof.

2.1.24   "Cash Collateral" has the meaning set forth in the Subscription Agreement.

2.1.25   "Cash Election" means the election available to each Holder of Existing Common Stock to receive Cash in lieu of Reinstatement of its Existing Common Stock under the Plan.

2.1.26   "Cash Elector Percentage" means the percentage of the total number of outstanding shares of Existing Common Stock held by Holders of Existing Common Stock who exercise the Cash Election.

2.1.27   "Cash-Out" has the meaning set forth in Section 4.3.9 of the Plan.

2.1.28   "Cause of Action" means any action, claim, cause of action, controversy, proceeding, reimbursement claim, affirmative defense, demand, right, Lien, indemnity, guaranty, suit, obligation, liability, loss, damage, remedy, judgment, account, defense, offset (including setoff or recoupment rights), power, privilege, license and franchise of any kind or character whatsoever, known or unknown, foreseen or unforeseen, Contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, and assertable directly or derivatively, whether arising before, on or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.

4

For the avoidance of doubt, Cause of Action includes:  (i) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) the right to object to or otherwise contest Claims or Interests, (iii) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, (iv) any Avoidance Action, (v) any claim or defense, including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code, and (vi) any claim under any state or foreign law, including any fraudulent transfer or similar claim.

> 2.1.29    "Certificate" means any instrument evidencing a Claim or an Interest.

> 2.1.30    "Chapter 11 Cases" means (i) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (ii) when used with reference to all Debtors, the jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

> 2.1.31    "Claim" means a "claim" as defined in section 101(5) of the Bankruptcy Code.

> 2.1.32    "Claims Objection Deadline" means 11:59 p.m. (prevailing Eastern Time) on the 90th calendar day after the Effective Date, subject to further extensions and/or exceptions as may be ordered by the Bankruptcy Court upon motion on notice to all parties filing a notice of appearance and request for service pursuant to Bankruptcy Rule 2002 in the Chapter 11 Cases.

> 2.1.33    "Claims Register" means the official register of Claims maintained by the Notice and Claims Agent.

> 2.1.34    "Class" means a class of Claims or Interests classified by Section 4 of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

> 2.1.35    "Closing" means the closing of the Transaction.

> 2.1.36    "Co-Borrower" means Garrett Borrowing LLC.

> 2.1.37    "Committees" means the Equity Committee and the UCC.

> 2.1.38    "Company Entity" means a Debtor or any Affiliate of a Debtor.

> 2.1.39    "Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

> 2.1.40    "Confirmation Hearing" means the hearing held by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code to consider Confirmation of the Plan, as such hearing may be, or may have been, continued from time to time.

4820-5709-6917 v.6

2.1.41    "Confirmation Order" means the order of the Bankruptcy Court entered confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which such order shall be in form and substance reasonably acceptable to the Requisite Consenting Lenders.

2.1.42    "Confirmation" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

2.1.43    "Consenting Lenders" has the meaning set forth in the Restructuring Support Agreement.

2.1.44    "Contingent" means, when used in reference to a Claim, any Claim the liability for which attaches or is dependent upon the occurrence or happening of, or is triggered by, an event that has not yet occurred as of the date on which such Claim is sought to be estimated or on which an objection to such Claim is filed, whether or not such event is within the actual or presumed contemplation of the holder of such Claim and whether or not a relationship between the holder of such Claim and the applicable Debtor now or hereafter exists or previously existed.

2.1.45    "Creditor" means any holder of a Claim against any of the Debtors.

2.1.46    "Cure Cost" means the amounts, including, where applicable, an amount of $0.00, required to cure any and all monetary defaults under an Executory Contract or Unexpired Lease (or such lesser amounts as may be agreed upon by the parties to an Executory Contract or Unexpired Lease) that is to be assumed by the Debtors pursuant to section 365 or 1123 of the Bankruptcy Code.

2.1.47    "D&O Insurance Policies" means any Insurance Policies for directors', managers', officers' and any other Insured (as defined in such policy) entities' liability (including employment practices liability and fiduciary liability) maintained on behalf of the Debtors prior to the Effective Date.

2.1.48    "Debtor Released Claims" has the meaning set forth in Section 11.7 of the Plan.

2.1.49    "Debtor Releases" has the meaning set forth in Section 11.7 of the Plan.

2.1.50    "Debtor Transaction Expenses" has the meaning set forth in the Subscription Agreement.

2.1.51    "Debtors" has the meaning set forth in the Introduction hereto.

2.1.52    "DIP Agent" means Citibank N.A. as administrative agent and collateral agent for the lenders under the DIP Credit Agreement and any successor agent appointed in accordance with the terms of the DIP Credit Agreement.

2.1.53    "DIP Claims" means any Claim against any of the Debtors arising out of or related to the DIP Facility or the DIP Facility Documents, including any outstanding principal,

6

4820-5709-6917 v.6

accrued and unpaid interest and fees, costs, expenses, reimbursement obligations, premiums and all other amounts that are outstanding obligations under the DIP Facility Documents.

2.1.54   "DIP Credit Agreement" means that certain Senior Secured Super-Priority Debtor-in-Possession Credit Agreement, dated as of October 9, 2020, by and among GMI, as borrower, each lender party thereto from time to time, and the DIP Agent, as amended, supplemented or otherwise modified from time to time, including all exhibits and annexes thereto.

2.1.55   "DIP Facility Documents" means the DIP Credit Agreement, together with all other agreements, documents, filings and instruments delivered or entered into in connection with the DIP Credit Agreement or the DIP Facility, including the DIP Guarantee Agreement, the DIP U.S. Collateral Agreement, any other pledge, guarantee and collateral agreements, financing statements, perfection documents, intercreditor agreements, subordination agreements, fee letters and security documents, each as amended, restated, supplemented or otherwise modified from time to time in accordance with its terms.

2.1.56   "DIP Facility" means that certain senior secured superpriority debtor-in-possession credit facility governed by the DIP Facility Documents.

2.1.57   "DIP Guarantee Agreement" means that certain Debtor-in-Possession Guarantee Agreement, dated as of October 9, 2020, by and among each of the Guarantors from time to time party thereto and the DIP Agent, as amended, restated, supplemented or otherwise modified from time to time in accordance with its terms.

2.1.58   "DIP Required Lenders" has the meaning set forth in the Final DIP Order.

2.1.59   "DIP Secured Parties" means the DIP Agent and the lenders, issuing banks, arrangers and other secured parties under the DIP Facility.

2.1.60   "DIP U.S. Collateral Agreement" means that certain Debtor-in-Possession U.S. Collateral Agreement, dated as of October 9, 2020, by and among GMI, the other U.S. Subsidiary Loan Parties party thereto from time to time (as defined therein) and the DIP Agent, as amended, supplemented or otherwise modified from time to time in accordance with its terms.

2.1.61   "Directors" means the directors of the board of GMI immediately prior to the Effective Date.

2.1.62   "Disclosure Statement" means the disclosure statement for the Plan, including all exhibits, appendices and schedules thereto, as amended, supplemented or otherwise modified from time to time, as approved by the Bankruptcy Court.

2.1.63   "Disputed" means, with respect to any Claim or Interest, a Claim or Interest or any portion thereof that is not Allowed but that has not been disallowed by a Final Order.

7

2.1.64   "Distribution Agent" means any Person or Entity designated or retained by the Debtors (prior to the Effective Date) or the Plan Administrator for the Reorganized Debtors (after the Effective Date), without the need for any further order of the Bankruptcy Court, to serve as distribution agent under the Plan.  The Plan Administrator may be the Distribution Agent.

2.1.65   "Distribution Date" means any date, including the Effective Date, on which a distribution to a holder of an Allowed Claim or an Allowed Interest is contemplated to be made under the Plan and as more fully set forth in Section 9.2 of the Plan.

2.1.66   "Effective Date" means the first Business Day on or after the Confirmation Date on which the conditions to the effectiveness of the Plan specified in Section 12.1 of the Plan have been either satisfied or waived as set forth herein.

2.1.67   "Eligible Holder" has the meaning set forth in the Rights Offering Procedures.

2.1.68   "Entity" means an "entity" as defined in section 101(15) of the Bankruptcy Code.

2.1.69   "Equity Committee" means the official committee of equity security holders of the Debtors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as may be reconstituted from time to time.

2.1.70   "Estate" means, with respect to each Debtor, the estate created as to such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

2.1.71   "Exculpated Parties" means (i) the Debtors, (ii) the Reorganized Debtors, (iii) the UCC and its members, in their capacities as such, (iv) the Equity Committee and its members, in their capacities as such, (v) the Plan Sponsor, (vi) the Plan Administrator, (vii) the Prepetition Credit Agreement Secured Parties, (viii) the DIP Secured Parties, and (ix) with respect to each entity named in (i) through (viii), such entity's managers, members, current and former directors, officers, employees, consultants, agents, predecessors, successors, heirs, executors and assigns, attorneys, financial advisors, restructuring advisors, investment bankers, accountants and other professionals or representatives solely when acting in any such capacities.

2.1.72   "Executory Contract" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection pursuant to section 365 of the Bankruptcy Code.

2.1.73   "Existing Common Stock" means the GMI Common Stock (including restricted stock) issued and outstanding immediately prior to the Closing (including as a result of any Seller Equity Awards that are vested and exercised and/or settled (as applicable) on or prior to the Closing (including pursuant to Section 2.14 of the Subscription Agreement) or as a result of the issuance of any shares of GMI Common Stock on account of GMI Common Stock 510(b) Claims, if any, on or prior to the Closing Date).

8

4820-5709-6917 v.6

2.1.74    "Exit Facilities Documents" means the definitive documents governing the Exit Facilities, to be entered into pursuant to the Transaction Documents.

2.1.75    "Exit Facilities" means the exit financing provided under the Exit Facilities Documents, which shall consist of (i) the Exit Term Debt and (ii) the Exit Revolver.

2.1.76    "Exit Revolver" means the revolving credit facility provided under the Exit Facilities Documents and as disclosed in the Plan Supplement.

2.1.77    "Exit Term Debt" means the term indebtedness (whether in the form of term loans, notes, and/or other debt securities (or any combination thereof)) with an aggregate amount of funded net Cash proceeds not to exceed $1.500 billion and provided pursuant to the Exit Facilities Documents and as disclosed in the Plan Supplement.

2.1.78    "Final DIP Order" means the *Final Order (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expenses Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing and (VI) Granting Related Relief* [D.I. 281], as may be amended or modified from time to time by order of the Bankruptcy Court with the consent of the DIP Required Lenders and Requisite Consenting Lenders.

2.1.79    "Final Order" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, stayed, modified or amended, and as to (i) which the time to appeal, petition for *certiorari* or move for a new trial, reargument or rehearing has expired, and as to which no appeal, petition for *certiorari* or other proceedings for a new trial, reargument or rehearing is pending or has been timely taken or (ii) if an appeal, writ of *certiorari*, new trial, reargument or rehearing has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order or judgment, or such appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have otherwise been dismissed with prejudice, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired; *provided*, *however*, no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure or Federal Bankruptcy Rule 9024 has been or may be filed with respect to such order or judgment.

2.1.80    "General Unsecured Claim" means any Claim against any of the Debtors that is not an Administrative Expense Claim, Priority Tax Claim, Other Priority Claim, Other Secured Claim, DIP Claim, Prepetition Credit Agreement Claim, Senior Subordinated Noteholder Claim, Honeywell Plan Claim, Intercompany Claim or GMI Common Stock 510(b) Claim.

2.1.81    "GMHI II" means Garrett Motion Holdings II Inc.

9

2.1.82   "GMHI" means Garrett Motion Holdings Inc.

2.1.83   "GMI Cash Elector" means any holder of Existing Common Stock that has elected to receive cash in lieu of reinstatement of its Existing Common Stock under the Plan.

2.1.84   "GMI Common Stock 510(b) Claims" means any Claim arising from rescission of a purchase or sale of GMI Common Stock, for damages arising from the purchase or sale of GMI Common Stock, or for reimbursement or contribution allowed under Section 502 of the Bankruptcy Code on account of such a Claim.

2.1.85   "GMI Common Stock Rights" means the GMI Options, GMI RSUs, GMI PSUs and GMI CPSUs.

2.1.86   "GMI Common Stock" means the common stock, $0.001 par value per share, of GMI.

2.1.87   "GMI CPSU" means each outstanding performance unit under the Stock Incentive Plan.

2.1.88   "GMI Option" means each outstanding option to purchase shares of GMI Common Stock under the Stock Incentive Plan.

2.1.89   "GMI PSU" means each outstanding performance stock unit under the Stock Incentive Plan.

2.1.90   "GMI RSU" means each outstanding restricted stock unit under the Stock Incentive Plan.

2.1.91   "GMI Stock Elector" has the meaning set forth in the Subscription Agreement.

2.1.92   "GMI" has the meaning set forth in the Introduction hereto.

2.1.93   "Governmental Unit" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

2.1.94   "Holder" means an Entity holding a Claim or an Interest, as applicable.

2.1.95   "Honeywell Agreements" means (i) the Bendix Subordinated Indemnity Documents, (ii) the Contribution and Assignment Agreement, dated September 14, 2018, by and between Honeywell ASASCO Inc., and Garrett ASASCO Inc., (iii) unless the Plan Sponsor notifies the Debtors to the contrary in writing not later than five (5) Business Days prior to the deadline for filing the Plan Supplement (or such later date as may be approved by the Bankruptcy Court), the Separation and Distribution Agreement, by and between Honeywell and Seller, dated as of September 27, 2018, (iv) the Tax Matters Agreement, and (v) to the extent the Plan Sponsor notifies the Debtors Seller not later than five Business Days prior to the deadline for filing the Plan Supplement (or such later date as may be approved by the Bankruptcy Court), any other spin-off related document with Honeywell or any of its Affiliates.

10

2.1.96   "Honeywell Indemnity Agreement" means, collectively, that certain Indemnification and Reimbursement Agreement, dated September 12, 2018, by and among Honeywell ASASCO Inc., Honeywell ASASCO 2 Inc. and Honeywell International Inc., and that certain Contribution and Assignment Agreement, dated September 14, 2018, by and between Honeywell ASASCO Inc. and ASASCO, as each may be amended, restated, supplemented or otherwise modified from time to time prior to the date hereof.

2.1.97   "Honeywell Plan Claims" means all Claims (i) held by Honeywell against any Debtor or Affiliates of a Debtor that do not arise under agreements being assumed by the Debtors or Reorganized Debtors, as applicable, and (ii) the Honeywell Spin-Off Claims.

2.1.98   "Honeywell Spin-Off Claims" means any Claim held by Honeywell arising under or relating to the Honeywell Agreements or the spin-off of GMI and its Subsidiaries from Honeywell.

2.1.99   "Honeywell" means Honeywell International Inc., its affiliates and their respective officers, directors, professional advisors, consultants and related persons.

2.1.100   "Impaired" means, with respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

2.1.101   "Initial GMI Stock Elector Distribution Value" has the meaning set forth in the Subscription Agreement.

2.1.102   "Initial Stockholder Distribution Value" means the lesser of (i) $350 million *less* the Adjustment Escrow Amount and (ii) the amount in Dollars determined by the Plan Administrator that is the minimum amount of value distributable from GMI's Estate to holders of Existing Common Stock on the date of Closing in accordance with the Plan (which, for the avoidance of doubt, will be reduced by the Adjustment Escrow Amount, without duplication).

2.1.103   "Insurance Policy" and, collectively, the "Insurance Policies" means each of the insurance policies issued to or for the benefit of any Debtor(s) or any of their predecessors-in-interest at any time and any agreements, documents or instruments related thereto, including any insurance policy for directors', managers' and officers' liability.

2.1.104   "Insurer" means any company or other entity that issued an Insurance Policy, any third-party administrator, and any respective predecessors and/or affiliates thereof.

2.1.105   "Intercompany Claim" means any Claim held by a Company Entity against any other Company Entity.

2.1.106   "Intercompany Interest" means any Interest held by a Company Entity in any other Company Entity.

2.1.107   "Intercreditor Agreement" means that certain Intercreditor Agreement, dated as of September 27, 2018, by and among GMI, as Holdings, Garrett LX I S.à r.l., as Lux

11

Notes Issuer, Garrett LX II S.à r.l., as LuxCo 2, Garrett LX III S.à r.l., as Lux Borrower, Garrett Motion Sàrl (f/k/a Honeywell Technologies Sàrl), as Swiss Borrower, Garrett Borrowing LLC, as U.S. Co-Borrower and as U.S. Co-Notes Issuer, the other Debtors and Grantors party thereto, JPMorgan Chase Bank, N.A., as Senior Secured Administrative Agent, Senior Secured Collateral Agent and a Senior Priority Representative for the Senior Secured Credit Agreement Secured Parties, Deutsche Trustee Company Limited, as Senior Subordinated Notes Trustee and a Senior Subordinated Priority Representative for the Senior Subordinated Notes Secured Parties, Deutsche Bank AG, London Branch, as Senior Subordinated Collateral Agent for the Senior Subordinated Notes Secured Parties, the Intra-Group Lenders from time to time party thereto, Honeywell ASASCO 2, Inc., as Honeywell Indemnity, and each additional Representative from time to time party thereto, as may be amended, supplemented or otherwise modified from time to time.

2.1.108   "Interest" means any equity security within the meaning of section 101(16) of the Bankruptcy Code or any other equity or ownership interest, including, without limitation, all issued, unissued, authorized or outstanding limited liability company membership interests (including common and preferred) or other equity interests, together with any warrants, options, convertible securities, liquidating preferred securities or contractual rights to purchase or acquire any such equity interests at any time and all rights arising with respect thereto.

2.1.1      "Joint Ventures" means FMP Group (Australia) Pty Ltd., FMP Group Pty Limited, FMP Distribution Ltd. and FMP Group (Thailand) Limited.

2.1.2      "Lien" means a "lien" as defined in section 101(37) of the Bankruptcy Code.

2.1.3      "Local Rules" means the Local Bankruptcy Rules for the Southern District of New York.

2.1.4      "New Board" means the board of directors of New GMI.

2.1.5      "New Common Stock" means the common stock of New GMI.

2.1.6      "New GMI Securities" means New Common Stock and New Preferred Stock.

2.1.7      "New GMI" means GMI, as reorganized pursuant to and under the Plan, and any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

2.1.8      "New Preferred Stock" means preferred stock of New GMI on terms approved by the Plan Sponsor, the Debtors and the Equity Committee.

2.1.9      "Notice and Claims Agent" means the Debtors' notice and claims agent, Kurtzman Carson Consultants LLC.

2.1.10    "Offered Shares" has the meaning set forth in the Rights Offering Procedures.

12

2.1.11  "Other Priority Claim" means a Claim entitled to priority in right of payment pursuant to section 507(a) of the Bankruptcy Code, other than an Administrative Expense Claim or a Priority Tax Claim.

2.1.12  "Other Secured Claim" means any Secured Claim or portion thereof, other than a Prepetition Credit Agreement Claim, Senior Subordinated Noteholder Claim or DIP Claim.

2.1.13  "Person" means a "person" as defined in section 101(41) of the Bankruptcy Code.

2.1.14  "Petition Date" means, with respect to a Debtor, the date on which such Debtor commenced its Chapter 11 Cases.

2.1.15  "Plan" has the meaning set forth in the Introduction hereto.

2.1.16  "Plan Administrator" means the Person or Entity, or any successor thereto, designated by the Debtors, who shall be reasonably acceptable to the Plan Sponsor, in accordance with Section 6.11 of this Plan.

2.1.17  "Plan Administration Agreement" means the agreement among the Plan Administrator and the Debtors regarding the administration of the Plan, to be filed as part of the Plan Supplement.

2.1.18  "Plan Sponsor" means AMP Alberta Holdings, LP.

2.1.19  "Plan Supplement" means one or more compilations of documents and forms of documents, instruments, schedules and exhibits to the Plan, as each such document, agreement, instrument, schedule and exhibit and form thereof may be altered, restated, modified or replaced from time to time, including subsequent to the filing of any such documents.  Each such document, agreement, instrument, schedule or exhibit, or form thereof, is referred to herein as a "Plan Supplement."

2.1.20  "Prepetition Credit Agreement Agent" means JPMorgan Chase Bank, N.A., as Administrative Agent under the Prepetition Credit Agreement, and any successor agent appointed in accordance with the terms of the Prepetition Credit Agreement.

2.1.21  "Prepetition Credit Agreement Claim" means any Claim arising out of or related to the Prepetition Credit Agreement Documents.

2.1.22  "Prepetition Credit Agreement Documents" mean the Prepetition Credit Agreement and any Prepetition Credit Agreement Guarantee together with all other agreements, documents, filings and instruments delivered or entered into in connection with the Prepetition Credit Agreement or any Prepetition Credit Agreement Guarantee, including any pledge and collateral agreements, financing statements, perfection documents, intercreditor agreements, subordination agreements, fee letters and security documents, each as amended restated, supplemented or otherwise modified from time to time in accordance with its terms.

13

2.1.23  "Prepetition Credit Agreement Guarantee" means any guarantee of any obligation arising under the Prepetition Credit Agreement Documents.

2.1.24  "Prepetition Credit Agreement Secured Parties" mean the Prepetition Credit Agreement Agent, the Holders of Prepetition Credit Agreement Claims and all other lenders, issuing banks, arrangers and other secured parties under the Prepetition Credit Agreement Documents.

2.1.25  "Prepetition Credit Agreement" means that certain Credit Agreement, dated as of September 27, 2018, by and among GMI, as holdings, Garrett LX III S.à r.l., as Lux Borrower, Garrett Borrowing LLC, as U.S. Co-Borrower, Garrett Motion Sàrl (f/k/a Honeywell Technologies Sàrl), as Swiss Borrower, the Lenders and Issuing Banks party thereto and JPMorgan Chase Bank, N.A., as Administrative Agent, as amended, restated, supplemented or otherwise modified from time to time in accordance with its terms.

2.1.26  "Priority Tax Claim" means a Claim (whether secured or unsecured) of a Governmental Unit against any Debtor entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

2.1.27  "Pro Rata" means, as applicable, with respect to an Allowed or estimated Claim or Interest, the percentage represented by a fraction (i) the numerator of which shall be an amount equal to such Allowed or estimated Claim or Interest and (ii) the denominator of which shall be an amount equal to the aggregate amount of Allowed and estimated Claims or Interests in the same Class as such Claim or Interest, except in cases where Pro Rata is used in reference to multiple Classes, in which case Pro Rata means the portion that such Holder's Claim or Interest in a particular class bears to the aggregate amount of all Allowed and estimated Claims or Interests in such multiple Classes.

2.1.28  "Professional" means a Person or Entity:  (i) employed in the Chapter 11 Cases pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to section 327, 328, 329, 330 or 331 of the Bankruptcy Code, or (ii) for which compensation and reimbursement has been awarded by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

2.1.29  "Professional Fee Claim" means any Claim of a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code.

2.1.30  "Professional Fee Escrow Account" means an account to be funded by the Debtors on or prior to the Effective Date in an amount equal to the Professional Fee Reserve Amount.

2.1.31  "Professional Fee Reserve Amount" means the estimate of the aggregate amount of unpaid Professional Claims for all Professionals through the Effective Date.

14

2.1.32    "Proof of Claim" means a proof of claim against a Debtor filed by a holder of a Claim against any Debtor.

2.1.33    "Purchaser Cash Consideration" shall have the meaning set forth in the Subscription Agreement.

2.1.34    "Reinstated" means, with respect to any Claim or Interest, that such Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

2.1.35    "Rejection Damages Claim" means a Claim arising from the rejection of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code.

2.1.36    "Rejection Damages Claims Bar Date" means 4:00 p.m. (Eastern Time) on the 30th day after the Effective Date.

2.1.37    "Released Parties" means (i) the Exculpated Parties, (ii) the Senior Subordinated Notes Indenture Trustee, and (iii) each of their respective current and former directors, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, employees, consultants, agents, affiliates, parents, members, managers, predecessors, successors, heirs, executors and assigns, participants, subsidiaries, managed accounts or funds, partners, limited partners, general partners, principals, fund advisors, attorneys, financial advisors, restructuring advisors, investment bankers, accountants and other professionals or representatives solely when acting in any such capacities.

2.1.38    "Releasing Parties" means (i) the Released Parties, (ii) Plan Sponsor, (iii) all holders of Claims or Interests that vote to accept the Plan, (iv) all holders of Claims or Interests that vote to reject the Plan but elect on their ballot to opt into the voluntary release by holders of Claims and Interests, (v) all holders of Claims and Interests not described in the foregoing clauses (i) through (v) who elect to opt into the voluntary release by holders of Claims and Interests; and (vi) with respect to each entity named (i) through (v), such entity's managers, members, current and former directors, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, employees, consultants, agents, affiliates, parents, members, managers, predecessors, successors, heirs, executors and assigns, participants, subsidiaries, managed accounts or funds, partners, limited partners, general partners, principals, fund advisors, attorneys, financial advisors, restructuring advisors, investment bankers, accountants and other professionals or representatives, in each case, solely when acting in any such capacities.

2.1.39    "Reorganized Debtor" means a Debtor, as reorganized pursuant to and under the Plan, or any applicable successor(s) thereto, by asset purchase, merger, consolidation or otherwise, on or after the Effective Date.

2.1.40    "Requisite Consenting Lenders" has the meaning set forth in the Restructuring Support Agreement.

15

4820-5709-6917 v.6

2.1.41   "Restructuring Support Agreement" means that certain Restructuring Support Agreement, dated as of September 20, 2020, by and among GMI, the Debtors party thereto and the Consenting Lenders party thereto, as amended, supplemented or otherwise modified from time to time, including all exhibits and annexes thereto.

2.1.42   "Restructuring Transactions" has the meaning set forth in Section 6.12 hereof.

2.1.43   "Rights Offering" means the offering of Subscription Rights in accordance with the Rights Offering Procedures.

2.1.44   "Rights Offering Procedures" means the procedures with respect to the Rights Offering authorized pursuant to the Solicitation Procedures Order.

2.1.45   "Rights Offering Subscription Amount" has the meaning set forth in the Subscription Agreement.

2.1.46   "Rights Offering Shares" has the meaning set forth in the Subscription Agreement.

2.1.47   "Secured Claim" means a Claim that is (i) secured by a Lien on property in which an Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code, or (ii) Allowed pursuant to the Plan as a Secured Claim.

2.1.48   "Securities Act" means the Securities Act of 1933, as now in effect or hereafter amended, and the rules and regulations of the U.S. Securities and Exchange Commission promulgated thereunder.

2.1.49   "Senior Subordinated Noteholder Claim" means any Claim arising out of or related to the Senior Subordinated Notes Indenture and the Senior Subordinated Notes Guarantee.

2.1.50   "Senior Subordinated Notes Guarantee" means any guarantee of any obligation arising under the Senior Subordinated Notes Indenture.

2.1.51   "Senior Subordinated Notes Indenture Trustee" means Deutsche Trustee Company Limited, as indenture trustee of the Senior Subordinated Notes Indenture, and any successor trustee appointed in accordance with the terms of the Senior Subordinated Notes Indenture.

2.1.52   "Senior Subordinated Notes Indenture" means that certain Indenture, dated as of September 27, 2018, among GMI, as Parent, Garrett LX I S.à r.l., as Issuer, Garrett Borrowing LLC, as Co-Issuer, the guarantors named therein, Deutsche Trustee Company Limited, as Trustee, Deutsche Bank AG, as Security Agent and Paying Agent, and Deutsche Bank Luxembourg S.A., as Registrar and Transfer Agent, pursuant to which the Senior

16

4820-5709-6917 v.6

Subordinated Notes were issued, as may be amended, supplemented or otherwise modified from time to time.

2.1.53    "Senior Subordinated Notes" mean the 5.125% senior notes, due 2026, outstanding under the Senior Subordinated Notes Indenture.

2.1.54    "Solicitation Procedures Order" means the *Order (I) Approving the Disclosure Statement and Form and Manner of Notice of Disclosure Statement Hearing; (II) Establishing a Voting Record Date for the Plan; (III) Approving Solicitation Packages and Procedures for the Distribution Thereof; (IV) Approving the Forms of Ballots; (V) Establishing Procedures for Voting on the Plan; and (VI) Establishing Notice and Objection Procedures for the Confirmation of the Plan* [D.I. [•]].

2.1.55    "Stock Elector Percentage" means the percentage of the total number of outstanding shares of Existing Common Stock as of the Effective Date held by Holders of Existing Common Stock that did not exercise the Cash Election.

2.1.56    "Stock Incentive Plan" means the Garrett Motion Inc. Stock Incentive Plan.

2.1.57    "Stock Register" means the ownership register of GMI Common Stock maintained by, or behalf of, the Debtors.

2.1.58    "Subscribing Holder" means any Eligible Holder that exercises its Subscription Rights and purchases shares of New Common Stock through the Rights Offering.

2.1.59    "Subscription Agreement" means that certain Subscription Agreement, dated as of January 8, 2021, by and among GMI, as Seller, Plan Sponsor, as Buyer, and, solely for purposes of Section 9.19 therein, GMHI, ASASCO, GMHI II, AMP Intermediate B.V. and AMP U.S. Holdings, LLC.

2.1.60    "Subscription Rights" means the rights to subscribe for and acquire New Common Stock on the Effective Date pursuant to the Rights Offering.

2.1.61    "Subsequent Holder" means any entity that, as of the relevant time, (i) holds New Common Stock that was issued as Offered Shares through the Rights Offering and (ii) is not the Subscribing Holder to whom such Offered Shares were originally issued through the Rights Offering.

2.1.62    "Subsequent Stockholder Distribution Value" has the meaning set forth in Section 9.2.1(iii) of the Plan.

2.1.63    "Subsidiary" means, with respect to any Person, any entity (i) whose securities or other ownership interests or contractual rights having by their terms the power to elect a majority of the board of directors or other persons performing similar functions are owned or controlled, directly or indirectly, by such Person, (ii) whose business and policies such Person has the power to direct, or (iii) for which such Person acts as a general partner, managing

17

member or in a similar capacity.  For the avoidance of doubt, neither the Joint Ventures nor their Subsidiaries shall be considered "Subsidiaries" of GMI or its Subsidiaries.

2.1.64    "Swiss Borrower" means Garrett Motion Sàrl.

2.1.65    "Tax Matters Agreement" means that certain Tax Matters Agreement, dated September 12, 2018, by and among Honeywell International Inc., GMI, Honeywell ASASCO Inc. and Honeywell ASASCO 2 Inc., as may be amended, supplemented or otherwise modified from time to time.

2.1.66    "TLB Borrower" means Garrett LX III S.à r.l.

2.1.67    "Total Cash Consideration" means the Purchaser Cash Consideration and the Additional Purchaser Cash Consideration.

2.1.68    "Total Stockholder Distribution Value" means all Cash and New Common Stock available for distribution to holders of Existing Common Stock under the Plan which, for the avoidance of doubt, shall be net of Cash or other value applied by the Plan Administrator or otherwise required (i) to make distributions for Allowed Claims under the Plan, (ii) to fund the Professional Fee Escrow Account or pay other Debtor Transaction Expenses, or (iii) to pay the expenses and costs of administering the Plan, including, for the avoidance doubt and without limitation, the aggregate fees, costs and expenses of the Plan Administrator and any financial advisor, legal counsel, accountant, agent, auditor, broker, expert or other advisor or consultant retained by or on behalf of the Plan Administrator or (iv) to pay the aggregate fees, costs and expenses of the Committees and any financial advisor, legal counsel, accountant, agent, auditor, broker, expert or other advisor or consultant retained by or on behalf of the Committees.

2.1.69    "Transaction" means the transaction contemplated by the Transaction Documents.

2.1.70    "Transaction Documents" has the meaning set forth in the Subscription Agreement.

2.1.71    "Unsubscribed Shares" means any Offered Shares that are not purchased by Eligible Holders.

2.1.72    "U.S. Debtors" mean GMI, GMHI, Garrett Motion Holdings II Inc., Garrett Transportation I Inc., BRH LLC, Friction Materials LLC and Garrett Motion International Services S.R.L.

2.1.73    "U.S. Trustee Fees" mean fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

2.1.74    "U.S. Trustee" means the Office of the United States Trustee for the Southern District of New York.

4820-5709-6917 v.6

2.1.75   "UCC" means the official committee of unsecured creditors of the Debtors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as may be reconstituted from time to time.

2.1.76   "Unclaimed Distribution" means any distribution under the Plan on account of an Allowed Claim or Interest to a Holder that has not:  (i) accepted a particular distribution or, in the case of a distribution made by check, negotiated such check, (ii) given written notice to the Distribution Agent of an intent to accept a particular distribution, (iii) responded in writing to the request of the Distribution Agent for information necessary to facilitate a particular distribution, or (iv) taken any other action necessary to facilitate such distribution.

2.1.77   "Unexpired Lease" means a lease to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

2.1.78   "Unimpaired" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not impaired within the meaning of such term in section 1124 of the Bankruptcy Code.

2.1.79   "United States of America," "United States" or "U.S." means the United States of America and its federal agencies.

2.1.80   "Voting Record Date" means the record date for voting on the Plan, which shall be February 15, 2021.

2.2   Rules of Interpretation

For the purposes of this Plan:  (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender, (ii) any reference herein to the word "including" or any word of similar import shall be read to mean "including without limitation," (iii) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto, (iv) unless otherwise specified, the words "herein," "hereof" and "hereto" refer to the Plan in its entirety rather than a particular portion of the Plan, (v) captions and headings to Sections are inserted for the convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan, (vi) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply, (vii) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement, (viii) all references to docket numbers of documents filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's Case Management/Electronic Case Files system, (ix) all references to statutes, regulations, orders, rules of courts and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated, (x) any reference herein to a contract, agreement, lease, plan, policy, document or instrument being in a particular form or on particular terms and conditions means that the same shall be substantially in that form or substantially on those terms and conditions, (xi) any reference herein to a contract, agreement, lease, plan, policy, document or instrument or schedule or exhibit thereto, whether or not filed,

19

shall mean the same as amended, restated, modified or supplemented from time to time in accordance with the terms hereof or thereof, (xii) any immaterial effectuating provisions may be interpreted by the Debtors, Reorganized Debtors or Plan Administrator, as applicable, in such a manner that is consistent with the overall purpose and intent of the Plan, all without further Bankruptcy Court order, (xiii) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and permitted assigns, (xiv) references to "shareholders," "directors" and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company laws, (xv) except as otherwise expressly provided in this Plan, where this Plan contemplates that any Debtor, Reorganized Debtor or Plan Administrator as applicable, shall take any action, incur any obligation, issue any security or adopt, assume, execute or deliver any contract, agreement, lease, plan, policy, document or instrument on or prior to the Effective Date, the same shall be duly and validly authorized by the Plan and effective against and binding upon such Debtor, Reorganized Debtor or the Plan Administrator as applicable, on and after the Effective Date without further notice to, order of or other approval by the Bankruptcy Court, action under applicable law, regulation, order or rule, or the vote, consent, authorization or approval of the board of directors of any Debtor or any other Entity, and (xvi) except as otherwise provided in the Plan, anything required to be done by the Debtors, Reorganized Debtors or Plan Administrator, as applicable, on the Effective Date may be done on the Effective Date or as soon as reasonably practicable thereafter.

2.3     Computation of Time

In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.  If any payment, distribution, act or deadline under the Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but shall be deemed to have been completed or to have occurred as of the required date.

2.4     References to Monetary Figures

All references in the Plan to monetary figures shall refer to currency of the United States of America unless otherwise expressly provided.

4820-5709-6917 v.6

## 3.     ADMINISTRATIVE EXPENSE CLAIMS, PROFESSIONAL FEE CLAIMS, DIP CLAIMS, PRIORITY TAX CLAIMS AND STATUTORY FEES

### 3.1     Administrative Expense Claims

#### 3.1.1    Treatment of Administrative Expense Claims

Except to the extent that the applicable Holder of an Allowed Administrative Expense Claim agrees to less favorable treatment with the Debtors or the Plan Administrator, as applicable, each Holder of an Allowed Administrative Expense Claim shall receive, on account of such Allowed Administrative Expense Claim, payment in full in Cash (i) on or as soon as reasonably practicable after the later of the Effective Date and the date such Claim is Allowed, (ii) if such Allowed Administrative Expense Claim is for goods and services provided to the Debtors in the ordinary course of business, in accordance with the terms and conditions of the applicable transaction documentation or course of business dealings with the applicable Debtor, or (iii) as otherwise may be agreed upon by such Holder and the applicable Debtor or the Plan Administrator, as applicable, or (iv) as otherwise ordered by the Bankruptcy Court.

#### 3.1.2    Filing Administrative Expense Claims

Absent order of the Bankruptcy Court to the contrary, all requests for payment of Administrative Expense Claims that accrued on or before the Effective Date (other than on account of Professional Fee Claims and U.S. Trustee Fees) must be filed with the Notice and Claims Agent and served on counsel for the Debtors by the Administrative Expense Claim Bar Date.  Any Holder of an Administrative Expense Claim who is required to, but does not, file and serve a request for payment of such Administrative Expense Claim pursuant to the procedures specified in the Confirmation Order on or prior to the Administrative Expense Claim Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Expense Claim against the Debtors or the Reorganized Debtors or their respective property, and such general Administrative Expense Claim shall be deemed discharged as of the Effective Date.

The Plan Administrator, in its sole discretion, shall have exclusive authority to settle Administrative Expense Claims without further Bankruptcy Court approval.

Unless the Debtors or the Plan Administrator object to a timely filed and properly served Administrative Expense Claim by the Claims Objection Deadline, such Administrative Expense Claim shall be deemed Allowed in the amount requested.  If the Debtors or the Plan Administrator object to an Administrative Expense Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court shall determine whether such Administrative Expense Claim should be Allowed and, if so, in what amount.  Notwithstanding the foregoing, requests for payment of Administrative Expense Claims need not be filed for Administrative Expense Claims that (i) are for goods or services provided to the Debtors in the ordinary course of business, (ii) previously have been Allowed by Final Order of the Bankruptcy Court, (iii) are for Cure Costs, (iv) are on account of post-petition taxes (including any related penalties or interest) owed by the Debtors to any Governmental Unit, or (v) the Debtors or the Plan Administrator have otherwise agreed in writing do not require such a filing.

4820-5709-6917 v.6

### 3.2     Professional Fee Claims

#### 3.2.1   Final Fee Applications

All final requests for payment of Professional Fee Claims shall be filed and served no later than 30 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims.  Any objections to Professional Fee Claims must be filed and served on the Debtors and the requesting party no later than 30 days after service of the final request for payment of Professional Fee Claims.

Except to the extent that the applicable Holder of an Allowed Professional Fee Claim agrees to less favorable treatment with the Debtors or the Plan Administrator, each Holder of a Professional Fee Claim that has been approved by the Bankruptcy Court shall be paid in full in Cash.

#### 3.2.2   Professional Fee Escrow Account

On or prior to the Effective Date, the Debtors shall fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Professionals.  The Professional Fee Escrow Account shall be maintained in trust for the Professionals.  Such funds in the Professional Fee Escrow Account shall not constitute property of the Debtors' Estates, except as otherwise expressly set forth in the last sentence of this paragraph.  The amount of Professional Fee Claims owing to the Professionals on and after the Effective Date shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account, without interest or other earnings therefrom, as soon as reasonably practicable after such Claims are Allowed by a Bankruptcy Court order; *provided* that the Debtors' obligation with respect to Professional Fee Claims will not be limited nor be deemed to be limited in any way to the balance of funds held in the Professional Fee Escrow Account.  When all Allowed Professional Fee Claims have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, shall revert to the Debtors, without any further action or order of the Bankruptcy Court.

#### 3.2.3   Professional Fee Reserve Amount

To receive payment for unbilled fees and expenses incurred through and including the Effective Date, the Professionals shall estimate their accrued Professional Fee Claims prior to and as of the Confirmation Date, along with an estimate of fees and expenses to be incurred through and including the Effective Date, and shall deliver such good-faith estimates to the Debtors no later than seven days after the Confirmation Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to the fees and expenses of such Professional.  If a Professional does not provide such estimate, the Debtors may estimate the unbilled fees and expenses of such Professional.  The total amount so estimated shall comprise the Professional Fee Reserve Amount.  To the extent the Professional Fee Reserve Amount is not sufficient to pay all Allowed Professional Fee Claims in full, the remaining aggregate amount of the Allowed Professional Fee Claims shall be paid by the Debtors.

### 3.2.4   Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Plan Administrator shall, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash the legal, professional or other fees and expenses related to the implementation and consummation of the Plan incurred by the Plan Administrator or any Professional following the Effective Date. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Plan Administrator may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

### 3.3   DIP Claims

All DIP Claims shall be Allowed in the full amount due and owing under the DIP Facility Documents and the Final DIP Order. For the avoidance of doubt, the DIP Claims shall not be subject to any avoidance, reduction, setoff, recoupment, recharacterization, subordination (equitable, contractual or otherwise), counterclaim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation.

Except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment, on the Effective Date, each Holder of an Allowed DIP Claim shall receive Cash equal to the full amount of its Allowed DIP Claims in full and final satisfaction of such Claims.

Upon the indefeasible payment and satisfaction in full of all Allowed DIP Claims, and termination of all commitments made and incurred pursuant to the DIP Credit Agreement, all Liens and security interests granted pursuant to the DIP Facility Documents, whether in the Chapter 11 Cases or otherwise, shall be terminated and shall be of no further force or effect.

### 3.4   Treatment of Priority Tax Claims

Except to the extent that the applicable Holder of an Allowed Priority Tax Claim has been paid by the Debtors before the Effective Date, or such Holder agrees to less favorable treatment, each Holder of an Allowed Priority Tax Claim shall receive, on account of such Allowed Priority Tax Claim, at the option of the Debtors or the Plan Administrator, (i) payment in full in Cash made on or as soon as reasonably practicable after the Effective Date, (ii) regular installment payments in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, or (iii) such other amounts and in such other manner as may be determined by the Bankruptcy Court to provide the Holder of such Allowed Priority Tax Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Priority Tax Claim.

The Plan Administrator shall have the right, in its sole discretion, to pay any Allowed Priority Tax Claim or any remaining balance of an Allowed Priority Tax Claim (together with accrued but unpaid interest) in full at any time on or after the Effective Date without premium or penalty.

4820-5709-6917 v.6

3.5      <u>Ad Hoc Lender Group Expenses</u>

Any outstanding and unpaid Ad Hoc Lender Group Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date without the requirement to file a fee application with the Bankruptcy Court or comply with any guidelines of the U.S. Trustee, and, subject to the Final DIP Order, without any requirement for review or approval by the Bankruptcy Court or any other party. All Ad Hoc Lender Group Expenses to be paid on the Effective Date shall be estimated, as necessary, prior to and as of the Effective Date and such estimate shall be delivered to the Debtors; *provided* that such estimate shall not be considered an admission or limitation with respect to such Ad Hoc Lender Group Expenses.  In addition, the Debtors or the Plan Administrator shall continue to pay the Ad Hoc Lender Group Expenses, as necessary, after the Effective Date when due and payable in the ordinary course solely to the extent related to implementation, consummation and defense of the Plan, whether incurred before, on or after the Effective Date, without any requirement for review or approval by the Bankruptcy Court or any other party.

3.6      <u>Statutory Fees Payable Pursuant to 28 U.S.C. § 1930</u>

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code prior to the Effective Date shall be paid by the Debtors on the Effective Date.  After the Effective Date, the Debtors and the Reorganized Debtors shall be jointly and severally liable to pay any and all such fees when due and payable.  The Debtors shall file all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee.  After the Effective Date, the Plan Administrator shall file with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee, which reports shall include a separate schedule of disbursements made by the Distribution Agent during the applicable period, attested to by an authorized representative of the Distribution Agent. Notwithstanding the substantive consolidation of the Debtors called for in the Plan, each and every one of the Debtors and the Reorganized Debtors shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.

4820-5709-6917 v.6

## 4.    CLASSIFICATION AND TREATMENT OF OTHER CLAIMS AND INTERESTS

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, all Claims and Interests, except for Claims addressed in Section 3 of the Plan, are classified for all purposes as set forth in this Section 4. A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise satisfied prior to the Effective Date. For any Claim or Interest where a Proof of Claim has been filed, upon payment or satisfaction of such Claim or Interest and notice of such payment or satisfaction to the Holder of such Claim or Interest, such Claim or Interest may be adjusted or expunged on the Claims Register without a claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

Except as otherwise specifically provided for in the Plan, the Confirmation Order or other order of the Bankruptcy Court, or required by applicable non-bankruptcy law, in no event shall any Holder of an Allowed Claim be entitled to receive payments that in the aggregate exceed the Allowed amount of such Holder's Claim.

### 4.1    Deemed Substantive Consolidation

The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order deeming (i) the Estates of the ASASCO Debtors to be substantively consolidated for the limited purposes of voting, Confirmation and distribution, and (ii) the Estates of the U.S. Debtors to be substantively consolidated for the limited purposes of voting, Confirmation and distribution. As a result of the deemed substantive consolidations of the Estates, each Class of Claims and Interests will be treated as against each consolidated Estate without regard to the separate legal existence of the applicable Debtors. The Plan will not result in the merger or otherwise affect the separate legal existence of each Debtor, other than with respect to voting and distribution rights under the Plan.

### 4.2    Summary of Classes and Treatment of Claims Against and Interests in the Debtors

The following table designates the Classes of Claims against and Interests in the Debtors, as applicable, and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan and (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code or deemed to accept or reject the Plan.[2]

---

[2]    The information in the table is provided in summary form, and is qualified in its entirety by Section 4.3 of the Plan.

| Class | Designation | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Prepetition Credit Agreement Claims | Impaired | Entitled to Vote |
| 4 | Senior Subordinated Noteholder Claims | Impaired or Unimpaired | Entitled to Vote |
| 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 6 | Honeywell Plan Claims | Impaired or Unimpaired | Entitled to Vote |
| 7 | Intercompany Claims | Impaired or Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| 8 | Intercompany Interests | Impaired or Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| 9 | Existing Common Stock | Impaired or Unimpaired | Entitled to Vote |
| 10 | GMI Common Stock 510(b) Claims | Impaired or Unimpaired | Not Entitled to Vote |

4.3    Treatment of Claims and Interests

4.3.1   Class 1 – Other Priority Claims

i.      *Classification*:  Class 1 consists of all Other Priority Claims.

ii.     *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Other Priority Claim, each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on or as soon as reasonably practicable after the latest of (A) the Effective Date, (B) the date on which such Other Priority Claim becomes Allowed, and (C) such other date as may be ordered by the Bankruptcy Court.

iii.    *Voting*:  Claims in Class 1 are Unimpaired.  Each Holder of an Other Priority Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of Other Priority Claims is entitled to vote to accept or reject the Plan.

26

### 4.3.2    Class 2 – Other Secured Claims

i. *Classification*:  Class 2 consists of all Other Secured Claims.

ii. *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive one of the following treatments, in the sole discretion of the Debtors:  (A) payment in full in Cash, (B) delivery of the collateral securing such Allowed Other Secured Claim, or (C) treatment of such Allowed Other Secured Claim in any other manner that renders the Claim Unimpaired.

iii. *Voting*:  Claims in Class 2 are Unimpaired.  Each Holder of an Other Secured Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of an Other Secured Claim is entitled to vote to accept or reject the Plan.

### 4.3.3    Class 3 – Prepetition Credit Agreement Claims

i. *Classification*:  Class 3 consists of all Prepetition Credit Agreement Claims.

ii. *Allowance*:  Prepetition Credit Agreement Claims shall be Allowed as Secured Claims in the aggregate principal amount of no less than $1,467,061,090,[3] plus accrued and unpaid interest at the non-default contractual rate up to and including the Effective Date, plus all unpaid costs, fees and expenses outstanding under the Prepetition Credit Agreement as of the Effective Date.  For the avoidance of doubt, the Prepetition Credit Agreement Claims shall not be subject to any avoidance, reduction, setoff, recoupment, recharacterization, subordination (equitable, contractual or otherwise), counterclaim, defense, disallowance, objection, or any challenges under applicable law or regulation.

iii. *Treatment*:  Except to the extent that a Holder of an Allowed Prepetition Credit Agreement Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Prepetition Credit Agreement Claim, each Holder of an Allowed Prepetition Credit Agreement Claim shall receive on the Effective Date payment in

---

[3]    This assumes a 1.18 USD to EUR currency exchange rate.

27

Cash in an amount equal to such Holder's Allowed Prepetition Credit Agreement Claims.

iv.   *Voting*:  Claims in Class 3 are Impaired.  Each Holder of an Allowed Prepetition Credit Agreement Claim is entitled to vote to accept or reject the Plan.

### 4.3.4   Class 4 – Senior Subordinated Noteholder Claims

i.   *Classification*:  Class 4 consists of all Senior Subordinated Noteholder Claims.

ii.   *Allowance*:  If Class 4 votes to accept the Plan, Senior Subordinated Noteholder Claims shall be Allowed in the aggregate principal amount of $413 million, plus accrued and unpaid interest to and including the Effective Date at the non-default contract rate (but not including any purported make-whole or other redemption premium), plus all unpaid costs, fees and expenses outstanding under the Senior Subordinated Notes Indenture as of the Effective Date.

If Class 4 does not vote to accept the Plan, Senior Subordinated Noteholder Claims shall be Allowed in the amount stipulated by the Debtors, Plan Sponsor and Senior Subordinated Notes Trustee or amount due under the Senior Subordinated Notes Indenture as determined by the Bankruptcy Court.

iii.   *Treatment*:  Except to the extent that a Holder of an Allowed Senior Subordinated Noteholder Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Senior Subordinated Noteholder Claim, each Holder of an Allowed Senior Subordinated Noteholder Claim shall receive (A) payment in Cash in an amount equal to such Holder's Allowed Senior Subordinated Notes Claims on or promptly after the later of (1) the Effective Date and (2) the date on which such Senior Subordinated Noteholder Claim becomes Allowed or (B) such other treatment permitted under the Bankruptcy Code as agreed between the Debtors and Plan Sponsor.

iv.   *Voting*:  If Class 4 votes to accept the Plan, Class 4 will be Impaired.  If Class 4 does not vote to accept the Plan, Class 4 will be Unimpaired.  Each Holder of an Allowed Senior Subordinated Noteholder Claim is entitled to vote to accept or reject the Plan.

### 4.3.5   Class 5 – General Unsecured Claims

i.   *Classification*:  Class 5 consists of all General Unsecured Claims.

28

4820-5709-6917 v.6

ii.  *Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall have its Claim Reinstated, paid in full, and/or assumed by one or more Reorganized Debtors in the ordinary course of business.

iii.  *Voting*:  Claims in Class 5 are Unimpaired.  Each Holder of an Allowed General Unsecured Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of an Allowed General Unsecured Claim is entitled to vote to accept or reject the Plan.

### 4.3.6    Class 6 – Honeywell Plan Claims

i.  *Classification*:  Class 6 consists of all Honeywell Plan Claims.

ii.  *Allowance*:  Except to the extent that a Holder of a Honeywell Plan Claim agrees to an allowance in a lower specified amount, the Honeywell Plan Claims shall be allowed (A) in an amount and (B) solely against those Debtors determined by the Bankruptcy Court, as reflected in either the Confirmation Order or any other order entered by the Bankruptcy Court before or substantially contemporaneously with the Confirmation Order.

iii.  *Treatment*:  Except to the extent that a Holder of an Allowed Honeywell Plan Claim agrees to a less favorable treatment, subject to Sections 4.1 and 4.3.6(ii) hereof, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Honeywell Plan Claim, each Holder of an Allowed Honeywell Plan Claim shall receive Cash or, at the option and with the mutual consent of the Debtors and the Plan Sponsor (each, in their sole discretion), (A)(1) New Preferred Stock (subject to the consent of the Plan Sponsor and on terms approved by the Plan Sponsor), (2) other preferred stock or indebtedness issued by one or more Reorganized Debtors on terms approved by the Plan Sponsor and the Debtors, or (3) any combination of Cash and the foregoing, in each case with an aggregate value equal to the lesser of (a) such Allowed Honeywell Plan Claim or (b) such Holder's Pro Rata share (determined with respect to all Holders of Claims in Class 6) of the ASASCO Residual Value, if any, or (B) such other treatment permitted under the Bankruptcy Code as agreed between the Debtors and Plan Sponsor.

29

iv.    *Voting*:  Claims in Class 6 are Impaired or Unimpaired, and each Holder of an Allowed Honeywell Plan Claim is entitled to vote to accept or reject the Plan.

### 4.3.7    Class 7 – Intercompany Claims

i.    *Classification*:  Class 7 consists of all Intercompany Claims.

ii.    *Treatment*:  On or prior to the Effective Date, all Intercompany Claims will be adjusted, continued, settled, Reinstated, discharged or eliminated as determined by the Debtors.

iii.    *Voting*:  Claims in Class 7 are Impaired or Unimpaired.  Each Holder of an Intercompany Claim is conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or 1126(g) of the Bankruptcy Code.  No Holder of an Intercompany Claim is entitled to vote to accept or reject the Plan.

### 4.3.8    Class 8 – Intercompany Interests

i.    *Classification*:  Class 8 consists of all Intercompany Interests.

ii.    *Treatment*:  On or prior to the Effective Date, all Intercompany Interests shall be adjusted, continued, settled, Reinstated, discharged or cancelled as determined by the Debtors.

iii.    *Voting*:  Interests in Class 8 are Impaired or Unimpaired.  Each Holder of an Intercompany Interest is conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or 1126(g) of the Bankruptcy Code.  No Holder of an Intercompany Interest is entitled to vote to accept or reject the Plan.

### 4.3.9    Class 9 – Existing Common Stock

i.    *Classification*:  Class 9 consists of all Holders of Existing Common Stock.

ii.    *Treatment*:

(i) Each Holder of Existing Common Stock who (A) votes in favor of the Plan, (B) holds 25 or more shares of Existing Common Stock as of the Voting Record Date, and (C) timely exercises the Cash Election shall receive in Cash its Pro Rata share of the Total Stockholder Distribution Value, subject to a proportionate reduction to account for the Cash portion of the 510(b) Claim Share Recovery as provided in Section 4.3.10 of the Plan, in full and final satisfaction, settlement, release,

30

4820-5709-6917 v.6

discharge and cancellation of and in exchange for its Existing Common Stock.

(ii) Each Holder of Existing Common Stock who does not timely exercise the Cash Election shall (A) have its Existing Common Stock Reinstated as New Common Stock, subject to dilution by the Rights Offering and as provided in Section 6.5 of the Plan, and (B) in the event the Total Stockholder Distribution Value is $350 million or greater, receive in Cash its Pro Rata share of the Total Stockholder Distribution Value in excess of $350 million; *provided* that if the sum of (i) the lesser of (A) the *product of* (x) $350 million *multiplied by* (y) the GMI Stock Elector Proportion (as defined in the Subscription Agreement) and (B) the amount in dollars that is the *product of* (x) the Total Stockholder Distribution Value as reasonably determined by the Plan Administrator *multiplied by* (y) the GMI Stock Elector Proportion; *plus* (ii) the value of the Rights Offering Shares subscribed for in the Rights Offering, is less than $150 million, then the Plan Sponsor, in its sole discretion and within five Business Days of being notified of the results of the Cash Election and the Rights Offering, may elect that the GMI Stock Electors shall receive Cash rather than Reinstatement of their Existing Common Stock under the Plan and that the Rights Offering shall be terminated and no Rights Offering Shares shall be issued (the "Cash-Out").

(iii) Each Eligible Holder of Existing Common Stock shall also receive its Pro Rata share (determined with respect to all Holders of Claims in Class 9) of the Subscription Rights; *provided* that if the Plan Sponsor exercises the Cash-Out, then the Rights Offering shall be terminated, no Rights Offering Shares shall be issued, and any amounts paid by any Eligible Holder in connection with the exercise of Subscription Rights shall be returned to such Eligible Holder.

   iii.   *Voting*:  The Debtors reserve the right to treat the Holders of Existing Common Stock as Impaired or Unimpaired.  Each Holder of Existing Common Stock is entitled to vote to accept or reject the Plan.

### 4.3.10  Class 10 – GMI Common Stock 510(b) Claims

   i.    *Classification*:  Class 10 consists of any and all Holders of GMI Common Stock 510(b) Claims.

   ii.   *Treatment*:  Except to the extent that a Holder of an Allowed GMI Common Stock 510(b) Claim agrees to a less favorable treatment,

31

4820-5709-6917 v.6

in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed GMI Common Stock 510(b) Claim, each Holder of an Allowed GMI Common Stock 510(b) Claim, if any, shall receive its 510(b) Claim Share Recovery in the form of (A) a number of shares of New Common Stock equal to such 510(b) Claim Share Recovery *multiplied by* the Stock Elector Percentage and (B) Cash equal to such 510(b) Claim Share Recovery *multiplied by* the Cash Elector Percentage; *provided* that if the Plan Sponsor exercises the Cash-Out, all Holders of Allowed GMI Common Stock 510(b) Claims, if any, shall receive Cash in lieu of New Common Stock.

iii. *Voting*:  The Debtors reserve the right to treat Claims in Class 10 as Impaired or Unimpaired. No Holder of a GMI Common Stock 510(b) Claim is entitled to vote to accept or reject the Plan.

4820-5709-6917 v.6

## 5.   ACCEPTANCE OR REJECTION OF THE PLAN

### 5.1   Voting of Claims or Interests

Each Holder of a Claim or Interest in an Impaired Class that is entitled to vote on the Plan as of the Voting Record Date pursuant to Section 4 of the Plan shall be entitled to vote to accept or reject the Plan.

### 5.2   Acceptance by Impaired Classes

Pursuant to sections 1126(c) and (d) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, (i) an Impaired Class of Claims shall have accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Claims of such Class entitled to vote that actually vote on the Plan have voted to accept the Plan and (ii) an Impaired Class of Interests shall have accepted the Plan if the Holders of at least two-thirds in dollar amount of such Class entitled to vote that actually vote on the Plan have voted to accept the Plan.  Prepetition Credit Agreement (Class 3), Senior Subordinated Noteholder Claims (Class 4), Honeywell Plan Claims (Class 6) and Holders of Existing Common Stock (Class 9) are or may be Impaired, and the votes of Holders of Claims or Interests in such Classes will be solicited.  No other votes from any other classes of Claims or Interests will be solicited.  If Holders of Claims or Interests in a particular Impaired Class of Claims or Interests were given the opportunity to vote to accept or reject the Plan, but no Holders of Claims or Interests in such Impaired Class voted to accept or reject the Plan, then such Class shall be deemed to have accepted the Plan.

### 5.3   Elimination of Vacant Classes

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court solely for voting purposes as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan solely for purposes of (i) voting to accept or reject the Plan and (ii) determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### 5.4   Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code

If there is one or more rejecting Class of Claims the Debtors shall seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any such rejecting Class or Classes.  Subject to Section 13 of the Plan, the Debtors reserve the right to amend the Plan to the extent that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

33

**6.**     **IMPLEMENTATION OF THE PLAN**

6.1     Operations Between the Confirmation Date and Effective Date

During the period from the Confirmation Date through and until the Effective Date, the Debtors may continue to operate their businesses as debtors-in-possession in the ordinary course in a manner consistent with past practice in all material respects (other than any changes in operations (i) resulting from or relating to the Plan or the filing of the Chapter 11 Cases, (ii) imposed by the Bankruptcy Court, or (iii) in accordance with and as required by the terms of the Transaction Documents), and substantially consistent with the transactions contemplated by the Plan and the Transaction Documents and subject to all applicable orders of the Bankruptcy Court.

6.2     Purchase of New Common Stock by Plan Sponsor

On the Effective Date, in exchange for payment of the estimated Total Cash Consideration *less the* Rights Offering Subscription Amount, New GMI shall issue a number of shares of New Common Stock to the Plan Sponsor representing a pro forma percentage of all outstanding New Common Stock upon the Effective Date equal to a fraction, the numerator of which is the estimated Total Cash Consideration *less* the Rights Offering Subscription Amount and the denominator of which is the sum of (i) the estimated Total Cash Consideration and (ii) the Initial GMI Stock Elector Distribution Value.  Upon the Effective Date, Plan Sponsor shall hold (as calculated pursuant to the Subscription Agreement) at least 60% of the outstanding shares of New Common Stock and, for the avoidance of doubt, pursuant to the terms of the Transaction Documents and at the election of the Plan Sponsor, in the event the shares of New Common Stock issued to the Plan Sponsor on the Effective Date would otherwise represent less than 60% of the outstanding New Common Stock immediately following the Closing (as calculated pursuant to the Subscription Agreement), the Initial GMI Stock Elector Distribution Value shall be reduced such that the Plan Sponsor will hold 60% of the outstanding New Common Stock immediately following the Closing (as calculated pursuant to the Subscription Agreement).  The reduction in the Initial GMI Stock Elector Distribution Value described in the foregoing sentence shall be offset by a corresponding increase in the Purchaser Cash Consideration.

6.3     Rights Offering

The Debtors will implement the Rights Offering in accordance with the Transaction Documents and the Rights Offering Procedures.  The Rights Offering shall be open to all Eligible Holders.  The Rights Offering shall consist of a distribution of the Subscription Rights in accordance with the Solicitation Procedures Order.  Any Unsubscribed Shares will be purchased by the Plan Sponsors.

6.4     Sources of Cash for Plan Distributions

Cash distributions pursuant to the Plan shall be solely funded by:  (i) funded net cash proceeds under the Exit Term Debt, (ii) proceeds under the Exit Revolver drawn in order to fund Permitted Distributions (as defined in the Subscription Agreement) pursuant to the Plan

34

4820-5709-6917 v.6

(which proceeds shall be drawn solely at the discretion of the Plan Sponsor and shall reduce the Purchaser Cash Consideration), (iii) the Purchaser Cash Consideration, (iv) proceeds of the Rights Offering, and (v) Verified Excess Cash (as defined in the Subscription Agreement) (for the avoidance of doubt, and without duplication, net of any Leakage (as defined in the Subscription Agreement)).

Following the Closing, the sources available to make Permitted Distributions in accordance with the Plan shall also include (i) any Cash delivered to GMI's Estate in connection with the release of Cash Collateral in accordance with Section 6.15 of the Subscription Agreement, (ii) any amounts released from the Adjustment Escrow Account to GMI's Estate in accordance with Section 2.12 of the Subscription Agreement, (iii) any additional amounts payable by the Plan Sponsor to GMI's Estate in accordance with Section 2.12 of the Subscription Agreement, and (iv) Additional Excess Cash (as defined in the Subscription Agreement) (for the avoidance of doubt, and without duplication, net of any Leakage).

After the Effective Date, all Cash or other assets for distributions pursuant to the Plan shall be maintained in one or more account(s) established by the Debtors or Plan Administrator and controlled by the Plan Administrator segregated from the accounts of the Reorganized Debtors.

6.5    Dilution of New Common Stock After the Effective Date

All New Common Stock shall be subject to dilution by (i) the issuance of additional New Common Stock, if any, in respect of GMI Common Stock 510(b) Claims or pursuant to Section 2.18(b) of the Subscription Agreement; *provided*, that the New Common Stock held by the Plan Sponsor or that was issued as Offered Shares through the Rights Offering and is held by a Subscribing Holder shall in no circumstances be subject to such dilution, (ii) any management incentive plan established by New GMI in connection with or following the Effective Date, and (iv) any issuance of New Common Stock other than in connection with the Plan by New GMI in connection with or following the Effective Date.

In addition, any New Common Stock that was issued as Offered Shares through the Rights Offering but is held by any Person other than the Subscribing Holder to whom such Offered Shares were issued shall be subject to dilution by the issuance of New Common Stock to the Plan Sponsor and the Subscribing Holders (i) pursuant to Section 2.16(b) of the Subscription Agreement in connection with the issuance of New Common Stock in respect of GMI Common Stock 510(b) Claims, if any and (ii) under Section 2.18(b) of the Subscription Agreement. For the avoidance of doubt, Subsequent Holders shall have no right to receive any issuance or distribution of New Common Stock in connection with the issuance of New Common Stock (i) in respect of GMI Common Stock 510(b) Claims, (ii) in respect of an issuance of New Common Stock pursuant to Section 2.18(b) of the Subscription Agreement, or (iii) any other issuance or distribution of New Common Stock to the Plan Sponsor or Subscribing Holders under the Subscription Agreement or Plan.

35

4820-5709-6917 v.6

6.6    Acceleration of Outstanding Equity Awards: Outstanding Cash Performance
Units

Certain of the Debtors' employees hold outstanding GMI Common Stock Rights under the Stock Incentive Plan. The Stock Incentive Plan provides that, in the event of a change in control of GMI, outstanding and unvested GMI Common Stock Rights that are not assumed, substituted, or continued by the acquirer will accelerate and vest pursuant to the terms of the applicable award agreements. Under the Transaction Documents, immediately prior to the Closing, outstanding GMI Options will accelerate and vest in full (to the extent not yet vested), vested GMI Options (including those GMI Options that vested prior to the Closing under their terms) shall be deemed exercised on a net settled basis and the shares of GMI Common Stock issued upon the exercise of such GMI Options shall be deemed outstanding as of the Effective Date. Each Holder of GMI Common Stock acquired or issued in respect of such exercised GMI Options shall be deemed a GMI Cash Elector with respect to such shares of GMI Common Stock. For the avoidance of doubt, the deemed exercise of the GMI Options shall not under any circumstance be dilutive of the New Common Stock issued to the Plan Sponsor and the Subscribing Holders as described herein. Additionally, under the Transaction Documents, immediately prior to the Closing, outstanding GMI PSUs, GMI CPSUs and GMI RSUs will accelerate and vest pursuant to the terms of the applicable award agreements (including with respect to measurement of performance, and in the case of GMI CPSUs only, with respect to any required proration). Such vested GMI RSUs and GMI PSUs, as applicable, will each entitle each Holder thereof to the number of shares of GMI Common Stock underlying each such award, in each case determined in accordance with the terms of the applicable award agreement, and the shares of GMI Common Stock issued as a result thereof shall be deemed outstanding as of the Effective Date and each such Holder shall be deemed a GMI Cash Elector with respect to such shares of GMI Common Stock. Such vested GMI CPSUs will each entitle the Holder thereof to an amount in Cash, determined in accordance with the terms of the applicable award agreement as a Debtor Transaction Expense. For the avoidance of doubt, any shares of GMI Common Stock acquired or issuable as a result of the accelerated vesting and settlement of GMI RSUs and GMI PSUs shall not under any circumstance be dilutive of the New Common Stock issued to the Plan Sponsor and the Subscribing Holders as described herein.

6.7    New GMI Securities

On the Effective Date, New GMI's governing documents shall have provided for the issuance of authorized New GMI Securities and New GMI shall issue or reserve for issuance a sufficient number of shares of New GMI Securities as required to make distributions pursuant to the Plan (including in connection with the Transaction Documents). The shares of New GMI Securities issued in connection with the Plan, including in connection with the consummation of the Transaction Documents, shall be authorized without the need for further corporate action or without any further action by any Person and, once issued, shall be duly authorized, validly issued, fully paid and non-assessable.

6.8    Exemption from Registration

Except with respect to any Person that is an underwriter as defined in section 1145(b) of the Bankruptcy Code or an "affiliate" as defined in the Securities Act, as applicable,

36

the Reinstatement of Existing Common Stock as New Common Stock and the issuance of New Preferred Stock or other preferred stock or indebtedness to Holders of Honeywell Plan Claims, if any, under the Plan, shall be exempt from registration under Section 5 of the Securities Act (or any State or local law requiring registration for offer or sale of a security) under section 1145 of the Bankruptcy Code.

The Subscription Rights and New Common Stock issued to the Plan Sponsor or issued in connection with the Rights Offering shall be issued without registration in reliance upon the exemption set forth in section 4(a)(2) of the Securities Act and will be "restricted securities," in each case to the extent such exemption is available.

6.9    Exit Facilities

On the Effective Date, the Reorganized Debtors shall, and are hereby authorized to, enter into and perform and execute and deliver the Exit Facilities Documents to which such Reorganized Debtors are contemplated to be a party on the Effective Date (including as a result of the "Closing Transactions" as defined in the Subscription Agreement).  The Reorganized Debtors are hereby authorized to borrow under such Exit Facilities, if applicable, and use the proceeds of such borrowings on the Effective Date for any use not prohibited thereunder, including to fund distributions under and in accordance with the Plan, and ongoing business operations, general corporate purposes and working capital needs.  Without limiting the forgoing, the Reorganized Debtors shall pay, as and when due, all fees, expenses, losses, damages, indemnities and other amounts, including any applicable refinancing premiums and applicable exit fees, provided under the DIP Facilities Documents related to the DIP Facilities and/or the Exit Facilities Documents relating to such Exit Facilities.

Confirmation of the Plan shall be deemed (i) approval of the Exit Facilities and all transactions contemplated hereby and thereby, and all actions to be taken, undertakings to be made, and indebtedness and other obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, expenses, losses, damages, indemnities, and other amounts provided for by the Exit Facilities Documents, and (ii) authorization for the Reorganized Debtors to enter into, deliver and perform under the Exit Facilities Documents.  The Exit Facilities Documents shall constitute legal, valid, binding and authorized obligations of the Reorganized Debtors party thereto, enforceable against such Reorganized Debtors in accordance with their terms.  The financial accommodations to be extended pursuant to the Exit Facilities Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.

On the Effective Date, all of the liens and security interests to be granted in accordance with the Exit Facilities Documents (i) shall be deemed to be approved, (ii) shall be legal, binding and enforceable liens on, and security interests in, the collateral granted under respective Exit Facilities Documents in accordance with the terms of the Exit Facilities Documents; (iii)(A) shall be deemed perfected on the Effective Date, and (B) the priorities of such liens and security interests shall be as set forth in the respective Exit Facilities Documents,

37

in the case of this clause (B), subject only to such liens and security interests as may be permitted under the Exit Facilities Documents; and (iv) shall not be subject to avoidance, recharacterization or subordination (including equitable subordination) for any purposes whatsoever (except as otherwise expressly permitted by the Exit Facilities Documents) and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the secured parties (and their designees and agents) under such Exit Facilities Documents are hereby authorized to make all filings and recordings, and to obtain all governmental approvals and consents to establish and perfect such liens and security interests under the provisions of the applicable state, provincial, federal or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection of the liens and security interests granted under the Exit Facilities Documents shall occur automatically by virtue of the entry of the Confirmation Order and funding on or after the Effective Date, and any such filings, recordings, approvals and consents shall not be necessary or required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties.  To the extent that any Holder of a Secured Claim that has been satisfied or discharged pursuant to the Plan, or any agent for such Holder has filed or recorded any liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder), at the Reorganized Debtors' expense, shall take any and all steps requested by the Plan Sponsor, the Reorganized Debtors, New GMI, or any administrative agent under the Exit Facilities Documents that are necessary to evidence in the public record the release, cancellation, and/or extinguishment of such liens and/or security interests (it being understood that such liens and security interests held by Holders of Secured Claims that are satisfied on the Effective Date pursuant to the Plan shall be automatically released, cancelled or extinguished automatically on the Effective Date by virtue of the entry of the Confirmation Order).

      6.10    <u>Organizational Existence</u>

Except as otherwise provided in the Plan, each Debtor shall, as a Reorganized Debtor, continue to exist after the Effective Date as a separate legal Entity, each with all the powers of a corporation or other form of organization, as applicable, under the laws of its respective jurisdiction of organization and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under the law of the applicable state or other jurisdiction.

      6.11    <u>Plan Administrator</u>

The Plan Administrator shall be a Person or Entity, or any successor thereto, selected by the Debtors, reasonably acceptable to the Plan Sponsor.  The Plan Administrator shall not be an Affiliate of the Plan Sponsor.

The Plan Administrator shall be vested immediately upon confirmation of the Plan and prior to the Effective Date with all powers and authority as set forth in this Plan, shall be deemed to have been appointed as the representative of the Debtors, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, and shall have the duties of a trustee set forth in sections

38

704(a)(1), 704(a)(2) and 704(a)(5) of the Bankruptcy Code.  Following the Effective Date, the Plan Administrator shall act for the Debtors with respect to the matters delegated to the Plan Administrator in the same capacity as applicable to a board of managers and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).

Subject to and solely as provided in the Plan Administration Agreement, the Plan Administrator will be responsible for (i) determining the Initial Stockholder Distribution Value, (ii) resolving disputed Claims, (iii)  enforcing the rights and performing the obligations assigned to the Plan Administrator under the Transaction Documents, (iv) enforcing the rights and performing the obligations of the Debtors or the Debtors' Estates, as applicable, including, without limitation, with respect to post-Closing price adjustments, (v) making distributions to pursuant to the Plan, (vi) administering the Plan, and (vii) taking necessary actions with respect to the Debtors' assets to accomplish the foregoing.

The compensation of the Plan Administrator shall be as set forth in the Plan Administration Agreement.

### 6.12   Retention of Professionals

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals on their own behalf that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of its duties and to administer the Plan.  The reasonable fees and expenses of such professionals shall be paid upon the monthly submission of statements to the Plan Administrator.  The payment of the reasonable and documented fees and expenses of the retained professionals of the Plan Administrator shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court.

### 6.13   Cancellation of Existing Interests, Existing Indebtedness and Related Agreements

On the Effective Date, except as otherwise specifically provided for in this Plan, all rights of any Holder of Interests in the Debtors, including, without limitation, options or warrants to purchase Interests, or obligating the Debtors to issue, transfer or sell Interests of the Debtors, including, without limitation, GMI Common Stock held by any Holder who timely exercises the Cash Election, shall be cancelled.

Upon the indefeasible payment in full in Cash of its Allowed Prepetition Credit Agreement Claim or Allowed Senior Subordinated Noteholder Claim, each Holder of such Allowed Claim shall be deemed to have surrendered its respective loan or note, and all such surrendered loans, notes, loan documents and indentures shall be deemed to be cancelled as to the Debtors pursuant to this Section 6.13 of the Plan, except to the extent otherwise provided herein.  Such Claims shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Claims.

39

Upon the indefeasible payment in full in Cash of all Allowed Prepetition Credit Agreement Claims and Allowed Senior Subordinated Noteholder Claims, or promptly thereafter, Holders of such Allowed Claims shall deliver to the Debtors or Plan Administrator, as applicable, any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Claim that may reasonably be required in order to terminate any related financing statements, mortgages, mechanic's liens, or *lis pendens*, and take any and all other steps reasonably requested by the Debtors or Plan Administrator, as applicable, that are necessary to cancel and/or extinguish any Liens or security interests securing such Holder's Claim; *provided*, *however*, that the Debtors or Plan Administrator, as applicable, shall be solely responsible for all costs and expenses associated with any of the foregoing actions or requests.

Except as otherwise set forth herein, upon the indefeasible payment in full in Cash of all Allowed Prepetition Credit Agreement Claims and Allowed Senior Subordinated Noteholder Claims, the Prepetition Credit Agreement Documents and Senior Subordinated Notes Indenture, respectively, shall terminate, except as necessary to (i) enforce the rights and Claims of the respective agent or trustee vis-à-vis the applicable lenders or holders and any parties other than the Debtors, including, for avoidance of doubt, pursuant to the Intercreditor Agreement, (ii) allow the respective agent or trustee to receive distributions under the Plan and to distribute them to the applicable lenders or holders in accordance with the terms of the applicable documents, and (iii) preserve any rights of the respective agent or trustee and any predecessor thereof as against any money or property distributable to Holders of Prepetition Credit Agreement Claims or Senior Subordinated Noteholder Claims.

6.14    Additional Implementing Transactions

On the Effective Date, the applicable Debtors shall enter into any transaction and shall take any actions as may be necessary or appropriate to effect the transactions described herein, including, as applicable, consummation of the Transaction, the issuance of all securities, notes, instruments, certificates and other documents required to be issued pursuant to the Plan, one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dispositions, dissolutions, transfers, liquidations, spinoffs, intercompany sales, purchases, or other corporate transactions (collectively, the "Restructuring Transactions"), including any Restructuring Transaction contemplated by the Transaction Documents.

6.15    Section 1146 Exemption from Certain Transfer Taxes and Recording Fees

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, any transfers from the Debtors to the Reorganized Debtors or to any other Person, pursuant to, in contemplation of, or in connection with the Plan (including any transfer pursuant to:  (i) the issuance, distribution, transfer, or exchange of any debt, equity security or other interest in the Debtors or the Reorganized Debtors, (ii) the creation, modification, consolidation, assumption, termination, refinancing and/or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means, (iii) the making, assignment, or recording of any lease or sublease; (iv) the grant of collateral as security for any or all of the Exit Facilities, or (v) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including

40

any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to, the Plan) shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, sales and use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee or other similar tax or governmental assessment, and the appropriate state or local government officials or agents shall, and shall be directed to, forgo the collection of any such tax, recordation fee, or government assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee or government assessment.  The Bankruptcy Court shall retain specific jurisdiction with respect to these matters.

### 6.16   Insurance Policies

All Insurance Policies (including tail coverage liability insurance), surety bonds, and indemnity agreements entered into in connection with surety bonds to which any Debtor is a party as of the Effective Date shall be deemed to be and treated as executory contracts and shall be assumed by the applicable Debtor or Reorganized Debtor and shall continue in full force and effect thereafter in accordance with their respective terms.  Nothing in the Plan, including any releases, shall diminish or impair the enforceability of any Insurance Policies or other policies of insurance that may cover insurance claims or other claims against the Debtors or any other Person and such policies shall continue in full force and effect after the Effective Date in accordance with their respective terms.

### 6.17   Preservation of Causes of Action

Except as otherwise provided in Section 11 or the other provisions of the Plan, as of the Effective Date, each Cause of Action of the Debtors shall be preserved and, along with the exclusive right to enforce such Cause of Action, shall vest exclusively in the applicable Reorganized Debtor.  Unless a Cause of Action is expressly waived, relinquished, released, or compromised in the Plan or an order of the Bankruptcy Court, the Debtors or Reorganized Debtors, as applicable, expressly reserve such Cause of Action for later adjudication and, accordingly, no doctrine of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), laches or other preclusion doctrine shall apply to such Cause of Action as a consequence of the Confirmation, the Plan, the vesting of such Cause of Action in the Reorganized Debtors, any order of the Bankruptcy Court or these Chapter 11 Cases.  **No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as an indication that the Debtors or Reorganized Debtors, as applicable, will not pursue such Cause of Action.**

### 6.18   Effectuating Documents and Further Transactions

The Debtors, or the Reorganized Debtors, as applicable, may take all actions to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan.  The secretary and any assistant secretary of each Debtor or Reorganized Debtor shall be authorized to certify or attest to any of the foregoing actions.

41

Prior to, on, or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the shareholders, directors or members of the Debtors shall be deemed to have been so approved and shall be in effect prior to, on, or after the Effective Date (as appropriate), pursuant to applicable law), and without any requirement of further action by the shareholders, directors, managers or partners of the Debtors, or the need for any approvals, authorizations, actions or consents.

On the Effective Date, the organizational documents of the Reorganized Debtors shall become effective without further action from any Person or Entity, and shall be binding and enforceable upon each of the parties thereto.

4820-5709-6917 v.6

**7.    PROVISIONS REGARDING GOVERNANCE OF THE REORGANIZED DEBTORS**

7.1    Organizational Action

On and after the Effective Date, the adoption, filing, approval, and ratification, as necessary, of all limited liability company, corporate, or related actions contemplated hereby for each of the Reorganized Debtors shall be deemed authorized and approved in all respects. Without limiting the foregoing, such actions may include: (i) the adoption of the organizational documents of the Reorganized Debtors, (ii) the election or appointment, as the case may be, of officers, directors, managers, board of managers, or managing members for New GMI (or the other Reorganized Debtors), (iii) the issuance of the New GMI Securities, (iv) the Restructuring Transactions to be effectuated pursuant to the Plan and (v) the qualification of any Reorganized Debtors as foreign corporations if and wherever the conduct of business by such entities requires such qualifications, in each case, consistent with the Transaction Documents.

All matters provided for herein involving the organizational structure of any Debtor or any Reorganized Debtor, or any limited liability company or corporate action required by any Debtor or any Reorganized Debtor in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders or directors of such Debtor or Reorganized Debtor or by any other stakeholder or any other corporate action.

On and after the Effective Date, the appropriate officers of each Reorganized Debtor and members of the board of directors, board of managers, or equivalent body of each Reorganized Debtor are authorized and directed to issue, execute, deliver, file, and record any and all agreements, documents, securities, deeds, bills of sale, conveyances, releases, and instruments contemplated by the Plan in the name of and on behalf of such Reorganized Debtor and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

7.2    Organizational Documents

The organizational documents of the Reorganized Debtors, including the certificate of incorporation and bylaws of New GMI, shall be amended or adopted or deemed amended or adopted as may be required to be consistent with the provisions of the Plan (including the Plan Supplement) and the Bankruptcy Code including, among other purposes, to authorize the new Interests in the Reorganized Debtors (including as provided in the Governance Documents (as defined in the Subscription Agreement)).  After the Effective Date, the Reorganized Debtors may amend and restate their certificates of incorporation, bylaws, certificates of formation, operating agreements or other analogous organizational documents, as applicable, as permitted by the terms thereof and applicable law and may file amended and restated certificates of incorporation (or other formation documents, if applicable) with the Secretary of State in any appropriate jurisdiction.

43

4820-5709-6917 v.6

7.3     Directors and Officers of the Reorganized Debtors

On the Effective Date, the management, control and operation of each Reorganized Debtor shall become the general responsibility of the board of managers, directors, members or managing members, as applicable, of such Reorganized Debtor or other governing body as provided in the applicable governing documents.

On the Effective Date, the term of the Directors shall expire and such Directors shall be replaced by the New Board.  The New Board will initially consist of at least nine directors designated by the Plan Sponsor, including the Chief Executive Officer, and who shall be appointed as set forth in the Transaction Documents and the Governance Documents.

The classification and composition of the New Board shall be consistent with applicable non-bankruptcy law and the terms of the New GMI's governing documents.  In the Plan Supplement, to the extent known, the Debtors will disclose, pursuant to section 1129(a)(5) of the Bankruptcy Code, the identity and affiliations of the Persons proposed to serve on the New Board.  The New Board members shall serve from and after the Effective Date in accordance with applicable non-bankruptcy law and the terms of the New GMI's governing documents.

Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not discharge, impair or otherwise modify any advancement, indemnity or other obligations of the D&O Insurance Policies.  In addition, after the Effective Date, none of the Debtors, Reorganized Debtors or Plan Administrator shall terminate or otherwise reduce the coverage under the D&O Insurance Policies with respect to conduct occurring prior to the Effective Date, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled from the insurers to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date.

As of the Effective Date, each Reorganized Debtor shall be authorized to procure and maintain directors' and officers' liability insurance policies for the benefit of its respective directors, officers, members, trustees and managers in the ordinary course of business.

44

4820-5709-6917 v.6

## 8.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 8.1   Assumption and Rejection of Executory Contracts and Unexpired Leases

All Executory Contracts and Unexpired Leases other than the Honeywell Agreements will be deemed assumed, and the Honeywell Agreements that are Executory Contracts or Unexpired Leases will be deemed rejected, as of the Effective Date in accordance with sections 365 and 1123 of the Bankruptcy Code.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions or rejections of such Executory Contracts and Unexpired Leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code and effective on the occurrence of the Effective Date.  Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the Debtors and the applicable counterparty, or by order of the Bankruptcy Court.  To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor Entity party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

### 8.2   Objections to and Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

To the extent a monetary default exists under an Executory Contract or Unexpired Lease proposed to be assumed pursuant to the Plan, such monetary default shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the applicable Cure Cost by the Debtors (i) in the Ordinary Course prior to the Adjustment Time (each, as defined in the Subscription Agreement) and (ii) to the extent not paid prior to the Adjustment Time, by payment of the applicable Cure Costs by the Debtors in the Ordinary Course on or after the Adjustment Time.

Objections to the assumption of any Executory Contract or Unexpired Lease or any applicable Cure Cost shall be made in accordance with the Solicitation Procedures Order.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims held by the non-Debtor Entity party thereto against, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, by, the applicable Debtor(s) arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of the assumption; *provided*, *however*, that the counterparty to such Executory Contract or Unexpired Lease may seek additional amount(s) on account of any defaults occurring between the filing of the notice of assumption and the occurrence of the Effective Date of the Plan.

45

8.3     <u>Modifications, Amendments, Supplements, Restatements or Other Agreements</u>

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority or amount of any Claims or Interests that may arise in connection therewith.

8.4     <u>Claims Based on Rejection of Honeywell Agreements</u>

Unless otherwise provided by an order of the Bankruptcy Court, any Holder of a Claim arising from the rejection of a Honeywell Agreement must file a Proof of Claim with the Notice and Claims Agent on or before the Rejection Damages Claims Bar Date.  Unless otherwise provided by an order of the Bankruptcy Court, any Claim arising from the rejection or repudiation of a Honeywell Agreement is not timely filed with the Bankruptcy Court shall not be Allowed, shall be forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates or property of the foregoing parties, without the need for any objection by the Debtors or further notice to, or action, order or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of a Honeywell Claim shall be deemed fully satisfied, released and discharged, notwithstanding anything in a Proof of Claim to the contrary.

Unless the Debtors or the Plan Administrator object to a timely filed and properly served Claim arising from the rejection of a Honeywell Claim by the Claims Objection Deadline, such Claim shall be deemed Allowed in the amount requested.  If the Debtors or the Plan Administrator object to such Claim, the parties may confer to try to reach a settlement, subject to the Transactions Documents, including, without limitation, Section 5.2(d) of the Subscription Agreement and, failing that, the Bankruptcy Court shall determine whether such Claim should be Allowed and if so, in what amount.  All Allowed Claims arising from the rejection of a Honeywell Agreement constitute an Allowed Honeywell Plan Claim and shall be treated in accordance with Section 4.3.6 of the Plan.

8.5     <u>Contracts and Leases Entered Into After the Petition Date</u>

Any contract or lease entered into after the Petition Date by any Debtor, including any Executory Contract or Unexpired Lease assumed by a Debtor, will be performed by the applicable Debtor(s) or Reorganized Debtor(s), or its successors or assigns liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

4820-5709-6917 v.6

8.6     Indemnification and Reimbursement Obligations

On and from the Effective Date, and except as prohibited by applicable law or subject to the limitations set forth herein, the Reorganized Debtors shall be deemed to have assumed all indemnification obligations currently in place for the Debtors' directors, officers, managers, employees, attorneys, other professionals, and agents, whether in the bylaws, certificates of incorporation (or other formation documents), board resolutions, employment contracts or other agreements of the Debtors, other than such obligations relating to, arising from or in connection with any GMI Common Stock 510(b) Claim.

8.7     Reservation of Rights

Nothing contained in the Plan, nor the Debtors' delivery of a notice of proposed assumption of a contract or lease to the applicable contract and lease counterparties, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Reorganized Debtor would have any liability thereunder.

Notwithstanding any non-bankruptcy law to the contrary, the Debtors or Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased, or services previously received, by the contracting Debtors from counterparties to rejected Executory Contracts or Unexpired Leases.

47

**9.      PROVISIONS GOVERNING DISTRIBUTIONS**

9.1      Distribution Agents

The Debtors (prior to the Effective Date) or the Plan Administrator (after the Effective Date) shall have the authority, each in their or its sole discretion, to enter into agreements with one or more Distribution Agents to facilitate the distributions required hereunder.  To the extent the Debtors or the Plan Administrator, as applicable, determine to utilize a Distribution Agent to facilitate any distributions, such Distribution Agent would first be required to:  (i) affirm its obligation to facilitate the prompt distribution of any documents, (ii) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required under the Plan, and (iii) waive any right or ability to set off, deduct from or assert any Lien or other encumbrance against the distributions required under the Plan to be distributed by such Distribution Agent.

The Debtors or the Plan Administrator, each as applicable, shall pay to the Distribution Agents all of their reasonable and documented fees and expenses without the need for any approvals, authorizations, actions or consents of the Bankruptcy Court or otherwise.  The Distribution Agents shall submit detailed invoices to counsel to the Debtors or the Plan Administrator for all fees and expenses for which the Distribution Agents seek reimbursement, and the Debtors or the Plan Administrator, as applicable, shall pay those amounts that they, in their sole discretion, deems reasonable, and shall object in writing to those fees and expenses, if any, that the Debtors or the Plan Administrator, as applicable, deem to be unreasonable.  In the event that the Debtors or the Plan Administrator, as applicable, object to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Debtors or the Plan Administrator, as applicable, and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses.  In the event that the Debtors or the Plan Administrator, as applicable, and a Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

9.1.1    Powers of the Distribution Agent

The Distribution Agent shall be empowered to:  (i) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (ii) make all distributions contemplated hereby, (iii) employ professionals to represent it with respect to its responsibilities, and (iv) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

9.2      Timing and Delivery of Distributions

9.2.1    Timing

Except as otherwise expressly provided herein, distributions to be made under the Plan shall be made on the Effective Date or as otherwise determined by the Plan Administrator in accordance with the Plan.  The Plan Administrator may commence distributions to beneficiaries

48

of the Estates at any time after the Effective Date in its sole discretion, subject to the terms of the Plan, the Confirmation Order and the Subscription Agreement.

i.      <u>Distributions to Holders of Existing Common Stock</u>

The Plan Administrator shall determine the Initial Stockholder Distribution Value prior to Closing as set forth in the Transaction Documents. The Plan Administrator shall determine the Total Stockholder Distribution Value available to Holders of Existing Common Stock from time to time. The Plan Administrator shall determine appropriate reserves when determining the amount available for distribution pursuant to the Plan.

ii.      <u>Initial Distributions to Holders of Existing Common Stock</u>

On or as soon as reasonably practicable after the Effective Date, subject to Section 4.3.9 of the Plan, the Plan Administrator shall make distributions in Cash to each Holder of Existing Common Stock that exercised its Cash Election in an amount equal to such Holder's Pro Rata share of the net of the Initial Stockholder Distribution Value.

iii.      <u>Subsequent Distributions to Holders of Existing Common Stock</u>

If and when the Plan Administrator determines that additional portions of the Total Stockholder Distribution Value are available for distribution (the "<u>Subsequent Stockholder Distribution Value</u>"), the Plan Administrator shall identify periodic dates for purposes of making additional subsequent distributions to or for the benefit of Holders of Existing Common Stock under the Plan; *provided*, *however*, that any such subsequent distributions to Holders of Existing Common Stock shall be made only after accounting for Cash or other value anticipated to be applied by the Plan Administrator or otherwise required (i) to make distributions for Allowed Claims under the Plan, (ii) to fund the Professional Fee Escrow Account or pay other Debtor Transaction Expenses, (iii) to pay the expenses and costs of administering the Plan, including, for the avoidance of doubt and without limitation, the aggregate fees, costs and expenses of the Plan Administrator and financial advisor, legal counsel, accountant, auditor, broker, expert or other advisor or consultant retained by or on behalf of the Plan Administrator or (iv) to pay the aggregate fees, costs and expenses of the Committees and any financial advisor, legal counsel, accountant, agent, auditor, broker, expert or other advisor or consultant retained by or on behalf of the Committees.

On each subsequent Distribution Date, subject to Sections 4.3.9 and 6.2 of the Plan and Section 2.18 of the Subscription Agreement, until the amount of Total Stockholder Distribution Value distributed to or for the benefit of Holders of Existing Common Stock hereunder equals $350 million, the Plan Administrator shall (i) for each Holder of Existing Common Stock that exercised its Cash Election, distribute to such Holder in Cash an amount equal to such Holder's Pro Rata share of the Subsequent Stockholder Distribution Value and (ii) for each Holder of Existing Common Stock that did not exercise its Cash Election, apply an amount equal to such Holder's Pro Rata share of the Subsequent Stockholder Distribution Value to purchase New Common Stock from the Plan Sponsor and distribute to each such Holder a number of shares of the purchased New Common Stock equal to such Holder's Pro Rata share of

4820-5709-6917 v.6

the number of shares purchased from the Plan Sponsor, all in accordance with the terms and conditions of the Section 2.18 of the Subscription Agreement.

On each subsequent Distribution Date, to the extent the amount of Total Stockholder Distribution Value distributed to or for the benefit of Holders of Existing Common Stock hereunder exceeds $350 million, the Plan Administrator shall distribute to all Holders of Existing Common Stock their Pro Rata share of such excess Subsequent Stockholder Distribution Value.

As soon as reasonably practicable following each Distribution, the Debtors shall issue additional shares of Existing Common Stock to the Plan Sponsor and Subscribing Holders, as applicable, to the extent required under Section 2.18(b) of the Subscription Agreement.

### 9.2.2   *De Minimis* Distributions

Notwithstanding any other provision of the Plan, none of the Plan Administrator nor the Distribution Agent shall have any obligation to make any distributions under the Plan with a value of less than $50, unless a written request therefor is received by the Distribution Agent from the relevant recipient within 120 days after the later of (i) the Effective Date and (ii) the date such Claim or Interest becomes an Allowed Claim or Interest.  *De minimis* distributions for which no such request is timely received shall revert to the Debtors.  Upon such reversion, the relevant Allowed Claim or Interest of less than $50 (and any Claim or Interest on account of such missed distributions) shall be automatically deemed satisfied, discharged, and forever barred, notwithstanding any federal or state escheat laws to the contrary.

### 9.2.3   Record Date and Delivery of Distributions

Distributions shall only be made to the record holders of Allowed Claims and Interests as of the Confirmation Date, except as to Holders of Prepetition Credit Agreement Claims, Senior Subordinated Noteholder Claims, and DIP Claims whose distribution is to be administered by the Prepetition Credit Agreement Agent, Senior Subordinated Notes Indenture Trustee and DIP Agent, respectively, which distributions shall be deposited with the Prepetition Credit Agreement Agent, Senior Subordinated Notes Indenture Trustee and DIP Agent for distribution to Holders of Prepetition Credit Agreement Claims, Senior Subordinated Noteholder Claims and DIP Claims, respectively, in accordance with the provisions of this Plan and the terms of the governing agreement.  Distributions on account of Prepetition Credit Agreement Claims, Senior Subordinated Noteholder Claims and DIP Claims shall be deemed completed upon delivery to the Prepetition Credit Agreement Agent, Senior Subordinated Notes Indenture Trustee and DIP Agent, as applicable.  On the Confirmation Date, the Claims Register and the Stock Register shall be closed and the Distribution Agent shall be authorized and entitled to recognize only those Holders of Claims or Interests listed on the Claims Register or Stock Register as of the close of business on the Confirmation Date.  If a Claim or Interest is transferred 20 or fewer days before the Confirmation Date, the Distribution Agent shall make distributions to the transferee only to the extent practical, and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

50

If any dispute arises as to the identity of a Holder of an Allowed Claim or Interest that is entitled to receive a distribution pursuant to the Plan, the Distribution Agent may, in lieu of making such distribution to such person, make the distribution into an escrow account until the disposition thereof is determined by Final Order or by written agreement among the interested parties to such dispute.

Except as otherwise provided herein, the Distribution Agent, at the direction of the Debtors or the Plan Administrator, as applicable, shall make all distributions required under the Plan to Holders of Allowed Claims or Interests.  Except as otherwise provided herein, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims or Interests shall be made to Holders of record as of the Confirmation Date by the Distribution Agent, as appropriate:  (i) to the signatory set forth on any Proof of Claim filed by such Holder or other representative identified therein (or at the last known address of such Holder if no Proof of Claim is filed or if the Debtors, the Plan Administrator, or the Distribution Agent have been notified in writing of a change of address), or (ii) at the address set forth in any written notice of change of address delivered to the Notice and Claims Agent.  The Plan Administrator, the Distribution Agent and the Notice and Claims Agent shall not incur any liability whatsoever on account of the delivery of any distributions under the Plan.

### 9.3    Manner of Payment Under Plan

#### 9.3.1    Cash Payments

At the Distribution Agent's option, any Cash payment may be made by check, wire transfer or any other customary payment method.

#### 9.3.2    Allocation of Plan Distributions Between Principal and Interest

To the extent that any Claim entitled to a distribution under the Plan is based upon any obligation or instrument that is treated for U.S. federal income tax purposes as indebtedness of any Debtor and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

#### 9.3.3    Compliance Matters

In connection with the Plan, to the extent applicable, the Debtors, the Plan Administrator and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any federal, state, local or foreign tax law, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors, the Plan Administrator and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding in kind, liquidating a portion of the distributions to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are

51

reasonable and appropriate.  For purposes of the Plan, any withheld amount (or property) shall be treated as if paid to the applicable claimant.  The Plan Administrator reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.  Distributions in full or partial satisfaction of Allowed Claims shall be allocated first to trust fund-type taxes, then to other taxes, and then to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that has accrued on such Claims.

### 9.3.4   Foreign Currency Exchange Rate

Except as otherwise provided herein or in an order of the Bankruptcy Court, or, solely with regard to the Prepetition Credit Agreement Claims, as directed by the Required Lenders (as defined in the Prepetition Credit Agreement), or as agreed to by any Holder and either the Debtors or the Plan Administrator, as applicable, any Claim or Interest asserted in a currency other than U.S. dollars shall be automatically deemed converted, as of the Effective Date, to the equivalent U.S. dollar value using the exchange rate on the Petition Date, as quoted at 4:00 p.m. (New York time), at the mid-range spot rate of exchange for the applicable currency as published in *The Wall Street Journal*, National Edition, on the day after the Petition Date.

### 9.3.5   Fractional Payments and Distributions

Whenever the Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down. To the extent that Cash to be distributed under the Plan remain undistributed as a result of the aforementioned rounding, such Cash shall be treated as an Unclaimed Distribution.

Whenever the Plan would otherwise call for, with respect to a particular Person, distribution on account of a Claim or Interest of a fraction of a share, the portion of such Claim or Interest entitled to such distribution shall instead be paid in Cash.

### 9.3.6   Fractional Shares

No fractional shares of New Common Stock shall be distributed under the Plan. When any distribution pursuant to the Plan on account of an Allowed Interest would otherwise result in the issuance or delivery of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded to the next lower whole number with no further payment or other distribution therefor.  The total number of shares of New Common Stock to be distributed to holders of Allowed Interests shall be adjusted downward as necessary to account for the rounding provided in this Section 9.3.6.

### 9.4   Undeliverable Distributions

In the event that any distribution to any Holder is returned as undeliverable, or no address for such Holder is found in the Debtors' records, no further distribution to such Holder shall be made unless and until the Plan Administrator or the Distribution Agent is notified in writing of the then-current address of such Holder, at which time such distribution shall be made

4820-5709-6917 v.6

to such Holder not less than 30 days thereafter.  Undeliverable distributions shall remain in the possession of the Plan Administrator or the Distribution Agent until such time as such distribution becomes deliverable or such distribution reverts to the Debtors or is cancelled pursuant to Section 9.5 herein, and shall not be supplemented with any interest, dividends or other accruals of any kind.

9.5    Reversion

Any distribution under the Plan, including distributions made by the Prepetition Credit Agreement Agent or the Senior Subordinated Notes Indenture Trustee in accordance with Section 9.2.3 herein, that is an Unclaimed Distribution for a period of six months thereafter, shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code, and such Unclaimed Distribution shall revest in the Debtors.  Upon such revesting, the Claim or Interest of any Holder or its successors and assigns with respect to such property shall be cancelled, discharged and forever barred, notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary.  The provisions of the Plan regarding undeliverable distributions and Unclaimed Distributions shall apply with equal force to distributions that are issued by the Plan Administrator or the Distribution Agent made pursuant to any indenture or Certificate, notwithstanding any provision in such indenture or Certificate to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned or unclaimed property law.

Nothing contained herein shall require the Plan Administrator or the Distribution Agent to attempt to locate any Holder of an Allowed Claim or Interest whose distribution is declared an undeliverable or an Unclaimed Distribution.

9.6    Claims or Interests Paid by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable under one of the Debtors' Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy.

Except as otherwise provided in the Plan, payments to Holders of Claims covered by an Insurance Policy and otherwise payable under the Plan shall be made from the proceeds of such Insurance Policy in accordance with the provisions of any such applicable Insurance Policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including Insurers, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by Insurers.

To the extent a Creditor receives a distribution on account of a Claim or Interest and also receives payment from a party that is not a Debtor, Reorganized Debtor, Plan Administrator, or Distribution Agent on account of such Claim or Interest, such Creditor shall, within 30 calendar days of receipt thereof, repay and/or return the distribution to the Plan Administrator, as applicable, to the extent the Creditor's total recovery on account of such Claim or Interest from the third party and under the Plan exceeds the amount of the Claim or Interest as of the date of any such distribution under the Plan.

53

### 9.7   Setoffs

Except as otherwise provided herein, a Final Order of the Bankruptcy Court, or as agreed to by the Holder and the Plan Administrator, each as applicable, pursuant to the Bankruptcy Code (including section 553 thereof), applicable non-bankruptcy law, or such terms as may be agreed to by the Holder and the Plan Administrator, the Plan Administrator may, without any further notice to, or action, order or approval of the Bankruptcy Court, set off against any Allowed Claim or Interest and the distributions to be made on account of such Allowed Claim or Interest (before any distribution is made on account of such Allowed Claim or Interest), any claim, right and Cause of Action of any nature that the Reorganized Debtors, each as applicable, may hold against the Holder of such Allowed Claim or Interest, to the extent such claim, right or Cause of Action against such Holder has not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided* that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by the Debtors, the Reorganized Debtors or the Plan Administrator of any such Claims or Interests, rights and Causes of Action that the Debtors or the Reorganized Debtors may possess against or in such Holder.  In no event shall any Holder of a Claim or Interest be entitled to set off any Claim or Interest against any Claim or Interest, right, or Cause of Action of a Debtor, Reorganized Debtor or Plan Administrator, as applicable, unless such Holder has filed a Proof of Claim in these Chapter 11 Cases preserving such setoff and a Final Order of the Bankruptcy Court has been entered, authorizing and approving such setoff.

### 9.8   No Post-petition Interest on Claims

Unless otherwise specifically provided for in the Plan or the Confirmation Order, required by applicable law, or agreed to by the Debtors or the Plan Administrator, no Holder of a Claim or Interest against the Debtors shall be entitled to interest accruing on or after the Petition Date with respect to such Claim or Interest, notwithstanding any dispute or other delay with respect to any distribution.

### 9.9   No Payment Over the Full Amount

In no event shall a Holder of a Claim or Interest receive more than the full payment of such Claim or Interest.  To the extent any Holder has received payment in full with respect to a Claim or Interest, such Claim or Interest shall be expunged without an objection to such Claim or Interest having been filed and without any further notice to or action, order or approval of the Bankruptcy Court.

4820-5709-6917 v.6

## 10.   CLAIMS ADMINISTRATION PROCEDURES

### 10.1   Administration Responsibilities

Except as otherwise specifically provided in the Plan, after the Effective Date the Plan Administrator shall have the sole authority to (i) file, withdraw or litigate to judgment objections to Claims or Interests, (ii) settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court, and (iii) administer and adjust, or cause to be administered and adjusted, the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.  Nothing in this Section 10.1 shall limit the ability under the Bankruptcy Code of any party-in-interest to object to any Claim or Interest unless otherwise ordered by the Bankruptcy Court.

### 10.2   Estimation of Claims

Before or after the Effective Date, the Debtors or the Plan Administrator, as applicable, may, within its reasonable discretion, at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not yet been the subject of a Final Order, shall be deemed to be estimated at zero dollars unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including, but not limited to, for purposes of distributions).

Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court or under the Plan.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation of such Claim unless the Holder of such Claim has filed a motion with the Bankruptcy Court requesting the right to seek such reconsideration on or before 20 calendar days after the date such Claim is estimated by the Bankruptcy Court.

### 10.3   Expungement and Disallowance of Claims or Interests

#### 10.3.1   Paid, Satisfied, Amended, Duplicated, or Superseded Claims or Interests

Any Claim or Interest that has been paid, satisfied, amended, duplicated (by virtue of the substantive consolidation provided for under this Plan or otherwise), or superseded may be adjusted or expunged on the Claims Register by the Plan Administrator on or after 14 calendar

55

4820-5709-6917 v.6

days after the date on which notice of such adjustment or expungement has been filed with the Bankruptcy Court, without an objection to such Claim or Interest having to be filed, and without any further action, order or approval of the Bankruptcy Court.

### 10.3.2    Claims by Persons From Which Property Is Recoverable

Unless otherwise agreed to by the Debtors or the Plan Administrator, as applicable, or ordered by the Bankruptcy Court, any Claim or Interest held by any Person or Entity from which property is recoverable under section 542, 543, 550 or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and any Holder of such Claim or Interest may not receive any distributions on account of such Claim or Interest until such time as such Cause of Action against that Person or Entity has been resolved.

### 10.4    Amendments to Proofs of Claim

On or after the Effective Date, a Proof of Claim may not be amended (other than solely to update or correct the name or address of the Holder of such Claim) without the prior authorization of the Bankruptcy Court or the Plan Administrator, and any such amended Proof of Claim filed without such prior authorization shall be deemed disallowed in full and expunged without any further notice to or action, order or approval of the Bankruptcy Court.

### 10.5    No Distributions Pending Allowance

If an objection to the amount, validity, priority, or classification of a Claim or Interest or a portion thereof is filed or is intended to be filed as set forth herein or a Claim or Interest otherwise remains a Disputed Claim or Interest, except as otherwise provided in a Final Order of the Bankruptcy Court, no payment or distribution provided under the Plan shall be made on account of such Claim or Interest or portion thereof, as applicable, unless and until such Disputed Claim becomes an Allowed Claim or Interest.

### 10.6    Distributions After Allowance

To the extent that a Disputed Claim or Interest ultimately becomes a finally Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the applicable provisions of the Plan.

4820-5709-6917 v.6

## 11.    EFFECT OF CONFIRMATION

### 11.1    Vesting of Assets

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan or in the Confirmation Order, upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property (including all interests, rights and privileges related thereto) of each of the Debtors shall vest in each of the respective Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges and Interests.  All Liens, Claims, encumbrances, charges and Interests shall be deemed fully released and discharged as of the Effective Date, except as otherwise provided in the Plan or the Confirmation Order.  Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and settle and compromise Claims and Interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code with respect to the Debtors.

### 11.2    Compromise and Settlement of Claims and Controversies

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise of all Claims, Causes of Action and controversies relating to the contractual, legal and subordination rights that a Holder of an Allowed Claim or Interest may have against any Debtor, or any distribution to be made on account of such an Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors and their Estates and is fair, equitable and reasonable.  In accordance with the provisions of the Plan, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice or action, order or approval of the Bankruptcy Court, after the Effective Date, the Plan Administrator may compromise and settle Claims against them and Causes of Action against other entities.

### 11.3    Subordinated Claims

The allowance, classification and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account, conform to, and satisfy the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto; *provided*, *however*, that the Debtors reserve the right to reclassify or modify the treatment of any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto, unless otherwise provided in a settlement agreement concerning such Allowed Claim or Interest, *provided, further*, that in no event shall the Prepetition Credit Agreement Claims or DIP Claims be reclassified or subordinated pursuant to section 510 of the Bankruptcy Code, principles of equitable subordination or otherwise.

57

### 11.4   Release of Liens

Except as otherwise provided in the Plan, or in any contract, instrument, release or other agreement or document created pursuant to the Plan or the Confirmation Order, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a DIP Claim or Secured Claim, indefeasible payment and satisfaction in full in cash of the portion of the DIP Claim or Secured Claim that is Allowed as of the Effective Date in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released, settled, discharged and compromised, and all rights, titles and interests of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall revert to the applicable Debtor and its successors and assigns.  The Debtors, the Reorganized Debtors or Plan Administrator, as applicable, shall be authorized to file any necessary or desirable documents to evidence such release in the name of the party secured by such pre-Effective Date mortgages, deeds of trust, Liens, pledges or other security interests.

### 11.5   Discharge

Pursuant to and to the fullest extent permitted by the Bankruptcy Code, except as otherwise specifically provided in the Plan or the Confirmation Order, the treatment of Claims and Interests under the Plan shall be in full and final satisfaction, settlement, release, discharge and termination, as of the Effective Date, of all Claims of any nature whatsoever, whether known or unknown, against, and Interests in, the Debtors, any property of the Estates, or any property of the Reorganized Debtors, including all Claims of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not:  (i) a Proof of Claim or Interest based upon such Claim, debt, right or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim or Interest based upon such Claim, liability, obligation or Interest is Allowed pursuant to section 502 of the Bankruptcy Code, or (iii) the Holder of such a Claim, liability, obligation or Interest has accepted the Plan.  Except as otherwise provided herein, any default by the Debtors or their Affiliates with respect to any Claim that existed immediately prior to or on account of the filing of these Chapter 11 Cases shall be deemed cured on the Effective Date.

### 11.6   Term of Injunction or Stays

Unless otherwise provided herein, any injunction or stay arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code or otherwise that is in existence on the Confirmation Date shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 11.7   Release by the Debtors

**For good and valuable consideration, including the service of the Released Parties to facilitate the administration of the Chapter 11 Cases and the implementation of the transactions contemplated by the Plan, on and after the Effective Date, the Released Parties shall be released and discharged by the Debtors, the Reorganized Debtors and the Estates, including any successor and assign to the Debtors, Reorganized Debtors or any**

58

**Estate representative, from all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of a Debtor or Reorganized Debtor, and its successors, assigns and representatives, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, contract, violations of federal or state securities laws, or otherwise, including, those that any of the Debtors, the Reorganized Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the Estates, the conduct of the businesses of the Debtors, these Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any Security of the Debtors or Reorganized Debtors, the release or discharge of any mortgage, lien or security interest, the distribution of proceeds, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the administration of Claims and Interests prior to or during these Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement or, in each case, related agreements, instruments or other documents, any action or omission with respect to intercompany claims and intercompany settlements, any action or omission as an officer, director, agent, representative, fiduciary, controlling person, member, manager, affiliate or responsible party, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission is determined by a final order in a court of competent jurisdiction to have constituted gross negligence, willful misconduct, actual fraud, or a criminal act.**

      11.8   <u>Exculpation</u>

      **Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtors and their directors, officers, employees, attorneys, investment bankers, financial advisors, restructuring advisors, and other professional advisors, representatives and agents will be deemed to have solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(e) of the Bankruptcy Code and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with the solicitation.**

      **The Exculpated Parties shall neither have nor incur any liability arising on or after the petition date to any entity for any act or omission in connection with these Chapter 11 Cases, including (i) the operation of the Debtors' businesses during the pendency of these Chapter 11 Cases, (ii) the administration of Claims and Interests during these Chapter 11 Cases, (iii) formulating, negotiating, preparing, disseminating, implementing, administering, confirming and/or effecting the disclosure statement, the Plan, the plan supplement, and any related contract, instrument, release, or other agreement or document created or entered into in connection therewith (including the solicitation of votes for the Plan and other actions taken in furtherance of confirmation and consummation of the Plan), (iv) the offer and issuance of any securities under or in**

59

connection with the Plan, or (v) the administration and adjudication of Claims, other than liability resulting from any act or omission that is determined by final order in a court of competent jurisdiction to have constituted gross negligence, willful misconduct, actual fraud or a criminal act.

11.9   Third-Party Release

For good and valuable consideration, including the service of the Released Parties to facilitate the administration of the Chapter 11 Cases, the implementation of the orderly liquidation contemplated by the Plan, and the release of mortgages, liens, and security interests on property of the Estates, the distribution of proceeds, on and after the Effective Date, to the fullest extent permitted by applicable law, the Releasing Parties (regardless of whether a Releasing Party is a Released Party) shall be deemed to conclusively, absolutely, unconditionally, irrevocably, and forever release, waive and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of a Debtor, Reorganized Debtor or Estate, and its successors, assigns and representatives, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, contract, violations of federal or state securities laws or otherwise, including, those that any of the Debtors, the Reorganized Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the Estates, the conduct of the businesses of the Debtors, these Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the administration of Claims and Interests prior to or during these Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement or, in each case, related agreements, instruments or other documents, any action or omission with respect to intercompany claims or intercompany settlements, any action or omission as an officer, director, agent, representative, fiduciary, controlling person, member, manager, affiliate or responsible party, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission is determined by a final order in a court of competent jurisdiction to have constituted gross negligence, willful misconduct, actual fraud or a criminal act.

11.10   Injunction

Except as otherwise specifically provided in the Plan or the Confirmation Order, all Persons or Entities who have held, hold or may hold (i) Claims or Interests that arose prior to the Effective Date, (ii) Causes of Action that have been released pursuant to Sections 11.7 and 11.9 of the Plan or are subject to exculpation pursuant to Section 11.8 of the Plan (but only to the extent of the exculpation provided in Section 11.8 of the Plan), or

60

**(iii) Claims, Interests or Causes of Action that are otherwise discharged, satisfied, stayed, or terminated pursuant to the terms of the Plan and all other parties-in-interest seeking to enforce such Claims, Interests or Causes of Action are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim (including a section 510(b) Claim) against or Interest in the Debtors or the Reorganized Debtors, or property of any Debtors or Reorganized Debtors, other than to enforce any right to a distribution pursuant to the Plan, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors or Reorganized Debtors or property of any Debtors or Reorganized Debtors with respect to any such Claim or Interest, other than to enforce any right to a distribution pursuant to the Plan, (c) creating, perfecting or enforcing any Lien or encumbrance of any kind against the Debtors or the Reorganized Debtors, or against the property or interests in property of the Debtors or the Reorganized Debtors with respect to any such Claim or Interest, other than to enforce any right to a distribution pursuant to the Plan, or (d) asserting any right of setoff (except for setoffs exercised prepetition) or subrogation of any kind against any obligation due from the Debtors or the Reorganized Debtors, or against the property or interests in property of the Debtors or the Reorganized Debtors, with respect to any such Claim or Interest.  Such injunction shall extend to any successors or assignees of the Debtors or the Reorganized Debtors and their respective properties and interests in properties.**

11.11    Scope of Releases

**Each person providing releases under the Plan, including the Debtors, the Reorganized Debtors, the Estates and the Releasing Parties, shall be deemed to have granted the releases set forth in the Plan notwithstanding that such person may hereafter discover facts in addition to, or different from, those which it now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such person expressly waives any and all rights that it may have under any statute or common law principle which would limit the effect of such releases to those claims or causes of action actually known or suspected to exist at the time of execution of such release.**

**For the avoidance of doubt, nothing herein, including, without limitation, the releases, waivers, and exculpations provided in Sections** Error! Reference source not found.**– 11.9, shall constitute a release, waiver, discharge, or limitation of any kind of any rights, liabilities, or obligations arising under the Plan or any of the Transactions Documents.**

11.12    Preservation of Causes of Action

Except as expressly provided in this Section 11 of the Plan or the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action that the Debtors or the Reorganized Debtors may have or that the Debtors, the Reorganized Debtors or the Plan Administrator, as applicable, may choose to assert on behalf of the Estates under any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including (i) any and all Causes of Action or Claims against any

61

Person or Entity, to the extent such Person or Entity asserts a cross-claim, counterclaim and/or claim for setoff that seeks affirmative relief against the Debtors or the Reorganized Debtors, and in each case, their officers, directors or representatives or (ii) the turnover of any property of the Estates to the Debtors or the Reorganized Debtors.

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors, the Reorganized Debtors or the Plan Administrator, as applicable, will not pursue any and all available Causes of Action against them. The Debtors, the Reorganized Debtors and the Plan Administrator expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein.

Except as set forth in this Section 11 of the Plan or the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action that the Debtors had immediately prior to the Petition Date or the Effective Date against or regarding any Claim or Interest left Unimpaired by the Plan. The Plan Administrator or Reorganized Debtors, as applicable, shall have, retain, reserve, and be entitled to assert all such rights and Causes of Action as fully as if the Chapter 11 Cases had not been commenced, and all of the Plan Administrator's and Reorganized Debtors' legal and equitable rights respecting any Claim or Interest left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

Except as set forth in this Section 11 of the Plan or the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to release any post-Effective Date obligations of any party under the Plan, or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan, including pursuant to Section 11 of the Plan or a Final Order, the Plan Administrator and Reorganized Debtors expressly reserve all Causes of Action for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or occurrence of the Effective Date.

4820-5709-6917 v.6

**12.    CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN**

12.1    Conditions to Effectiveness

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied on or prior to the Effective Date or waived in accordance with Section 12.2 of the Plan:

i.      The conditions precedent to the Transaction have been satisfied or waived by the Debtors and/or the Plan Sponsor, as applicable, in accordance with the terms of the Transaction Documents;

ii.     All definitive documentation for the applicable transactions contemplated by the Plan, where applicable, have been executed and remain in full force and effect, which definitive documentation shall be in form and substance acceptable to the Requisite Consenting Lenders;

iii.    The Bankruptcy Court has entered the Confirmation Order, in form and substance acceptable to the Requisite Consenting Lenders and the Plan Sponsor, which shall be in full force and effect, and no order staying (including, for the avoidance of doubt, the stay pursuant to Bankruptcy Rule 6004), reversing, modifying, or amending such Confirmation Order shall be in effect on the Effective Date;

iv.     The Debtors have obtained all applicable authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

v.      No governmental entity or federal or state court of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any law or order (whether temporary, preliminary or permanent), in any case which is in effect and which prevents or prohibits consummation of the Plan, and no governmental entity has instituted any action or proceeding (which remains pending at what would otherwise be the date of Closing) seeking to enjoin, restrain or otherwise prohibit consummation of the transactions contemplated by the Plan; and

vi.     All Ad Hoc Lender Group Expenses have been paid in full as provided in the Restructuring Support Agreement.

63

12.2    Waiver of Conditions to Confirmation or Effectiveness

Except as set forth below, subject to the Restructuring Support Agreement and upon the prior written consent of the Plan Sponsor, the Debtors may waive any of the conditions set forth in Section 12.1 of the Plan at any time, without any notice to other parties-in-interest or the Bankruptcy Court and without any formal action other than proceeding to confirm and/or consummate the Plan; *provided*, *however*, that the prior written consent of the Requisite Consenting Lenders shall be necessary to waive any such condition over which the Requisite Consenting Lenders have a consent right.  Subject to the Restructuring Support Agreement and the Transaction Documents, the failure to satisfy any applicable condition before the Confirmation Date or the Effective Date may be asserted by the Debtors as a reason not to seek Confirmation or declare an Effective Date, regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtors, in their sole discretion).  Subject to the Restructuring Support Agreement and the Transaction Documents, the failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

4820-5709-6917 v.6

**13.    MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN**

13.1    Plan Modifications

Subject to the Restructuring Support Agreement and the Transaction Documents, certain restrictions and requirements set forth in section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, those restrictions on modifications set forth in the Plan, the Debtors may alter, amend or modify the Plan as it applies to any particular Debtor, including the Plan Supplement, without additional disclosure pursuant to section 1125 of the Bankruptcy Code prior to the Confirmation Date.  After the Confirmation Date and before substantial consummation of the Plan, the Debtors may institute proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, including the Plan Supplement, the Disclosure Statement, or the Confirmation Order, relating to such matters as may be necessary to carry out the purposes and effects of the Plan.

After the Confirmation Date, but before the Effective Date, subject to the consent of the Plan Sponsor and any other applicable consent rights, the Debtors may make appropriate technical adjustments and modifications to the Plan, including the Plan Supplement, without further order or approval of the Bankruptcy Court; *provided*, that such adjustments and modifications do not materially and adversely affect the treatment of holders of Claims or Interests and are otherwise permitted under section 1127(b) of the Bankruptcy Code; *provided further*, that, notwithstanding anything to the contrary herein, the Debtors may not modify or seek to modify the treatment of Prepetition Credit Agreement Claims or DIP Claims without the prior written consent of the Required Lenders (as defined in the Prepetition Credit Agreement) or DIP Required Lenders, as applicable (with email from counsel being sufficient in each case).

13.2    Effect of Confirmation on Modification

Entry of a Confirmation Order shall mean that all modifications and amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code, and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

13.3    Revocation or Withdrawal of the Plan and Effects of Non-Occurrence of Confirmation or Effective Date

Subject to the Restructuring Support Agreement and the Transaction Documents, the Debtors reserve the right to revoke, withdraw, or delay consideration of the Plan before the Confirmation Date, either entirely or as to any one or more of the Debtors.  If the Plan is revoked, withdrawn, or delayed as to fewer than all of the Debtors, such revocation, withdrawal or delay shall not affect the enforceability of the Plan as it relates to the Debtors for which the Plan is not revoked, withdrawn, or delayed, subject to the Transaction Documents.  If the Debtors revoke or withdraw the Plan in its entirety or if the Confirmation Date or the Effective Date does not occur, then, absent further order of the Bankruptcy Court, (i) the Plan shall be null and void in all respects unless extended by the Debtors if the Effective Date does not occur upon the earlier of (A) 120 days after entry of the Confirmation Order and (B) the termination of the

65

Restructuring Support Agreement pursuant to the terms thereof, (ii) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void, and (iii) nothing contained in the Plan shall (A) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person or Entity, (B) prejudice in any manner the rights of such Debtors or any other Person or Entity or (C) constitute an admission of any sort by the Debtors or any other Person or Entity.

If the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction over any request to extend the deadline for assuming or rejecting Executory Contracts or Unexpired Leases.

4820-5709-6917 v.6

## 14.    RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain its existing jurisdiction over all matters arising in or out of, or related to, the Chapter 11 Cases or the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

i.    Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

ii.    Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

iii.    Resolve any matters related to:  (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease and, if necessary, liquidate, any Claims arising therefrom, including any disputes regarding cure obligations in accordance with the Plan, (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed, and (iii) any dispute regarding whether a contract or lease is, or was, executory or expired;

iv.    Ensure that distributions to Holders of Allowed Claims or Interests are accomplished pursuant to the Plan and adjudicate any and all disputes from, or relating to, distributions under the Plan;

v.    Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and Causes of Action, and grant or deny any applications, involving a Debtor that may be pending before the Bankruptcy Court on the Effective Date;

vi.    Adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

vii.    Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, Plan Supplement, or Disclosure Statement;

67

viii. Enter and enforce any order for the sale of property pursuant to section 363, 1123, or 1146(a) of the Bankruptcy Code;

ix. Adjudicate, decide, or resolve any and all disputes as to the ownership of any Claim or Interest;

x. Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with enforcement of the Plan;

xi. Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the existence, nature, and scope of the releases, injunctions, and other provisions contained in the Plan, and enter such orders as may be necessary or appropriate to implement and enforce such releases, injunctions, and other provisions;

xii. Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

xiii. Determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan, the Plan Supplement, or the Disclosure Statement;

xiv. Enter an order or final decree concluding or closing the Chapter 11 Cases;

xv. Consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

xvi. Hear and determine disputes, cases, controversies, or Causes of Action arising in connection with the interpretation, implementation, or enforcement of the Transaction Documents, Plan, Confirmation Order, or any other agreement, document or instrument executed in connection with the Plan;

xvii. Hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge;

xviii. Hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

xix. Enforce all orders previously entered by the Bankruptcy Court; and

68

xx.  Adjudicate all other matters over which the Bankruptcy Court has jurisdiction;

*provided*, *however*, that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court, and any disputes concerning documents contained in the Plan Supplement that contain such clauses shall be governed in accordance with the provisions of such documents.

69

4820-5709-6917 v.6

## 15. MISCELLANEOUS

### 15.1 Expedited Tax Determination

The Plan Administrator may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of the Reorganized Debtors for all taxable periods ending on or before the Effective Date.

### 15.2 Plan Supplement

Draft forms of certain documents, agreements, instruments, schedules, and exhibits specified in the Plan shall, where expressly so provided for in the Plan, be contained in the Plan Supplement and filed from time to time.

### 15.3 Additional Documents

The Debtors, Plan Administrator, Reorganized Debtors, all Holders of Claims or Interests receiving distributions hereunder, and all other parties-in-interest may and shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 15.4 Exhibits; Schedules; Plan Supplement

All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full herein.

### 15.5 Claims Against Other Debtors

Nothing in the Plan or the Disclosure Statement or any document or pleading filed in connection therewith shall constitute or be deemed to constitute an admission that any of the Debtors are subject to or liable for any Claim against any other Debtor.

### 15.6 Nonseverability

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration or interpretation; *provided, however*, that the votes of holders of Prepetition Credit Agreement Claims shall be resolicited if any such holding, alteration or interpretation renders the treatment of the Prepetition Credit Agreement Claims hereunder different from the treatment of such Claims provided by the Restructuring Support Agreement. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (i) valid and enforceable pursuant to

70

its terms, (ii) integral to the Plan and may not be deleted or modified without the consent of the Debtors and Plan Sponsor, and (iii) nonseverable and mutually dependent.

15.7    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein or therein, the laws of the State of New York, without giving effect to the principles of conflicts of laws, shall govern the construction and implementation of the Plan and any agreement, document or instrument executed or entered into in connection with the Plan.

15.8    Dissolution of Committees

After the Effective Date, the Committees' functions shall be restricted to and shall not be heard on any issue except:  (i) applications filed pursuant to sections 330 and 331 of the Bankruptcy Code, and (ii) motions or litigation, including pending appeals, seeking enforcement of the provisions of the Plan or under the Confirmation Order; *provided*, that with respect to pending appeals and related proceedings, the Committees shall continue to comply with sections 327, 328, 329, 330, 331 and 1103 of the Bankruptcy Code in seeking compensation for services rendered.  Upon the resolution of all matters set forth in the prior sentence, the Committees shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases.

15.9    Binding Effect

Notwithstanding Bankruptcy Rule 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, Plan Administrator, Reorganized Debtors, the Estates, any and all Holders of Claims and Interests (irrespective of whether Holders of such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

15.10   Notices

To be effective, any notice, request or demand to or upon, as applicable, the Debtors, the Prepetition Credit Agreement Agent, the Ad Hoc Lender Group, the DIP Agent, the UCC, the Equity Committee, the Plan Sponsor, and the U.S. Trustee must be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually received and confirmed by the relevant party as follows:

71

If to the Debtors:

Garrett Motion Inc.
47548 Halyard Drive
Plymouth, MI 48170
Attention:        General Counsel

with a copy to:

Sullivan & Cromwell, LLP
125 Broad Street
New York, New York  10004
Attention:        Andrew G. Dietderich (dietdericha@sullcrom.com)
                  Brian D. Glueckstein (gluecksteinb@sullcrom.com)
                  Alexa J. Kranzley (kranzleyj@sullcrom.com)
                  Benjamin S. Beller (bellerb@sullcrom.com)
Telephone:        (212) 558-4000
Facsimile:        (212) 558-3588

If to the Prepetition Credit Agreement Agent:

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York  10038
Attention:        Kristopher M. Hansen (khansen@stroock.com)
                  Jonathan D. Canfield (jcanfield@stroock.com)
                  Joanne Lau (jlau@stroock.com)
                  Alexander A. Fraser (afraser@stroock.com)
Telephone:        (212) 806-6056
Facsimile:        (212) 806-6006

If to the Ad Hoc Lender Group:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York  10166
Attention:        Scott J. Greenberg (sgreenberg@gibsondunn.com)
                  Steven A. Domanowski (sdomanowski@gibsondunn.com)
                  Robert A. Klyman (rklyman@gibsondunn.com)
                  Matthew G. Bouslog (mbouslog@gibsondunn.com)
Telephone:        (212) 351-5928
Facsimile:        (212) 716-0798

4820-5709-6917 v.6

If to the DIP Agent:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attention:      Ray C. Schrock, P.C. (ray.schrock@weil.com)
                Candace M. Arthur, Esq. (candace.arthur@weil.com)
Telephone:      (212) 310-8000
Facsimile:      (212) 310-8007

If to the UCC:

White & Case LLP
1221 Avenue of the Americas
New York, New York  10020
Attention:      Brian Pfeiffer (brian.pfeiffer@whitecase.com)
                John Ramirez (john.ramirez@whitecase.com)
Telephone:      (212) 819-8200
Facsimile:      (212) 354-8113

If to the Equity Committee:

Kasowitz Benson Torres LLP
1633 Broadway
New York, New York 10019
Attention:      Andrew K. Glenn (aglenn@kasowitz.com)
                David S. Rosner (drosner@kasowitz.com)
                Matthew B. Stein (mstein@kasowitz.com)
                Shai Schmidt (sschmidt@kasowtiz.com)
Telephone:       (212) 506-1700
Facsimile:      (212) 506-1800

If to the Plan Sponsor:

Davis Polk and Wardwell LLP
450 Lexington Avenue
New York, New York  10017
Attention:      Brian M. Resnick (brian.resnick@davispolk.com)
                Joshua Y. Sturm (joshua.sturm@davispolk.com)
Telephone:      (212) 450-4000
Facsimile:      (212) 701-5800

73

If to the U.S. Trustee:

Office of the United States Trustee
U.S. Federal Office Building
201 Varick Street, Suite 1006
New York, New York  10014
Attention:     Paul Schwartzberg
                     Benjamin Higgins
Telephone:    (212) 510-0500
Facsimile:     (212) 668-2256

15.11   Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  Before the Effective Date, none of the filing of the Plan, any statement or provision contained herein or the taking of any action by the Debtors related to the Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors of any kind, including as to the holders of Claims or Interests or as to any treatment or classification of any contract or lease.

15.12   No Stay of Confirmation Order

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rule 3020(e), 6004(h), or 7062.

15.13   Waiver or Estoppel

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, be Allowed in a certain priority, be secured, or not be subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement or papers filed with the Bankruptcy Court prior to the Confirmation Date.

15.14   Post-Effective Date Service

After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities that have filed renewed requests for service.

74

4820-5709-6917 v.6

New York, New York
January 8, 2021

Respectfully Submitted,


**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich
Brian D. Glueckstein
Alexa Kranzley
Benjamin S. Beller
125 Broad Street
New York, NY 10004
Telephone:    (212) 558-4000
Facsimile:    (212) 558-3588
E-mail:        dietdericha@sullcrom.com
                gluecksteinb@sullcrom.com
                kranzleya@sullcrom.com
                bellerb@sullcrom.com

*Counsel to the Debtors*

4820-5709-6917 v.6