Andrew G. Dietderich
Brian D. Glueckstein
Alexa J. Kranzley
Benjamin S. Beller
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Counsel to the Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| GARRETT MOTION INC., *et al.*,[1] | : | Case No. 20-12212 (MEW) |
| | : | |
| Debtors. | : | Jointly Administered |

**NOTICE OF DEBTORS' MOTION FOR AN ORDER (I) AUTHORIZING
THE DEBTORS TO ENTER INTO AND PERFORM UNDER (A) THE
PLAN SUPPORT AGREEMENT AND (B) THE EQUITY BACKSTOP
COMMITMENT AGREEMENT AND (II) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** that on the date hereof, Garrett Motion Inc. its

affiliated debtors and debtors-in-possession (collectively, the "Debtors"), filed the *Debtors'*

*Motion for an Order (I) Authorizing the Debtors to Enter into and Perform Under (A) the Plan*

*Support Agreement and (B) the Equity Backstop Commitment Agreement and (II) Granting*

*Related Relief* (the "Motion").

---

[1]     The last four digits of Garrett Motion Inc.'s tax identification number are 3189.  Due to the large number of debtor entities in these Chapter 11 Cases, which are being jointly administered, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://www.kccllc.net/garrettmotion.  The Debtors' corporate headquarters is located at La Pièce 16, Rolle, Switzerland.

4844-6279-8040 v.2

**PLEASE TAKE FURTHER NOTICE** that the undersigned counsel will present the Motion to the Honorable Michael E. Wiles, United States Bankruptcy Court for the Southern District of New York (the "Court") at a hearing to be held on **February 16, 2021 at 11:00 a.m. (Eastern Time)** (the "Hearing").

**PLEASE TAKE FURTHER NOTICE** that any responses or objections (the "Objections") to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules for the United States Bankruptcy Court for the Southern District of New York and shall be filed with the Court in accordance with the customary practices of the Court and General Order M-399.  Objections must be filed and received no later than **February 9, 2021 at 11:00 p.m. (Eastern Time)** (the "Objection Deadline") and must be served on the following parties: (a) counsel to the Debtors, Sullivan & Cromwell LLP, 125 Broad Street, New York, New York 10004, Attn: Andrew G. Dietderich, Brian D. Glueckstein, Alexa J. Kranzley and Benjamin S. Beller; (b) the Office of the United States Trustee for the Southern District of New York, Attn: Benjamin Higgins, Esq.; (c) counsel to the Official Committee of Unsecured Creditors, White & Case LLP, 1221 Avenue of the Americas, New York, NY 10020, Attn: Brian Pfeiffer and John Ramirez; (d) proposed counsel to the Equity Committee, Kasowitz Benson Torres LLP, 1633 Broadway, New York, NY 10019, Attn: Andrew K. Glenn and David S. Rosner; (e) counsel to Citibank, N.A., as administrative agent under the DIP credit facility, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153, Attn: Ray C. Schrock, P.C. and Candace M. Arthur, Esq.; (f) counsel to Wilmington Savings Fund Society, FSB, as administrative agent under the Debtors' prepetition credit facility, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, NY 10038, Attn: Kristopher M. Hansen, Jonathan D. Canfield, Joanne Lau and Alexander A. Fraser; (g) counsel to Deutsche

-2-

4844-6279-8040 v.2

Trustee Company Limited, as indenture trustee under the Debtors' 5.125% senior notes due 2026, Norton Rose Fulbright, 1301 Avenue of the Americas, New York, NY 10019, Attn: Francisco Vasquez; (h) counsel to the ad hoc group of lenders under the Debtors' prepetition credit facility, Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166, Attn: Scott J. Greenberg, Steven A. Domanowski, Robert A. Klyman  and Matthew G. Bouslog; (i) counsel to the ad hoc group of bondholders, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036, Attn: Matthew M. Roose and Mark I. Bane; (j) counsel to Honeywell, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022, Attn: Nicole L. Greenblatt, P.C., Mark McKane, P.C. and Joseph M. Graham; (k) counsel to Oaktree and Centerbridge, as plan sponsors, Milbank LLP, 55 Hudson Yards, New York, NY 10003, Attn: Dennis F. Dunne, Andrew M. Leblanc and Andrew C. Harmeyer; (l) counsel to additional investors, Jones Day, 250 Vesey Street, New York, NY 10281, Attn: Anna Kordas and Jones Day, 555 S. Flower St., 50th Floor, Los Angeles, CA 90071, Attn: Bruce Bennett, Joshua M. Mester and James O. Johnston; and (m) to the extent not listed herein, those parties requesting notice pursuant to Bankruptcy Rule 2002.

**PLEASE TAKE FURTHER NOTICE** that only those objections that are timely filed, served and received will be considered at the Hearing.  Failure to file a timely objection may result in the entry of an order granting the relief requested in the Motion without further notice.  Failure to attend the Hearing in person or by counsel may result in relief being granted or denied upon default.  In the event that no objection to the Motion is timely filed and served, the relief requested in the Motion may be granted without a hearing before the Court.

-3-

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion may be

obtained from the Court's website, https://ecf.nysb.uscourts.gov, for a nominal fee, or obtained

free of charge by accessing the website of the Debtors' claims and noticing agent,

http://www.kccllc.net/garrettmotion.

Dated:  January 22, 2021              /s/ Andrew G. Dietderich
New York, New York               Andrew G. Dietderich
                                 Brian D. Glueckstein
                                 Alexa J. Kranzley
                                 Benjamin S. Beller
                                 SULLIVAN & CROMWELL LLP
                                 125 Broad Street
                                 New York, New York  10004
                                 Telephone:    (212) 558-4000
                                 Facsimile:    (212) 558-3588
                                 E-mail:       dietdericha@sullcrom.com
                                               gluecksteinb@sullcrom.com
                                               kranzleya@sullcrom.com
                                               bellerb@sullcrom.com

                                 *Counsel to the Debtors*

4844-6279-8040 v.2

Andrew G. Dietderich
Brian D. Glueckstein
Alexa J. Kranzley
Benjamin S. Beller
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Counsel to the Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ─────────────────────────── x | |
| In re | Chapter 11 |
| GARRETT MOTION INC., *et al.*,[1] | Case No. 20-12212 (MEW) |
| Debtors. | Jointly Administered |
| ─────────────────────────── x | |

**DEBTORS' MOTION FOR AN ORDER (I) AUTHORIZING
THE DEBTORS TO ENTER INTO AND PERFORM UNDER (A) THE
PLAN SUPPORT AGREEMENT AND (B) THE EQUITY BACKSTOP
COMMITMENT AGREEMENT AND (II) GRANTING RELATED RELIEF**

---

[1]    The last four digits of Garrett Motion Inc.'s tax identification number are 3189.  Due to the large number of debtor entities in these Chapter 11 Cases, which are being jointly administered, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://www.kccllc.net/garrettmotion.  The Debtors' corporate headquarters is located at La Pièce 16, Rolle, Switzerland.

4846-5437-1798 v.7

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................................2

BACKGROUND........................................................................................................................5

FACTS SPECIFIC TO THE RELIEF REQUESTED..........................................................................6

    I.   The Debtors' Competitive Process .........................................................................6

    II.  The Plan Support Agreement.................................................................................10

    III. The Equity Backstop Commitment Agreement......................................................12

    IV. Benefits of the Plan Support Agreement and the Equity Backstop Commitment
    Agreement ...........................................................................................................13

JURISDICTION AND STATUTORY PREDICATE .........................................................................15

RELIEF REQUESTED .............................................................................................................15

BASIS FOR RELIEF................................................................................................................15

    I.   Entry Into and Performance Under the Plan Support Agreement and the Equity Backstop
    Commitment Agreement Is a Sound Exercise of the Debtors' Business
    Judgment. ............................................................................................................15

        A.  Entry Into the Plan Support Agreement and the Equity Backstop Commitment
            Agreement is a Reasonable Exercise of the Debtors' Sound Business Judgment.......16

        B.  Payment of the Expense Reimbursement and Indemnification Claims is a Reasonable
            Exercise of the Debtors' Business Judgment.............................................17

        C.  The Expense Reimbursement and Indemnification Claims Are Entitled to
            Administrative Expense Status Under Sections 503(b) and 507(a)(2) of the
            Bankruptcy Code. ...........................................................................19

        D.  The Plan Support Agreement Complies with Section 1125 of the Bankruptcy Code. 19

WAIVER OF BANKRUPTCY RULES 6004(A) AND 6004(H) ........................................................20

NOTICE ................................................................................................................................21

NO PRIOR REQUEST .............................................................................................................22

CONCLUSION........................................................................................................................22

4846-5437-1798 v.7

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Ionosphere Clubs, Inc.*,
    98 B.R. 174 (Bankr. S.D.N.Y. 1989) ...................................................................................15

*In re Johns-Manville Corp.*,
    60 B.R. 612 (Bankr. S.D.N.Y. 1986) ...................................................................................16

*Official Comm. Of Unsecured Creditors of LTV Aerospace & Defense Co.* v. *LTV
    Corp. (In re Chateaugay Corp.)*,
    973 F.2d 141 (2d Cir. 1992) ...............................................................................................15

**Statutes**

11 U.S.C. § 105 ...........................................................................................................................1, 15

11 U.S.C. § 363 .......................................................................................................................1, 15, 16

11 U.S.C. § 503 .......................................................................................................................1, 15, 19

11 U.S.C. § 507 .......................................................................................................................1, 15, 19

11 U.S.C. § 1125 ......................................................................................................................... 19-21

28 U.S.C. § 157 ................................................................................................................................15

28 U.S.C. § 1334 ..............................................................................................................................15

28 U.S.C. § 1408 ..............................................................................................................................15

28 U.S.C. § 1409 ..............................................................................................................................15

Garrett Motion Inc. ("GMI") and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") hereby submit this motion (this "Motion") for entry of an order, substantially in the form attached hereto as Exhibit A (the "Order"), pursuant to sections 105(a), 363(b), 503(b) and 507(a)(2) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), rule 6004 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), (a) authorizing the Debtors to enter into and perform under (i) that certain Plan Support Agreement (as may be amended, modified or supplemented from time to time, the "Plan Support Agreement"), dated January 11, 2021, among the Debtors, Centerbridge Partners, L.P. ("Centerbridge"), Oaktree Capital Management, L.P. ("Oaktree"), Honeywell International Inc. ("Honeywell"), additional investors represented by Jones Day (the "Additional Investors"), and certain holders of the Debtors' 5.125% senior secured notes (the "Consenting Noteholders" and, together with Centerbridge, Oaktree, Honeywell, and the Additional Investors, the "COH Group"), a copy of which is attached hereto as Exhibit B, and (ii) that certain Equity Backstop Commitment Agreement (as may be amended, modified or supplemented from time to time, the "Equity Backstop Commitment Agreement"), dated January 22, 2021, among the Debtors, Centerbridge, Oaktree and certain Additional Investors (the "Equity Backstop Parties"), a copy of which is attached hereto as Exhibit C, and (b) granting related relief.[2] In support of the Motion, the Debtors submit the *Declaration of Bruce Mendelsohn in Support of Debtors' Motion for an Order (I) Authorizing the Debtors to Enter Into and Perform Under (A) the Plan Support Agreement and (B) the Equity Backstop Commitment Agreement and (II) Granting Related Relief* (the "Mendelsohn Declaration"), attached hereto as Exhibit D, and respectfully state as follows:

---

[2] Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Plan Support Agreement or the Backstop Commitment Agreement, as applicable.

4846-5437-1798 v.7

**Preliminary Statement**

1.      The Debtors entered chapter 11 with the stated goal of conducting a thorough and extensive competitive process to maximize value for all stakeholders.  Over the past four months, the Debtors have done just that, as they were able to procure three committed and financed Qualified Bids, each of which continued to improve during an auction that included numerous rounds of bidding and weeks of negotiations.  Through parallel negotiations, these efforts ultimately culminated in the COH Group submitting an improved plan proposal that, among other things, (a) increased the amount of the Rights Offering available *pro rata* to all GMI stockholders that desire to purchase Convertible Series A Preferred Stock from $100 million to $200 million, (b) offered a cash buy-out option of $6.25 per share for electing GMI stockholders, and (c) included a global settlement with Honeywell that will provide the Debtors with the flexibility to pay off their remaining obligations to Honeywell in the near-term.

2.      After a lengthy deliberative process, the boards of directors of GMI, ASASCO, and GMHI—including the applicable independent directors at ASASCO and GMHI—determined to proceed with the final written proposal submitted by the COH Group.  In a sound exercise of their business judgment, the boards of directors of GMI, ASASCO, and GMHI all unanimously determined that the COH Group's improved proposal represented the highest and best bid available to the Debtors.

3.      The benefits of the COH Group's proposal are numerous and include: (a) a committed investment of over $1 billion by members of the COH Group in Convertible Series A Preferred Stock, (b) the issuance of Series B Preferred Stock as part of a consensual global resolution of Honeywell's claims against the Debtors and their affiliates, under which Honeywell has agreed to convert its claims into equity and remain in the Debtors' capital structure premised on Centerbridge's and Oaktree's commitments to invest in, and sponsor, the

-2-

reorganized Debtors and the new governance structure contemplated by the Plan Support

Agreement, (c) the ability of GMI's stockholders to (i) retain their stock, (ii) retain their stock

and participate in a $200 million Rights Offering for additional shares of Convertible Series A

Preferred Stock, or (iii) receive a cash buy-out of $6.25 per share in exchange for cancellation of

their shares, and (d) payment in full of all general unsecured claims (other than Honeywell, who

has agreed to its treatment).  The boards of directors further recognized that the global settlement

with Honeywell benefits the estates by staying (and ultimately resolving) all litigation between

the Debtors and Honeywell and thereby minimizing litigation risk and the significant litigation

expenses that would have occurred in connection with both the Honeywell estimation trial and a

contested confirmation hearing.

4.      To ensure full commitment and execution of these critical transactions

pending consideration of their merits by this Court, the Debtors and the COH Group entered into

a Plan Support Agreement and Equity Backstop Commitment Agreement.  With the framework

and requisite support for the Debtors' successful reorganization now in place, the Debtors intend

to move forward promptly and, to that end, concurrently with the filing of this Motion will also

be filing an amended Plan and related Disclosure Statement.

5.      To ensure the Debtors are able to capture the benefits of the Plan Support

Agreement and Equity Backstop Commitment Agreement, the Debtors are requesting approval

of their entry into those agreements and the performance of the obligations contained therein.  As

explained further below, the Debtors' entry into these agreements is a sound exercise of their

business judgment and requires minimal undertakings by the Debtors at this stage, including the

following:

- The payment of the reasonable and documented fees and expenses of the
  COH Group, up to a cap of $25 million prior to the Debtors' emergence

from chapter 11, with all unpaid fees and expenses to be paid by the Reorganized Debtors upon the effectiveness of the Plan; and

- A "no-shop" provision reflecting the Debtors' commitment to not solicit, discuss, or negotiate an alternative transaction that is expressly *subject to* a fiduciary out in the event the Debtors receive an unsolicited alternative transaction they deem to be superior.

6. As a result, the relief sought in this Motion is both necessary and relatively narrow—necessary because it locks in the terms of the COH Group's proposal and permits the Debtors to pursue and obtain confirmation of their Plan, and narrow because it merely seeks authorization to pay certain of the fees incurred by the COH Group and restricts the Debtors from continuing to solicit an alternative transaction.

7. The payment of the COH Group's fees is a sound exercise of business judgment because the COH Group would not have otherwise agreed to enter into the Plan Support Agreement and Equity Backstop Commitment Agreement absent this provision. Payment of these fees is also appropriate in light of the extensive efforts by the COH Group to provide binding financial commitments, negotiate the terms of the transaction and the definitive documentation, and its continued participation in connection with the formulation and pursuit of confirmation of the Plan. Importantly, the COH Group is not seeking any commitment fees in connection with providing the valuable binding financing commitments contained in the Equity Backstop Commitment Agreement.

8. The "no-shop" provision is similarly appropriate and a sound exercise of the Debtors' business judgment. As noted above and discussed in further detail below, the Debtors ran a robust marketing and auction process that resulted in numerous Qualified Bids and the ultimate selection of the COH Group's proposal. The Debtors have more than adequately canvassed the market and there is no need at this point to continue to solicit bids for alternative transactions. In fact, doing so would be counterproductive, as it would consume time and estate

-4-

4846-5437-1798 v.7

resources while unlikely to produce a better result.  Nevertheless, the Debtors insisted that they retain a fiduciary out that would allow them to consider any unsolicited offers received if the Board of Directors determines in good faith and after consultation with their legal, financial and other advisors that the failure to respond would reasonably be expected to be inconsistent with the Board's fiduciary duties under applicable laws.  Thus, the Plan Support Agreement provides the Debtors with the best of both worlds—flexibility to consider alternative transactions that may be received and a framework and milestones that move the Debtors towards plan confirmation and an expeditious exit from bankruptcy.

9.      After months of tireless work, non-stop negotiations, and litigation across the capital structure, the Debtors have made a significant step forward in bringing these cases to a successful conclusion with their entry into the Plan Support Agreement and Equity Backstop Commitment Agreement.  Accordingly, the Debtors submit that the Court should authorize the Debtors' entry into and performance under those agreements.

**Background**

10.      GMI is a Delaware corporation established in 2018, with its headquarters located in Rolle, Switzerland.  The Debtors design, manufacture and sell highly engineered turbocharger, electric-boosting and connected vehicle technologies.

11.      On September 20, 2020 (the "Petition Date"), each of the Debtors filed with the Court a voluntary petition for relief under the Bankruptcy Code.  Each Debtor continues to operate its business and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Joint administration of the Debtors' cases (the "Chapter 11 Cases") was authorized by the Court by entry of an order on September 21, 2020 [D.I. 27].  On October 5, 2020, the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the

-5-

"Creditors' Committee") pursuant to section 1102 of the Bankruptcy Code [D.I. 161], which was reconstituted on November 19, 2020 [D.I. 423]. On November 19, 2020, the U.S. Trustee appointed an Official Committee of Equity Security Holders (the "Equity Committee") pursuant to section 1102 of the Bankruptcy Code [D.I. 404].

12. On January 8, 2021, the Debtors filed the *Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [D.I. 712] (as may be modified, amended or supplemented from time to time, the "Plan") and the *Disclosure Statement for Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [D.I. 713] (as may be modified, amended or supplemented from time to time, the "Disclosure Statement"). Simultaneously with the filing of this Motion, the Debtors filed the *Notice of Amended Joint Plan of Reorganization*, which attached as Exhibit A an amended Plan, and the *Notice of Revised Disclosure Statement*, which attached as Exhibit A an amended Disclosure Statement.

13. Additional factual background relating to the Debtors' businesses and the commencement of these Chapter 11 Cases is set forth in detail in the *Declaration of Sean Deason in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [D.I. 15].

**Facts Specific to the Relief Requested**

I. **The Debtors' Competitive Process**

14. Since the Petition Date, the Debtors have conducted a wide-ranging competitive process to select sponsors for a plan of reorganization that maximizes value for all stakeholders. This competitive process began on the very first day of these cases with the filing of the Debtors' motion to approve bid procedures (the "Bid Procedures") relating to the sale of the Debtors' assets. After two days of contested hearings, the Court entered an order [D.I. 282] (the "Bid Procedures Order") approving, among other things, the Bid Procedures and found that such approval would "promote a competitive and efficient sale process."

-6-

4846-5437-1798 v.7

15.     The Bid Procedures Order permitted the Debtors to consider all potential plans of reorganization, including sales of stock, sales of assets and stand-alone plans of reorganization.  Since entry of the Bid Procedures Order, the Debtors have engaged in extensive discussions and hard-fought negotiations with several potential transaction counterparties.  (*See* Mendelsohn Decl. ¶ 3.)  Pursuant to the Bid Procedures, the Debtors' leading alternatives were eventually narrowed and the Debtors identified three Qualified Bids (as defined in the Bid Procedures Order) to participate in an auction (the "Auction").

16.     On October 13, 2020, Centerbridge, Oaktree, and Honeywell entered into that certain Coordination Agreement (as amended, the "Coordination Agreement").  The Coordination Agreement contemplated a stand-alone reorganization of the Debtors (the "Initial COH Group Proposal") and included, among other things, (a) a settlement with Honeywell for cash and new preferred stock in the reorganized Debtors, (b) the reinstatement of GMI's common stock, (c) the issuance of new convertible preferred stock of reorganized GMI to Centerbridge and Oaktree to raise approximately $1,050 million in equity capital and (d) an up to $100 million rights offering of additional new convertible preferred stock [D.I. 233, Ex. B].  The Coordination Agreement was amended and restated on October 20, 2020 to include the Additional Investors and then again on November 2, 2020 to add the Consenting Noteholders as parties thereto.  The Debtors and their advisors engaged with the COH Group and sought improvements to the terms of the transaction offered through the Coordination Agreement.  (*See* Mendelsohn Decl. ¶ 4.)

17.     The Auction commenced on December 21, 2020, and continued for several rounds.  Each of the three Qualified Bids had financing commitments and each of the bidders committed to legally-binding documentation at the time of the commencement of the Auction.  (*Id.* ¶ 3.)  During the Auction, the Debtors consulted with a large group of Consulting

-7-

Professionals (as defined in the Bid Procedures) regarding the Qualified Bids and the COH Group Proposal. (*Id.* ¶ 8.) The Consulting Professionals included legal and financial advisors to the Creditors' Committee, the Equity Committee, the ad hoc group of lenders under the Debtors' prepetition credit facility, the administrative agent under the Debtors' prepetition credit facility, the indenture trustee under the Debtors' 5.125% senior notes due 2026, and the administrative agent under the DIP credit facility. The Debtors had eight formal conference calls relating to the Auction, to which all of the Consulting Professionals were invited to join, and countless individual discussions with Consulting Professionals, who were invited to—and did—provide feedback as deal terms were negotiated and the Qualified Bids reviewed by the Debtors. (*Id.*)

18.     On December 22, 2020, immediately following the commencement of the Auction, the Coordination Agreement was further amended and restated to provide for, among other things, the extension of certain deadlines relating to the filing and consummation of a plan of reorganization consistent with the terms of the Coordination Agreement and certain economic changes to the terms of the Initial COH Group Proposal. The COH Group did not participate in the first round of the Auction, but the Debtors continued discussions with the COH Group and announced to the COH Group and Auction participants that they would consider proposals from the COH Group concurrently with their consideration of other bids. (*Id.* ¶ 5.) On January 4, 2021, the Debtors held the second round of the Auction, where representatives of the COH Group attended and continued discussions with the Debtors, but did not make a further bid on the record. (*Id.*)

19.     After further discussions with the bidders at the Auction and the Consulting Professionals, the Debtors determined to solicit final and best bids from all participants in the competitive process by January 5, 2021. (*Id.* ¶ 6.) At the conclusion of the Auction, after consideration of all written bids received, the Debtors determined that the final

-8-

4846-5437-1798 v.7

and improved written bid submitted by the Stalking Horse Purchaser was the highest and best

offer, however, the Debtors believed that, if the most recent verbal offer from the COH Group

could be memorialized, then the COH Group proposal could prevail.  (*Id.*)  Accordingly, on

January 8, 2021, the Debtors filed the *Notice of Successful Bidder* [D.I. 711] (the "Auction

Notice") announcing that bid's selection.  The Auction Notice also disclosed that the Debtors

were actively considering the most recent verbal proposal made by the COH Group.

20.    The final written proposal from the COH Group (the "Final COH Group

Proposal") improved the terms of the Initial COH Group Proposal by, among other things,

(a) increasing the amount of the rights offering from $100 million to $200 million (the "Rights

Offering"), (b) offering a cash buy-out option to electing GMI stockholders of $6.25 per share,

and (c) decreasing the total nominal cash amount owed by the Debtors to Honeywell (by

increasing the upfront cash payment, thereby eliminating payments that would have otherwise

been due to Honeywell in the later years of the amortization schedule and decreasing the total

nominal cash payments owed over time) and providing beneficial flexibility to the Debtors to

pay-off their remaining obligations to Honeywell in the near-term.

21.    Following the Debtors' further negotiations with the COH Group, the

GMI Board of Directors deliberated at length and unanimously determined that the Final COH

Group Proposal was higher and better than the final bid from the Stalking Horse Purchaser, and

approved proceeding with the transaction and the beneficial settlement and compromises

embodied therein.  (*See* Mendelsohn Decl. ¶ 7.)  The Final COH Group Proposal was also

independently considered and approved by the Boards of Directors of ASASCO and GMHI,

including their independent directors.  (*Id.*)

22.    To ensure the Debtors receive the beneficial terms of the Final COH

Group Proposal, the Debtors and the COH Group agreed to document the terms of the agreement

-9-

and commitments of the parties to each other in a plan support agreement. Accordingly, on

January 11, 2021, the Debtors entered into the Plan Support Agreement with the COH Group to

effectuate the transactions contemplated by the Final COH Group Bid and filed a notice

announcing such decision [D.I. 717].

## II.    The Plan Support Agreement

23.    The Plan Support Agreement memorializes the Final COH Group

Proposal and contemplates restructuring transactions that provide for, among other things:[3]

- Payment in full of all creditors, including payment in full of all customer, supplier, trade, vendor, employee, pension, regulatory, environmental and other liabilities of the Debtors and their subsidiaries (with the exception of Honeywell, who has agreed to its treatment as part of the global settlement and transactions contemplated by the Plan Support Agreement);

- Holders of GMI's common stock to exchange their stock for new GMI common stock and participate in the Rights Offering or, at each stockholder's election (unless such stockholder is a party to the Plan Support Agreement), receive a cash payment in the amount of $6.25 per share in exchange for cancellation of their shares;

- A $200 million Rights Offering by which holders of existing common stock that do not elect the cash-out option may purchase their *pro rata* share of new Convertible Series A Preferred Stock;

- The full backstop of the Rights Offering by certain members of the COH Group, without any backstop commitment fees;

- Commitments by certain members of the COH Group to purchase Convertible Series A Preferred Stock for $1,050.8 million in cash on improved terms, including (a) a dividend that, if paid in kind, would be convertible into common stock at a market-based rate rather than at $3.50 per share, (b) a right for GMI to convert the Convertible Series A Preferred Stock into common stock after six years, and (c) an automatic conversion of the Convertible Series A Preferred Stock into common stock as soon as the amount owed to Honeywell is reduced below $125 million and other financial metrics are met;

---

[3]    The summary of the Plan Support Agreement in this Motion is qualified in its entirety by reference to the provisions of the Plan Support Agreement. To the extent there is any discrepancy between the summary contained in the Motion and the terms set forth in the Plan Support Agreement, the terms of the Plan Support Agreement shall govern.

-10-

4846-5437-1798 v.7

- Committed debt financing from large and sophisticated financial institutions that will, among other things, fund distributions under the Plan and provide working capital to the reorganized Debtors; and

- A final global settlement of substantially all claims of Honeywell and its affiliates (including spin-off related claims, but excluding claims arising under ordinary course business dealings) against the Debtors and their affiliates, in exchange for an upfront payment of $375 million in cash and new Series B Preferred Stock issued by reorganized GMI to Honeywell on the Effective Date, pursuant to which reorganized GMI will make total nominal cash payments of $834.8 million over nine years, subject to various put and call rights set forth in the new Series B Preferred Stock, and Honeywell's right to elect a board member to the New Board of reorganized GMI.

(PSA, Ex. A.)

24.     The Plan Support Agreement also provides that the Debtors will reimburse the reasonable and documented fees and expenses of the COH Group (the "PSA Expense Reimbursement"), with up to $25 million of such fees and expenses paid prior to the Debtors' emergence from chapter 11 and all remaining unpaid fees and expenses to be paid by the Reorganized Debtors upon effectiveness of the Plan.  (*See* PSA §11.01.)

25.     In the Plan Support Agreement, the Debtors agreed to a "no-shop" provision whereby they have committed to cease solicitation, discussions, or negotiations of any Alternative Transaction.  (PSA § 5.04(a).)  Notwithstanding that commitment, the Plan Support Agreement authorizes the Debtors to consider and respond to an unsolicited Alternative Transaction Proposal if the Board of Directors determines in good faith and after consultation with their legal, financial and other advisors that the failure to respond to such proposal would reasonably be expected to be inconsistent with the Board's fiduciary duties under applicable laws.  (*Id.* § 5.04(b).)  In addition, to facilitate the Equity Committee's discussions regarding financing for a stand-alone plan of reorganization, the Debtors may continue to provide the Equity Committee access to a virtual data room that the Equity Committee may use to share

-11-

available diligence information with third parties that execute nondisclosure agreements. (*Id.* § 5.04(d).)

26. The Plan Support Agreement requires that the Debtors to obtain Court approval of their entry into both the Plan Support Agreement and the Equity Backstop Commitment Agreement (described below) by February 19, 2021. (*Id.* § 4(b)(ii).)

## III. The Equity Backstop Commitment Agreement

27. The Debtors negotiated the Equity Backstop Commitment Agreement with the Equity Backstop Parties to ensure that all $200 million of the Convertible Series A Preferred Stock to be offered pursuant to the Rights Offering is purchased, thereby ensuring that the Debtors have sufficient liquidity to emerge from chapter 11. A summary of the principal terms of the Equity Backstop Commitment Agreement is as follows:[4]

- **Rights Offering:** As described above, GMI will conduct a Rights Offering, pursuant to which the holders of GMI common stock who do not elect the cash buy-out option will have the right to purchase their *pro rata* share (based on their respective holding of GMI common stock) of $200 million of Convertible Series A Preferred Stock.

- **Rights Offering Backstop Commitment:** Each Equity Backstop Party agrees to purchase, on a *pro rata* basis (in accordance with its Equity Backstop Percentage), Unsubscribed Shares on the Closing Date for the applicable aggregate Per Share Purchase Price and subject to the terms and conditions of the Equity Backstop Commitment Agreement (the "Rights Offering Backstop Commitment").

- **Expense Reimbursement:** In consideration for the Rights Offering Backstop Commitment, the Equity Backstop Parties are entitled to reimbursement of (i) all reasonable and documented out-of-pocket fees and expenses (including travel costs and expenses) of all attorneys, accountants, other professionals, advisors, and consultants incurred on behalf of the Equity Backstop Parties or their Affiliates in connection with the Chapter 11 Cases and/or the Restructuring Transactions (whether incurred before or after the Petition Date) and (ii) any applicable filing or other similar fees required to be paid in all applicable jurisdictions, in an aggregate amount that, together with and inclusive of the PSA Expense Reimbursement, shall

---

[4] The summary of the Equity Backstop Commitment Agreement in this Motion is qualified in its entirety by reference to the provisions of the Equity Backstop Commitment Agreement. To the extent there is any discrepancy between the summary contained in the Motion and the terms set forth in the Equity Backstop Commitment Agreement, the terms of the Equity Backstop Commitment Agreement shall govern.

4846-5437-1798 v.7

not exceed $25 million prior to the Debtors' emergence from chapter 11 (the "EBA Expense Reimbursement" and, together with the PSA Expense Reimbursement, the "Expense Reimbursement").

- **Indemnification Provisions:** GMI agrees to indemnify and hold harmless each Equity Backstop Party and its Affiliates (each, an "Indemnified Person") from and against any and all losses, claims, damages, liabilities and costs and expenses (other than Taxes of the Equity Backstop Parties except to the extent otherwise provided for in the Equity Backstop Commitment Agreement) (collectively, "Losses") (but not including any fees and expenses that would be reimbursable by the Debtors as an EBA Expense Reimbursement if the $25 million cap were disregarded) (the "Indemnification Claims").

- **Termination Events:** The Equity Backstop Parties' respective commitments under the Backstop Agreement may be terminated in certain events, including, without limitation, (a) by mutual agreement of the parties, (b) by GMI following an uncured breach of a representation, warranty or covenant in the Equity Backstop Commitment Agreement by an Equity Backstop Party, or (c) by the Requisite Consenting Parties following an uncured breach of a representation, warranty or covenant in the Equity Backstop Commitment Agreement by the Debtors. The Equity Backstop Commitment Agreement will automatically terminate if the Plan Support Agreement terminates with respect to the rights and obligations of the Debtors prior to the occurrence of the Effective Date in accordance with its terms.

(BCA §§ 2.2, 3.1, 8.1, 9.)

## IV.   Benefits of the Plan Support Agreement and the Equity Backstop Commitment Agreement

28.     By this Motion, the Debtors are seeking approval of their entry into the Plan Support Agreement and the Equity Backstop Commitment Agreement and performance of their obligations thereunder. The transactions contemplated by the Plan Support Agreement and the Equity Backstop Commitment Agreement offer significant benefits to the Debtors' estates. (*See* Mendelsohn Decl. ¶ 9.) The Plan Support Agreement provides for, among other things: (a) the committed investment of over $1 billion in Convertible Series A Preferred Stock by members of the COH Group, (b) a global resolution of Honeywell's claims against the Debtors and their affiliates, (c) the choice for GMI's stockholders to (i) retain their stock, (ii) retain their stock and participate in a $200 million Rights Offering or (iii) receive a cash buy-out of $6.25 per share in exchange for cancellation of their shares, and (d) payment in full of all general

-13-

unsecured claims (other than Honeywell).  (PSA, Ex. A.)  The Equity Backstop Commitment

Agreement, in turn, provides for the Equity Backstop Parties to guarantee that all $200 million of

the Convertible Series A Preferred Stock to be offered through the Rights Offering will be sold,

thereby ensuring the Debtors additional and sufficient liquidity for their exit from chapter 11.

29.     The Plan Support Agreement and Equity Backstop Commitment

Agreement are the culmination of a lengthy and exhaustive competitive process conducted

pursuant to the Court's Bid Procedures Order over a period of more than three months.  The

Agreements are the product of vigorous and arms'-length negotiations between the Debtors and

the COH Group.  (*See* Mendelsohn Decl. ¶ 9.)  Simply put, the Agreements provide the

framework and support for the Debtors' Plan, the confirmation and consummation of which will

allow the Debtors to successfully emerge from bankruptcy and bring a successful and rapid

conclusion to these Chapter 11 Cases.

30.     In view of the importance of the Plan Support Agreement and the Equity

Backstop Commitment Agreement to the Debtors' restructuring, Court approval of the Debtors'

entry into these agreements and performance of their obligations thereunder is essential.  The

Debtors believe that the transactions contemplated by the Plan Support Agreement and the

Equity Backstop Commitment Agreement represent the highest and best offer for the Debtors'

businesses and will maximize value for all of the Debtors' stakeholders, and that their entry into

such agreements are a sound exercise of their business judgment.  (*Id.* ¶ 10.)  This view is

informed and confirmed by the thorough and extensive "market test" resulting from the Bid

Procedures and the Auction, which produced an offer that is the highest and best available.

31.     Accordingly, the Debtors respectfully request approval of their entry into

the Plan Support Agreement and the Equity Backstop Commitment Agreement and performance

of their obligations as set forth therein.

4846-5437-1798 v.7

**Jurisdiction and Statutory Predicate**

32.     The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  The statutory predicates for the relief requested herein are sections 105(a), 363(b), 503(b) and 507(a)(2) of the Bankruptcy Code and Bankruptcy Rule 6004.

**Relief Requested**

33.     By this Motion, the Debtors request entry of the Order, substantially in the form attached hereto as Exhibit A, (a) authorizing the Debtors to enter into and perform under (i) the Plan Support Agreement and (ii) the Equity Backstop Commitment Agreement and (b) granting related relief.

**Basis for Relief**

I.     **Entry Into and Performance Under the Plan Support Agreement and the Equity Backstop Commitment Agreement Is a Sound Exercise of the Debtors' Business Judgment.**

34.     Section 363(b) of the Bankruptcy Code empowers the Court to allow the debtor, in the exercise of its sound business judgment and after notice and a hearing, to "use, sell, or lease, other than in the ordinary course of business, property of the estate."  *See* 11 U.S.C. § 363(b)(1); *see also Official Comm. Of Unsecured Creditors of LTV Aerospace & Defense Co. v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143, 145 (2d Cir. 1992) (holding that a court may approve an application under section 363(b) upon a showing of a good business reason for the disposition).  For a court to approve the use, sale or lease of estate property under section 363(b) of the Bankruptcy Code, the debtor must "articulate some business justification, other than mere appeasement of major creditors . . . ."  *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989).  Moreover, "[w]here the debtor articulates a reasonable basis for its

-15-

business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted).

A.    Entry Into the Plan Support Agreement and the Equity Backstop Commitment Agreement is a Reasonable Exercise of the Debtors' Sound Business Judgment.

35.    Entry into the Plan Support Agreement and the Equity Backstop Commitment Agreement, and the Debtors' performance of their obligations thereunder, represent a sound exercise of the Debtors' business judgment and will significantly benefit the Debtors' estates by locking-in the terms of the Final COH Proposal, and the commitment of the COH Group to support those terms, pending the Court's consideration of the Debtors' Plan. (*See* Mendelsohn Decl. ¶ 10.)  The Plan Support Agreement and the Equity Backstop Commitment Agreement are the product of extensive arms' length, good faith negotiations among the Debtors and many of their key stakeholders. (*Id.*)

36.    The Debtors' agreement to the Plan Support Agreement and the Equity Backstop Agreement was undertaken only after an exhaustive competitive process that culminated with a public auction that stretched over nearly a month, at which the Debtors considered in parallel two other proposed transactions. (*Id.*)  Ultimately, after careful consideration by the Debtors' management and lengthy deliberations by the GMI Board of Directors, in consultation with their advisors, the GMI, ASASCO and GMHI Boards of Directors each determined that the restructuring transactions contemplated by the Plan Support Agreement represent the highest and best available transaction to maximize recoveries for all stakeholders. (*Id.*)  Accordingly, the Debtors exercised their business judgment and entered into the Plan Support Agreement and, shortly thereafter, the Equity Backstop Commitment Agreement, subject to this Court's approval.

-16-

37.     The Plan Support Agreement and the Equity Backstop Commitment Agreement are essential to facilitate the Debtors' pursuit of confirmation and consummation of the Plan and the Debtors' emergence from chapter 11.  (*Id*. ¶ 11.)  Indeed, the success of the Plan hinges on the consideration provided by the COH Group as signatories to the Plan Support Agreement and the Equity Backstop Commitment Agreement.  Ensuring the COH Group's commitments set forth in the Plan Support Agreement and Equity Backstop Commitment Agreement is necessary and critical to permit the Debtors to pursue and obtain confirmation of their Plan.  The benefits of the Plan—which the Court will consider on the merits at a future confirmation hearing—are immense.  But to permit the Debtors and their stakeholders an opportunity to realize the full benefits of the COH Group Final Proposal, the Debtors need authorization to enter into these agreements.

B.      Payment of the Expense Reimbursement and Indemnification Claims is a Reasonable Exercise of the Debtors' Business Judgment.

38.     For the reasons set forth above, the Debtors submit that entry into the Plan Support Agreement and the Equity Backstop Commitment Agreement is an exercise of their sound business judgment.  That business judgment includes the Debtors' agreement to the Expense Reimbursement and Indemnification Claims as part of the Plan Support Agreement and the Equity Backstop Commitment Agreement.  Without the ability to pay the Expense Reimbursement and Indemnification Claims, the Debtors would be unable to secure the commitments of the parties to the Plan Support Agreement and the Equity Backstop Commitment Agreement.  (*Id*. ¶ 12.)  At this juncture, such a result would jeopardize the Debtors' ability to confirm the Plan and emerge from chapter 11 in a timely manner.  (*Id*.)

39.     Payment of the Expense Reimbursement up to an aggregate amount of $25 million prior to emergence and any Indemnification Claims is appropriate because of the extensive efforts undertaken by the COH Group to provide binding financing commitments and

-17-

negotiate the Plan Support Agreement and the Equity Backstop Commitment Agreement, as well as their continued participation in connection with the formulation and pursuit of confirmation of the Plan. (*Id*. ¶ 13.) Moreover, the Expense Reimbursement and Indemnification Claims are reasonable in light of the benefits that the Debtors and their estates will receive from confirmation and consummation of the Plan. (*Id*.) Notably, the COH Group is not seeking any commitment fee in connection with the binding financing commitments set forth in the Equity Backstop Commitment Agreement.

40. Courts in this district and elsewhere have recognized the benefits of agreements like the Plan Support Agreement and the Equity Backstop Commitment Agreement and, where satisfied that they are within the debtors' sound business judgment, have authorized the entry into and the payment of fees and expenses in connection with restructuring support agreements and backstop commitment agreements. *See, e.g.*, *In re Stearns Holdings, LLC*, Case No. 19-12226 (SCC) (Bankr. S.D.N.Y. Sept. 26, 2019) [D.I. 350] (authorizing entry into a postpetition restructuring support agreement and payment by the debtors of all reasonable and documented fees and expenses incurred by certain restructuring support parties); *In re Aegean Marine Petroleum Network Inc.*, Case No. 18-13374 (MEW) (Bankr. S.D.N.Y. Jan. 15, 2019) [D.I. 291] (same); *In re AOG Entm't, Inc.*, Case No. 16-11090 (SMB) (Bankr. S.D.N.Y. June 29, 2016) [D.I. 184] (same); *In re Windstream Holdings, Inc.*, Case No. 19-22312 (RDD) (S.D.N.Y. May 12, 2020) [D.I. 1806] (approving the Debtors' reimbursement of fees and expenses incurred by backstop parties in connection with Debtors' rights offering); *In re SunEdison, Inc.*, Case No. 16-10992 (SMB) (S.D.N.Y. June 6, 2017) [D.I. 3283] (same); *In re Roust Corp.*, Case No. 16-23786 (Bankr. S.D.N.Y. Jan. 10, 2017) [D.I. 40] (same).

C.  The Expense Reimbursement and Indemnification Claims Are Entitled to Administrative Expense Status Under Sections 503(b) and 507(a)(2) of the Bankruptcy Code.

41.  Independently, the Expense Reimbursement and the Indemnification Claims constitute "actual and necessary costs and expenses of preserving the estate" entitled to administrative expense status and payment under sections 503(b) and 507(a)(2) of the Bankruptcy Code. 11 U.S.C. §§ 503(b)(1)(A) and 507(a)(2). The Debtors' agreement to pay the Expense Reimbursement and the Indemnification Claims was necessary to induce the COH Group to enter into the Plan Support Agreement and the Equity Backstop Parties to commit to backstop the Rights Offering. (*See* Mendelsohn Decl. ¶ 14.) Absent the Debtors' agreement to pay such amounts, the COH Group would not have been willing to execute the Plan Support Agreement and the Equity Backstop Parties would not have been willing to provide the Rights Offering Backstop Commitment, threatening the Debtors' ability to consummate the transactions contemplated by the Plan Support Agreement and pursue confirmation of the Plan for the benefit of all stakeholders. (*Id.*) Such costs and expenses should therefore be afforded administrative expense priority.

42.  Courts in this district have often granted relief similar to the relief requested herein. *See, e.g.*, *In re SunEdison, Inc.*, Case No. 16-10992 (Bankr. S.D.N.Y. June 6, 2017) (approving administrative expense priority to backstop fees and expenses); *In re Roust Corp.*, Case No. 16-23786 (Bankr. S.D.N.Y. Jan. 10, 2017) (same); *In re In re K-V Discovery Solutions Inc.*, Case No. 12-13346 (Bankr. S.D.N.Y. June 7, 2013) (same). The facts and circumstances here warrant similar treatment.

D.  The Plan Support Agreement Complies with Section 1125 of the Bankruptcy Code.

43.  Section 1125(b) of the Bankruptcy Code provides that "[a]n acceptance or rejection of a plan may not be solicited after the commencement of the case under this title . . .

-19-

unless, at the time of or before such solicitation, there is transmitted . . . a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information." 11 U.S.C. § 1125(b).

44.    Postpetition agreements to support a plan "have generally been approved by courts in this district and other districts" notwithstanding section 1125. *In re Residential Capital, LLC*, No. 12-12020, 2013 WL 3286198, at *20 (Bankr. S.D.N.Y. June 27, 2013) (approving a postpetition plan support agreement); *see, e.g.*, *In re Stearns Holdings, LLC*, Case No. 19-12226 (SCC) (Bankr. S.D.N.Y. Sept. 26, 2019) [D.I. 350]; *In re BCBG Max Azria Global Holdings, LLC*, Case No. 17-10466 (SCC) (Bankr. S.D.N.Y. June 23, 2017) [D.I. 460]; *In re AOG Entm't, Inc.*, Case No. 16-11090 (SMB) (Bankr. S.D.N.Y. June 29, 2016) [D.I. 184]; *In re AMR Corp.*, Case No. 11-15463 (SHL) (Bankr. S.D.N.Y. June 4, 2013) [D.I. 8577]; *In re Eastgate Tower Hotel Assocs., L.P.*, Case No. 12-13539 (SCC) (Bankr. S.D.N.Y. Aug. 21, 2012) [D.I. 19].

45.    Here, the Plan Support Agreement does not implicate section 1125 of the Bankruptcy Code because, among other things, it contains numerous reasonable termination events pursuant to which the COH Group could terminate the Plan Support Agreement.  Thus, the Plan Support Agreement does not constitute a "vote" for solicitation purposes.  (PSA § 9.)

46.    Accordingly, the Debtors submit that the Court should authorize the Debtors' entry into and performance under the Plan Support Agreement and Equity Backstop Commitment Agreement.

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

47.    Given the nature of the relief requested herein, the Debtors respectfully request a waiver of (i) the notice requirements under Bankruptcy Rule 6004(a) and (ii) the 14-day stay under Bankruptcy Rule 6004(h).  Pursuant to Bankruptcy Rule 6004(h), "[a]n order

-20-

authorizing the use, sale, or lease of property other than cash collateral is stayed until expiration of 14 days after entry of the order, unless the court orders otherwise." For the reasons described above, the relief requested is essential to prevent potentially irreparable damage to the Debtors' operations, value and ability to reorganize.

**Notice**

48.    No trustee or examiner has been appointed in these chapter 11 cases. Notice of this Motion has been provided to: (a) the Office of the United States Trustee for the Southern District of New York (Attn: Benjamin Higgins, Esq.); (b) counsel to the Official Committee of Unsecured Creditors, White & Case LLP, 1221 Avenue of the Americas, New York, NY 10020, Attn: Brian Pfeiffer and John Ramirez; (c) proposed counsel to the Equity Committee, Kasowitz Benson Torres LLP, 1633 Broadway, New York, NY 10019, Attn: Andrew K. Glenn and David S. Rosner; (d) counsel to Citibank, N.A., as administrative agent under the DIP credit facility, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153, Attn: Ray C. Schrock, P.C. and Candace M. Arthur, Esq.; (e) counsel to Wilmington Savings Fund Society, FSB, as administrative agent under the Debtors' prepetition credit facility, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, NY 10038, Attn: Kristopher M. Hansen, Jonathan D. Canfield, Joanne Lau and Alexander A. Fraser; (f) counsel to Deutsche Trustee Company Limited, as indenture trustee under the Debtors' 5.125% senior notes due 2026, Norton Rose Fulbright, 1301 Avenue of the Americas, New York, NY 10019, Attn: Francisco Vasquez; (g) counsel to the ad hoc group of lenders under the Debtors' prepetition credit facility, Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166, Attn: Scott J. Greenberg, Steven A. Domanowski, Robert A. Klyman  and Matthew G. Bouslog; (h) counsel to the ad hoc group of bondholders, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036, Attn: Matthew M. Roose and Mark I. Bane; (i) counsel to

-21-

4846-5437-1798 v.7

Honeywell, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022, Attn: Nicole

L. Greenblatt, P.C., Mark McKane, P.C. and Joseph M. Graham; (j) counsel to Oaktree and

Centerbridge, as Plan Sponsors, Milbank LLP, 55 Hudson Yards, New York, NY 10001, Attn:

Dennis F. Dunne, Andrew M. Leblanc, Matthew L. Brod and Andrew C. Harmeyer; (k) counsel

to Additional Investors, Jones Day, 250 Vesey Street, New York, NY 10281, Attn: Anna Kordas

and Jones Day, 555 S. Flower St., 50th Floor, Los Angeles, CA 90071, Attn: Bruce Bennett,

Joshua M. Mester and James O. Johnston; and (l) to the extent not listed herein, those parties

requesting notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the

nature of the relief requested, no other or further notice need be provided.

### No Prior Request

49.    No prior motion for the relief requested herein has been made to this or

any other Court.

### Conclusion

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request

that the Court (a) enter the Order, substantially in the form attached hereto as Exhibit A and

(b) grant such other and further relief as is just and proper.

-22-

4846-5437-1798 v.7

Dated:  January 22, 2021          */s/ Andrew G. Dietderich*
New York, New York                Andrew G. Dietderich
                                  Brian D. Glueckstein
                                  Alexa J. Kranzley
                                  Benjamin S. Beller
                                  SULLIVAN & CROMWELL LLP
                                  125 Broad Street
                                  New York, New York  10004
                                  Telephone:    (212) 558-4000
                                  Facsimile:    (212) 558-3588
                                  E-mail:       dietdericha@sullcrom.com
                                                gluecksteinb@sullcrom.com
                                                kranzleya@sullcrom.com
                                                bellerb@sullcrom.com

                                  *Counsel to the Debtors*

## EXHIBIT A

**Proposed Order**

4846-5437-1798 v.7

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re | Chapter 11 |
| GARRETT MOTION INC., *et al.*,[1] | Case No. 20-12212 (MEW) |
| Debtors. | Jointly Administered |

### ORDER (I) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER (A) THE PLAN SUPPORT AGREEMENT AND (B) THE EQUITY BACKSTOP COMMITMENT AGREEMENT AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of Garrett Motion Inc. and its affiliated debtors

and debtors-in-possession (collectively, the "Debtors"), for entry of an order (this "Order")

(a) authorizing the Debtors to enter into and perform under (i) the Plan Support Agreement and

(ii) the Equity Backstop Commitment Agreement and (b) granting related relief; and this Court

having jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and venue of

these Chapter 11 Cases and the Motion in this district being proper pursuant to 28 U.S.C.

§§ 1408 and 1409; and this matter being a core proceeding pursuant to 28 U.S.C. § 157(b); and

this Court having found that proper and adequate notice of the Motion and the relief requested

therein has been provided in accordance with the Bankruptcy Rules and the Local Bankruptcy

Rules for the Southern District of New York, and that, except as otherwise ordered herein, no

other or further notice is necessary; and any objections (if any) to the Motion having been

---

[1]   The last four digits of Garrett Motion Inc.'s tax identification number are 3189.  Due to the large number of debtor entities in these Chapter 11 Cases, which are being jointly administered, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://www.kccllc.net/garrettmotion. The Debtors' corporate headquarters is located at La Pièce 16, Rolle, Switzerland.

[2]   Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Motion.

4846-5437-1798 v.7

withdrawn, resolved or overruled on the merits; and a hearing having been held to consider the relief requested in the Motion and upon the record of the hearing and all of the proceedings had before this Court; and this Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates, their creditors and all other parties-in-interest; and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor;

IT IS HEREBY ORDERED THAT:

1.       The Motion is GRANTED as set forth herein.

2.       The Debtors are authorized to enter into the Plan Support Agreement and the Equity Backstop Support Agreement and perform thereunder in accordance with their terms.

3.       The payment of the Expense Reimbursement, in an amount not to exceed $25 million prior to the Effective Date, and the Indemnification Claims, is approved in accordance with the terms of the Plan Support Agreement and the Equity Backstop Commitment Agreement, and no recipient of a payment on account of the Expense Reimbursement or the Indemnification Claims shall be required to file any interim or final applications with this Court as a condition precedent to the Debtors' obligations to make such payments.

4.       The Expense Reimbursement and the Indemnification Claims are actual and necessary costs and expenses of preserving the Debtors' estates and shall be treated as allowed administrative expenses of the Debtors pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code, and none of the amounts shall be discharged, modified or otherwise affected by any chapter 11 plan of the Debtors, or otherwise subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether contractual, equitable or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, or any other challenges under any applicable law or regulation by any person or entity, subject to and in

2

accordance with the terms of the Plan Support Agreement and the Equity Backstop Commitment Agreement.

5.      The Plan Support Agreement is approved in its entirety and shall be binding and enforceable on the parties thereto in accordance with its terms.

6.      The Equity Backstop Commitment Agreement is approved in its entirety and shall be binding and enforceable on the parties thereto in accordance with its terms.

7.      The Debtors are authorized, but not directed, to enter into amendments to the Plan Support Agreement and the Equity Backstop Commitment Agreement from time to time as necessary, subject to the terms and conditions set forth in the Plan Support Agreement and the Equity Backstop Commitment Agreement, as applicable, and without further order of the Court.

8.      The entry into the Plan Support Agreement shall not constitute a solicitation of votes in violation of section 1125(b) of the Bankruptcy Code.

9.      The failure to describe specifically or include any particular provision of the Plan Support Agreement or the Equity Backstop Commitment Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Debtors' entry into and performance under the Plan Support Agreement and the Equity Backstop Commitment Agreement are approved in their entirety.

10.     Notwithstanding anything to the contrary in the Plan Support Agreement, the obligations of the Debtors pursuant to section 5.03(a) of the Plan Support Agreement shall be subject to the provisions of section 5.04 of the Plan Support Agreement.

11.     To the extent applicable, the automatic stay provisions of section 362 of the Bankruptcy Code are hereby vacated and modified to effectuate all terms and provisions of the Plan Support Agreement, the Equity Backstop Commitment Agreement, and this Order,

3

including to permit the delivery of any notices contemplated by the Plan Support Agreement or

the Equity Backstop Commitment Agreement, or to exercise any rights set forth under such

agreements with respect to termination, in each case, without further order of the Court.

12.     Notice of the Motion is adequate under Bankruptcy Rule 6004(a).

13.     This Order is immediately effective and enforceable, notwithstanding the

possible applicability of Bankruptcy Rule 6004(h) or otherwise.

14.     This Court shall retain jurisdiction with respect to any matters, claims,

rights or disputes arising from or related to the Motion or the implementation of this Order.


Dated: _____
        New York, New York

_____
The Honorable Michael E. Wiles
United States Bankruptcy Judge

4

4846-5437-1798 v.7

## EXHIBIT B

**Plan Support Agreement**

4846-5437-1798 v.7

EXECUTION VERSION

**THIS PLAN SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS PLAN SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

## PLAN SUPPORT AGREEMENT

This Plan Support Agreement, dated as of January 11, 2021 (including all exhibits and schedules attached hereto and in accordance with Section 2, this "**Agreement**"), amends and restates in its entirety that certain Third Amended and Restated Coordination Agreement, dated December 22, 2020 (the "**Third A&R Agreement**"), by and among the following parties (each of the foregoing described in sub-clauses (1) through (6), and any person or entity that becomes a party hereto in accordance with the terms hereof, a "**Party**" and, collectively, the "**Parties**"):

1. Honeywell International Inc. ("**Honeywell**");

2. Oaktree Capital Management, L.P., acting solely in its capacity as an investment adviser on behalf of certain funds and accounts and wholly-owned entities of such funds and accounts ("**Oaktree**");

3. Centerbridge Partners, L.P., acting solely in its capacity as an investment adviser on behalf of certain funds and accounts and wholly-owned entities of such funds and accounts ("**Centerbridge**" and, together with Oaktree, the "**Plan Sponsors**");

4. Attestor Value Master Fund LP; The Baupost Group, L.L.C., acting on behalf of certain managed funds; Cyrus Capital Partners, L.P., solely in its capacity as investment manager to and on behalf of certain managed funds and accounts; FIN Capital Partners LP acting to behalf of certain managed funds; Hawk Ridge Capital Management LP acting to behalf of certain managed funds; IngleSea Capital acting on behalf of certain managed funds or accounts; Keyframe Capital Partners, L.P., solely in its capacity as investment manager to and on behalf of certain managed funds; Newtyn Management, LLC on behalf of its advisee funds; Sessa Capital (Master), L.P.; and Whitebox Multi-Strategy Partners, L.P. (each, an "**Additional Investor**");

5. those certain holders of those certain 5.125% senior secured notes (the "**Senior Notes**" and, the holders thereof, the "**Senior Noteholders**") due 2026 under that certain Indenture, dated as of September 27, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Indenture**"), by and among Garrett, as parent, Garrett LX I S.à r.l. and Garrett Borrowing LLC, as issuers, certain of the Debtors, as guarantors, and Deutsche Trustee Company Limited, as the trustee (and any successor thereto, the "**Indenture Trustee**"), that are signatory to the Second A&R Agreement (the "**Initial Consenting Noteholders**");

6. Garrett, BRH LLC, Calvari Limited, Friction Materials LLC, Garrett ASASCO Inc., Garrett Borrowing LLC, Garrett Holding Company Sàrl, Garrett LX I S.à r.l., Garrett LX II S.à r.l., Garrett LX III S.à r.l., Garrett Motion Australia Pty Limited, Garrett Motion Automotive Research Mexico S. de R.L. de C.V., Garrett Motion Holdings Inc., Garrett Motion Holdings II Inc., Garrett Motion International Services S.R.L., Garrett Motion Ireland A Limited, Garrett Motion Ireland B Limited, Garrett Motion Ireland C Limited, Garrett Motion Ireland Limited, Garrett Motion Italia S.r.l., Garrett Motion Japan Inc., Garrett Motion LLC, Garrett Motion México, Sociedad Anónima de Capital Variable, Garrett Motion Romania S.R.L., Garrett Motion Sàrl, Garrett Motion Slovakia s.r.o., Garrett Motion Switzerland Holdings Sàrl, Garrett Motion UK A Limited, Garrett Motion UK B Limited, Garrett Motion UK C Limited, Garrett Motion UK D Limited, Garrett Motion UK Limited, Garrett Transportation I Inc., Garrett Transportation Systems Ltd, Garrett Transportation Systems UK II Ltd, Garrett TS Ltd, Garrett Turbo Ltd (collectively, the "**Debtors**");

7. if additional holders of Senior Notes join this Agreement (collectively, the "**Additional Consenting Noteholders**" and, together with the Initial Consenting Noteholders, the "**Consenting Noteholders**"), such Additional Consenting Noteholders;

8. if prepetition lenders under that certain Credit Agreement (as amended, restated, amended and restated, extended, supplemented, or otherwise modified from time to time, the "**Credit Agreement**"), dated as of September 27, 2018, by and among Garrett, as holdings, Garrett LX I S.à r.l., Garrett LX II S.à r.l., Garrett LX III S.à r.l., Garrett Borrowing LLC and Garrett Motion Sàrl (f/k/a Honeywell Technologies Sàrl), as borrowers, certain of the Debtors, as guarantors, JPMorgan Chase Bank, N.A., as administrative agent (and any successor thereto, the "**Agent**"), and the lenders party thereto from time to time (the "**Prepetition Lenders**"), become a Party hereto (the "**Consenting Lenders**"), such Consenting Lenders; and

9. if additional holders of common stock in Garrett Motion Inc. ("**Garrett**" and, all holders of common stock in Garrett that execute this Agreement, collectively, the "**Consenting Equityholders**" and, together with Honeywell, the Plan Sponsors, the Additional Investors, the Consenting Lenders, and the Consenting Noteholders, the "**Commitment Parties**") become a Party hereto, such Consenting Equityholders.

Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Term Sheet (defined below) attached hereto as **Exhibit A**, subject to Section 2 hereof.

As used herein, (1) the term "**Requisite Additional Investors**" means, at any relevant time, the Additional Investors holding at least a majority of the commitments to purchase Convertible Series A Preferred Stock (as defined below) held by such Additional Investors, (2) the term "**Requisite Consenting Noteholders**" means, at any relevant time, the Consenting Noteholders holding at least 67% in principal amount of the Senior Notes Claims held by such Consenting Noteholders, excluding Senior Note Claims held by the Plan Sponsors or the Additional Investors; (3) the term "**Requisite Consenting Lenders**" means, at any relevant time, the Consenting Lenders holding at least a majority in principal amount of the Secured Credit Facility Claims held by such Consenting Lenders; and (4) the term "**Requisite Consenting Equityholders**" means, at

2

any relevant time, the Consenting Equityholders holding at least a majority of the common stock in Garrett held by such Consenting Equityholders (each of the foregoing described in clauses (1) through (4), together with Honeywell, Oaktree, and Centerbridge, collectively, the "**Requisite Commitment Parties**").

## RECITALS

**WHEREAS**, on September 20, 2020, the Debtors commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"), which are being jointly administered under the caption *In re Garrett Motion Inc.*, Case No. 20-12212 (MEW) (Bankr. S.D.N.Y. Sept. 20, 2020) (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

**WHEREAS**, in connection with the Chapter 11 Cases, the Parties have engaged in good faith, arm's length negotiations regarding the terms of a chapter 11 plan of reorganization to be prepared and proposed by the Debtors so long as the Debtors are a Party hereto (the "**Approved Plan**"), which Approved Plan shall contain the terms and conditions set forth in, and be consistent in all respects with, the term sheet attached as **Exhibit A** hereto (such term sheet, including all exhibits thereto, the "**Term Sheet**," and such transactions on the terms and conditions described in this Agreement, the "**Restructuring Transactions**");

**WHEREAS**, upon the consent of the Debtors, Honeywell, the Plan Sponsors, the Requisite Additional Investors, and the Requisite Consenting Noteholders (which consent of any of the foregoing shall not be unreasonably withheld, conditioned, or delayed), the Consenting Lenders, the Additional Consenting Noteholders, and the Consenting Equityholders may become Parties to this Agreement;

**WHEREAS**, as of the date hereof, Honeywell has filed proofs of claim against each Debtor that assert claims of: (i) not less than $1,800.9 million in principal amount outstanding under that certain Indemnification and Reimbursement Agreement, dated September 12, 2018 (as amended, restated, amended and restated, extended, supplemented, or otherwise modified from time to time), by and among Honeywell ASASCO Inc., Honeywell ASASCO 2 Inc., and Honeywell (the "**IRA**") and that certain Indemnification Guarantee Agreement, dated as of September 27, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), by and among Honeywell ASASCO 2 Inc. as payee, Garrett ASASCO Inc. as payor, and certain subsidiary guarantors as defined therein (the "**Guarantee Agreement**," and together with the IRA, the "**Indemnification Agreements**"), plus potential contingent, unliquidated claims for accruing attorneys' costs and fees, breach of contract, subrogation, and various non-contractual claims;[1] (ii) not less than $126 million in principal amount outstanding and additional indemnity payments owed under that certain Tax Matters Agreement (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), by and among Garrett, Honeywell, Honeywell ASASCO Inc., and Honeywell ASASCO 2 Inc. (the "**Tax Matters Agreement**"), plus potential contingent, unliquidated claims for indemnification, contribution, reimbursement, and

---

[1]   For the avoidance of doubt, the issuance of the Series B Preferred Stock does not satisfy the Debtors' obligations to pay Honeywell's fees and expenses set forth in Section 11.01 of this Agreement.

various non-contractual claims; and (iii) additional potential contingent, unliquidated contractual and non-contractual claims and causes of action (collectively, the "**Honeywell Claims**");

WHEREAS, Honeywell has also asserted in its proofs of claims additional liquidated claims that have arisen in the ordinary course of the business dealings between Honeywell and the Debtors and are expressly not included in the term Honeywell Claims;[2]

WHEREAS, to effectuate the Restructuring Transactions, the Plan Sponsors and the Additional Investors have committed, severally and not jointly, to purchase shares of new convertible preferred stock of reorganized Garrett (the "**Convertible Series A Preferred Stock**") at a purchase price of $1,050.8 million in the aggregate in cash;

WHEREAS, the Parties desire to express to each other their mutual support and commitment with respect to the Restructuring Transactions and matters discussed in the Term Sheet and hereunder;

WHEREAS, notwithstanding any proposed deadlines in relation to the Restructuring Transactions, the Parties intend to complete the Restructuring Transactions with all speed in as timely a manner as practicable and to negotiate in good faith with one another to consummate the Restructuring Transactions;

WHEREAS, subject to the execution of definitive documentation and appropriate approvals by the Bankruptcy Court, the terms of this Agreement set forth the Parties' entire agreement concerning their respective obligations;

WHEREAS, the Plan Sponsors, Honeywell, the Requisite Additional Investors, and the Requisite Consenting Noteholders have agreed to amend and restate the Third A&R Agreement as reflected in this Agreement;

WHEREAS, the Debtors have agreed to execute this Agreement after the conclusion of the Debtors' publicly-announced auction and competitive process for plan of reorganization proposals; and

WHEREAS, each of the Debtors and Honeywell have determined that, taking into consideration and in the context of the global resolution of multiple claims and disputes among them and the value of the Approved Plan and the Restructuring Transactions to the estates of the

---

[2] For the avoidance of doubt, claims arising under ordinary course business dealings or commercial contracts or related to ongoing services or amounts owed under the Employee Matters Agreement, Intellectual Property Agreement, Trademark License Agreement, Transition Services Agreement, or Cash Repatriation Agreement (each as defined in Honeywell's proof of claim) will be addressed by the Debtors and Honeywell in good faith and in the ordinary course of business, in consultation with the Plan Sponsors and subject to the Plan Sponsors' consent (such consent not to be unreasonably withheld, conditioned or delayed), and are not being satisfied by the issuance of the Series B Preferred Stock and any claims by Honeywell against the Debtors on account of such matters shall be included in Class 6 General Unsecured Claims as set forth in the Term Sheet. Resolution of any of these matters will not be asserted, directly or indirectly, as a condition to the execution, delivery, or approval by Honeywell or the Debtors of any Restructuring Document and no allegation of non-performance with respect to any of these matters will excuse any Debtor or Honeywell from the performance of their obligations under this Agreement or any Restructuring Document.

4

Debtors, taken as a whole, the proposed treatment of the Honeywell Claims is a fair and reasonable compromise of the issues raised in the proceedings to estimate Honeywell's claims governed by the *Order Establishing Procedures for the Estimation of Claims of Honeywell et al. Against the Debtors* [Docket No. 540] and the adversary proceeding captioned *Garrett Motion Inc. and Garrett ASASCO Inc. v. Honeywell International Inc. et al.*, Adv. Pro. No. 20-01223 (MEW) (collectively, the "**Honeywell Litigation**");

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

**Section 1.**    *Agreement Effective Date.*  This Agreement shall become effective and binding upon each Party immediately following the occurrence of the following conditions (the "**Agreement Effective Date**"):

(a)    Honeywell has executed and delivered counterpart signatures to this Agreement to each other Party;

(b)    Oaktree has executed and delivered counterpart signatures to this Agreement to each other Party;

(c)    Centerbridge has executed and delivered counterpart signatures to this Agreement to each other Party;

(d)    Garrett has executed and delivered counterpart signatures to this Agreement to each other Party;

(e)    The Requisite Additional Investors have executed and delivered counterpart signatures to this Agreement to each other Party; and

(f)    The Requisite Consenting Noteholders have executed and delivered counterpart signatures to this Agreement to each other Party.

Notwithstanding the occurrence of the Agreement Effective Date, this Agreement contemplates, that, upon the consent of Honeywell, the Plan Sponsors, the Requisite Additional Investors, and the Requisite Consenting Noteholders (which consent of such Parties shall not be unreasonably withheld, conditioned, or delayed), (i) the Consenting Lenders may become Parties upon execution and delivery of counterpart signature pages of this Agreement to counsel to each other Party and at such time those Prepetition Lenders shall become obligated under this Agreement, (ii) Additional Consenting Noteholders may become Parties upon execution and delivery of counterpart signature pages of this Agreement to counsel to each other Party and at such time those Senior Noteholders shall become obligated under this Agreement, and (iii) the Consenting Equityholders may become Parties upon execution and delivery of counterpart signature pages of this Agreement to counsel to each other party and at such time the Consenting Equityholders shall become obligated under this Agreement.

For the avoidance of doubt, if there is a subsequent Termination Date (defined in Section 9.07) pursuant to Section 9.02 or Section 9.06 with respect to the Debtors, any and all provisions of the

5

Agreement referencing "S&C," the "Debtor," or "Debtors" are, and shall continue to be, in full force and effect with respect to the Commitment Parties as if such provisions were written without reference to "S&C," the "Debtor," or "Debtors," and this Agreement shall continue to be in full force and effect with respect to each other Party hereto.  Further, for the avoidance of doubt, (i) if the Prepetition Lenders never become a Party, any and all provisions of the Agreement referencing "Gibson," "Prepetition Lenders," "Consenting Lenders," or "Requisite Consenting Lenders" are, and shall continue to be, in full force and effect with respect to the other Commitment Parties as if such provisions were written without reference to those terms and this Agreement shall be in full force and effect with respect to each other Party hereto; and (ii) if Consenting Equityholders other than the Plan Sponsors and the  Additional Investors never become a Party, any and all provisions of the Agreement referencing  "Consenting Equityholders" or "Requisite Consenting Equityholders" are, and shall continue to be, in full force and effect with respect to the other Commitment Parties as if such provisions were written without reference to those terms and this Agreement shall be in full force and effect with respect to each other Party hereto.

Signature pages executed by the Parties set forth in Section 1(a) through (f) shall be delivered to: (a) Kirkland & Ellis LLP ("**K&E**"), legal counsel to Honeywell; (b) Milbank LLP ("**Milbank**"), legal counsel to the Plan Sponsors; (c) Sullivan & Cromwell ("**S&C**"), legal counsel to the Debtors; (d) Jones Day, legal counsel to the Additional Investors; (e) Ropes & Gray LLP ("**R&G**"), legal counsel to the Consenting Noteholders; and (f) if applicable, legal counsel to  the *ad hoc* committee of Prepetition Lenders, Gibson, Dunn & Crutcher, ("**Gibson**").   Each Commitment Party intends to be and is bound under this Agreement with respect to any and all claims against, or interests in, any of the Debtors, whether currently held or hereafter acquired by such Commitment Party.

**Section 2.**     *Exhibits Incorporated by Reference.*  Each of the exhibits and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the exhibits.  In the event of any inconsistency between this Agreement (without reference to the exhibits) and the exhibits, the terms of the exhibits shall govern.  This Agreement (without reference to the exhibits) may be interpreted with reference to the definitions set forth in the exhibits, to the extent such terms are used herein.

**Section 3.**     *Definitive Documentation*.

(a)     The definitive documents and agreements (collectively, the "**Restructuring Documents**") related to or otherwise utilized to implement, effectuate or govern the Restructuring Transactions shall consist of every order entered by the Bankruptcy Court and every pleading, motion, proposed order or document (but not including any notices, except as otherwise set forth in this section) filed by the Parties, to the extent, in each case, such orders, pleadings, motions, proposed orders or documents relate to the Restructuring Transactions or the implementation or consummation of the transactions contemplated by this Agreement (including the Term Sheet).  The Restructuring Documents that remain subject to negotiation and completion shall upon completion, contain terms, conditions, representations, warranties, and covenants consistent in all respects with, and containing the terms and conditions set forth in, this Agreement (including the Term Sheet), and otherwise be in form and substance reasonably acceptable to (i) the Debtors, (ii) the Plan Sponsors and Honeywell, except as otherwise set forth herein, (iii) solely to the extent such documents adversely affect the Additional Investors, the Requisite Additional

6

Investors, (iv) solely to the extent such documents adversely affect the economic treatment of the Prepetition Lenders, the Requisite Consenting Lenders, (v) solely to the extent such documents adversely affect the economic treatment of the Senior Notes, the Requisite Consenting Noteholders, and (vi) solely to the extent such documents adversely affect the economic treatment of the Consenting Equityholders, the Requisite Consenting Equityholders.

(b)   The Restructuring Documents include:

(i)   the Approved Plan;

(ii)   the disclosure statement (and all exhibits and other documents and instruments related thereto) with respect to the Approved Plan  (the "**Disclosure Statement**"), the other solicitation materials in respect of the Approved Plan (such materials, collectively, the "**Solicitation Materials**"), the motion to approve the Disclosure Statement and the order approving the Disclosure Statement (the "**Disclosure Statement Order**");

(iii)   the documents or agreements relating to the issuance of the Convertible Series A Preferred Stock and the Series B Preferred Stock, including the backstop commitment agreement for the Rights Offering (the "**BCA**") and the orders approving the Debtors' entry into the BCA and this Agreement (the "**Approval Orders**");

(iv)   any documents or agreements in connection with the Restructuring Transactions and related to the governance and management of the reorganized Debtors following the conclusion of the Chapter 11 Cases, including any certificates of incorporation, certificates of formation, bylaws, limited liability company agreements (or equivalent governing documents), employment agreements, shareholders' agreements and registration rights agreements;

(v)   all other documents that will comprise the supplement to the Approved Plan; and

(vi)   the order confirming the Approved Plan (the "**Confirmation Order**") and pleadings in support of entry of the Confirmation Order.

(c)   Further, notwithstanding anything set forth in this Agreement to the contrary, the definitive documents or agreements for the post-Effective Date governance of reorganized Garrett shall be consistent in all material respects with the Term Sheet and otherwise subject to the reasonable consent and approval of the Debtors, Honeywell, the Plan Sponsors, and the Requisite Additional Investors.

(d)   Except as specifically set forth herein, nothing in any of the Restructuring Documents shall impose any restrictions on any Party transferring any of the equity of Garrett following consummation of the Restructuring Transactions.

**Section 4.**    *Milestones*.[3]   The following milestones (the "**Milestones**") shall apply to this Agreement, unless extended, waived or otherwise agreed to in writing (email being sufficient) by counsel to the Debtors, counsel to Honeywell, counsel to the Plan Sponsors, and Counsel to the Additional Investors:

(a)    [Reserved.]

(b)    the Parties shall reasonably cooperate with one another in an effort to:

(i)  file an Approved Plan with the Bankruptcy Court by no later than January 22, 2021;

(ii) obtain entry of the Approval Orders by no later than February 19, 2021;

(iii) obtain entry of the Disclosure Statement Order by the Bankruptcy Court by no later than March 8, 2021;

(iv) obtain entry of the Confirmation Order by the Bankruptcy Court by no later than April 29, 2021; and

(v)  cause the effective date of the Approved Plan (the "**Effective Date**") to occur by no later than May 7, 2021.

**Section 5.**    ***Commitments Regarding the Restructuring Transactions***.

5.01.   Commitment of the Commitment Parties.

(a)    During the period beginning on the Agreement Effective Date and ending on a Termination Date (defined in Section 9.07) (such period, the "**Effective Period**"), subject to the terms and conditions hereof, each of the Commitment Parties agrees, severally and not jointly, that:

(i)    it shall cooperate and coordinate activities (to the extent practicable and subject to the terms hereof) with the other Parties and will use commercially reasonable efforts to pursue, support, solicit, implement, confirm, and consummate the Restructuring Transactions, as applicable, and to execute any document and give any notice, order, instruction, or direction reasonably necessary to support, facilitate, implement, consummate, or otherwise give effect to the Restructuring Transactions, as applicable, and to act in good faith and take all commercially reasonable actions to negotiate the Restructuring Documents with the other Commitment Parties and the Debtors and consummate the Restructuring Transactions consistent with this Agreement;

---

[3]    The milestones shall be calculated in accordance with Rule 9006 of the Bankruptcy Code.

(ii)    it shall use commercially reasonable efforts to cooperate with and assist the other Parties in obtaining additional support for the Restructuring Transactions from other stakeholders and shall consult with the Debtors, Honeywell, the Plan Sponsors, and the Requisite Additional Investors regarding the status and the material terms of any negotiations with other stakeholders that are not party to this Agreement (including, for the avoidance of doubt, giving the Debtors, Honeywell, the Plan Sponsors, and the Requisite Additional Investors notice and a reasonable opportunity to coordinate with the other Parties in advance of any outreach or communications to stakeholders that are not party to this Agreement);

(iii)    it shall not, directly or indirectly:

(A)    object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions; and

(B)    propose, support, vote for, encourage, seek, solicit, pursue, initiate, assist, join in, participate in the formulation of or enter into negotiations or discussions with, any entity regarding any Alternative Transaction[4] or any arrangement, understanding or agreements related to any Alternative Transaction or any other financing of or investment in any of the Debtors other than the Restructuring Transactions.

(iv)    to the extent applicable, timely vote each of its claims against or equity interests in the Debtors (such equity interests, collectively, the "**Debtor Interests**" and, such claims, collectively, the "**Debtor Claims**" and, such Debtor Interests and Debtor Claims together, the "**Debtor Claims/Interests**") to accept the Approved Plan by delivering its duly executed and completed ballot(s) accepting the Approved Plan, on a timely basis following the commencement of the solicitation and its actual receipt of the Solicitation Materials and ballot, and not change, withdraw, or revoke (or cause to be changed, withdrawn, or revoked) such vote; provided, however, that such vote may be revoked (and, upon such revocation, deemed void *ab initio*) by such Commitment Party at any time if this Agreement is terminated with respect to such Commitment Party (it being understood by the Parties that any modification of the Approved Plan that results in a termination of this Agreement pursuant to Section 9 hereof shall entitle such Commitment Party an opportunity to change its vote in accordance with section 1127(d) of the Bankruptcy Code);

---

[4]    "Alternative Transaction" shall mean any plan, inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, asset sale, share issuance, tender offer, exchange offer, recapitalization, plan of reorganization, share exchange, business combination, joint venture, or similar transaction involving any one or more Debtors or the debt, equity, or other interests in any one or more of the Debtors, that is an alternative to one or more of the Restructuring Transactions.

(v)     except to the extent expressly contemplated under the Approved Plan or this Agreement, it will not exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any of the Debtor Claims/Interests, and any other claims against any direct or indirect subsidiaries of the Debtors that are not Debtors;

(vi)     support and consent to the releases and exculpation provisions in the Approved Plan, which shall be substantially identical to those in the Term Sheet (as defined in the Term Sheet, the "**Releases and Exculpation Provisions**");

(vii)     negotiate in good faith upon reasonable request of the Debtors or the Plan Sponsors any modifications to the Restructuring Transactions that improve the tax efficiency of the Restructuring Transactions;

(viii)     provide draft copies of all motions or proposed orders unrelated to the Restructuring Documents prepared by any Commitment Party to K&E, Milbank, Jones Day, S&C, Gibson, and R&G, as applicable, that such Commitment Party intends to file with the Bankruptcy Court at least three (3) business days (or such shorter review period as necessary in light of exigent circumstances) prior to such filing and consult in good faith with K&E, Milbank, Jones Day, S&C, Gibson, and R&G, as applicable, regarding the form and substance of all such proposed filings with the Bankruptcy Court;

(ix)     provide draft copies of any Restructuring Documents and related motions prepared by any Commitment Party to K&E, Milbank, Jones Day, S&C, Gibson, and R&G, as applicable, at least five (5) business days (or such shorter review period as necessary in light of exigent circumstances) prior to such filing.  The applicable Commitment Party shall consult in good faith with K&E, Milbank, Jones Day, S&C, Gibson, and R&G, as applicable, regarding the form and substance of all proposed filings with the Bankruptcy Court; provided, that the consent requirements set forth in this Agreement or Approved Plan shall apply with respect to any motions, declarations, proposed orders or other filings with the Bankruptcy Court that constitute Restructuring Documents;

(x)     use commercially reasonable efforts to make all filings and submissions required by any antitrust, competition and merger control laws and any other laws in connection with the Restructuring Transaction within thirty (30) days following the Agreement Effective Date and to promptly file any additional information requested as soon as practicable after receipt of request therefor; and

(xi)     promptly (but in any event within three (3) business days) notify the Debtor in writing between the date hereof and the Effective Date of (A) the occurrence, or failure to occur, of any event of which such Commitment Party has actual knowledge and which such occurrence or failure would likely cause

(1) any representation of such Commitment Party contained in this Agreement to be untrue or inaccurate in any material respect, (2) any covenant of such Commitment Party contained in this Agreement not to be satisfied in any material respect, or (3) any condition precedent contained in the Approved Plan or this Agreement related to the obligations of such Commitment Party not to occur or become impossible to satisfy.

provided, however, that nothing in this Section 5.01(a) shall require any Commitment Party to incur any expenses, liabilities or other obligations, or agree to any commitments, undertakings, concessions, indemnities or other arrangements, that could result in expenses, liabilities or other obligations to any such Party, other than as specifically stated in this Agreement (including the Term Sheet).

(b)    The foregoing sub-clause (a) of this Section 5.01 will not limit any of the following Commitment Parties rights:

(i)    under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including, appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case provided that such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and do not hinder, delay or prevent consummation of the Restructuring Transactions;

(ii)    to take or direct any action relating to maintenance, protection, or preservation of any collateral provided that such action is not inconsistent with this Agreement and does not hinder, delay, or prevent consummation of the Restructuring Transactions;

(iii)    to purchase, sell or enter into any transactions in connection with any of the Debtor Claims/Interests, subject to the terms of this Agreement;

(iv)    to consult with other Commitment Parties, the Debtors, or any other party in interest in the Chapter 11 Cases; provided, that such action is not inconsistent with this Agreement and does not hinder, delay or prevent consummation of the Restructuring Transactions; or

(v)    to enforce any right, remedy, condition, consent or approval requirement under this Agreement or any of the Restructuring Documents.

5.02.    **Additional Commitments of the Commitment Parties**.

(a)    The Plan Sponsors and the Additional Investors hereby agree, severally and not jointly, (i) to purchase shares of Convertible Series A Preferred Stock at a purchase price of $1,050.8 million in the aggregate in cash and (ii) to purchase additional shares of Convertible Series A Preferred Stock at a purchase price up to $200 million in the aggregate in cash pursuant to the BCA in connection with the Rights Offering, in each case, on the terms and conditions set

11

forth in this Agreement, the Term Sheet and, with respect to Series A Preferred Stock purchased in connection with the Rights Offering, the BCA. The Plan Sponsors and the Additional Investors may assign such commitments to any Party, to their respective creditworthy affiliates or either Plan Sponsor or any Additional Investors or their respective creditworthy affiliates, but otherwise no Party may sell, use, pledge, assign, transfer, permit the participation in, or otherwise dispose of, any such commitments to any person. None of the commitments to purchase the Convertible Series A Preferred Stock of any Plan Sponsor or any Additional Investor shall be reduced for any reason.

(b)      Each Plan Sponsor, Additional Investor, Consenting Noteholder and Honeywell represents and warrants to the other Plan Sponsors, Additional Investors, Consenting Noteholders and Honeywell that, as of October 30, 2020, it beneficially owns (as that term is defined in SEC Rule 13d-3 ("**Beneficial Ownership**")) the number of shares of equity securities of Garrett set forth on **Annex 1**. Each Commitment Party, for so long as it is a Party, will, as promptly as practicable, and in any event within one business day, notify counsel to the other Commitment Parties of any change in its Beneficial Ownership of equity securities of Garrett. Each Party will individually make and be solely responsible for any filings or notifications as may be necessary under applicable law in connection with the entry into this Agreement and the performance of its obligations hereunder. The Commitment Parties agree not to (i) make any acquisition of equity securities of Garrett that is coordinated between any of them or (ii) share any pecuniary interest in any equity securities of Garrett held by any other Plan Sponsor, Additional Investor, Consenting Noteholder or Honeywell.

(c)      During the Effective Period for so long as the Debtors are Parties to this Agreement, Honeywell agrees that it will not malign, denigrate, or disparage the Debtors with respect to any past or present activities in a manner that could reasonably be expected to be damaging to the reputation of the Debtors.

(d)      For so long as the Debtors are Parties to this Agreement, each of the Plan Sponsors, the Additional Investors, and Honeywell agrees that it will (i) submit drafts to S&C of any press releases that disclose the existence or terms of this Agreement or any amendment to the terms of this Agreement as soon as reasonably practicable prior to making any such disclosure and (ii) afford the Debtors an opportunity to comment on such documents and disclosures and address any comments received from such parties in good faith; provided, that this clause (d) will not apply to any disclosures required under federal or state securities laws, including, without limitation, SEC Rule 13d.

5.03.   **Commitments of the Debtors**.

(a)      During the Effective Period, the Debtors agree to:

(i)      Within twelve (12) hours of this Agreement becoming effective, file a notice with the Bankruptcy Court disclosing Garrett's entry into this Agreement and the Agreement's effectiveness in a form acceptable to the Debtors, Honeywell, the Plan Sponsors, and the Requisite Additional Investors;

12

(ii) use commercially reasonable efforts to pursue the Restructuring Transactions on the terms set forth in this Agreement, the Term Sheet, and the Approved Plan, and not sign any agreement to pursue any Alternative Transaction or other restructuring transaction for the Debtors or substantially all of their assets or equity interests;

(iii)      use good faith efforts to implement this Agreement and the Approved Plan in accordance with the Term Sheet, the transactions and other actions contemplated hereby and thereby;

(iv)      (A) support and use commercially reasonable efforts to complete the Restructuring Transactions set forth in this Agreement; (B) negotiate in good faith all Restructuring Documents that are subject to negotiation as of the Agreement Effective Date; (C) use commercially reasonable efforts to execute and deliver any other required agreements to effectuate and consummate the Restructuring Transactions; (D) make commercially reasonable efforts to obtain required regulatory and/or third-party approvals for the Restructuring Transactions, if any; (E) not undertake any actions inconsistent with the Restructuring Transactions or the Approved Plan and confirmation thereof and not take any action directly or indirectly that is inconsistent with, or that would reasonably be expected to prevent, interfere with, delay, or impede the approval of the Disclosure Statement, the solicitation of votes on the Approved Plan, and the confirmation and consummation of the Approved Plan and the Restructuring Transactions, including soliciting or causing or allowing any of its agents or representatives to solicit any agreements or commence or continue negotiations with any party in interest in these Chapter 11 Cases relating to any Alternative Transaction or chapter 11 plan or restructuring transaction (including, for the avoidance of doubt, a transaction premised on an asset sale under section 363 of the Bankruptcy Code) or otherwise supporting, pursuing, or otherwise facilitating the consummation of an Alternative Transaction; (F) not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with this Agreement or delay, impede, appeal, or take any other negative action, directly or indirectly, to interfere with the acceptance or implementation of the Restructuring Transactions; (G) purchase a directors' and officers' liability insurance policy or policies (or renewal or replacements therefor) providing for continuous coverage for acts and omissions arising following the expiration of the current directors' and officers' liability insurance policies through the Effective Date (including a provision for six (6) years of customary "run off" coverage) at a commercially reasonable cost based on market availability; and (H) use commercially reasonable efforts to support and obtain Bankruptcy Court approval of the release, exculpation and, and indemnification provisions set forth in the Restructuring Documents;

(v)      do all things reasonably necessary and appropriate in furtherance of confirming the Approved Plan and consummating the

13

Restructuring Transactions in accordance with, and within the time frames contemplated by, this Agreement;

(vi)    at least two (2) business days (or such shorter review period as necessary in light of exigent circumstances) prior to the date when the Debtors intend to file, provide draft copies of all motions and proposed orders unrelated to the Restructuring Documents to K&E, Milbank, Jones Day, Gibson, and R&G, as applicable, that any Debtor intends to file with the Bankruptcy Court and, at least three (3) business days (or such shorter review period as may be necessary in light of exigent circumstances) prior to the date when the applicable Debtor intends to file, provide draft copies of any Restructuring Documents and related motions, the Confirmation Order, any supplements to the Approved Plan, and any amended versions of the Approved Plan or Disclosure Statement to K&E, Milbank, Jones Day, Gibson, and R&G. The Debtors shall consult in good faith with K&E, Milbank, Jones Day, Gibson, and R&G regarding the form and substance of all such proposed filings with the Bankruptcy Court; provided, that the consent requirements set forth in this Agreement or Approved Plan shall apply with respect to any motions, declarations, proposed orders or other filings with the Bankruptcy Court that constitute Restructuring Documents;

(vii)    (A) submit drafts to K&E, Milbank, Jones Day, and R&G, as applicable, of any press releases and public documents that announce the existence or terms of this Agreement or any amendment to the terms of this Agreement at least two (2) calendar days prior (where practicable) to making any such disclosure and (B) afford such advisors and their respective clients an opportunity to comment on such documents and disclosures and address any comments received from such parties in good faith;

(viii)    timely object to any motion filed with the Bankruptcy Court by a party other than the Plan Sponsors or Honeywell seeking the entry of an order (A) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in  sections 1106(a)(3) and (4) of the Bankruptcy Code), (B) converting any of the Chapter 11 Cases to a case  under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases;

(ix)    timely oppose any objections filed with the Bankruptcy Court to (A) the Disclosure Statement, (B) the Approved Plan, or (C) confirmation of the Approved Plan;

(x)    timely object to any motion filed with the Bankruptcy Court by a party seeking the entry of an order modifying  or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable;

(xi)    timely oppose any Alternative Transaction, including, without limitation, (A) any motion, application, or request filed with the

14

Bankruptcy Court in connection with or in anticipation of any Alternative Transaction and (B) the *Motion of the Official Committee of Equity Securities Holders for Entry of an Order Authorizing Reimbursement Of Certain Fees and Expenses Incurred by Potential Equity Financing Parties* [Docket No. 678];

(xii)    comply in all material respects with applicable laws (including making or seeking to obtain all required material consents and/or appropriate filings or registrations with, notifications to, or authorizations, consents or approvals of any regulatory or governmental authority, and paying all material taxes as they become due and payable except to the extent nonpayment thereof is permitted by the Bankruptcy Code);

(xiii)    maintain the good standing (or equivalent status under the laws of its incorporation or organization) under the laws of the state or other jurisdiction in which each of the Debtors are incorporated or organized;

(xiv)    (A) operate the business of each of the Debtors in the ordinary course (other than changes in the operations resulting from or relating to the Restructuring Transactions or the filing of the Chapter 11 Cases) and consistent with past practice and in a manner that is consistent with this Agreement and the business plan of the Debtors and confer with the Commitment Parties and their respective representatives, as reasonably requested, on operational matters and the general status of ongoing operations, and (B) provide the Commitment Parties with any information reasonably requested regarding the Debtors and reasonable access to management and advisors of the Debtors for the purposes of evaluating the Debtors' assets, liabilities, operations, businesses, finances, strategies, prospects and affairs. Notwithstanding the generality of the foregoing, the Debtors shall, except as expressly contemplated by this Agreement or with the prior written consent (email being sufficient) of the Plan Sponsors, Honeywell, and the Requisite Additional Investors (such consent not to be unreasonably withheld, conditioned or delayed), and, subject to applicable bankruptcy law, use commercially reasonable efforts consistent with the Restructuring Transactions to (1) maintain their physical assets, properties and facilities in their current working order, condition and repair as of the date hereof, ordinary wear and tear excepted, (2) perform all obligations required to be performed by the Debtors under any executory contracts or unexpired leases that have not been rejected by order of the Bankruptcy Court, (3) maintain their books and records on a basis consistent with prior practice, (4) bill for products sold or services rendered and pay accounts payable in a manner generally consistent with past practice, but taking into account the Restructuring Transactions and the filing of the Chapter 11 Cases, (5) maintain all insurance policies, or suitable replacements therefor, in full force and effect through the close of business on the Effective Date, (6) neither encumber nor enter into any material new leases, licenses, or other use or occupancy agreements for real property or any part thereof outside of the ordinary course of business, and (7) not enter into, adopt or amend any employment agreements, executive or insider employment

15

agreements or any executive or insider management compensation, severance or incentive plans, including any equity arrangements, or increase in any manner the compensation or benefits (including severance), in each case, of any insider of the Debtors outside of the ordinary course of business, except as contemplated by the Approved Plan;

(xv)     to the extent that any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated in this Agreement or the Approved Plan, negotiate in good faith appropriate additional or alternative provisions to address any such impediment, in consultation with the Commitment Parties; provided, however, that the economic outcome for the Commitment Parties, the anticipated timing of confirmation and the Effective Date, and other material terms as contemplated in this Agreement and in the Approved Plan must be preserved;

(xvi)     promptly (but in any event within three (3) business days) notify the Commitment Parties in writing between the date hereof and the Effective Date of (A) the occurrence, or failure to occur, of any event of which the Debtors have actual knowledge and which such occurrence or failure would likely cause (1) any representation of the Debtors contained in this Agreement to be untrue or inaccurate in any material respect, (2) any covenant of the Debtors contained in this Agreement not to be satisfied in any material respect, or (3) any condition precedent contained in the Approved Plan or this Agreement not to occur or become impossible to satisfy, (B) receipt of any written notice of any proceeding commenced, or, to the actual knowledge of the Debtors, threatened against the Debtors, relating to or involving or otherwise affecting in any material respect the Restructuring Transactions, and (C) any failure of the Debtors to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder in any material respect,;

(xvii)     promptly (but in any event within three (3) business days) notify the Commitment Parties in writing of any governmental or third-party complaints, litigations, investigations, or hearings (or communications indicating that the same may be contemplated or threatened);

(xviii)     use commercially reasonable efforts to cause the Confirmation Order to become effective and enforceable immediately upon its entry and to have the period in which an appeal thereto must be filed commence immediately upon its entry;

(xix)     comply in all material respects with the terms and conditions of any debtor-in-possession financing that remains outstanding with respect to the Debtors;

16

(xx)    not seek to amend or modify, or file a pleading seeking authority to amend or modify, the Restructuring Documents in a manner that is materially inconsistent with this Agreement;

(xxi)    not file any pleading materially inconsistent with the Restructuring Transactions or the terms of this Agreement or the Approved Plan;

(xxii)    unless notice has already been given pursuant to Section 5.04, promptly (but in any event within one (1) business day) notify the Commitment Parties in writing of any bona fide written proposals, offers, or expressions of interest received after the Agreement Effective Date by any of the Debtors, any of their subsidiaries, or any of their respective representatives, relating to any Alternative Transaction, which such notice shall include a copy thereof; *provided* that if the Debtors receive a bona fide oral proposal, offer or expression of interest after the Agreement Effective Date and prepare a written summary of such proposal, offer, or expression of interest for any member of management or the Board, the Debtors shall promptly (but in any event within one (1) business day) share such written summary with the Commitment Parties;

(xxiii)    so long as Honeywell is party hereto, suspend all litigation activities related to and stay the Honeywell Litigation through the Effective Date and dismiss with prejudice such proceedings upon the Effective Date;

(xxiv)    so long as the Requisite Consenting Noteholders are party hereto, suspend all litigation activities related to and stay the adversary proceeding captioned *Garrett LX I S.A.R.L. v. Deutsche Trustee Company Limited*, Adv. Pro. No. 20-01319 (MEW), through the Effective Date and dismiss with prejudice such proceeding upon the Effective Date;

(xxv)    so long as Honeywell and the Requisite Consenting Noteholders, as applicable, are party hereto, not support, encourage, solicit, participate or assist in any litigation similar to, related to, or seeking the same relief as the adversary proceedings and contested matters identified in clauses (xxiii) and (xxiv) above brought by any other party; and

(xxvi)    so long as Honeywell is party hereto, not malign, denigrate, or disparage Honeywell with respect to any past or present activities in a manner that could reasonably be expected to be damaging to the reputation of Honeywell.

(b)    Nothing in sub-clause (a) of this Section 5.03 shall: (A) affect the ability of any Debtor to consult with any Commitment Party or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or (B) prevent any Debtor from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

17

5.04. **No Shop**

(a) During the Effective Period, (i) the Debtors shall, and shall instruct, direct and cause any person acting on the Debtors' behalf to, immediately cease and terminate any ongoing solicitation, discussions and negotiations with respect to any Alternative Transaction and (ii) the Debtors shall not, and the Debtors shall instruct, direct and cause any person acting on the Debtors' behalf not to, directly or indirectly, initiate, solicit, engage in or participate in any discussions, inquiries or negotiations in connection with any proposal or offer relating to an Alternative Transaction, afford access to the business properties, assets, books or records of or provide any non-public information relating to the Debtors to, otherwise cooperate in any way with, or knowingly assist, participate in, facilitate, or encourage any effort by any entity or person with respect to any Alternative Transaction that such entity or person is seeking to make or has made, in each of cases (i) and (ii) unless with the consent of the Plan Sponsors, Honeywell and the Requisite Additional Investors (such consent not to be unreasonably withheld, conditioned or delayed) or as the Court may order.

(b) Notwithstanding the foregoing Section 5.04(a), if during the Effective Period, the Debtors receive a bona fide, written, unsolicited proposal regarding an Alternative Transaction (an "**Alternative Transaction Proposal**") from any entity or person not solicited by the Debtors or any person acting on the Debtors' behalf in violation of Section 5.04(a) with respect to which the board of directors of the Debtors (the "**Board**") has determined in good faith, after consulting with the Debtors' outside counsel, investment bankers, financial advisors, and consultants, as applicable, and taking into consideration all factors including, without limitation, the likelihood of consummation of such Alternative Transaction Proposal, any costs or risks of a delay in emergence from Chapter 11, the interests of all creditors and all shareholders, whether the Alternative Transaction Proposal includes fully executed and binding commitments to consummate all transactions and financing contemplated therein, and whether the Alterative Transaction could be consummated without the settlement with Honeywell provided in this Agreement and the Approved Plan (including taking into account scenarios in which the Honeywell Litigation produces an outcome that is less favorable to the Debtors' creditors (excluding Honeywell) and shareholders as compared to the proposed treatment of the Honeywell Claims under the Approved Plan), that the failure of the Board to consider such Alternative Transaction Proposal would reasonably be expected to be inconsistent with the Board's fiduciary duties under applicable laws, the Debtors and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants and other advisors or representatives shall have the right to (i) consider, respond to, provide access for and facilitate any inquiries, proposals, discussion or negotiations of such Alternative Transaction Proposal and (ii) enter into discussions or negotiations with respect to such Alternative Transaction Proposal; *provided* that, on or prior to the business day immediately following receipt of such Alternative Transaction Proposal, the Debtors shall notify the Commitment Parties of the receipt of such Alternative Transaction Proposal and deliver to the Commitment Parties a copy of such Alternative Transaction Proposal and the basis for the Board's determination that the failure to consider the Alternative Transaction Proposal would be reasonably expected to be inconsistent with the Board's fiduciary duties under applicable law, (y) provide the Commitment Parties with regular updates as to the status and progress of such Alternative Transaction Proposal and (z) use commercially reasonable efforts to respond promptly to reasonable information requests from the Commitment Parties relating to such Alternative Transaction Proposal.

18

(c)     During the Effective Period as to the Debtors, if, after complying with their obligations in Section 5.04(b), any of the Debtors or any person acting on the Debtors' behalf determines to file, support, make a written proposal or counterproposal to any person relating to an Alternative Transaction Proposal or counterproposal to any person relating to an Alternative Transaction Proposal, the Debtors shall notify the Commitment Parties at least two (2) business days in advance of commencing such action, which notice shall specify the identity of the person making such Alternative Transaction Proposal and all of the material terms and conditions of such Alternative Transaction Proposal and attach the most current version of any proposed transaction agreement (and any related agreements) providing for such Alternative Transaction Proposal. Upon receipt of any notice pursuant to this clause, each of Honeywell, the Plan Sponsors, the Requisite Additional Investors and the Requisite Consenting Noteholders shall have the right to terminate this Agreement with respect to the Debtors pursuant to Section 9.06.

(d)     Notwithstanding the foregoing Section 5.04(a) and without prejudice to the Debtors' rights under Section 5.04(b), from the Agreement Effective Date through and including January 25, 2021, the Debtors may provide the Official Committee of Equity Securities Holders (the "**Equity Committee**") with access to a virtual data room that the Equity Committee may use to share available diligence information with third parties that execute nondisclosure agreements in forms acceptable to the Debtors to facilitate discussions regarding financing for a stand-alone plan of reorganization.

**Section 6.     *Transfer of Claims and Interests*.**

(a)     During the Effective Period, no Commitment Party, as applicable, shall sell, use, pledge, assign, transfer, permit the participation in, or otherwise dispose of any ownership (including any beneficial ownership[5]) in any Debtor Claims/Interests in whole or in part (each, a "**Transfer**") to any party, unless, solely with respect to Debtor Claims, it satisfies all of the following requirements (a transferee that satisfies such requirements, a "**Permitted Transferee**," and such Transfer, a "**Permitted Transfer**"):

(i)     the intended transferee (x) is another Commitment Party, (y) as of the date of such Transfer,  controls, is controlled by or is under common control with a Commitment Party, a Commitment Party's affiliate, a Commitment Party's affiliated fund or a Commitment Party's affiliated entity with a common investment advisor, or (z) executes a transfer agreement in the form attached hereto as **Exhibit B** (a "**Transfer Agreement**") prior to or concurrently with the closing of such Transfer; and

(ii)     notice of any Transfer, including the amount transferred and, in the case of (i)(z) above, the fully executed Transfer Agreement, shall be provided on a confidential and "professional eyes only" basis to K&E, Milbank,

---

[5]     As used herein, the term "beneficial ownership" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the voting rights and the disposition of, the Debtor Claims/Interests or the right to acquire such claims or interests.

Jones Day, S&C, Gibson, and R&G within three (3)  business days following the closing of such Transfer.

(b)      Upon satisfaction of the requirements in Section 6(a), (i) the Permitted Transferee shall be deemed to be a Commitment Party hereunder, and, for the avoidance of doubt, a Permitted Transferee is bound as a Party under this Agreement with respect to any and all claims against, or interests in, any of the Debtors, whether held at the time such Permitted Transferee becomes a Party or later acquired by such Permitted Transferee, and (ii) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations.

(c)      Notwithstanding Section 6(a), a Qualified Marketmaker[6] that acquires any Debtor Claims with the purpose and intent of acting as a Qualified Marketmaker for such Debtor Claims, shall not be required to execute and deliver to any of K&E, Milbank, Jones Day, S&C, Gibson, or R&G a Transfer Agreement in respect of such Debtor Claims if (A) such Qualified Marketmaker intends to subsequently transfer such Debtor Claims (by purchase, sale, assignment, participation, or otherwise) within five (5) business days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund or affiliated entity with a common investment advisor, (B) the transferee otherwise is a Permitted Transferee and (C) the Transfer otherwise is a Permitted Transfer.  To the extent that a Commitment Party is acting in its capacity as a Qualified Marketmaker, it may transfer (by purchase, sale, assignment, participation or otherwise) any right, title or interest in the Debtor Claims that such Commitment Party acquires in its capacity as a Qualified Marketmaker from a holder of the Debtor Claims who is not a Commitment Party without regard to the requirements set forth in Section 6(a) hereof.

(d)      This Agreement shall in no way be construed to preclude the Commitment Parties  from acquiring additional Debtor Claims/Interests; provided, however, that (i) any Commitment Party that acquires additional Debtor Claims, as applicable, after the Agreement Effective Date shall notify K&E, Milbank, Jones Day, S&C, Gibson, and R&G of such acquisition, within five (5) business days following such acquisition, including the amount of such acquisition on a confidential and "professional eyes only" basis, which notice may be deemed to be provided by the filing of a statement with the Bankruptcy Court as required by Rule 2019 of the Federal Rules of Bankruptcy Procedure, including revised holdings information for such Commitment Party and (ii) such additional Debtor Claims/Interests shall automatically and immediately upon acquisition by a Commitment Party, as applicable, be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to the respective counsels to the Commitment Parties).

(e)      In addition, other than pursuant to a Permitted Transfer, any holder of Debtor Claims/Interests shall become a Party, and become obligated as a Commitment Party,

---

[6]   As used herein, the term "**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims against or interests in the Debtors (or enter with customers into long and short positions in claims against or interests in the Debtors), in its capacity as a dealer or market maker in claims against or interests in the Debtors and (b) is, in fact, regularly in the business of making a market in claims against or interests in issuers or borrowers (including equity or debt securities or other debt).

20

solely to the extent (i) the ascension of such holder to this Agreement is consented to in writing (with email being sufficient) by the Debtors, Honeywell, the Plan Sponsors, the Requisite Additional Investors and the Requisite Consenting Noteholders (which consent of any of the foregoing shall not be unreasonably withheld, conditioned, or delayed) and (ii) (x) such holder executes a joinder agreement in the form attached hereto as **Exhibit C** (a "**Joinder Agreement**"), and shall be deemed a Commitment Party hereunder and (y) such joinder is delivered on a confidential and "professional eyes only" basis to K&E, Milbank, Jones Day, S&C, Gibson, and R&G within three (3) business days following the execution thereof.

(f)       Notwithstanding anything to the contrary herein, no Commitment Party shall sell, assign, transfer, permit the participation in, or otherwise dispose of any ownership (including any Beneficial Ownership) in any Debtor Interests, in whole or in part, until (i) the Effective Period has terminated and (ii) such Commitment Party has filed an amendment to its Schedule 13D with respect to Garrett disclosing such termination.

(g)       Any Transfer made in violation of this Section 6 shall be void *ab initio*. Each other Commitment Party shall have the right to enforce the voiding of such Transfer. Any Commitment Party that effectuates a Permitted Transfer to a Permitted Transferee shall have no liability under this Agreement arising from or related to the failure of the Permitted Transferee to comply with the terms of this Agreement.

(h)       Notwithstanding anything to the contrary in this Section 6, the restrictions on Transfer set forth in this Section 6 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker dealer or prime broker holding such claims and interests in custody or prime brokerage in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests in accordance with the terms of the custody or prime brokerage agreement(s), as applicable. For the avoidance of doubt, a bank, broker-dealer or prime broker holding custody of the claims and interests shall not be subject to the terms of this Agreement solely when acting in such capacity.

**Section 7.** *Representations and Warranties.*

7.01.   Representations and Warranties. Each Commitment Party represents and warrants, severally, and not jointly, and, each Debtor also represents and warrants, to each other Party, as of the date hereof (or as of the date a Permitted Transferee or Debtor becomes a Party) that:

(a)       other than the Debtors, it is the beneficial owner of, or is the nominee, investment manager, adviser, or sub-adviser for beneficial holders of, the Debtor Claims/Interests in the amounts identified by its counsel to the counsel for all Parties via email (such Debtor Claims/Interests, the "**Owned Debtor Claims/Interests**");

(b)       other than the Debtors, it has the full power and authority to act on behalf of, vote and consent to matters concerning the Owned Debtor Claims/Interests;

(c)       other than the Debtors, the Owned Debtor Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that

21

would adversely affect in any way such Commitment Party's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)      other than Honeywell and the Debtors, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) an institutional accredited investor (defined in Rule 501(a)(1), (2), (3), or (7) under the Securities Act of 1933, as amended (the "**Securities Act**"), (C) non-U.S. person as defined in Regulation S under the Securities Act, or (D) the foreign equivalent of (A) or (B) above, and (ii) any securities of any Debtor acquired by the applicable Commitment Party in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act;

(e)      as of the date hereof, it has no actual knowledge of any event that, due to any fiduciary or similar duty to any other person or entity, would prevent it from taking any action required of it under this Agreement;

(f)      it is validly existing and in good standing (or equivalent) under the laws of its jurisdiction of organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(g)      except as expressly provided in this Agreement, the Approved Plan, the Term Sheet, or the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform the respective obligations under, this Agreement;

(h)      except as expressly provided in this Agreement, it has all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(i)      except as expressly set forth herein (and subject to necessary Bankruptcy Court approval and/or regulatory approvals associated with the Restructuring Transactions), the execution, delivery, and performance by it of this Agreement does not, and shall not, require any registration or filing with consent or approval of, or notice to, or other action to, with or by, any federal, state, or other governmental authority or regulatory body;

(j)      it is not a party to any contract, agreement, commitment, understanding or other obligation (written or oral) with any other person or entity which is in effect with respect to any proposal inconsistent with the Restructuring Transactions, or with respect to an Alternative Transaction, and, in the case of Honeywell, is not party to any contract, agreement, commitment, understanding, or other obligation (written or oral) with any Plan Sponsor or Additional Investor with respect to the Restructuring Transactions except for this Agreement or as otherwise disclosed in writing to S&C prior to the date hereof; and

22

(k)     the execution, delivery, and performance of this Agreement does not and shall not:  (a) violate any provision of law, rules or regulations applicable to it or any of its subsidiaries in any material respect; or (b) violate its certificate of incorporation, bylaws, or other organizational documents or those of any of its subsidiaries.

**Section 8.**     *Acknowledgement*.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities laws and provisions of the Bankruptcy Code.

**Section 9.**     *Termination Events*.

9.01.   <u>Commitment Party Termination Events</u>.  This Agreement may be terminated (a) with respect to Honeywell, by Honeywell, (b) with respect to Oaktree, by Oaktree, (c) with respect to Centerbridge, by Centerbridge, (d) with respect to the Additional Investors, by Additional Investors holding at least 60% of the commitments to purchase Convertible Series A Preferred Stock held by such Additional Investors, (e) with respect to the Consenting Noteholders, by the Requisite Consenting Noteholders, (f) with respect to the Consenting Lenders, by the Requisite Consenting Lenders, and (g) with respect to the Consenting Equityholders, by the Requisite Consenting Equityholders, in each case, by the delivery to the Debtors and the other Commitment Parties of a written notice (email being sufficient) in accordance with <u>Section 11.12</u> hereof upon the occurrence of any of the following events:

(a)     the breach in any material respect by any other Party of any of the representations, warranties, covenants, obligations or commitments set forth in this Agreement, which breach (i) would materially and adversely impede or interfere with the overall acceptance, implementation or consummation of the Restructuring Transactions on the terms and conditions set forth in this Agreement (including the Term Sheet) and (ii) is uncured for a period of five (5) business days after the receipt by the Debtors and such breaching Party of written notice in accordance with <u>Section 11.12</u> of such breach from any non-breaching Party, other than with respect to any breach that is uncurable, for which no notice or cure period shall be required or apply (it being understood and agreed that any actions required to be taken by such Parties that are included in the Approved Plan or the Term Sheet but not in this Agreement are to be considered "covenants" of such Parties, and therefore covenants of this Agreement, notwithstanding the failure of any specific provision in the Approved Plan or the Term Sheet to be re-copied in this Agreement).

(b)     the issuance by any governmental authority, including any regulatory authority, the Bankruptcy Court, or another court of competent jurisdiction, of any injunction, judgment, decree, charge, ruling or order that, in each case, would have an adverse effect on a material provision of this Agreement or a material portion of the Restructuring Transactions or the Approved Plan or a material adverse effect on the Debtors' businesses, unless the Debtors or any of the Commitment Parties have sought a stay of such injunction, judgment, decree, charge, ruling, or order within fifteen (15) business days after the date such terminating Commitment Party transmits a written notice to the Debtors detailing any such issuance, and such injunction, judgment, decree, charge, ruling, or order is reversed or vacated within twenty (20) business days

23

after the date of such notice; <u>provided</u>, that this termination right may not be exercised by any Commitment Party that sought or requested the issuance of such injunction, judgment, decree, charge, ruling or order in contravention of any obligation set forth in this Agreement;

(c)     an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code, a trustee, or a receiver shall have been appointed in the Chapter 11 Cases unless waived by all parties entitled to waive such event of default;

(d)     the (i) conversion of one or more of the Chapter 11 Cases of the Debtors to a case under chapter 7 of the Bankruptcy Code or (ii) dismissal of one or more of the Chapter 11 Cases of the Debtors, unless such conversion or dismissal, as applicable, is made with the prior written consent of Honeywell and the Plan Sponsors;

(e)     any of the Restructuring Documents after completion, (i) contain terms, conditions, representations, warranties or covenants that are materially inconsistent with the terms of this Agreement, (ii) shall have been materially and adversely amended or modified with respect to the terminating Party or (iii) shall have been withdrawn, in each case, without the consent of the applicable Party in accordance with its approval rights under this Agreement (including the Term Sheet), and in the case of a Restructuring Document that is also an order, including the Confirmation Order, such order shall have been materially stayed, reversed, vacated or adversely modified, without the prior written consent of the Plan Sponsors and Honeywell, solely to the extent the Additional Investors are adversely affected, the Requisite Additional Investors, and solely to the extent the economic treatment of the Prepetition Lenders, the Senior Noteholders, or the Consenting Equityholders is adversely affected, the Requisite Consenting Lenders, the Requisite Consenting Noteholders, or the Requisite Consenting Equityholders, respectively, unless the Debtors have sought a stay of such order within five (5) business days after the date of such issuance, and such order is stayed, reversed or vacated within ten (10) business days after the date of such issuance;

(f)     the Approved Plan or Disclosure Statement is amended or modified in any manner that is materially adverse to the Commitment Party seeking termination pursuant to this provision and such Commitment Party did not duly consent to such amendment or modification;

(g)     any other Party directly or indirectly proposes, supports, assists, solicits or files a pleading seeking approval of any Alternative Transaction (or any approval of any sales, voting or other procedures in connection with an Alternative Transaction) without the prior written consent of Honeywell, the Plan Sponsors, and the Requisite Additional Investors that results in a material adverse effect for the consummation of the Restructuring Transactions;

(h)     the Bankruptcy Court enters an order avoiding, disallowing, subordinating or recharacterizing any claim, lien or interest held by the Commitment Parties, unless any Party sought a stay of such order within five (5) business days after the date of such issuance, and such order is stayed, reversed or vacated within ten (10) business days after the date of such issuance; <u>provided</u>, <u>that</u> no Party other than the Requisite Consenting Noteholders may terminate this Agreement in the event that the Bankruptcy Court enters an order disallowing any claim arising under, derived from, or based on the Applicable Premium (as defined in the

24

Indenture) (a "**Make-Whole Disallowance**"), and the Requisite Consenting Noteholders may only terminate this Agreement with respect to the rights and obligations of the Consenting Noteholders hereunder in the event of any such Make-Whole Disallowance;

(i)      solely with respect to the Additional Investors (upon the exercise by the Requisite Additional Investors of the termination right set forth in this clause (m)) or the Consenting Noteholders (upon the exercise by the Requisite Consenting Noteholders of the termination right set forth in this clause (m)), if on or after April 19, 2021, an Approved Plan is not filed with the Bankruptcy Court by a person with the right to file a chapter 11 plan on the date of filing such Approved Plan (the "**Plan Filing Deadline**"), provided that the Plan Filing Deadline shall be automatically extended by an additional ninety (90) days, and for subsequent ninety (90) day periods thereafter, in the event that the Requisite Additional Investors or Requisite Consenting Noteholders, as applicable, do not provide notice of the exercise of the termination right in this clause (i) within five (5) business days after the applicable operative Plan Filing Deadline, in which case this Agreement shall terminate solely with respect to such terminating Party and such date shall be extended with respect to the non-terminating Party, as applicable;

(j)      the Effective Date has not occurred by June 30, 2021 (the "**Effective Date Deadline**"); provided, that the Effective Date Deadline shall be automatically extended for an additional ninety (90) days, and for subsequent ninety (90) day periods thereafter, in the event that either (i) the Plan Filing Deadline has been extended, or (ii) a Party fails to provide notice of the exercise of the termination right in this clause (j) within five (5) business days after the expiration of the operative Effective Date Deadline, in which case this Agreement shall terminate solely with respect to such terminating Party and such deadline shall be extended with respect to all other Parties;

(k)      solely to the extent that this Agreement has been terminated with respect to the Debtors, if Honeywell, either Plan Sponsor, the Requisite Additional Investors or the Requisite Consenting Noteholders reasonably determine, in good faith, after consulting with and upon the advice of external counsel, and after consultation with the advisors to Honeywell, the Plan Sponsors, the Additional Investors and the Consenting Noteholders, that (i) the implementation or consummation of the Restructuring Transactions is no longer practicable, and (ii) there are no reasonable alternatives available to address the legal, structural, or other impediments preventing the implementation or consummation of the Restructuring Transactions that do not materially and adversely affect the economic treatment of such terminating Party under this Agreement; or

(l)      if the Bankruptcy Court grants relief that (i) is inconsistent with this Agreement in any material respect or (ii) would, or would reasonably be expected to, materially frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring Transactions, unless the Debtors or the Commitment Parties have sought a stay of such relief within five (5) business days after the date of such issuance, and such order is stayed, reversed or vacated within ten (10) business days after the date of such issuance.

9.02.   Debtor Termination Events.  Any Debtor may terminate this Agreement as to itself only upon prior written notice to all parties in accordance with Section 11.12 hereof upon the occurrence of any of the following events:

25

(a)      The breach in any material respect by one or more of the Commitment Parties of any of the undertakings, representations, warranties or covenants of the Commitment Parties set forth herein, which breach or failure to act (i) would materially and adversely impede or interfere with the implementation or consummation of the Restructuring Transactions on the terms and conditions set forth in this Agreement (including the Term Sheet) and (ii) is uncured for a period of ten (10) business days after the receipt of written notice in accordance with Section 11.12 of such breach from any non-breaching Party, other than with respect to any breach that is uncurable, for which no notice or cure period shall be required or apply (it being understood and agreed that any actions required to be taken by such Parties that are included in the Approved Plan or the Term Sheet but not in this Agreement are to be considered "covenants" of such Parties, and therefore covenants of this Agreement, notwithstanding the failure of any specific provision in the Approved Plan or the Term Sheet to be restated in this Agreement);

(b)      The Board reasonably determines in good faith after receiving the advice of outside counsel that the Debtors' continued performance under this Agreement would be inconsistent with the exercise of the Board's fiduciary duties under applicable law; provided that the Debtors may not terminate this Agreement pursuant to this clause (b) unless the Debtors are in compliance with Section 5.04 in all respects;

(c)      The Requisite Commitment Parties give a notice of termination of this Agreement;

(d)      An order is entered by the Bankruptcy Court or a court of competent jurisdiction denying confirmation of the Approved Plan or declining to approve the Disclosure Statement (in each case, unless caused by a default by any Debtor of its obligations hereunder, in which event the Debtors shall not have the right to terminate under this subsection); provided, that the Debtors shall not have the right to terminate this Agreement pursuant to this Section 9.02(c) if the Bankruptcy Court declines to approve the Disclosure Statement or denies confirmation of the Approved Plan subject only to the making of ministerial or administrative modifications to the Approved Plan or Disclosure Statement;

(e)      The issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling, judgment or order enjoining the consummation of a material portion of the Restructuring Transactions, which ruling, judgment or order has not been stayed, reversed or vacated within twenty (20) business days after such issuance;

(f)      any other Party directly or indirectly proposes, supports, assists, solicits or files a pleading seeking approval of any Alternative Transaction (or any approval of any sales, voting or other procedures in connection with an Alternative Transaction) without the prior written consent of the Debtors that results in a material adverse effect for the consummation of the Restructuring Transactions;

(g)      the Effective Date has not occurred by the Effective Date Deadline; or

(h)      if the Bankruptcy Court grants relief that would, or would reasonably be expected to, materially frustrate the purposes of this Agreement, including by preventing the

consummation of the Restructuring Transactions, unless the Debtors or the Commitment Parties have sought a stay of such relief within five (5) business days after the date of such issuance, and such order is stayed, reversed or vacated within ten (10) business days after the date of such issuance.

9.03.   Restructuring Document Termination Event.  If any Party files a pleading seeking authority to amend, modify, or withdraw any of the Restructuring Documents (the "Filing Party") without the prior written consent of the Debtors, the Plan Sponsors, and Honeywell, solely to the extent the Additional Investors are adversely affected, the Requisite Additional Investors, and solely to the extent the economic treatment of the Prepetition Lenders, the Senior Noteholders, or the Consenting Equityholders is adversely affected, the Requisite Consenting Lenders, the Requisite Consenting Noteholders, or the Requisite Consenting Equityholders, respectively, such Parties, as applicable, may, upon notice to the Filing Party, terminate the Filing Party's rights and obligations under this Agreement; provided, that the Filing Party shall have three (3) business days following such notice to withdraw such pleading; provided, further, that in the event that a Filing Party files an Approved Plan containing a modification or amendment that adversely affects the economic treatment of the Senior Notes and if an individual Consenting Noteholder does not consent to such modification or amendment, then such individual Consenting Noteholder may, by delivering to the Debtors and the other Commitment Parties a written notice (email being sufficient) in accordance with Section 11.12 hereof, terminate this Agreement solely with respect to its obligations hereunder, unless such modification or amendment has been withdrawn, reversed, or annulled within three (3) business days of the Filing Party's receipt of such notice.

9.04.   Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement (email being sufficient) among the Debtors and the Requisite Commitment Parties.

9.05.   Automatic Termination.  This Agreement shall terminate automatically without any further required action or notice on the Effective Date.

9.06.   Termination of Debtors' Rights and Obligations.  Upon the occurrence of any of the following events, Honeywell, the Plan Sponsors, and the Additional Investors holding at least 60% of the commitments to purchase Convertible Series A Preferred Stock held by such Additional Investors together may, by delivering a written notice (email being sufficient) to the Debtors and the other Commitment Parties in accordance with Section 11.12, terminate the Debtors' rights and obligations under this Agreement; provided that no such notice to terminate shall be effective at any time when any of Honeywell, the Plan Sponsors or any subset of the Additional Investors holding more than 40% of the commitments to purchase Convertible Series A Preferred Stock held by all Additional Investors are in material breach of this Agreement:

(a)     all of the Debtors, other than Garrett, fail to deliver signature pages to this Agreement to the Commitment Parties within fourteen (14) calendar days of the Agreement Effective Date;

(b)     the Debtors fail to meet any of the Milestones set forth in Section 4(b) as a result of the failure by any Debtor to use commercially reasonable efforts to reach such Milestone;

27

(c)      (i) any Debtor fails to comply with, or any Debtor causes any person acting on the Debtors' behalf to fail to comply with, Section 5.04 of this Agreement in any material respect or (ii) the Debtors deliver, or become required to deliver, a notice contemplated by Section 5.04(c);

(d)      any Debtor consents to or fails to contest a motion to terminate its exclusive right under section 1121 of the Bankruptcy Code to file a plan of reorganization and solicit votes thereon;

(e)      any Debtor files any motion or application seeking authority to sell all or a material portion of its assets or equity interests, without the prior written consent of Honeywell, the Plan Sponsors, and the Requisite Additional Investors;

(f)      any Debtor files any motion seeking authority to enter into postpetition secured financing, without the prior written consent of Honeywell, the Plan Sponsors, and the Requisite Additional Investors; or

(g)      the occurrence of an event of default under any debtor-in-possession financing that leads to an acceleration of such financing.

9.07.   Effect of Termination.

(a)      No Party may terminate this Agreement if such Party failed to perform or comply in all material respects with the terms and conditions of this Agreement, with such failure to perform or comply causing, or resulting in, the occurrence of one or more termination events specified herein.  The date on which termination of this Agreement is effective as to a Party shall be referred to as a "**Termination Date**" for that Party.

(b)      Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all claims or causes of action; provided, that such termination shall not relieve any such Party from any liability arising prior to termination.  Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; provided, however, any Commitment Party withdrawing or changing its vote pursuant to this Section 9.07(b) shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and file notice of such withdrawal or change with the Bankruptcy Court.  Nothing in this Agreement shall be construed as prohibiting a Debtor or any of the Commitment Parties from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as

28

expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Debtor or the ability of any Debtor to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Commitment Party and (b) any right of any Commitment Party, or the ability of any Commitment Party, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Debtor or Commitment Party. No purported termination of this Agreement shall be effective under this Section 9.07(b) or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 9.02(d).

(c) Notwithstanding anything to the contrary herein, to the extent that Honeywell, the Plan Sponsors, and the Additional Investors holding at least 60% of the commitments to purchase Convertible Series A Preferred Stock held by such Additional Investors together exercise any termination right with respect to the Debtors pursuant to Section 9.06, such action shall only terminate the Debtors' rights and obligations under this Agreement, and the Commitment Parties shall not be permitted to terminate this Agreement with respect to any other Party.

9.08. Automatic Stay. The Debtors acknowledge that neither the giving of notice of termination by any Party pursuant to this Agreement nor compliance with any provision hereto shall be a violation of the automatic stay of section 362 of the Bankruptcy Code; provided, that nothing herein shall prejudice any Party's rights to argue that the giving of notice of termination was not proper under the terms of this Agreement.

**Section 10.** *Amendments*.

(a) This Agreement, including the Term Sheet, may not be modified, amended, or supplemented in any manner except as consented to (in writing, with email from the applicable counsel being sufficient) by (i) the Debtors, the Plan Sponsors, and Honeywell, (ii) solely to the extent such modification, amendment, or supplement adversely affects the Additional Investors, the Requisite Additional Investors, (iii) solely to the extent such modification, amendment, or supplement adversely affects the economic treatment of the Prepetition Lenders, the Requisite Consenting Lenders, (iv) solely to the extent such modification, amendment, or supplement adversely affects the Consenting Noteholders, the Requisite Consenting Noteholders (*provided* that, to the extent any such modification, amendment, or supplement adversely affects the economic treatment of the Senior Notes, if an individual Consenting Noteholder does not consent to such modification, amendment, or supplement, such individual Consenting Noteholder may, by delivering to the Debtors and the other Commitment Parties a written notice (email being sufficient) in accordance with Section 11.12 hereof, terminate this Agreement solely with respect to its obligations hereunder), and (v) solely to the extent such modification, amendment, or supplement adversely affects the economic treatment of the Consenting Equityholders, the Requisite Consenting Equityholders.

**Section 11.** *Miscellaneous*.

11.01. Fees and Expenses. The Debtors shall promptly pay or reimburse, and the Approved Plan shall provide for the payment in full in cash of, all reasonable and documented fees

29

and expenses of the following (regardless of when such fees are or were incurred): (a) Milbank, as legal counsel to the Plan Sponsors, and Houlihan Lokey, Inc., as financial advisor to the Plan Sponsors, (b) K&E, as legal counsel to Honeywell, and TRS Advisors LLC and Centerview Partners LLC as financial advisors to Honeywell, (c) Jones Day, as legal counsel to each Additional Investor, and Rothschild & Co. as financial advisor to each Additional Investor, (d) Fried, Frank, Harris, Shriver & Jacobson LLP, as legal counsel to The Baupost Group, LLC, and Ducera Partners LLC, as financial advisor to The Baupost Group, LLC, and (e) Ropes & Gray LLP, as legal counsel to the Consenting Noteholders, and Moelis & Co., as financial advisor to the Consenting Noteholders (the "**Fees**"); provided, that, prior to the Effective Date, the Debtors' obligation to pay or reimburse the Fees promptly after receipt of an invoice therefor shall be subject to an aggregate cap of $25 million (the "**Interim Cap**").  The Debtors shall pay or reimburse all unpaid Fees in excess of the Interim Cap on the Effective Date.  The Fees shall be payable by the Debtors without any requirement to (x) file retention or fee applications, (y) provide notice to any person other than the Debtors, or (z) provide individual time entries to the Debtors or any other person.

11.02.   Confidentiality.  No Party may disclose or share this Agreement or any information related to the holdings amounts or participation of any other Parties, except as may be required under applicable law, any enforceable order of any court or administrative authority with jurisdiction over the applicable disclosing Party, or applicable regulations or stock exchange rules, as reasonably determined by the applicable disclosing Party upon consultation with counsel (including in-house counsel); provided, further, that copies of this Agreement with such holdings amounts redacted may be shared for purposes of executing a Joinder Agreement or for purposes of the Debtors obtaining Bankruptcy Court approval of this Agreement.

11.03.   Further Assurances.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court in connection with the Approved Plan, from time to time, to effectuate the Restructuring Transactions, as applicable.

11.04.   Entire Agreement.  This Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral, or written, among the Parties with respect thereto.

11.05.   Headings.  The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

11.06.   GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement in  the Bankruptcy Court (or court of proper appellate jurisdiction) (the "**Chosen Court**"), and solely in connection with claims arising under this Agreement: (a)

irrevocably submits to the exclusive jurisdiction of the Chosen Court; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Court; and (c) waives any objection that the Chosen Court is an inconvenient forum or does not have jurisdiction over any Party hereto or constitutional authority to finally adjudicate the matter.

11.07.  Trial by Jury Waiver.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

11.08.  Execution of Agreement.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

11.09.  Rules of Construction.  Notwithstanding anything contained herein to the contrary, it is the intent of the Parties that all references to votes or voting in this Agreement be interpreted to include votes or voting on a chapter 11 plan under the Bankruptcy Code.  When a reference is made in this Agreement to a section or exhibit, such reference shall be to a section or exhibit, respectively, of or attached to this Agreement unless otherwise indicated.  Unless the context of this Agreement otherwise requires, (a) words using the singular or plural number also include the plural or singular number, respectively, (b) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement, (c) the words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (d) the word "or" shall not be exclusive and shall be read to mean "and/or." "Writing," "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form, and any requirement that any notice, consent or other information shall be provided "in writing" shall include email. Any reference to "business day" means any day, other than a Saturday, a Sunday or any other day on which banks located in New York, New York are closed for business as a result of federal, state or local holiday and any other reference to day means a calendar day.

11.10.  Interpretation; Representation by Counsel.  This Agreement is the product of negotiations among the Debtors and the Commitment Parties and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof. The Debtors and the Commitment Parties were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel and, therefore, waive the application of any law, regulation, holding or rule of construction (i) providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document or (ii) any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel.

11.11.  <u>Successors and Assigns; No Third Party Beneficiaries</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as expressly set forth in this Agreement.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.  For the avoidance of doubt, the treatment of the Honeywell Claims set forth herein and in the Term Sheet was negotiated and agreed to exclusively in connection with the Approved Plan and is expressly conditioned on the terms set forth herein and in the Term Sheet.  The compromised treatment of the Honeywell Claims as set forth herein is not assignable, transferrable, or portable, and in the event that this Agreement is terminated for any reason, Honeywell reserves all rights to pursue any and all claims and causes of action against the Debtors and, to the extent this Agreement is terminated with respect to the Plan Sponsors' rights and obligations hereunder, to require alternate treatment on account of the Honeywell Claims.

11.12.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered by electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

      (a)      if to the Debtors, to the electronic mail addresses set forth below such Party's signature, as the case may be, with copies to:

> Garrett Motion Inc.
> 47548 Halyard Drive
> Plymouth, MI 48170
> Attention:  Jerome Maironi
> Email: jerome.mairone@garrettmotion.com
>
> With a copy (which shall not constitute notice) to:
>
> Sullivan & Cromwell LLP (as counsel to the Debtors)
> 125 Broad Street
> New York, NY 10004-2498
> Attention: Andrew G. Dietderich
>         Brian D. Glueckstein
> Email: dietdericha@sullcrom.com; gluecksteinb@sullcrom.com

      (b)      if to Honeywell, to the electronic mail addresses set forth below such Party's signature (or as directed by any Permitted Transferee thereof), as the case may be, with copies to:

> Honeywell International Inc.
> 300 South Tryon Street, Suite 600
> Charlotte, North Carolina 28202
> Attention:  Anne Madden, SVP and General Counsel
> Email: anne.madden@honeywell.com
>
> Kirkland & Ellis LLP

32

601 Lexington Avenue
New York, NY 10022
Attention:  Nicole L. Greenblatt, P.C.
          Mark McKane, P.C.
          Joseph M. Graham

Email address: Nicole.greenblatt@kirkland.com;
mark.mckane@kirkland.com; joe.graham@kirkland.com;

(c)      if to a Plan Sponsor, to the electronic mail addresses set forth below such Party's signature (or as directed by any Permitted Transferee thereof), as the case may be, with copies to:

Milbank LLP
Attn:   Dennis F. Dunne, Andrew M. Leblanc, and
Andrew C. Harmeyer
55 Hudson Yards
New York, NY 10003
Tel:    (212) 530-5000
Fax:    (212) 530-5219
Email:  ddunne@milbank.com
        aleblanc@milbank.com
        aharmeyer@milbank.com

(d)      if to an Additional Investor, to:

Jones Day
250 Vesey Street
New York, New York 10281
Attention:  Anna Kordas
E-mail address: akordas@jonesday.com

-and-

Jones Day
555 S. Flower St.
50th Floor
Los Angeles, CA 90071
Attention:  Bruce Bennett
          Joshua M. Mester
          James O. Johnston
E-mail address: bbennett@jonesday.com; jmester@jonesday.com; jjohnston@jonesday.com

(e)      if to the Consenting Lenders, to:

Gibson, Dunn & Crutcher

33

> 200 Park Avenue
> New York, NY 10166
> Attention:  Scott J. Greenberg, Esq.
> Email: sgreenberg@gibsondunn.com

(f)      if to the Consenting Noteholders, to:

> Ropes & Gray
> 1211 Avenue of the Americas
> New York, New York 10036-8704
> Telephone: (212) 596-9000
> Attention:  Mark I. Bane
>                  Matthew M. Roose
>                  Daniel G. Egan
> Email: mark.bane@ropesgray.com;
> matthew.roose@ropesgray.com; daniel.egan@ropesgray.com

or such other address as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above.  Any notice given by delivery, mail (electronic or otherwise), or courier shall be effective when received.

11.13.  Survival.  Notwithstanding the termination of this Agreement pursuant to Section 9, the agreements and obligations of the Parties in this Section 11.13 and Sections 6(f), 9.07, 10, 11.01, 11.02, 11.04, 11.05, 11.06, 11.07, 11.08, 11.09, 11.10, 11.12, 11.14, 11.15, 11.16, 11.17, 11.18, 11.19, 11.20, 11.21, and 11.23 shall survive any such termination.

11.14.  Independent Analysis.  Each Party hereby confirms that its decision to execute this Agreement has been based upon its independent assessment of documents and information available to it, as it has deemed appropriate.  Each Commitment Party acknowledges and agrees that it is not relying on any representations or warranties other than as set forth in this Agreement.

11.15.  Waiver.   If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms, pursue the consummation of the Restructuring Transactions or the payment of damages to which a Party may be entitled under this Agreement.

11.16.  Relationship Among Parties.  Notwithstanding anything herein to the contrary, (i) the duties and obligations of the Parties under this Agreement shall be several, not joint, (ii) no Party shall have any responsibility by virtue of this Agreement for any trading by any other entity; (iii) no prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement; (iv) the Parties hereto acknowledge that this agreement does not constitute an agreement, arrangement or understanding with respect to acting together for the purpose of acquiring, holding, voting or disposing of any equity securities of the Debtors and the Parties do not constitute a "group" within the meaning of Rule 13d-5 under the Securities

34

Exchange Act of 1934, as amended (the "**Exchange Act**"); (v) none of the Parties shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities in any kind or form to each other, including as a result of this Agreement or the transactions contemplated herein or in the Term Sheet; and (vi) no action taken by any Party pursuant to this Agreement shall be deemed to constitute or to create a presumption by any of the Parties that the Parties are in any way acting in concert or as such a "group."

11.17. <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of a court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party or any other Party.

11.18. <u>Several, Not Joint and Several, Obligations</u>.  Except as otherwise expressly set forth herein, the agreements, representations, warranties, liabilities and obligations of the Parties under this Agreement are, in all respects, several and not joint and several.

11.19. <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, in whole or in part, the remaining provisions shall remain in full force and effect.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

11.20. <u>Reporting of Debtor Claims</u>.  The Parties agree and acknowledge that the reported amount of the Debtor Claims reflected in each Commitment Party signature block does not necessarily reflect the full amount of such Commitment Party Debtor Claims (including, without limitation, principal, accrued and unpaid interest, makewhole, fees and expenses) and any disclosure made on any Commitment Party signature block shall be without prejudice to any subsequent assertion by or on behalf of such Commitment Party of the full amount of its Debtor Claims.

11.21. <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

11.22. <u>Claim Resolution Matters</u>.  Prior to the Effective Date, the Debtors shall not enter into any agreements with holders of claims (as defined in the Bankruptcy Code) other than as contemplated in this Agreement, relating to the allowance, estimation, validity, extent, or priority of such claims, or the treatment and classification of such claims under the Approved Plan without

the prior written consent of the Plan Sponsors, Honeywell, and the Requisite Additional Investors (such consent not to be unreasonably withheld, conditioned or delayed), except with respect to (a) claims that the Debtors are authorized to resolve or pay pursuant to any applicable first day orders, (b) claims asserted by non-insiders of the Debtors, which the Debtors agree to settle or compromise in exchange for a payment in cash of less than $1,000,000 for any individual claim or $10,000,000 in the aggregate for all claims that the Debtors settle or compromise without the prior written consent of the Plan Sponsors, Honeywell, and the Requisite Additional Investors (such consent not to be unreasonably withheld, conditioned or delayed) based on reliance upon this clause (b), or (c) claims as otherwise contemplated herein.

11.23. <u>Settlement Discussions</u>. This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties. Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms. If the Approved Plan is not consummated, or if this Agreement is terminated for any reason, nothing in this Agreement shall be construed as a waiver by any Party of any or all of such Party's rights, remedies, claims, and defenses, and the Parties expressly reserve any and all of their respective rights, remedies, claims and defenses. This Agreement shall in no event be construed as, or be deemed to be, evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.

11.24. <u>Email Consents</u>. Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, such written consent, acceptance, approval or waiver shall be deemed to have occurred if, by agreement between counsel to the Debtors and the Commitment Parties, as applicable, submitting and receiving such consent, acceptance, approval or waiver, it is conveyed in writing (email being sufficient) between each such counsel without representations or warranties of any kind on behalf of such counsel.

11.25. <u>Indenture Trustee/Agent Direction</u>. The Consenting Noteholders and Consenting Lenders, to the extent constituting the holders of a majority of the principal amount of the Senior Notes or obligations outstanding under the Credit Agreement, respectively, hereby instruct and direct the Indenture Trustee and the Agent, respectively, to comply with this Agreement to the extent specified herein and to take other actions (or refrain from acting), in each case, as expressly contemplated hereby.

[*Remainder of page intentionally left blank*]

**IN WITNESS WHEREOF**, the Parties have executed this Agreement on the day and year first above written.

Monday, January 11, 2021        1:21 AM

DEBTORS

**Garrett Motion Inc.**

By: _____

Name: Sean Deason
Title:   Chief Financial Officer

DEBTORS

**BRH LLC**


By:  _____

Name:  Jerome Maironi
Title:  Authorized Signatory

DEBTORS

**Calvari Limited**

By:   _____

Name:  Jerome Maironi
Title:  Authorized Signatory

DEBTORS

**Friction Materials**


By:    _____
        Name:  Jerome Maironi
        Title:  Authorized Signatory

DEBTORS

**Garrett ASASCO Inc.**


By:    _____
       Name:  Jerome Maironi
       Title:  Authorized Signatory

DEBTORS

**Garrett Borrowing LLC**


By: _____
        Name:  Jerome Maironi
        Title:  Authorized Signatory

DEBTORS

**Garrett Holding Company Sàrl**

By:   _____
      Name:  Jerome Maironi
      Title:  Authorized Signatory

DEBTORS

**Garrett LX I S.à r.l.**


By:    _____
        Name:  Jerome Maironi
        Title:  Authorized Signatory

DEBTORS

**Garrett LX II S.à r.l.**


By:    _____
Name:  Jerôme Maironi
Title:  Authorized Signatory

DEBTORS

**Garrett LX III S.à r.l.**


By:      _____

Name:  Jerome Maironi
Title:  Authorized Signatory

DEBTORS

**Garrett Motion Australia Pty Limited**


By:   _____
      Name:  Jerome Maironi
      Title:  Authorized Signatory

DEBTORS

**Garrett Motion Automotive Research
Mexico S. de R.L. de C.V.**


By:  _____
        Name:  Jerome Maironi
        Title:  Authorized Signatory

DEBTORS

**Garrett Motion Holdings II Inc.**


By: _____
      Name:  Jerôme Maironi
      Title:  Authorized Signatory

DEBTORS

**Garrett Motion Holdings Inc.**


By:   _____

      Name:  Jerome Maironi
      Title:  Authorized Signatory

DEBTORS

**Garrett Motion International Services S.R.L.**


By:    _____
       Name:  Jerome Maironi
       Title:  Authorized Signatory

DEBTORS

**Garrett Motion Ireland A Limited**


By: _____
    Name: Jerome Maironi
    Title: Authorized Signatory

DEBTORS

**Garrett Motion Ireland B Limited**

By:    _____

     Name:  Jerome Maironi
     Title:  Authorized Signatory

DEBTORS

**Garrett Motion Ireland C Limited**


By:     _____
         Name:  Jerome Maironi
         Title:  Authorized Signatory

DEBTORS

**Garrett Motion Ireland Limited**


By:     _____
        Name:  Jerome Maironi
        Title:  Authorized Signatory

DEBTORS

**Garrett Motion Italia S.r.l.**


By:    _____
        Name:  Jerome Maironi
        Title:  Authorized Signatory

DEBTORS

**Garrett Motion Japan Inc.**


By: _____

Name:  Jerome Maironi
Title:  Authorized Signatory

DEBTORS

**Garrett Motion LLC**


By:    _____
Name:  Jerome Maironi
Title:  Authorized Signatory

DEBTORS

**Garrett Motion México, Sociedad Anónima de Capital Variable**

By:    _____

Name:  Jerome Maironi
Title:  Authorized Signatory

DEBTORS

**Garrett Motion Romania S.R.L.**


By:   _____
      Name:  Jerome Maironi
      Title:  Authorized Signatory

DEBTORS

**Garrett Motion Sàrl**


By:   _____
      Name:  Jerome Maironi
      Title:  Authorized Signatory

DEBTORS

**Garrett Motion Slovakia s.r.o.**

By: _____

Name:  Jerome Maironi
Title:  Authorized Signatory

DEBTORS

**Garrett Motion Switzerland Holdings Sàrl**


By:    _____

       Name:  Jerome Maironi
       Title:  Authorized Signatory

DEBTORS

**Garrett Motion UK A Limited**


By:    _____
         Name:  Jerome Maironi
         Title:  Authorized Signatory

DEBTORS

**Garrett Motion UK B Limited**


By:  _____
       Name:  Jerome Maironi
       Title:  Authorized Signatory

DEBTORS

**Garrett Motion UK C Limited**

By: _____
Name:  Jerome Maironi
Title:  Authorized Signatory

DEBTORS

**Garrett Motion UK D Limited**


By:     _____
            Name:  Jerome Maironi
            Title:  Authorized Signatory

DEBTORS

**Garrett Motion UK Limited**


By:   _____
        Name:  Jerome Maironi
        Title:  Authorized Signatory

DEBTORS

**Garrett Transportation I Inc.**


By: _____
        Name:  Jerome Maironi
        Title:  Authorized Signatory

DEBTORS

**Garrett Transportation Systems Ltd**


By:    _____

       Name:  Jerome Maironi
       Title:  Authorized Signatory

DEBTORS

**Garrett Transportation Systems UK II Ltd**


By:    _____

Name:  Jerome Maironi
Title:  Authorized Signatory

DEBTORS

**Garrett TS Ltd**


By:    _____
       Name:  Jerôme Maironi
       Title:  Authorized Signatory

DEBTORS

**Garrett Turbo Ltd**


By:    _____

       Name:  Jerome Maironi
       Title:  Authorized Signatory

HONEYWELL

**Honeywell International Inc.**

By: _____
    Name:  Anne Madden
    Title:   SVP and General Counsel

PLAN SPONSORS

**CENTERBRIDGE PARTNERS, L.P.**

By:

Name:  Vivek Melwani
Title:    Senior Managing Director

PLAN SPONSORS

**OAKTREE OPPORTUNITIES FUND XI
HOLDINGS (DELAWARE), L.P.**

By:     Oaktree Fund GP, LLC
Its:    General Partner

By;     Oaktree Fund GP I, L.P.
Its:    Managing Member

By:   _____
   Name:   Kaj Vazales
   Title:   Authorized Signatory

By:   _____
   Name:   Jordan Mikes
   Title:   Authorized Signatory

**Oaktree Value Opportunities Fund Holdings, L.P.**

By:     Oaktree Value Opportunities Fund GP, L.P.
Its:    General Partner

By:     Oaktree Value Opportunities Fund GP Ltd.
Its:    General Partner

By:     Oaktree Capital Management, L.P.
Its:    Director

By:   _____
   Name:   Steven Tesoriere
   Title:   Managing Director

By:   _____
   Name:   Jordan Mikes
   Title:   Senior Vice President

**Oaktree Phoenix Investment Fund, L.P.**

By:     Oaktree Phoenix Investment Fund GP, L.P.
Its:    General Partner

By:     Oaktree Phoenix Investment Fund GP Ltd.
Its:    General Partner

By:     Oaktree Capital Management, L.P.
Its:    Director

By:     _____
    Name:    Steve Tesoriere
    Title:   Managing Director

By:     _____
    Name:    Jordan Mikes
    Title:   Senior Vice President

**Oaktree Opportunities Fund Xb Holdings (Delaware), L.P.**

By:     Oaktree Fund GP, LLC
Its:    General Partner

By:     Oaktree Fund GP I, L.P.
Its:    Managing Member

By:     _____
    Name:    Kaj Vazales
    Title:   Managing Director

By:     _____
    Name:    Ross Rosenfelt
    Title:   Managing Director

ADDITIONAL INVESTOR

**Attestor Value Master Fund LP**

By: _____

Name: F.S Andreae
Title: Authorized Attorney

ADDITIONAL INVESTOR

**THE BAUPOST GROUP, L.L.C.**
Acting on behalf of certain managed funds

By:  _____
Name:  Joshua A. Greenhill
Title:  Partner

ADDITIONAL INVESTOR


Cyrus Capital Partners, L.P., in its capacity as investment manager to and on behalf of the following managed funds and accounts: Cyrus Opportunities Master Fund II, Ltd., Cyrus Select Opportunities Master Fund, Ltd., CRS Master Fund, L.P., Crescent 1, L.P., Canary SC Master Fund, L.P., Cyrus 1740 Master Fund, L.P. Cyrus Select Opportunities Master Fund II, L.P., PC Investors III LLC and Peterson Capital Investors LLC


By: _Jennifer M. Pulick_____
Name: Jennifer M. Pulick
Title:   Authorized Signatory

ADDITIONAL INVESTOR

**FIN Capital Partners LP**
By: Finn Management GP LLC
solely on behalf of the fund as its general
partner and not in its individual capacity

By: _____

Name:        Brian Finn
Title:        Manager

ADDITIONAL INVESTOR

**Hawk Ridge Master Fund, L.P.**
**By Hawk Ridge Capital Management, L.P. as**
**Investment Manager**

By: _____

Name: David Bradley
Title: COO/CFO/CCO of Hawk Ridge
Capital Management, L.P.

ADDITIONAL INVESTOR

Keyframe Capital Partners, L.P., in its capacity as investment manager to and on behalf of the following managed funds:
Keyframe Fund I, L.P., Keyframe Fund II, L.P., Keyframe Fund III, L.P. and Keyframe Fund IV, L.P.


By: *Jennifer M. Pulick*
Name:  Jennifer M. Pulick
Title:   Authorized Signatory

ADDITIONAL INVESTOR

Newtyn Management

By:

Name: Eugene Dozortsev
Title: Managing Member

ADDITIONAL INVESTOR

**Sessa Capital (Master), L.P.**

By: _____

Name: Jae Hong
Title: President

ADDITIONAL INVESTOR

**WHITEBOX MULTI-STRATEGY PARTNERS, L.P.**
By: Whitebox Advisors LLC its investment manager

By:

<span>DocuSigned by:</span>
*Luke Harris*
FA52A1B17F3241F...

Name: Luke Harris
Title: General Counsel – Corporate, Transactions & Litigation

ALLIANCEBERNSTEIN L.P., on behalf of certain discretionary managed accounts

By:

    Name: Paul A. Emerson
    Title: Assistant Secretary

Notice Address:

AllianceBernstein L.P.
1345 Avenue of the Americas
New York, NY  10105
Attention: Bob Schwartz
Email: robert.schwartz@alliancebernstein.com

Benefit Street Partners L.L.C., on behalf of its
Affiliated Funds

By:

Name: Mike Frick
Title: Authorized Signer

Notice Address:

9 West 57th Street, Suite 4920

New York, NY, 10019

Attention:

Email: C.Lutz@benefitstreetpartners.com

**Carronade Capital Management, LP solely on behalf of funds it manages**

By:_____

Name: Dan Gropper

Title: Managing Partner



Notice Address:

17 Old Kings Highway South – Suite 140
Darien, Connecticut 06820

Attention: Dan Gropper
Email: dgropper@carronade.com

DIAMETER MASTER FUND LP
By: Diameter Capital Partners LP, its Investment
Manager

By:

    Name: Shailini Rao
    Title: General Counsel and Chief Compliance
    Officer

Notice Address:

24 West 40th Street, 5th Floor
New York, NY 10018

Attention: Patrick Evans, Alex Engler and Shailini
Rao
Email: pevans@diametercap.com;
aengler@diametercap.com; srao@diametercap.com

King Street Capital Management, L.P., solely on behalf of the funds and/or accounts that it or its affiliates manages as manager or investment manager

By: _____

    Name: Howard Baum
    Title: Authorized Signatory



Notice Address:

299 Park Avenue
40th Floor
New York, NY 10171
Attention: Howard Baum
Email: backoffice@kingstreet.com;
kslegal@kingstreet.com

By: LORD, ABBETT & CO. LLC, as investment adviser on behalf of

Lord Abbett Credit Opportunities Fund

Lord Abbett Investment Trust – Lord Abbett High Yield Fund

Lord Abbett Passport Portfolios plc – Lord Abbett High Yield Fund

Lord Abbett Passport Portfolios plc – Lord Abbett High Yield Core Fund

Lord Abbett Passport Portfolios plc – Lord Abbett Global High Yield Fund

By:

Name: Steven Rocco
Title: Member & Director of Taxable Fixed Income



Notice Address:
c/o Lord, Abbett & Co. LLC
90 Hudson Street
Jersey City, NJ 07302
Attention: General Counsel
Email: LegalNotices@LordAbbett.com

**P. SCHOENFELD ASSET MANAGEMENT LP**,
as investment advisor on behalf of certain funds and
managed accounts

By: _____

Name: Dhananjay Pai
Title: President & COO

Notice Address:

c/o PSAM
1350 Avenue of the Americas, 21ˢᵗ Floor
New York, NY 10019
Attention: Dhan Pai
Email:  dpai@psam.com and nrabin@psam.com

**Robeco Capital Growth Funds SICAV – Robeco European High Yield Bonds**
*represented by its management company Robeco Institutional Asset Management B.V.*

By: _____

    Name:   R.A. Moraal
    Title:

By: _____
Name:   E.M.H. van Leeuwen
Title:



Notice Address:

Weena 850 _____
3014DA ROTTERDAM _____
The Netherlands

DocuSign Envelope ID: B0497E31-F7DF-4732-BC9D-CB1D13225C02

Attention: Mr. D. de Koning and/or Mr. P. Bawlf
Email: d.de.koning@robeco.nl / p.bawlf@robeco.nl

Attention: Mr. D. de Koning and/or Mr. P. Bawlf
Email: d.de.koning@robeco.nl / p.bawlf@robeco.nl

**Robeco Capital Growth Funds SICAV – Robeco High Yield Bonds**
*represented by its management company Robeco Institutional Asset Management B.V.*


By:
Name:   R.A. Moraal
Title:


By:
Name:   E.M.H. van Leeuwen
Title:

Notice Address:

Weena 850

3014DA ROTTERDAM

The Netherlands

DocuSign Envelope ID: B0497E31-F7DF-4732-BG9D-CB1D1322EC02

Attention: Mr. D. de Koning and/or Mr. P. Bawlf
Email: d.de.koning@robeco.nl / p.bawlf@robeco.nl

**Robeco Capital Growth Funds SICAV –
RobecoSAM SDG High Yield Bonds**
*Represented by its management company Robeco
Institutional Asset Management B.V.*

By:_____

Name:    R.A. Moraal

Title:


By:_____

Name:    E.M.H. van Leeuwen

Title:



Notice Address:

p/a Weena 850

3014DA ROTTERDAM

The Netherlands

Attention: Mr. D. de Koning and/or Mr. P. Bawlf
Email: d.de.koning@robeco.nl / p.bawlf@robeco.nl

**Gudme Raaschou Asset Management**
*duly represented by its investment manager Robeco
Institutional Asset Management B.V.*

By:

Name:    R.A. Moraal

Title:

By:

Name:    E.M.H. van Leeuwen

Title:



Notice Address:

p/a Weena 850

3014DA ROTTERDAM

The Netherlands

Attention: Mr. D. de Koning and/or Mr. P. Bawlf

DocuSign Envelope ID: B0497E31-F7DF-4732-BC9D-CB1D1322EC02

Email: d.de.koning@robeco.nl / p.bawlf@robeco.nl

**Nykredit Portefølje Administration A/S and
Kapitalforeningen Institutionel Investor**
*duly represented by its investment manager Robeco
Institutional Asset Management B.V.*

By:_____

Name:   R.A. Moraal

Title:

By:_____

Name:   E.M.H. van Leeuwen

Title:



Notice Address:

p/a Weena 850

3014DA ROTTERDAM

The Netherlands

DocuSign Envelope ID: B0497E31-F7DF-4732-BC9D-CB1D13325C02

Attention: Mr. D. de Koning and/or Mr. P. Bawlf
Email: d.de.koning@robeco.nl / p.bawlf@robeco.nl

**UBS Fundmanagement (Switzerland) AG**
*duly represented by its investment manager Robeco*
*Institutional Asset Management B.V.*



By:

Name:    R.A. Moraal
Title:


By:
Name:    E.M.H. van Leeuwen
Title:

Notice Address:

p/a Weena 850

3014DA ROTTERDAM

The Netherlands

Attention: Mr. D. de Koning and/or Mr. P. Bawlf
Email: d.de.koning@robeco.nl / p.bawlf@robeco.nl

CONSENTING EQUITYHOLDERS

By: _____

_____

Name: [●]

Title: [●]

Notice Address:

_____

_____

_____

Attention: _____

Email: _____

[PREPETITION LENDERS]

By:_____

   Name: [●]

   Title: [●]

Notice Address:

_____

_____

_____

Attention:_____

Email:_____

[SENIOR NOTEHOLDER]

By:_____

    Name: [●]

    Title: [●]

Notice Address:

_____

_____

_____

Attention:_____

Email:_____

## **EXHIBIT A**

## **TERM SHEET**

**IN RE: GARRETT MOTION INC., et al.**

**Restructuring Term Sheet**

This term sheet (the "**Term Sheet**") sets forth all material terms for (a) the legally binding commitments of the Parties to the Plan Support Agreement, dated as of  January 11, 2021 (the "**PSA**"), to which this Term Sheet is attached as Exhibit A and (b) the Approved Plan (hereinafter, the "**Plan**").[1]  There shall be no consent right nor condition to the obligations of any of the Subscription Parties or Parties to their respective commitments to the Debtors under the PSA other than as expressly set forth in this Term Sheet or the PSA.  The applicable parties may supplement or replace this Term Sheet with definitive documentation with respect to all or any part of their obligations hereunder, *provided* that the failure to agree on such definitive documentation shall not relieve the Parties of their obligations under the PSA subject to the terms and conditions set forth therein.

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF ALL APPLICABLE LAW.   THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO THE PROVISIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATE OR FEDERAL RULES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF INFORMATION EXCHANGED IN THE CONTEXT OF SETTLEMENT DISCUSSIONS.   THIS TERM SHEET INCORPORATES THE RULES OF CONSTRUCTION SET FORTH IN SECTION 102 OF THE BANKRUPTCY CODE. NOTHING IN THIS TERM SHEET SHALL BE DEEMED AN ADMISSION OF FACT OR LIABILITY BY ANY OF THE PARTIES.

| **GENERAL PROVISIONS REGARDING THE RESTRUCTURING** | |
|---|---|
| **Convertible Series A Preferred Stock** | On the Effective Date, the Plan Sponsors and the Additional Investors (the "**Subscription Parties**") shall purchase (subject to the Rights Offering) for cash, and Reorganized Garrett shall issue, a number of shares of Convertible Series A Preferred Stock at a purchase price of $1,250.8 million, in the aggregate.   The Convertible Series A Preferred Stock shall have the following terms and conditions:<br><br>• Dividend.  11% per annum. Payable quarterly in cash or PIK at the option of reorganized Garrett; *provided* that dividends will automatically PIK during any period in which the Reorganized Debtors' adjusted EBITDA (to be defined consistent with the definition of adjusted EBITDA included in the Credit Facilities, as they may be amended, modified or replaced from time to time) ("**Adjusted EBITDA**") on a consolidated basis for the period of four fiscal quarters ending with the fiscal quarter immediately preceding the declaration of the dividend falls below $425 million. During any period in which dividends are payable in cash or PIK at the option of reorganized Garrett, the cash/PIK election will be determined by a majority of the disinterested members of the New Board (with the |

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in Annex 1 attached hereto or the PSA.

benefit of input from reorganized Garrett's executive management team as such disinterested members deem appropriate). The Convertible Series A Preferred Stock will participate, on an as-converted basis, in any dividends paid to the holders of reorganized Garrett's common stock.

- Conversion.  Each holder will have the right to convert its shares of Convertible Series A Preferred Stock into common stock of reorganized Garrett, based on a conversion price of $3.50 per common share (the "**Conversion Price**") and the initial liquidation preference of the Convertible Series A Preferred Stock, subject to customary conversion procedures and anti-dilution protections (for the avoidance of doubt, not applicable to the Rights Offering or the MIP).  All outstanding Convertible Series A Preferred Stock shall convert into common stock of reorganized Garrett (i) with the approval of holders of a majority of the outstanding shares of Convertible Series A Preferred Stock; or (ii) automatically on the first date on or after the date that is two years from the Effective Date on which (A) $125 million or less of Amortization remains outstanding on the Series B Preferred Stock;  (B) the common stock of reorganized Garrett has a 75-day volume-weighted average price per share that is greater than or equal to 150% of the Conversion Price; and (C) the Reorganized Debtors' Adjusted EBITDA on a consolidated basis equals or exceeds $600 million for two (2) consecutive quarters (on an LTM basis).  The common stock issued upon such conversion shall be registered on a resale registration statement.  Notwithstanding anything to the contrary herein, any accrued and unpaid dividends, whether or not previously declared, and any dividends paid in kind on shares of Convertible Series A Preferred Stock shall, as and when the initial liquidation preference of the Convertible Series A Preferred Stock (as adjusted) converts into common stock of reorganized Garrett, be paid in cash or, at reorganized Garrett's option, convert at the lesser of: (i) the 30-day volume weighted average price per share of the common stock of reorganized Garrett at the time of such conversion; or (ii) the fair market value of the common stock of reorganized Garrett at the time of such conversion as determined by the New Board. Reorganized Garrett shall at all times reserve from its authorized and unissued shares of common stock not less than the aggregate number of shares of common stock as shall be issuable upon the conversion of all outstanding Convertible Series A Preferred Stock.

- Ranking. Senior liquidation and distribution rights with respect to all other preferred stock and common stock of reorganized Garrett.  For the avoidance of doubt, in a sale, liquidation, or similar event, if not previously converted, the holders of shares of Convertible Series A Preferred Stock shall be entitled to the greater of (i) the liquidation preference of such stock plus accrued and unpaid dividends thereunder, whether or not previously declared, and (ii) the amount the Convertible Series A Preferred Stock, including accrued and unpaid dividends thereunder, whether or not previously declared, would receive if such shares converted immediately before such event into common stock of reorganized Garrett pursuant to the conversion right specified above (assuming solely for this purpose that any such accrued and unpaid

2

dividends would be satisfied in cash and not in stock). Following the issue date, no preferred shares or equity securities ranking *pari passu* with or senior to the Convertible Series A Preferred Stock may be issued by the Reorganized Debtors without the consent of (x) holders of a majority of the outstanding shares of Convertible Series A Preferred Stock and (y) holders of the Series B Preferred Stock.

- Voting. The Convertible Series A Preferred Stock will vote on all matters before holders of common stock in reorganized Garrett as a single class with such holders of common stock on an as-converted basis.

- Maturity. Perpetual.

- Liquidation Preference. The Convertible Series A Preferred Stock shall have a liquidation preference equal to $1 per share and be issued at $1 per share.

- Redemption. The Convertible Series A Preferred Stock will not be redeemable by the Reorganized Debtors, except that (i) at any time following the sixth anniversary of the Effective Date or (ii) in connection with a transaction resulting in the transfer to a non-affiliate of (a) 50.01% or more of the total voting power of reorganized Garrett or (b) all or substantially all of the assets of the Reorganized Debtors (a "**Change of Control**"), reorganized Garrett may redeem any Convertible Series A Preferred Stock not converted into common stock of reorganized Garrett for an amount equal to the liquidation preference plus cash equal to the amount of any dividends that have accrued and not been paid in cash (including PIK dividends).

- Financial Covenant. Subject to exceptions that would be customary for analogous debt incurrence covenants applicable to senior secured credit agreements (including without limitation refinancing exceptions) and not less favorable than those set out in the Credit Facilities, the Reorganized Debtors will not be able to incur debt for borrowed money after the Effective Date that would result in the ratio of the Reorganized Debtors' Adjusted EBITDA on an LTM basis as of the most recently ended fiscal quarter to debt for borrowed money outstanding exceeding 3x on a pro forma basis, without the approval of holders of a majority of the outstanding shares of Convertible Series A Preferred Stock.

- New Money Investors. The Plan Sponsors and the Additional Investors shall commit, severally and not jointly, to purchase shares of Convertible Series A Preferred Stock at a purchase price of $1,050.8 million in the aggregate in cash in accordance with the allocation annex attached hereto as **Annex 2**.

- Rights Offering. Further, Garrett shall conduct a rights offering (the "**Rights Offering**") without registration under the Securities Act of 1933, as amended, in which all holders of common stock of Garrett that do not participate in the Cash-Out Option shall receive subscription rights to purchase (subject to compliance with all applicable securities laws)

3

| | additional shares of Convertible Series A Preferred Stock at a purchase price of $200 million in the aggregate in cash.  The record date for purposes of participation in the Rights Offering by holders of common stock of Garrett shall be set at least one week after the Bankruptcy Court's entry of the Disclosure Statement Order.<br><br>• Backstop of Rights Offering.  The Plan Sponsors and the Additional Investors (severally, but not jointly) commit to exercise the rights allocated to them in the Rights Offering based on their *pro rata* share of the outstanding common stock of Garrett as of the date of the execution of the PSA to purchase Convertible Series A Preferred Stock in cash at the issuance price. The Plan Sponsors and the Additional Investors (severally, but not jointly) commit to fully backstop the portion of the Rights Offering allocated to other holders of Garrett common stock (the "**Remaining Rights Offering Amount**") by committing to purchase for cash at the issuance price all unsubscribed shares on customary terms and conditions to be set forth in a backstop commitment agreement reasonably acceptable to the Debtors, the Plan Sponsors, Honeywell, and the Requisite Additional Investors.  The Plan Sponsors' aggregate backstop commitment shall be 63.6% of the Remaining Rights Offering Amount (allocated equally between the Plan Sponsors). The Additional Investors' aggregate backstop commitment shall be 36.4% of the Remaining Rights Offering Amount (allocated pro rata based on their holdings common stock of Garrett as of January 1, 2021).  There shall be no separate fees or other compensation for the backstop commitments, other than customary expense reimbursement and indemnities.<br><br>• Consent Rights.  The Plan Sponsors and the Debtors may not modify any of the foregoing terms or conditions, unless (i) Honeywell and the Requisite Additional Investors consent or (ii) such modification does not adversely affect the economic treatment of Honeywell or adversely affect the Additional Investors as provided herein.<br><br>• Other Provisions. The Convertible Series A Preferred Stock shall not have affirmative, negative or other covenants relating to the Company or any other material rights or privileges other than as set forth herein or as otherwise reasonably agreed among Honeywell, the Debtors, the Plan Sponsors, and the Requisite Additional Investors. |
| **Pro Forma Capital Structure** | The Plan shall provide for the recapitalization of the reorganized Debtors (the "**Reorganized Debtors**") on the effective date of the Plan (the "**Effective Date**"). |

4

| Cash Out Option | The Plan shall provide that Holders of common stock of Garrett may elect to deliver their shares of such common stock to reorganized Garrett for cancellation in exchange for a payment in cash on the Effective Date equal to $6.25 for each share properly delivered (the "**Cash-Out Option**" and, the cash payment offered through the Cash-Out Option, the "**Cash-Out Consideration**").   For the avoidance of doubt, (i) the Existing Commitment Parties shall not elect to participate in the Cash-Out Option and (ii) holders of common stock of Garrett that elect to participate in the Cash-Out Option and receive the Cash-Out Consideration shall (x) opt into the releases set forth in the Plan and (y) not be entitled to retain their common stock of reorganized Garrett or participate in the Rights Offering. |
|---|---|
| **Exit Credit Facilities** | Upon the Bankruptcy Court's entry of the Confirmation Order, Garrett shall have (x) accepted the assignment by FinCo of all of FinCo's rights and obligations under the Commitment Letter and the Fee Letter and (y) obtained entry of a Bankruptcy Court order approving such assignment, *provided* that (1) the terms and conditions of the Commitment Letter and the Fee Letter shall be reasonably acceptable to the Debtors, the Plan Sponsors, Honeywell, and the Requisite Additional Investors (it being understood that such documents in the form most recently delivered to the Debtors prior to the date of the PSA are reasonably acceptable to all Parties) and (2) the Debtors shall have no financial obligations thereunder until the entry of the Confirmation Order.   The aggregate principal amount of indebtedness outstanding under the Credit Facilities on the Effective Date shall not exceed the Debt Cap. |

## TREATMENT OF CLAIMS AND INTERESTS OF THE DEBTORS UNDER THE PLAN

| Class No. | Type of Claim | Treatment | Impairment / Voting |
|---|---|---|---|
| | | **Unclassified Non-Voting Claims** | |
| **N/A** | **Administrative Claims** | Except to the extent that a holder of an allowed Administrative Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each such Claim, on the Effective Date or as soon as reasonably practicable thereafter, each holder thereof shall receive payment in full in cash. | N/A |
| **N/A** | **Priority Tax Claims** | Except to the extent that a holder of an allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each such Claim, each holder thereof shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. | N/A |
| **N/A** | **DIP Facility Claims** | In full and final satisfaction, settlement, release, and discharge of and in exchange for each DIP Facility Claim, on the Effective Date, each holder thereof shall receive payment in full in cash. | N/A |

5

| Classified Claims and Interests of the Debtors | | | |
|---|---|---|---|
| Class 1 | **Other Secured Claims** | Except to the extent that a holder of an allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each such Claim, each holder thereof shall receive, at the option of the Plan Sponsors: (a) payment in full in cash; (b) delivery of the collateral securing its allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) reinstatement of its allowed Other Secured Claim; or (d) such other treatment rendering its allowed Other Secured Claim unimpaired in accordance with section 1124 of the Bankruptcy Code. | Unimpaired / Deemed to Accept |
| Class 2 | **Other Priority Claims** | Except to the extent that a holder of an allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each such Claim, each holder thereof shall receive payment in full in cash or such other treatment rendering its allowed Other Priority Claim unimpaired in accordance with section 1124 of the Bankruptcy Code. | Unimpaired / Deemed to Accept |
| Class 3 | **Secured Credit Facility Claims** | Except to the extent that a holder of a Secured Credit Facility Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Secured Credit Facility Claim, each holder thereof shall receive payment in full in cash on the Effective Date of all outstanding principal and accrued interest under the Credit Agreement at the contractual non-default rate to the Effective Date.[2] | Unimpaired / Deemed to Accept |

---

[2] Such treatment shall constitute "Acceptable Plan" treatment under that certain Restructuring Support Agreement (as may be amended, restated, amended and restated, extended, supplemented, or otherwise modified from time to time), effective September 20, 2020, by and among Garrett and certain of its Debtor affiliates, and certain of the Debtors' prepetition secured lenders. The Debtors, the Plan Sponsors, Honeywell, and the Requisite Additional Investors may collectively determine, consistent with the consent requirements set forth in the PSA, to solicit the approval of the holders of Secured Credit Facility Claims and Senior Note Claims to the extent the Secured Credit Facility Claims could be deemed to be impaired by the Plan, but such solicitation shall be without prejudice to the rights of any party to take a position that the Secured Credit Facility Claims and Senior Note Claims are not impaired.

6

| Class 4 | **Senior Notes Claims** | Except to the extent that a holder of a Senior Notes Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Senior Notes Claim, each holder thereof shall receive payment in full in cash on the Effective Date of (i) all outstanding principal and accrued and unpaid interest under the Senior Notes at the contractual non-default rate to the Effective Date plus (ii) $15,000,000 on account of Claims arising under, derived from, or based on the Applicable Premium (as defined in the Indenture). | Unimpaired / Deemed to Accept |
|---|---|---|---|
| Class 5 | **Honeywell Claims** | In full and final satisfaction, settlement, release, and discharge of and in exchange for each Claim of Honeywell arising under, derived from, based on, or related to the Indemnification Agreements and the Tax Matters Agreement (collectively, the "**Honeywell Claims**"),[3] Honeywell shall receive:  (a) a payment of $375 million in cash on the Effective Date; and (b) new Series B Preferred Stock issued by reorganized Garrett (the "**Series B Preferred Stock**"), which shall provide for payments to Honeywell in the amounts and at the times set forth in the following schedule:<br><br>**Payment Date[4]**     **Amount**<br><br>2022                    $34.8 million<br><br>2023                    $100.0 million<br><br>2024                    $100.0 million<br><br>2025                    $100.0 million<br><br>2026                    $100.0 million<br><br>2027                    $100.0 million | Impaired / Entitled to Vote |

[3] Honeywell Claims also include the additional potential contingent, unliquidated contractual and non-contractual claims and causes of action identified in Honeywell's proofs of claim, as set forth in the PSA.  For the avoidance of doubt, the issuance of the Series B Preferred Stock does not satisfy the Debtors obligations to pay Honeywell's fees and expenses as set forth in Section 11.01 of the PSA.  Moreover, claims arising under ordinary course business dealings or commercial contracts or related to ongoing services or amounts owed under the Employee Matters Agreement, Intellectual Property Agreement, Trademark License Agreement, Transition Services Agreement, or Cash Repatriation Agreement (each as defined in Honeywell's proofs of claim) will be addressed by the Debtors and Honeywell in good faith and in the ordinary course of business, in consultation with the Plan Sponsors and subject to the Plan Sponsors' consent (such consent not to be unreasonably withheld, conditioned or delayed), and are not being satisfied by the issuance of the Series B Preferred Stock, and any claims by Honeywell against the Debtors on account of such matters shall be included in Class 6 General Unsecured Claims.  Resolution of any of these ordinary course matters will not be asserted, directly or indirectly, as a condition to the execution, delivery, or approval by Honeywell or the Debtors of any Restructuring Document and no allegation of non-performance with respect to any of these matters will excuse any Debtor or Honeywell from the performance of their obligations under this Agreement or any Restructuring Document.

[4] Each payment date will fall on the anniversary of the Effective Date in the year referenced.

|  |  |  |  |
|---|---|---|---|
|  | 2028 | $100.0 million |  |
|  | 2029 | $100.0 million |  |
|  | 2030 | $100.0 million |  |
|  | **Total** | $834.8 million |  |

(such payments, the "**Amortization**").

The Amortization shall be subject to the following conditions: (i) if the Reorganized Debtors' annual Adjusted EBITDA on a consolidated basis falls below $425 million in any year, such annual Amortization payment for the subsequent year shall be deferred (without the accumulation of additional amounts) and paid in equal installments over the subsequent two years following the payment year of such deferred Amortization payment, in addition to any Amortization payments arising during such following years; (ii) reorganized Garrett may, (x) no more than once during the 18-month period following the Effective Date, call a portion of the Amortization for a payment equal to the present value of the Amortization so called, which payment shall be calculated as of the time of the exercise of such call option and discounted at a rate of 7.25% per annum (the "**Call Price**") (*provided* that the present value of any Amortization remaining (calculated at the Call Price) immediately after reorganized Garrett exercises such call option is no less than $400 million) or (y) at any time, call the Amortization in full for a lump sum payment equal to the Call Price of the remaining Amortization; and (iii) if (v) the Reorganized Debtors' Adjusted EBITDA on a consolidated basis for the prior twelve months reaches $600 million for two (2) consecutive quarters, (w) a change of control occurs,[5] (x) reorganized Garrett or the New Board asserts in writing that any portion of the Series B Preferred Stock is invalid or unenforceable, (y) indebtedness outstanding under the Credit Facilities is accelerated (and such acceleration is not rescinded), or (z) reorganized Garrett or any of its material subsidiaries files for bankruptcy or similar creditor protection then, in each case, Honeywell shall have the right to cause reorganized Garrett to repurchase, or in the case of clauses (w), (x), (y), and (z) reorganized Garrett shall be required to repurchase, all of the remaining Series B Preferred Stock (in the case of

---

[5] "Change of Control" for purposes of the Series B Preferred Stock will have a customary definition consistent with the definition in connection with the Convertible Series A Preferred Stock.

clause (v) above, within 60 days following written notice to reorganized Garrett) at an amount equal to the Call Price (the "**Put Option**").

Reorganized Garrett shall reimburse Honeywell for reasonable and documented costs and expenses incurred in connection with successfully enforcing Honeywell's right to receive the Amortization.

Upon the completion of the Amortization payments (including through exercise of a call option or the Put Option), the Series B Preferred Stock shall be cancelled and extinguished.

The Series B Preferred Stock shall be non-participating, non-transferrable, non-voting shares of reorganized Garrett. Following the issue date, no preferred shares or equity securities ranking *pari passu* with or senior to the Series B Preferred Stock (for the avoidance of doubt, other than shares issued in the Rights Offering or as PIK interest to issued Convertible Series A Preferred Stock) may be issued by the Reorganized Debtors without the consent of holders of a majority of the outstanding shares of Series B Preferred Stock (the "**Series B Majority**"). Reorganized Garrett and its subsidiaries shall not be permitted to enter into any consensual restriction on the ability of reorganized Garrett to make required payments on the Series B Preferred Stock without the prior written consent of the Series B Majority (except for customary restrictions in any agreement governing indebtedness).

The Series B Preferred Stock shall not have affirmative, negative, or other covenants relating to the Company or any other material rights or privileges other than as set forth herein.

9

| | | | |
|---|---|---|---|
| **Class 6** | **General Unsecured Claims** | Except to the extent that a holder of an allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each such Claim, each holder thereof shall receive, at the option of the Plan Sponsors: (a) reinstatement of such allowed General Unsecured Claim pursuant to section 1124 of the Bankruptcy Code; (b) payment in full in cash on the later of (i) the Effective Date or as soon as reasonably practicable thereafter, or (ii) the date such payment is due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such allowed General Unsecured Claim; or (c) such other treatment rendering such general unsecured claim unimpaired in accordance with section 1124 of the Bankruptcy Code.[6] | Unimpaired / Deemed to Accept |
| **Class 7** | **Intercompany Claims** | Each allowed Intercompany Claim shall be either reinstated or cancelled, as reasonably agreed between the Debtors, Honeywell, the Plan Sponsors, and the Requisite Additional Investors, and released without any distribution. | Impaired / Deemed to Reject or Unimpaired / Deemed to Accept |
| **Class 8** | **Intercompany Interests** | Each allowed Intercompany Interest shall be either reinstated or cancelled, as reasonably agreed between the Debtors, Honeywell, the Plan Sponsors, and the Requisite Additional Investors, and released without any distribution. | Impaired / Deemed to Reject or Unimpaired / Deemed to Accept |
| **Class 9** | **Section 510(b) Claims** | Treatment of Section 510(b) Claims shall be on terms mutually acceptable to the Debtors and the Plan Sponsors, and reasonably acceptable to Honeywell. | Impaired / Deemed to reject |
| **Class 10** | **Equity Interests in Garrett** | Except to the extent that a holder of equity interests in Garrett agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each equity interest in Garrett, each holder thereof shall have the option to elect to either (i) retain its equity interest in reorganized Garrett or (ii) receive the Cash-Out Consideration under the Cash-Out Option. The failure to make an election to receive the Cash-Out Consideration shall result in the holder retaining its equity interest in reorganized Garrett. | Impaired / Entitled to Vote |

---

[6] Treatment of any material rejection damages claims to be reasonably acceptable to the Plan Sponsors, Honeywell, and the Requisite Additional Investors.

10

| GENERAL PROVISIONS REGARDING THE PLAN | |
|---|---|
| **Vesting of the Debtors' Property** | The property of the estate of each Debtor shall vest in each respective Reorganized Debtor on and after the Effective Date free and clear (except as provided in the Plan) of liens, Claims, charges, and other encumbrances. |
| **Exemption from SEC Registration** | The issuance of Convertible Series A Preferred Stock will be exempt from registration with the U.S. Securities and Exchange Commission (the "SEC") under section 1145 of the Bankruptcy Code.  To the extent section 1145 is unavailable, such securities shall be exempt from SEC registration as a private placement pursuant to Section 4(a)(2) of the Securities Act of 1933, as amended, and/or the safe harbor of Regulation D promulgated thereunder, or such other exemption as may be available from any applicable registration requirements.<br><br>Garrett shall take such steps as are reasonably necessary to maintain the listing of its common stock on a national exchange. Garrett will also provide the Subscription Parties with customary registration rights. |
| **Professional Fees** | The plan shall contain customary provisions providing for the funding of a reserve on the Effective Date, sized by the Debtors in their reasonable discretion, providing for the payment of fees and expenses incurred or to be incurred by estate professionals in connection with the Restructuring Transactions.  All final requests for payment of professional fees shall be filed and served no later than 30 days after the Effective Date, and the Court shall determine the allowed amounts of such fees.  Unless the professional fee claimant agrees to less favorable treatment, such claimant that has been approved by the Bankruptcy Court shall be paid in full in cash. |
| **Releases, Exculpation, and Injunction** | The Plan shall contain release, exculpation, and injunction provisions substantively identical to the provisions set forth in **Annex 3** hereto, except as the Debtors, the Plan Sponsors, Honeywell, and the Requisite Additional Investors may otherwise agree. |
| **Honeywell and Debtor Mutual Release** | On the Effective Date, the Debtors shall release any and all claims and causes of action against Honeywell and its Related Parties based on or relating to, or in any manner arising from, in whole or in part (i) the spin-off of the Debtors by Honeywell, (ii) the Indemnification Agreements and the Tax Matters Agreement, and (iii) all actions taken in connection with the Debtors' chapter 11 cases (whether arising pre- or post-petition), *provided* that such release shall not include any claims arising under ordinary course business dealings or commercial contracts or related to ongoing services or amounts owed under the Employee Matters Agreement, Intellectual Property Agreement, Trademark License Agreement, Transition Services Agreement, or Cash Repatriation Agreement (each as defined in Honeywell's proof of claim).<br><br>On the Effective Date, Honeywell shall release any and all claims and causes of action against the Debtors and its Related Parties based on or relating to, or in any manner arising from, in whole or in part (i) the spin-off of the Debtors by Honeywell (and any litigation commenced in connection therewith), (ii) the Indemnification Agreements and the Tax Matters Agreement, and (iii) all actions taken in connection with the Debtors' chapter 11 cases (whether arising pre- or post-petition), *provided* that such release shall not include any claims arising under |

11

|  | ordinary course business dealings or commercial contracts or related to ongoing services or amounts owed under the Employee Matters Agreement, Intellectual Property Agreement, Trademark License Agreement, Transition Services Agreement, or Cash Repatriation Agreement (each as defined in Honeywell's proof of claim).<br><br>Each of Honeywell and the Debtors, in consultation with the Plan Sponsors and subject to the Plan Sponsors' consent (such consent not to be unreasonably withheld, conditioned or delayed), shall execute and deliver such documents as the other may reasonably request in connection with the Plan and the mutual releases described herein and shall work together in good faith with respect to any related tax and disclosure matters.  For the avoidance of doubt, this mutual release shall have no carve out for willful misconduct, fraud, or gross negligence. |
|---|---|
| **Executory Contracts and Unexpired Leases** | The Plan will provide that the executory contracts and unexpired leases that are not rejected as of the Effective Date (either pursuant to the Plan or a separate motion) will be deemed assumed pursuant to section 365 of the Bankruptcy Code. No executory contract or unexpired lease shall be rejected without the written consent of the Plan Sponsors, other than contracts related to Honeywell Claims to the extent contemplated herein or in the PSA.  For the avoidance of doubt, cure costs may be paid in installments following the Effective Date in a manner consistent with the Bankruptcy Code. |
| **Tax Issues** | The Parties shall cooperate in good faith to structure the Restructuring Transactions in a tax-efficient manner. |
| **Governance of the Reorganized Debtors** | Reorganized Garrett shall be a Delaware corporation listed on the NYSE or NASDAQ, and all Parties shall cooperate to make such modifications to the Restructuring Documents as may be reasonably necessary to meet applicable listing standards.<br>The board of directors (the "**New Board**") of reorganized Garrett will be seven (7) members, subject to increase with the consent of Honeywell (solely for so long as the Amortization remaining on the Series B Preferred Stock is greater than $125 million) and a majority of the outstanding shares of Convertible Series A Preferred Stock prior to the conversion thereof.  All directors shall be of the same class and have ordinary duties of corporate directors under Delaware law.  The composition of the New Board shall be determined as follows, with the New Board determined by the Plan on the Effective Date according to these principles; *provided*, that such nomination procedures shall not apply with respect to the Honeywell Director (as defined below):<br><br>• The holders of the Series B Preferred Stock shall have the right to elect one (1) board member (the "**Honeywell Director**") to the New Board (which right shall be included in the Certificate of Designation for the Series B Preferred Stock) until the date that the Amortization remaining on the Series B Preferred Stock is $125 million or less (the "**Resignation Date**").  The Honeywell Director shall resign on the Resignation Date and, thereafter, the holders of the Series B Preferred Stock shall have no further right to elect any directors to the New Board.  For the avoidance of doubt, (i) the Honeywell Director shall not have any special governance rights, |

12

and (ii) solely in their capacity as such, the Honeywell Director shall have fiduciary duties only to reorganized Garrett.

- Prior to the conversion of the Convertible Series A Preferred Stock, the Additional Investors shall have the right to nominate one (1) board member (the "**Additional Investors Director**") to the New Board, provided that, if the Additional Investors cease to collectively hold a number of shares of Convertible Series A Preferred Stock that is less than 60% of the number of shares of Convertible Series A Preferred Stock held by such investors on the issuance date, the Additional Investors Director shall resign, the Additional Investors shall have no further right to nominate any directors to the New Board, but, so long as 20% of the number of outstanding shares of Convertible Series A Preferred is owned by entities other than Centerbridge or Oaktree, the then-current holders of a majority of the outstanding shares of Convertible Series A Preferred Stock, excluding any Convertible Series A Preferred Stock owned by Centerbridge and Oaktree, shall have the right to nominate a board member to the New Board to replace the Additional Investors Director.

- One (1) board member will be a member of reorganized Garrett's executive management team.

- Half of the balance of the New Board nominees shall be selected by Centerbridge, for so long as Centerbridge holds a number of shares of common stock (including Convertible Series A Preferred Stock on an as-converted basis) that is no less than 60% of the number of shares of common stock (including Convertible Series A Preferred Stock on an as-converted basis) held by Centerbridge on the issuance date, with the number of nominees selected by Centerbridge subject to proportionate reduction as its ownership of the common stock (on an as-converted basis) further decreases. For so long as Centerbridge has the right to designate more than one nominee, at least one of those nominees will be an individual who is not an employee of Centerbridge.

- The other half of the balance of the New Board nominees shall be selected by Oaktree, for so long as Oaktree holds a number of shares of common stock (including Convertible Series A Preferred Stock on an as-converted basis) that is no less than 60% of the number of shares of common stock (including Convertible Series A Preferred Stock on an as-converted basis) held by Oaktree on the issuance date, with the number of nominees selected by Oaktree subject to proportionate reduction as its ownership of common stock (on an as-converted basis) further decreases. For so long as Oaktree has the right to designate more than one nominee, at least one of those nominees will be an individual who is not an employee of Oaktree.

Nominees selected pursuant to the foregoing following the Effective Date will be subject to customary nomination procedures for public company directors to be implemented at reorganized Garrett.

13

| | |
|---|---|
| **Management Incentive Plan** | Reorganized Garrett shall have a post-Effective Date management incentive plan, the terms of which, including with respect to amount, form, structure, and vesting, shall be determined by the New Board taking into consideration then-current market practices for similarly situated companies. |
| **Definitive Documentation** | The Parties shall negotiate the definitive documents necessary to complete the Restructuring Transactions in good faith. Any and all documentation necessary to effectuate the Restructuring Transactions, including the definitive documents, shall be in form and substance consistent with this Term Sheet and the PSA. All consent rights not otherwise set forth herein shall be as set forth in the PSA. |
| **Conditions Precedent to Plan Effective Date** | The occurrence of the Plan Effective Date shall be subject to the following conditions precedent and any other conditions precedent reasonably acceptable to each of the Debtors, the Plan Sponsors, Honeywell, and the Requisite Additional Investors:<br><br>• the Bankruptcy Court shall have entered an order confirming the Plan, in form and substance consistent with the PSA, and such order shall not have been stayed, modified, or vacated on appeal;<br>• the final version of the Plan supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements and exhibits to the Plan, shall have been filed;<br>• the PSA shall not have been terminated by each of the Parties thereto, and shall remain in full force and effect;<br>• the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan (and all applicable waiting periods have expired);<br>• all fees, expenses, and other amounts payable to the Parties under the PSA shall have been paid in full or a customary professional fee escrow shall have been established and funded on terms and conditions reasonably satisfactory to the Plan Sponsors, Honeywell, and the Requisite Additional Investors;<br>• the Debtors shall have implemented the Restructuring Transactions in a manner consistent with the Plan and the PSA;<br>• all definitive documentation for the Restructuring Transactions contemplated by the Plan have been executed and remain in full force and effect;<br>• the Rights Offering shall have been conducted in accordance with the rights offering procedures;<br>• the BCA remains in full force and effect and has not been terminated in accordance with its terms;<br>• no governmental entity or federal or state court of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any law or order (whether temporary, preliminary or permanent), in any case that is in effect and that prevents or prohibits consummation of the Plan; and<br>• no governmental entity has instituted any action or proceeding (that remains pending at what would otherwise be the Effective Date) seeking to enjoin, restrain, or otherwise prohibit consummation of the Plan or the transactions contemplated by the Plan. |
| **Reservation of Rights** | Nothing herein is an admission of any kind. If the Restructuring Transactions are not consummated for any reason, all Parties reserve any and all of their respective rights. |

14

| **Retention of Jurisdiction** | The Plan will provide that the Bankruptcy Court shall retain jurisdiction for usual and customary matters. |
|---|---|
| **Governing Law** | The governing law for all applicable documentation (other than any corporate governance documents) shall be the internal law of the State of New York (without regard to its conflict of law principles) and, to the extent applicable, the Bankruptcy Code. |

## Annex 1

### Definitions

| | |
|---|---|
| **Administrative Claim** | Any Claim incurred by the Debtors before the Effective Date for a cost or expense of administration of the Chapter 11 Cases entitled to priority under sections 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code. |
| **Claim** | As defined in section 101(5) of the Bankruptcy Code. |
| **Commitment Letter** | Project Gearbox Commitment Letter, dated as of December 21, 2020, by and among JPMorgan Chase Bank, N.A., Royal Bank of Canada, RBC Capital Markets, LLC, Deutsche Bank AG New York Branch, Deutsche Bank Securities, Inc., Fifth Third Bank, National Association, KeyBanc Capital Markets Inc., KeyBank National Association, and FinCo. |
| **Credit Facilities** | As defined in the Commitment Letter. |
| **Debt Cap** | $1,190 million, plus the amount of all promissory note cash collateral, supply chain financing cash collateral and cash collateralized L/Cs outstanding as of the Effective Date that the Debtors, the Plan Sponsors, and Requisite Additional Investors reasonably believe will be released to the reorganized Debtors within 90 days of the Effective Date. |
| **DIP Facility Claims** | Any Claim arising under, derived from, or based on the DIP Facility or such other debtor in possession financing that remains outstanding with respect to the Debtors immediately prior to the Effective Date. |
| **Existing Commitment Parties** | The Commitment Parties to the PSA as of January 11, 2021. |
| **Fee Letter** | Project Gearbox Credit Facilities Fee Letter, dated as of December 21, 2020, by and among JPMorgan Chase Bank, N.A., Royal Bank of Canada, RBC Capital Markets, LLC, Deutsche Bank AG New York Branch, Deutsche Bank Securities, Inc., Fifth Third Bank, National Association, KeyBanc Capital Markets Inc., KeyBank National Association, and FinCo. |
| **FinCo** | Gearbox FinCo LLC. |
| **General Unsecured Claim** | Any Claim other than an Administrative Claim, a Priority Tax Claim, a DIP Facility Claim, an Other Secured Claim, an Other Priority Claim, a Secured Credit Facility Claim, a Senior Notes Claim, a Honeywell Claim, an Intercompany Claim, or a Claim subject to subordination under section 510(b) of the Bankruptcy Code. |
| **Intercompany Claim** | A prepetition Claim held by a Debtor against a Debtor. |
| **Intercompany Interest** | An Interest in any Debtor other than Garrett. |
| **Interest** | Any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor. |

| **Other Priority Claim** | Any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code. |
|---|---|
| **Other Secured Claim** | Any Secured Claim against assets of any of the Debtors, other than a DIP Facility Claim, a Secured Credit Facility Claim, or a Senior Notes Claim. |
| **Priority Tax Claims** | Claims of governmental units of the type described in section 507(a)(8) of the Bankruptcy Code. |
| **Related Party** | With respect to any person or entity, each and all of such person's or entity's current and former affiliates, and such entities' and their current and former predecessors, successors and assigns, subsidiaries, direct or indirect equity holders (regardless of whether such interest are held directly or indirectly), affiliates, managed accounts or funds, directors, managers, officers and each of their current and former officers, directors, managers, principals, shareholders, members, equityholders, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and investment and other professionals, and each of the foregoing Person's respective heirs, executors, estates, successors, assigns and nominees. |
| **Secured** | When referring to a Claim: (i) secured by a lien on property in which any Debtor has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtor's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (ii) allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a secured claim. |
| **Secured Credit Facility Claim** | Any Claim arising under, derived from, or based on the Credit Agreement. |
| **Senior Notes Claims** | Any Claim arising under, derived from, or based on the Senior Notes. |

**Annex 2**

**Allocation**

## Garrett Motion - Convertible Series A Preferred Stock Allocation

*($ in millions)*

**Convertible Series A Preferred Stock Allocation**

|  | $ |
|---|---|
| Centerbridge & Oaktree | $690.8 |
| Additional Investors | 360.0 |
| Rights Offering Available to All Common Equity Holders[1] | 200.0 |
| **Total** | **$1,250.8** |

*(1) Rights offering participation based on common equity holdings and allocated pro rata.*

**Annex 3**

**Releases, Exculpation, and Injunction**

**Form of Releases**

**Definitions**

"*Exculpated Parties*" means (a) the Debtors, (b) the Reorganized Debtors, (c) the Official Committee of Unsecured Creditors (the "<u>Creditors Committee</u>") and its members, in their capacities as such, (d) the Official Committee of Equity Holders (the "<u>Equity Committee</u>") and its members, in their capacities as such, (e) the Commitment Parties, (f) the administrative agent, collateral agent, arranger, joint bookrunner, and lenders under the Credit Facilities, each in their capacities as such, and (g) with respect to each entity named in (a) through (f), such entity's affiliates and such entity's and its affiliates' respective managers, members, partners, investors, other equity holders, whether direct or indirect, and directors, officers, employees, consultants, agents, predecessors, successors, heirs, executors and assigns, attorneys, financial advisors, restructuring advisors, investment bankers, accountants and other professionals or representatives solely when acting in any such capacities.

"*Released Parties*" means (a) the Exculpated Parties, (b) the DIP agent and lenders, (c) the prepetition credit agreement agent and lenders in their capacities as such, (d) the senior subordinated notes indenture trustee, and (e) each of their respective current and former directors, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, employees, consultants, agents, affiliates, parents, subsidiaries, members, managers, predecessors, successors, heirs, executors and assigns, participants, subsidiaries, managed accounts or funds, partners, limited partners, general partners, principals, fund advisors, attorneys, financial advisors, restructuring advisors, investment bankers, accountants and other professionals or representatives solely when acting in any such capacities.

"*Releasing Parties*" means (a) the Released Parties, (b) the Commitment Parties, (c) all holders of Claims or interests that vote to accept the Plan, (d) all holders of Claims or interests that vote to reject the Plan but elect on their ballot to opt into the voluntary release by holders of Claims and interests, and (e) all holders of Claims or interests not described in the foregoing clauses (a) through (e) who elect to opt into the voluntary release by holders of Claims and interests; and (f) with respect to each entity named in (a) through (e), such entity's affiliates and such entity's and its affiliates' respective managers, members, partners, investors, other equity holders, whether direct or indirect, and directors, officers, employees, consultants, agents, predecessors, successors, heirs, executors and assigns, attorneys, financial advisors, restructuring advisors, investment bankers, accountants and other professionals or representatives solely when acting in any such capacities.

**Debtor Release**

For good and valuable consideration, including the service of the Released Parties to facilitate the administration of the Chapter 11 Cases and the implementation of the transactions contemplated by the Plan, on and after the Effective Date, the Released Parties shall be released and discharged by the Debtors, Reorganized Debtors and their estates, including any successor and assign to the Debtors, the Reorganized Debtors or any estate representative, from all claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of a Debtor or Reorganized Debtor, and its successors, assigns, and representatives, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, contract, violations of federal or state securities laws or otherwise, including those that any of the Debtors, the Reorganized Debtors or their estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or interest or any other person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the estates, the conduct of

the businesses of the Debtors, these Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or Reorganized Debtors, the release or discharge of any mortgage, lien or security interest, the subject matter of, or the transactions or events giving rise to, any Claim or interest that is treated in the Plan, the administration of Claims and interests prior to or during these Chapter 11 Cases, the negotiation, formulation, preparation, dissemination, implementation, administration, confirmation and/or effectuation of the PSA, BCA, the Plan, any plan supplement, any disclosure statement or, in each case, related agreements, instruments or other documents, any action or omission with respect to intercompany claims and intercompany settlements, any action or omission as an officer, director, agent, representative, fiduciary, controlling person, member, manager, affiliate or responsible party, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission is determined by a final order in a court of competent jurisdiction to have constituted gross negligence, willful misconduct, fraud, or a criminal act.

**Voluntary Release by Holders of Claims and Interests**

For good and valuable consideration, including the service of the Released Parties to facilitate the administration of the Chapter 11 Cases, the implementation of the reorganization contemplated by the Plan, the release of mortgages, liens and security interests on property of the estates, and distributions made pursuant to the Plan, on and after the Effective Date, to the fullest extent permitted by applicable law, the Releasing Parties (regardless of whether a Releasing Party is a Released Party) shall be deemed to conclusively, absolutely, unconditionally, irrevocably and forever release, waive and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of a Debtor or Reorganized Debtor and its successors, assigns, and representatives, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, contract, violations of federal or state securities laws or otherwise, including, those that any of the Debtors, the Reorganized Debtors or their estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or interest or any other person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the estates, the conduct of the businesses of the Debtors, these Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or interest that is treated in the Plan, the administration of Claims and interests prior to or during these Chapter 11 Cases, the negotiation, formulation, preparation, dissemination, implementation, administration, confirmation and/or effectuation of the PSA, BCA, the Plan, any plan supplement, any disclosure statement or, in each case, related agreements, instruments or other documents, any action or omission with respect to intercompany claims or intercompany settlements, any action or omission as an officer, director, agent, representative, fiduciary, controlling person, member, manager, affiliate or responsible party, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission is determined by a final order in a court of competent jurisdiction to have constituted gross negligence, willful misconduct, fraud, or a criminal act; provided, however, that the Additional Investors (whether in their capacities as Commitment Parties or as holders of Claims or Interests) shall not be deemed to have released any claim that is the kind of claim described in Section 510(b) of the Bankruptcy Code against the Debtors or any similar claim against one or more of the Debtors' current or former officers or directors; provided further that the each Additional Investor shall only assert claims against directors and officers as a member of a class in a class action in which the Additional Investor is not a lead plaintiff and respond to or oppose any objections or challenges to its inclusion in such class action, and the Debtors reserve all rights and defenses with respect to such claims and the inclusion of any Additional Investor in any class in a class action.

**Scope of Releases**

Each person providing releases under the Plan, including the Debtors, the Reorganized Debtors, their estates and the Releasing Parties, shall be deemed to have granted the releases set forth in the Plan notwithstanding that such person may hereafter discover facts in addition to, or different from, those which it now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such person expressly waives any and all rights that it may have under any statute or common law principle which would limit the effect of such releases to those claims or causes of action actually known or suspected to exist at the time of execution of such release.

**Exculpation**

Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtors and their directors, officers, employees, attorneys, investment bankers, financial advisors, restructuring advisors and other professional advisors, representatives and agents will be deemed to have solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(e) of the Bankruptcy Code and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with the solicitation.

The Exculpated Parties shall neither have nor incur any liability arising on or after the petition date to any entity for any act or omission in connection with these Chapter 11 Cases, including (a) the operation of the Debtors' businesses during the pendency of these Chapter 11 Cases; (b) the administration of Claims and interests during these Chapter 11 Cases; (c) formulating, negotiating, preparing, disseminating, implementing, administering, confirming and/or effecting the PSA, the BCA, disclosure statement, the Plan, the plan supplement, and any related contract, instrument, release or other agreement or document created or entered into in connection therewith (including the solicitation of votes for the Plan or other actions taken in furtherance of confirmation or consummation of the Plan); (d) the offer or issuance of any securities under or in connection with the Plan; or (e) the administration or adjudication of Claims, other than liability resulting from any act or omission that is determined by final order in a court of competent jurisdiction to have constituted gross negligence, willful misconduct, fraud or a criminal act.

## EXHIBIT B

**TRANSFER AGREEMENT**

## PROVISION FOR TRANSFER AGREEMENT

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Plan Support Agreement, dated as of [●], 2021 (the "**Agreement**"),[1] by and among the Commitment Parties, including the transferor to the Transferee of any Senior Note Claims (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "**Commitment Party**" under the terms of the Agreement, based on the Debtor Claim that is Transferred.  This Transfer Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.  The Transferee intends to be and is bound under the Agreement with respect to any and all claims against, or interests in, any of the Debtors, whether currently held or hereafter acquired by such Transferee.

Date Executed: _____

**TRANSFEREE**

Name of Institution: _____

By:         _____
Name:     _____
Its:         _____
Telephone: _____
Facsimile: _____

***Aggregate Amounts Beneficially Owned or Managed on Account of***

**Senior Note Claims:**
**2026 Senior Notes**

$ _____

**Credit Agreement Claims:**

$ _____

---

[1]   Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

**DIP Claims:**

$ _____

**Garrett Common Stock**

Number
of
Shares: _____

**Any other Debtor Claims:**

Type:

$ _____

Type:

$ _____

NOTICE ADDRESS:

[_____]
[_____]
[_____]
Attention: [_____]
E-mail: [_____]

with a copy to:

[_____]
[_____]
[_____]
Attention: [_____]
E-mail: [_____]

## **EXHIBIT C**

## **JOINDER AGREEMENT**

**Joinder Agreement**

**[_____], 2021**

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Plan Support Agreement, dated as of [●], 2021, a copy of which is attached hereto as Annex I (as it may be amended, supplemented, or otherwise modified from time to time, the "**Agreement**"),[1] by and among the Commitment Parties.

1.       Agreement to be Bound.  The Transferee hereby agrees to be bound by all of the terms of the Agreement.  The Transferee shall hereafter be deemed to be a "Party" and a "Party" for all purposes under the Agreement.

2.       Representations and Warranties.  With respect to the aggregate Debtor Claims/Interests set forth below its name on the signature page hereof, the Transferee hereby makes the representations and warranties of the Commitment Parties set forth in Section 7 of the Agreement to each other Party.

3.       Governing Law.  This joinder agreement (the "**Joinder Agreement**") to the Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

*****

*[Remainder of Page Intentionally Left Blank]*

---

[1]      Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Agreement.

IN WITNESS WHEREOF, the Transferee has caused this Joinder Agreement to be executed as of the date first written above.

Name of Transferor: _____

Name of Transferee: _____

By: _____

Name: _____

Title: _____

Amount of Credit Agreement Claims (if any): $_____
Amount of Senior Note Claims (if any): $_____
Amount of DIP Claims (if any): $_____
Number of Shares of Garrett Common Stock (if any): _____
Amount of any other Debtor Claims (if any): $_____

Notice Address:

_____
_____

Fax: _____
Attention: _____

With a copy to:

_____
_____

Fax: _____
Attention: _____

_____

**ANNEX 1**

**Plan Support Agreement**
**Annex 1**

| Party[1] | Number of Shares of Common Stock of Garrett |
|---|---:|
| Attestor Value Master Fund LP | 2,661,970 |
| The Baupost Group, L.L.C. | 3,575,000 |
| Benefit Street Partners L.P. | 1,389,839 |
| Centerbridge Partners, L.P. | 3,390,000 |
| Cyrus Capital Partners, L.P. | 10,220,254 |
| FIN Capital Partners LP | 380,000 |
| Hawk Ridge Capital Management LP | 2,336,564 |
| Honeywell International Inc. | 2,284,598 |
| IngleSea Capital | 300,000 |
| Keyframe Capital Partners, L.P. | 1,506,050 |
| Newtyn Management, LLC | 1,655,000 |
| Oaktree Capital Management, L.P. | 3,593,111 |
| Sessa Capital (Master), L.P. | 6,912,204 |
| Whitebox Multi-Strategy Partners, L.P. | 750,000 |

---

[1] Each entity listed herein is listed either in its principal capacity or in its capacity as agent, investment advisor, or investment manager for certain investment funds or accounts or their respective subsidiaries that have Beneficial Ownership of shares of equity securities in Garrett.

## EXHIBIT C

## Equity Backstop Commitment Agreement

4846-5437-1798 v.7

EXECUTION VERSION

EQUITY BACKSTOP COMMITMENT AGREEMENT

AMONG

GARRETT MOTION, INC.,

THE OTHER DEBTORS PARTY HERETO

AND

THE EQUITY BACKSTOP PARTIES PARTY HERETO

Dated as of January 22, 2021

4848-5437-1286.10
4820-3711-3559 v.8

TABLE OF CONTENTS

Page

## TABLE OF CONTENTS

### ARTICLE I

### DEFINITIONS

Section 1.1   Definitions ..................................................................................................2
Section 1.2   Construction................................................................................................12

### ARTICLE II

### BACKSTOP COMMITMENT

Section 2.1   The Rights Offering; Subscription Rights ...........................................13
Section 2.2   The Commitments......................................................................................14
Section 2.3   Equity Backstop Party Default; Replacement of Defaulting Equity
Backstop Parties........................................................................................14
Section 2.4   Funding ......................................................................................................16
Section 2.5   Closing .......................................................................................................17
Section 2.6   Designation and Assignment Rights......................................................17

### ARTICLE III

### EXPENSE REIMBURSEMENT

Section 3.1   Expense Reimbursement............................................................................18
Section 3.2   Tax Treatment of Rights Offering Backstop Commitments.............................19

### ARTICLE IV

### REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Section 4.1    Organization and Qualification...........................................................19
Section 4.2    Corporate Power and Authority............................................................20
Section 4.3    Execution and Delivery; Enforceability ...............................................20
Section 4.4    Authorized and Issued Equity Interests ...............................................21
Section 4.5    Issuance........................................................................................................21
Section 4.6    No Conflict ..................................................................................................22
Section 4.7    Consents and Approvals ..........................................................................22
Section 4.8    Arm's-Length................................................................................................23
Section 4.9    Company SEC Documents and Disclosure Statement ........................23
Section 4.10   Absence of Certain Changes....................................................................23
Section 4.11   No Violation; Compliance with Laws .....................................................23
Section 4.12   Legal Proceedings......................................................................................23
Section 4.13   Tax Matters.................................................................................................24
Section 4.14   No Unlawful Payments...............................................................................25

4820-3711-3559 v.8

TABLE OF CONTENTS (cont'd)

Page

Section 4.15   Compliance with Money Laundering and Sanctions Laws ...............................25
Section 4.16   No Broker's Fees .................................................................................................26
Section 4.17   Investment Company Act ....................................................................................26
Section 4.18   Internal Control Over Financial Reporting..........................................................26
Section 4.19   Disclosure Controls and Procedures ...................................................................26
Section 4.20   No Other Representations or Warranties...............................................................26

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF THE EQUITY BACKSTOP PARTIES

Section 5.1    Organization..........................................................................................................27
Section 5.2    Organizational Power and Authority ....................................................................27
Section 5.3    Execution and Delivery .......................................................................................27
Section 5.4    No Conflict ...........................................................................................................27
Section 5.5    Consents and Approvals .......................................................................................28
Section 5.6    No Registration .....................................................................................................28
Section 5.7    Purchasing Intent ..................................................................................................28
Section 5.8    Sophistication; Investigation.................................................................................28
Section 5.9    No Broker's Fees ..................................................................................................29
Section 5.10   Sufficiency of Funds .............................................................................................29
Section 5.11   Sanctions...............................................................................................................29
Section 5.12   No Prohibited Transactions ..................................................................................29
Section 5.13   ERISA 29
Section 5.14   No Other Representations or Warranties ...............................................................30

## ARTICLE VI

## ADDITIONAL COVENANTS

Section 6.1    Blue Sky................................................................................................................30
Section 6.2    Use of Proceeds ....................................................................................................30
Section 6.3    Securities Law Matters .........................................................................................30
Section 6.4    Antitrust Approval ................................................................................................31
Section 6.5    Registration Rights Agreement; Company Organizational Documents .............32
Section 6.6    Access to Information............................................................................................32

## ARTICLE VII

## CONDITIONS TO THE OBLIGATIONS OF THE PARTIES

Section 7.1    Conditions to the Obligations of the Equity Backstop Parties............................33
Section 7.2    Waiver of Conditions to Obligations of Equity Backstop Parties ......................34
Section 7.3    Conditions to the Obligations of the Company .................................................34

ii

TABLE OF CONTENTS (cont'd)

Page

**ARTICLE VIII**

**INDEMNIFICATION AND CONTRIBUTION**

Section 8.1    Indemnification Obligations ..................................................................35
Section 8.2    Indemnification Procedure.....................................................................36
Section 8.3    Settlement of Indemnified Claims .........................................................37
Section 8.4    Contribution ...........................................................................................37
Section 8.5    Treatment of Indemnification Payments.................................................37
Section 8.6    No Survival .............................................................................................38

**ARTICLE IX**

**TERMINATION**

Section 9.1    Consensual Termination .........................................................................38
Section 9.2    Automatic Termination...........................................................................38
Section 9.3    Termination by the Equity Backstop Parties ..........................................38
Section 9.4    Termination by the Company ..................................................................39
Section 9.5    Effect of Termination..............................................................................40

**ARTICLE X**

**GENERAL PROVISIONS**

Section 10.1    Notices ...................................................................................................40
Section 10.2    Assignment; Third Party Beneficiaries..................................................42
Section 10.3    Prior Negotiations; Entire Agreement ...................................................42
Section 10.4    Governing Law; Venue...........................................................................42
Section 10.5    Waiver of Jury Trial...............................................................................43
Section 10.6    Counterparts...........................................................................................43
Section 10.7    Waivers and Amendments; Rights Cumulative; Consent......................43
Section 10.8    Headings ................................................................................................44
Section 10.9    Specific Performance.............................................................................44
Section 10.10   Damages.................................................................................................44
Section 10.11   No Reliance............................................................................................45
Section 10.12   No Recourse...........................................................................................45
Section 10.13   Severability............................................................................................45

ANNEXES

Annex A        Commitment Schedule

iii

4820-3711-3559 v.8

**EQUITY BACKSTOP COMMITMENT AGREEMENT**

THIS EQUITY BACKSTOP COMMITMENT AGREEMENT (this "**Agreement**"), dated as of January 22, 2021, is made by and among Garrett Motion Inc. ((including as debtor in possession and a reorganized debtor, as applicable) the "**Company**") and the other Debtors (as defined below), on the one hand, and each Equity Backstop Party (as defined below), on the other hand. Capitalized terms that are used but not otherwise defined in this Agreement shall have the meanings given to them in Section 1.1 hereof or, if not defined therein, shall have the meanings given to them in the Plan Support Agreement (as defined below) (including the Restructuring Term Sheet (as defined below)), as applicable.

**RECITALS**

WHEREAS, the Parties are party to a Plan Support Agreement, dated as of January 11, 2021, by and among the Company, the other Debtors, the Equity Backstop Parties, Honeywell International Inc., the Initial Consenting Noteholders (as defined therein) and the other parties thereto (including the terms and conditions set forth in the term sheet attached thereto as Exhibit A (the "**Restructuring Term Sheet**") and all other exhibits thereto, as may be amended, supplemented or otherwise modified from time to time, the "**Plan Support Agreement**")), which (a) provides for the restructuring of the Debtors' capital structure and financial obligations pursuant to a plan of reorganization to be filed in the Company's jointly-administered voluntary cases under the caption *In re Garrett Motion Inc.,* Case No. 20-12212 (MEW) (Bankr. S.D.N.Y. Sept., 20, 2020) (the "**Chapter 11 Cases**") that are pending under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), implementing the terms and conditions of the Restructuring Transactions and (b) requires that the Plan be consistent with the Plan Support Agreement;

WHEREAS, pursuant to the Plan and this Agreement, the Company will conduct a rights offering that will provide holders of common stock of the Company with the right to purchase their pro rata share of the Rights Offering Shares (as defined below) for an aggregate purchase price equal to the Rights Offering Amount (as defined below), to be issued on the Effective Date; and

WHEREAS, subject to the terms and conditions contained in this Agreement, each Equity Backstop Party has agreed to purchase (on a several and not a joint basis) its Equity Backstop Percentage of the Unsubscribed Shares (as defined below), if any, and the Company has agreed to sell to each of the Equity Backstop Parties its Equity Backstop Percentage of such Unsubscribed Shares, if any.

NOW, THEREFORE, in consideration of the mutual promises, agreements, representations, warranties and covenants contained herein, the Company, the other Debtors and each of the Equity Backstop Parties hereby agrees as follows:

1

# ARTICLE I

# DEFINITIONS

Section 1.1    Definitions.    Except as otherwise expressly provided in this Agreement, whenever used in this Agreement (including any Exhibits and Schedules hereto), the following terms shall have the respective meanings specified therefor below:

"**Additional Investors**" has the meaning set forth in the Plan Support Agreement.

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly, Controls or is Controlled by or is under common Control with such Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made; provided, that for purposes of this Agreement, no Equity Backstop Party shall be deemed an Affiliate of any of the Company or its Subsidiaries.

"**Affiliated Fund**" means (a) any investment fund the primary investment advisor to which is an Equity Backstop Party or an Affiliate thereof or (b) one or more special purpose vehicles that are wholly owned by one or more Equity Backstop Parties or any investment fund described in clause (a), created for the purpose of holding the Rights Offering Backstop Commitment, and in each case with respect to which such Equity Backstop Party remains obligated to fund the Rights Offering Backstop Commitment.

"**Agreed Dilution**" means any equity issued (i) pursuant to the MIP or (ii) on the Effective Date pursuant to the Plan and in accordance with the Plan Support Agreement.

"**Agreement**" has the meaning set forth in the preamble.

"**Antitrust Authorities**" means the United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice, the attorneys general of the several states of the United States and any other Governmental Entity, whether domestic or foreign, having jurisdiction pursuant to the Antitrust Laws, and "**Antitrust Authority**" means any of them.

"**Anti-Corruption Law**" means the U.S. Foreign Corrupt Practices Act of 1977, as amended, the United Kingdom Bribery Act 2010, or any other applicable Law related to bribery or corruption.

"**Antitrust Laws**" means the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and any other Law, whether domestic or foreign, governing agreements in restraint of trade, monopolization, pre-merger notification, the lessening of competition through merger or acquisition or anti-competitive conduct, and any foreign investment Laws.

"**Applicable Consent**" has the meaning set forth in Section 4.7.

"**Applicable Group**" has the meaning set forth in Section 4.13(d).

2

4820-3711-3559 v.8

"**Available Shares**" means the Convertible Series A Preferred Shares that any Equity Backstop Party fails to purchase as a result of an Equity Backstop Party Default by such Equity Backstop Party.

"**Backstop Funding Account**" has the meaning set forth in Section 2.4(a).

"**Backstop Shares**" means, with respect to any Equity Backstop Party, the Unsubscribed Shares to be purchased by such Equity Backstop Party pursuant to this Agreement (including any Available Shares to be purchased by such Equity Backstop Party pursuant to Section 2.3).

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court.

"**BSA**" means the Bank Secrecy Act (31 U.S.C. Section 5311 et seq.), as amended.

"**BSA/PATRIOT Act**" means the BSA, as amended by the Patriot Act and its implementing regulations.

"**Business**" means the Company and its Subsidiaries' business of researching, developing, designing, engineering, and manufacturing certain automotive products, including turbochargers, electric-boosting and connected vehicle technologies, for sale and distribution to original equipment manufacturers and the aftermarket.

"**Business Day**" means any day, other than a Saturday, Sunday or legal holiday, as defined in Bankruptcy Rule 9006(a).

"**Centerbridge**" means Centerbridge Partners, L.P., acting solely in its capacity as an investment adviser on behalf of certain funds and accounts and wholly-owned entities of such funds and accounts.

"**Certificates of Designation**" means the Series A Certificate of Designation and (if Series B Preferred Stock is issued pursuant to the terms of the Plan) the Series B Certificate of Designation.

"**Chapter 11 Cases**" has the meaning set forth in the Recitals.

"**Closing**" has the meaning set forth in Section 2.5(a).

"**Closing Date**" has the meaning set forth in Section 2.5(a).

"**Code**" means the Internal Revenue Code of 1986, as amended.

3

4820-3711-3559 v.8

"**Company**" has the meaning set forth in the preamble.

"**Company SEC Documents**" means all of the reports, schedules, forms, statements and other documents (including exhibits and other information incorporated therein) filed with the SEC by the Company.

"**Company Organizational Documents**" means collectively, the organizational documents of the Company, including any certificate of formation or incorporation, applicable charter, articles of incorporation, limited liability company agreement, bylaws, Certificates of Designation or any similar documents.

"**Confidentiality Agreements**" means that certain confidentiality agreement, dated November 11, 2020, by and between Centerbridge Partners, L.P. and the Company; that certain confidentiality agreement, dated November 11, 2020, by and between Oaktree Capital Management, L.P. and the Company; that certain confidentiality agreement, dated October 31, 2020, by and between Milbank LLP and the Company; and that certain confidentiality agreement, dated October 2, 2020, by and between Jones Day and the Company.

"**Confirmation Order**" means the Order of the Bankruptcy Court that is not stayed confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"**Convertible Series A Preferred Shares**" means shares of Convertible Series A Preferred Stock of the Company, the terms and conditions of which will be set forth in the Series A Certificate of Designation.

"**Contract**" means any agreement, contract or instrument, including any loan, note, bond, mortgage, indenture, guarantee, deed of trust, license, franchise, commitment, lease, franchise agreement, letter of intent, memorandum of understanding or other obligation, and any amendments thereto, whether written or oral, but excluding the Plan.

"**Control**" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or agency or otherwise. "**Controlled**" has a correlative meaning.

"**COVID-19 Measures**" means any quarantine, shelter in place, stay at home, workforce reduction, social distancing, shut down, closure, sequester or similar restrictions imposed by any Law in connection with or in response to COVID-19.

"**Debtors**" means, collectively: Garrett Motion Inc., BRH LLC, Calvari Limited, Friction Materials LLC, Garrett ASASCO Inc., Garrett Borrowing LLC, Garrett Holding Company Sàrl, Garrett LX I S.à r.l., Garrett LX II S.à r.l., Garrett LX III S.à r.l., Garrett Motion Australia Pty Limited, Garrett Motion Automotive Research Mexico S. de R.L. de C.V., Garrett Motion Holdings Inc., Garrett Motion Holdings II Inc., Garrett Motion International Services S.R.L., Garrett Motion Ireland A Limited, Garrett Motion Ireland B Limited, Garrett Motion Ireland C Limited, Garrett Motion Ireland Limited, Garrett Motion Italia S.r.l., Garrett Motion Japan Inc., Garrett Motion LLC, Garrett Motion México, Sociedad Anónima de Capital Variable, Garrett Motion Romania S.R.L., Garrett Motion Sàrl, Garrett Motion Slovakia s.r.o., Garrett Motion

4

Switzerland Holdings Sàrl, Garrett Motion UK A Limited, Garrett Motion UK B Limited, Garrett Motion UK C Limited, Garrett Motion UK D Limited, Garrett Motion UK Limited, Garrett Transportation I Inc., Garrett Transportation Systems Ltd, Garrett Transportation Systems UK II Ltd, Garrett TS Ltd and Garrett Turbo Ltd.

"**Defaulting Equity Backstop Party**" means, in respect of an Equity Backstop Party Default that is continuing, the applicable defaulting Equity Backstop Party.

"**Definitive Documents**" means the definitive documents and agreements governing the Restructuring Transactions as set forth in the Plan Support Agreement.

"**DIP Facility**" means any credit agreement for debtor-in-possession financing to which any Debtor is a party.

"**Disclosure Statement**" has the meaning set forth in the Plan Support Agreement.

"**EBA Approval Obligations**" means the obligations of the Company and the other Debtors under this Agreement and the EBA Approval Order.

"**EBA Approval Order**" means the Order of the Bankruptcy Court that is not stayed (under Bankruptcy Rule 6004(h) or otherwise) that (a) authorizes the Company and the other Debtors to enter into and perform under this Agreement and the Plan Support Agreement, including all exhibits and other attachments and (b) provides that the Expense Reimbursement and the indemnification provisions contained herein shall constitute allowed administrative expenses of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code and shall be payable by the Debtors as provided in this Agreement without further Order of the Bankruptcy Court.

"**Effective Date**" means the date upon which (a) no stay of the Confirmation Order is in effect, (b) all conditions precedent to the effectiveness of the Plan have been satisfied or are expressly waived in accordance with the terms thereof, as the case may be, and (c) the Restructuring Transactions and the other transactions to occur on the Effective Date pursuant to the Plan become effective or are consummated.

"**Eligible Holders**" mean the holders of common stock of the Company that are eligible to participate in the Rights Offering pursuant to the Rights Offering Procedures.

"**Equity Backstop Amount**" means, with respect to any Equity Backstop Party, an amount equal to such Equity Backstop Party's Equity Backstop Percentage *multiplied by* the Rights Offering Amount.

"**Equity Backstop Party**" means each Party listed as such on Annex A to this Agreement.

"**Equity Backstop Party Default**" means the failure by any Equity Backstop Party to (a) deliver and pay the aggregate Per Share Purchase Price for such Equity Backstop Party's Equity Backstop Percentage of any Unsubscribed Shares by the Funding Date in accordance with Section 2.4(b) or (b) fully exercise all Subscription Rights that are issued to it pursuant to the

5

Rights Offering and duly purchase all Rights Offering Shares issuable to it pursuant to such exercise, in accordance with this Agreement and the Plan.

"**Equity Backstop Party Replacement**" has the meaning set forth in Section 2.3(a).

"**Equity Backstop Percentage**" means, with respect to any Equity Backstop Party, such Equity Backstop Party's percentage of the Rights Offering Backstop Commitment as set forth opposite such Equity Backstop Party's name under the column titled "Equity Backstop Percentage" on Annex A to this Agreement, subject to adjustment pursuant to Section 2.3(a). Any reference to "Equity Backstop Percentage" in this Agreement means the Equity Backstop Percentage in effect at the time of the relevant determination.

"**ERISA**" has the meaning set forth in Section 5.12.

"**ERISA Plan**" has the meaning set forth in Section 5.13.

"**Event**" means any event, development, occurrence, circumstance, effect, condition, result, state of facts or change.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Existing Equity Backstop Party Purchaser**" has the meaning set forth in Section 2.6(b).

"**Exit Credit Facilities**" means "Credit Facilities", as such term is defined in the Restructuring Term Sheet.

"**Expense Reimbursement**" has the meaning set forth in Section 3.1(a).

"**Filing Party**" has the meaning set forth in Section 6.4(b).

"**Funding Date**" has the meaning set forth in Section 2.4(b).

"**Funding Notice**" has the meaning set forth in Section 2.4(a).

"**GAAP**" means United States generally accepted accounting principles.

"**Governmental Entity**" means any non-U.S. or U.S. federal, state or local government or subdivision thereof, or legislative, judicial, executive, administrative or regulatory body or other governmental or quasi-governmental entity with competent jurisdiction, including the Bankruptcy Court.

"**Honeywell**" means Honeywell International Inc.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended from time to time.

"**Indemnified Claim**" has the meaning set forth in Section 8.2.

6

"**Indemnified Person**" has the meaning set forth in Section 8.1.

"**Indemnifying Party**" has the meaning set forth in Section 8.1.

"**Interim Cap**" has the meaning given in Section 11.01 of the Plan Support Agreement.

"**IRS**" means the United States Internal Revenue Service.

"**Joint Filing Party**" has the meaning set forth in Section 6.4(c).

"**Knowledge of the Company**" means the actual knowledge, after reasonable inquiry, of Olivier Rabiller, Peter Bracke, Jerome Maironi, Sean Deason or Jean Philippe Bedu.

"**Law**" means any law (statutory or common), statute, regulation, rule, code or ordinance enacted, adopted, issued or promulgated by any Governmental Entity.

"**Legal Proceedings**" has the meaning set forth in Section 4.12.

"**Legend**" has the meaning set forth in Section 6.3(b).

"**Lien**" means any lien, adverse claim, charge, option, right of first refusal, servitude, security interest, mortgage, pledge, deed of trust, easement, encumbrance, restriction on transfer, conditional sale or other title retention agreement, defect in title, lien or judicial lien as defined in sections 101(36) and (37) of the Bankruptcy Code or other restrictions of a similar kind.

"**Losses**" has the meaning set forth in Section 8.1.

"**Material Adverse Effect**" means any Event, which individually, or together with all other Events, has had or would reasonably be expected to have a material and adverse effect on (a) the business, assets, liabilities, finances, properties, results of operations or condition (financial or otherwise) of the Company and its Subsidiaries, taken as a whole, or (b) the ability of the Company and its Subsidiaries, taken as a whole, to perform their obligations under, or to consummate the transactions contemplated by, the Transaction Agreements, including the Rights Offering, except to the extent such Event results from, arises out of, or is attributable to, the following (either alone or in combination):

(i) any circumstance or development generally affecting global, national or regional political conditions (including hostilities, acts of war, sabotage, terrorism or military actions, or any escalation or material worsening of any such hostilities, acts of war, sabotage, terrorism or military actions existing or underway) or in the general business, market, financial or economic conditions affecting the industries, regions and markets in which the Company and its Subsidiaries operate, including any change in the United States or applicable foreign economies or securities, commodities or financial markets, changes in interest rates or exchange rates, tariffs, quotas or other trade restrictions or barriers, or force majeure events or "acts of God";

(ii) any changes or modifications or proposed changes or modifications after the date hereof in applicable Law or GAAP, or in the interpretation or enforcement thereof;

7

4820-3711-3559 v.8

(iii) the execution, existence, performance, announcement, pendency or consummation of this Agreement or the other Transaction Agreements or the transactions contemplated hereby or thereby (including any act or omission of the Company or its Subsidiaries expressly required or prohibited, as applicable, by the Plan Support Agreement or this Agreement or consented to by the Requisite Consenting Parties in writing);

(iv) changes in the market price or trading volume of the claims or equity or debt securities of the Company or its Subsidiaries (but not the underlying facts giving rise to such changes unless such facts are otherwise excluded pursuant to the clauses contained in this definition);

(v) the departure of officers or directors of any of the Company or its Subsidiaries not in contravention of the terms and conditions of this Agreement (but not the underlying facts giving rise to such departure unless such facts are otherwise excluded pursuant to the clauses contained in this definition);

(vi) declarations of national emergencies, natural disasters, including any hurricane, flood, tornado, earthquake, tsunami or other weather disaster, or any global health conditions (including any epidemic, pandemic, or other outbreak of illness, including as a result of the COVID-19 virus or other virus or disease and including any changes in Law in response thereto, such as COVID-19 Measures);

(vii) the occurrence of an Equity Backstop Party Default;

(viii) any failure by the Business to meet any internal or public projections or forecasts, estimates or predictions of revenues, earnings or other financial, accounting or reporting results or condition for any period, whether such projections, forecasts, estimates or predictions were made by the Company or any of its Affiliates or by independent third parties (but not the underlying facts giving rise to such failure unless such facts are otherwise excluded pursuant to the clauses contained in this definition);

(ix) any actions taken or failed to be taken by the Company at the Requisite Consenting Parties' written request;

(x) the commencement, pendency or prosecution of the Chapter 11 Cases pursuant to the Bankruptcy Code, any Order of the Bankruptcy Court (which Order is consistent with this Agreement and the Plan Support Agreement) and any actions approved pursuant thereto (provided that such prosecution is in a manner contemplated by and consistent with the Plan Support Agreement and/or the Plan); or

(xi) the availability or cost of equity, debt or other financing to the Equity Backstop Parties or any of its Affiliates;

provided, that the exceptions set forth in clauses (i), (ii) and (vi) shall not apply to the extent that such Event is disproportionately adverse to the Company and its Subsidiaries, taken as a whole, as compared to other companies in the industries in which the Company and its Subsidiaries operate.

"**Milbank**" means Milbank LLP.

8

4820-3711-3559 v.8

"**MIP**" means any new management incentive plan to be adopted by the reorganized Company, the terms of which, including with respect to amount, form, structure, and vesting, shall be determined by the board of directors of the reorganized Company.

"**Money Laundering Laws**" has the meaning set forth in Section 4.15(a).

"**Oaktree**" means Oaktree Capital Management, L.P., acting solely in its capacity as an investment adviser on behalf of certain funds and accounts and wholly-owned entities of such funds and accounts.

"**OFAC**" means the U.S. Treasury Department's Office of Foreign Assets Control.

"**OFAC List**" means the List of Specially Designated Nationals and Blocked Persons administered by OFAC or in any Executive Order issued by the President of the United States and administered by OFAC.

"**Order**" means any judgment, order, award, injunction, writ, permit, license or decree of any Governmental Entity or arbitrator of applicable jurisdiction.

"**Parties**" means the Company and each of the Equity Backstop Parties, but excludes, for the avoidance of doubt, the Debtors other than the Company.

"**PATRIOT Act**" means the USA PATRIOT Act of 2001, as amended.

"**Per Share Purchase Price**" means $1.00.

"**Person**" means an individual, firm, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, association, trust, Governmental Entity or other entity or organization.

"**Petition Date**" means September 20, 2020.

"**Plan**" means the Debtors' joint plan of reorganization to be approved by the Confirmation Order and in accordance with the Plan Support Agreement, including the Plan Supplement and all exhibits, supplements, appendices and schedules thereto, as may be amended, supplemented, or modified from time to time in accordance with its terms and with the Plan Support Agreement.

"**Plan Solicitation Order**" means the Order of the Bankruptcy Court approving the Disclosure Statement and solicitation with respect to the Plan in form and substance consistent with the terms of Plan Support Agreement.

"**Plan Supplement**" means the documents filed with the Bankruptcy Court as exhibits or supplements to the Plan, including any documents identified by the Plan or Disclosure Statement as such.

"**Plan Support Agreement**" has the meaning set forth in the Recitals.

9

"**Pre-Closing Period**" means the period from the date of this Agreement to the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with its terms.

"**Prohibition**" means any Law or Order (whether temporary, preliminary or permanent) that is in effect and restrains, enjoins or otherwise prohibits consummation of the transactions contemplated by this Agreement or the Plan Support Agreement.

"**Put Option**" has the meaning set forth in Section 2.2(b).

"**Registration Rights Agreement**" has the meaning set forth in Section 6.5(a).

"**Related Party**" means, with respect to any Person, (a) any former, current or future director, officer, agent, Affiliate, employee, general or limited partner, member, manager or stockholder of such Person and (b) any former, current or future director, officer, agent, Affiliate, employee, general or limited partner, member, manager or stockholder of any of the foregoing.

"**Related Purchaser**" means, with respect to any Equity Backstop Party, any creditworthy Affiliate or Affiliated Fund of such Equity Backstop Party (other than any portfolio company of such Equity Backstop Party or its Affiliates).

"**Replacing Equity Backstop Parties**" has the meaning set forth in Section 2.3(a).

"**Representatives**" means, with respect to any Person, such Person's directors, officers, members, partners, managers, employees, agents, investment bankers, attorneys, accountants, advisors and other representatives.

"**Required Foreign Antitrust Clearances**" means approvals or clearances under the Antitrust Laws of Austria and Germany.

"**Requisite Consenting Parties**" means each of (A) Centerbridge, (B) Oaktree and (C) Equity Backstop Parties constituting the Requisite Additional Investors (as defined in the Plan Support Agreement).

"**Restructuring Term Sheet**" has the meaning set forth in the Recitals.

"**Restructuring Transactions**" has the meaning set forth in the Plan Support Agreement.

"**Rights Offering**" means the rights offering that is backstopped by the Equity Backstop Parties for the Rights Offering Amount in connection with the Restructuring Transactions substantially on the terms set forth in the Plan Support Agreement (as such terms may be amended from time to time in accordance with the Plan Support Agreement), and in accordance with the Plan Solicitation Order, the Rights Offering Procedures and this Agreement, as applicable.

10

"**Rights Offering Amount**" means the aggregate purchase price of the Rights Offering Shares, which shall be equal to two hundred million Dollars ($200,000,000) unless amended in accordance with Section 10.7.

"**Rights Offering Backstop Commitment**" has the meaning set forth in Section 2.2(b).

"**Rights Offering Expiration Time**" means the time and the date on which the rights offering subscription forms must be duly delivered to the Rights Offering Subscription Agent in accordance with the Rights Offering Procedures, together with the applicable aggregate Per Share Purchase Price, if applicable.

"**Rights Offering Participants**" means those Eligible Holders who duly subscribe for Rights Offering Shares in accordance with the Rights Offering Procedures.

"**Rights Offering Procedures**" means the procedures with respect to the Rights Offering that are approved by the Bankruptcy Court pursuant to the Plan Solicitation Order, as they may be amended from time to time in accordance with the Plan Support Agreement.

"**Rights Offering Shares**" means the Convertible Series A Preferred Shares to be offered to Eligible Holders in the Rights Offering. For the avoidance of doubt, the Rights Offering Shares shall include all Unsubscribed Shares purchased by the Equity Backstop Parties pursuant to this Agreement).

"**Rights Offering Subscription Agent**" means  Kurtzman Carson Consultants.

"**Sanctions**" has the meaning set forth in Section 4.15(b).

"**SEC**" means the U.S. Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Series A Certificate of Designation**" means that certain Series A Certificate of Designation setting forth the terms governing the Convertible Series A Preferred Shares in form and substance reasonably acceptable to the Company and the Requisite Consenting Parties and reflecting, *inter alia*, the applicable terms set forth in the Restructuring Term Sheet.

"**Series B Certificate of Designation**" means that certain Series B Certificate of Designation setting forth the terms governing the Series B Preferred Stock (if any), in form and substance reasonably acceptable to the Company and the Requisite Consenting Parties and reflecting, *inter alia*, the applicable terms set forth in the Restructuring Term Sheet.

"**SOX**" has the meaning set forth in Section 4.9.

"**Spin-Off Date**" means October 1, 2018.

"**Subscription Rights**" means the subscription rights to purchase Rights Offering Shares.

11

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, joint venture or other legal entity as to which such Person (either alone or through or together with any other Subsidiary), (a) owns, directly or indirectly, more than fifty percent (50%) of the stock or other equity interests, (b) has the power to elect a majority of the board of directors or similar governing body, or (c) has the power to direct the business and policies.

"**Sullivan & Cromwell**" means Sullivan & Cromwell LLP.

"**Taxes**" means all taxes, assessments, duties, levies or other mandatory governmental charges paid to a Governmental Entity, including all federal, state, local, foreign and other income, franchise, profits, gross receipts, capital gains, capital stock, transfer, property, sales, use, value-added, occupation, excise, severance, windfall profits, stamp, payroll, social security, withholding and other taxes, assessments, duties, levies or other mandatory governmental charges of any kind whatsoever paid to a Governmental Entity (whether payable directly or by withholding and whether or not requiring the filing of a return), all estimated taxes, deficiency assessments, additions to tax, penalties and interest thereon and shall include any liability for such amounts as a result of being a member of a combined, consolidated, unitary or affiliated group, as transferee or successor, by Contract, as withholding agent, or otherwise.

"**Transaction Agreements**" has the meaning set forth in Section 4.2(a).

"**Transfer**" means to sell, transfer, assign, pledge, hypothecate, participate, permit the participation in, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, participations or other transactions in which any Person receives the right to own or acquire any current or future interest in a Subscription Right, a Rights Offering Share or common stock of the Company). "**Transfer**" used as a noun has a correlative meaning.

"**Unsubscribed Shares**" means the Rights Offering Shares that have not been duly purchased by Rights Offering Participants (other than Equity Backstop Parties) in the Rights Offering.

"**willful or intentional breach**" has the meaning set forth in Section 9.5.

Section 1.2    Construction.    In this Agreement, unless the context otherwise requires:

(a)    references to Articles, Sections, Exhibits and Schedules are references to the articles and sections or subsections of, and the exhibits and schedules attached to, this Agreement;

(b)    references in this Agreement to "writing" or comparable expressions include a reference to a written document transmitted by means of electronic mail in portable document format (pdf), facsimile transmission or comparable means of communication;

(c)    words expressed in the singular number shall include the plural and vice versa; words expressed in the masculine shall include the feminine and neuter gender and vice versa;

12

4820-3711-3559 v.8

(d)      the words "hereof", "herein", "hereto" and "hereunder", and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole, including all Exhibits and Schedules attached to this Agreement, and not to any provision of this Agreement;

(e)      the term "this Agreement" shall be construed as a reference to this Agreement as the same may have been, or may from time to time be, amended, modified, varied, novated or supplemented;

(f)      "include", "includes" and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words;

(g)      references to "day" or "days" are to calendar days;

(h)      references to "the date hereof" means the date of this Agreement;

(i)      unless otherwise specified, references to a statute means such statute as amended from time to time and includes any successor legislation thereto and any rules or regulations promulgated thereunder in effect from time to time; and

(j)      references to "dollars" or "$" refer to currency of the United States of America, unless otherwise expressly provided.

## ARTICLE II

## BACKSTOP COMMITMENT

Section 2.1      The Rights Offering; Subscription Rights.

(a)      On and subject to the terms and conditions hereof, including entry of the EBA Approval Order by the Bankruptcy Court, the Company shall conduct the Rights Offering pursuant to and in accordance with the Rights Offering Procedures, this Agreement and the Plan Solicitation Order, as applicable.

(b)      If requested by the Requisite Consenting Parties from time to time prior to the Rights Offering Expiration Time (and any permitted extensions thereto), the Company shall notify, or cause the Rights Offering Subscription Agent to notify, within forty eight (48) hours of receipt of such request by the Company, the Equity Backstop Parties of the aggregate number of Subscription Rights known by the Company or the Rights Offering Subscription Agent to have been exercised pursuant to the Rights Offering as of the most recent practicable time before such request.  The Rights Offering will be conducted, and the Rights Offering Shares (other than the Unsubscribed Shares) issued to Rights Offering Participants in reliance upon the exemption from registration provided in Section 1145 of the Bankruptcy Code.  The offer and sale of the Unsubscribed Shares purchased by the Equity Backstop Parties pursuant to this Agreement will be conducted in reliance upon the exemption from registration under Section 4(a)(2) of the Securities Act, or another available exemption from registration under the Securities Act, as applicable, and the Plan and the Disclosure Statement shall each include a statement to such effect.

13

(c)      All Convertible Series A Preferred Shares, including any such shares issued to Rights Offering Participants pursuant to the Rights Offering and any Unsubscribed Shares issued to Equity Backstop Parties pursuant to this Agreement, will be issued subject to Agreed Dilution.

Section 2.2      The Commitments.

(a)      On and subject to the terms and conditions hereof, including entry of the EBA Approval Order, each Equity Backstop Party agrees, severally (in accordance with its Equity Backstop Percentage) and not jointly, to exercise (or cause any of its Related Purchasers to exercise) all Subscription Rights that are issued to it (or such Related Purchaser) pursuant to the Rights Offering, and duly purchase all Rights Offering Shares issuable to it pursuant to such exercise, in accordance with the Rights Offering Procedures and the Plan; provided that any Defaulting Equity Backstop Party shall be liable to each Equity Backstop Party that is not a Defaulting Equity Backstop Party as a result of any breach of its obligations hereunder; provided further that no Equity Backstop Party shall be liable for the failure to exercise any of its Subscription Rights to the extent it is a result of a breach by the Company of the Rights Offering Procedures.

(b)      On and subject to the terms and conditions hereof, including entry of the Confirmation Order, each Equity Backstop Party hereby grants to the Company an option (collectively, the "**Put Option**") to require such Equity Backstop Party to purchase (or cause any of its Related Purchasers to purchase) on a *pro rata* basis (in accordance with its Equity Backstop Percentage) Unsubscribed Shares on the Closing Date subject to the terms and conditions of this Agreement.  Upon the exercise of the Put Option (which, for the avoidance of doubt, may only be exercised by the Company with respect to all Equity Backstop Parties), each Equity Backstop Party agrees, severally and not jointly (in accordance with its Equity Backstop Percentage), to purchase (or cause any of its Related Purchasers to purchase), and the Company agrees to sell to such Equity Backstop Party (or Related Purchaser), on the Closing Date, for the applicable aggregate Per Share Purchase Price, the number of Unsubscribed Shares equal to (x) such Equity Backstop Party's Equity Backstop Percentage multiplied by (y) the aggregate number of Unsubscribed Shares, rounded among the Equity Backstop Parties solely to avoid fractional shares as the Requisite Consenting Parties may determine in their sole discretion (provided that in no event shall such rounding reduce the aggregate commitment of such Equity Backstop Parties). The obligations of the Equity Backstop Parties to purchase such Unsubscribed Shares as described in this Section 2.2(b) shall be referred to as the "**Rights Offering Backstop Commitment**."  The Company shall exercise the Put Option by delivery to each Equity Backstop Party of a written put election notice.

Section 2.3      Equity Backstop Party Default; Replacement of Defaulting Equity Backstop Parties.

(a)      Upon the occurrence of an Equity Backstop Party Default, the Equity Backstop Parties and their respective Related Purchasers (other than any Defaulting Equity Backstop Party) shall have the obligation, within ten (10) Business Days after receipt of written notice from the Company to all Equity Backstop Parties of such Equity Backstop Party Default, which notice shall be given promptly following the occurrence of such Equity Backstop Party

14

Default and to all Equity Backstop Parties substantially concurrently, to make arrangements for one or more of the Equity Backstop Parties and their respective Related Purchasers (other than the Defaulting Equity Backstop Party) to purchase the Available Shares (such purchase, an "**Equity Backstop Party Replacement**") on the terms and subject to the conditions set forth in this Agreement and in such amounts as may be agreed upon among the Equity Backstop Parties electing to purchase Available Shares, or, if no such agreement is reached, based upon the relative applicable Equity Backstop Percentages of any such Equity Backstop Parties (other than any Defaulting Equity Backstop Party) (such Equity Backstop Parties, the "**Replacing Equity Backstop Parties**"); provided, that, each Equity Backstop Party (and/or its applicable Related Purchasers) shall have the right to purchase such Equity Backstop Party's *pro rata* share of the Available Shares, based upon the relative applicable Equity Backstop Percentages of the Equity Backstop Parties; provided, further, that notwithstanding the foregoing, no non-Defaulting Equity Backstop Party shall be obligated to purchase a total number of Unsubscribed Shares greater than such Equity Backstop Party's Equity Backstop Percentage (without giving effect to any commitment to purchase any Available Shares pursuant to this Section 2.3(a)) *multiplied by* the total aggregate number of Rights Offering Shares. Any Available Shares purchased by a Replacing Equity Backstop Party (and any commitment and applicable aggregate Per Share Purchase Price associated therewith) shall be included, among other things, in the determination of (x) the Unsubscribed Shares of such Replacing Equity Backstop Party for all purposes hereunder, (y) the Equity Backstop Percentage of such Replacing Equity Backstop Party for purposes of Section 2.3(c), Section 2.4(a) and Section 2.4(b) and (z) the Rights Offering Backstop Commitment of such Replacing Equity Backstop Party for purposes of the definition of "Requisite Consenting Parties."

(b) Notwithstanding anything in this Agreement to the contrary, if an Equity Backstop Party is a Defaulting Equity Backstop Party, it shall not be entitled to any of the expense reimbursement applicable to such Defaulting Equity Backstop Party (including the Expense Reimbursement) or indemnification provided, or to be provided, under or in connection with this Agreement.

(c) Nothing in this Agreement shall be deemed to require an Equity Backstop Party to purchase more than its Equity Backstop Percentage of the Unsubscribed Shares.

(d) For the avoidance of doubt, notwithstanding anything to the contrary set forth in Section 9.4, no provision of this Agreement shall limit the availability of money damages or the remedies set forth in Section 10.9 in connection with any such Defaulting Equity Backstop Party's Equity Backstop Party Default. Notwithstanding anything in this Agreement to the contrary, none of the Rights Offering Backstop Commitments of the Equity Backstop Parties shall be reduced for any reason.

Section 2.4 Funding.

(a) Funding Notice. No later than the fifth (5th) Business Day following the Rights Offering Expiration Time, the Rights Offering Subscription Agent shall, on behalf of the Company, deliver to each Equity Backstop Party a written notice (the "**Funding Notice**") setting forth (i) the number of Rights Offering Shares elected to be purchased by the Rights Offering Participants, and the aggregate Per Share Purchase Price therefor; (ii) the aggregate number of

15

Unsubscribed Shares, if any, and the aggregate Per Share Purchase Price therefor; (iii) the Equity Backstop Party's Equity Backstop Percentage and the aggregate number of Backstop Shares as of that date to be issued and sold by the Company to such Equity Backstop Party, and the aggregate Per Share Purchase Price therefor; (iv) if applicable, the number of Rights Offering Shares such Equity Backstop Party is subscribed for in the Rights Offering and for which such Equity Backstop Party had not yet paid to the Rights Offering Subscription Agent the aggregate Per Share Purchase Price therefor, together with such aggregate Per Share Purchase Price; and (v) subject to the last sentence of Section 2.4(b), a segregated account maintained by the Rights Offering Subscription Agent for proceeds received in respect of the Rights Offering Backstop Commitment in accordance with terms and subject to conditions reasonably satisfactory to the Requisite Consenting Parties and the Company ("**Backstop Funding Account**"), to which Backstop Funding Account such Equity Backstop Party shall deliver and pay the aggregate Per Share Purchase Price for such Equity Backstop Party's Backstop Shares and, if applicable, the aggregate Per Share Purchase Price for the Rights Offering Shares such Equity Backstop Party has subscribed for in the Rights Offering.  The Company shall promptly direct the Rights Offering Subscription Agent to provide any written backup, information and documentation relating to the information contained in the applicable Funding Notice as any Equity Backstop Party may request.

(b)      Funding.  On such date reasonably agreed among the Company and the Requisite Consenting Parties which shall not be earlier than the fourth (4th) Business Day following receipt of the Funding Notice or more than eight (8) Business Days prior to the planned Effective Date (the "**Funding Date**"), each Equity Backstop Party shall deliver and pay an amount equal to the sum of (i) the aggregate Per Share Purchase Price for such Equity Backstop Party's Backstop Shares, plus (ii) the aggregate Per Share Purchase Price for the Convertible Series A Preferred Shares issuable pursuant to such Equity Backstop Party's exercise of all the Subscription Rights issued to it in the Rights Offering, by wire transfer of immediately available funds in U.S. dollars into the Backstop Funding Account in satisfaction of such Equity Backstop Party's Rights Offering Backstop Commitment and its obligations to fully exercise its Subscription Rights.  If the Closing does not occur, all amounts deposited by the Equity Backstop Parties in the Backstop Funding Account shall be returned to such Equity Backstop Parties in accordance with the terms of the escrow agreement.  Notwithstanding the foregoing, all payments contemplated to be made by any Equity Backstop Party to the Backstop Funding Account pursuant to this Section 2.4 may instead be made, at the option of such Equity Backstop Party, to the segregated bank account of the Rights Offering Subscription Agent maintained by the Rights Offering Subscription Agent for receipt of the proceeds of the Rights Offering.

Section 2.5    Closing.

(a)      Subject to Article VII, unless otherwise mutually agreed in writing between the Company and the Requisite Consenting Parties, the closing of the Rights Offering (the "**Closing**") shall take place at the offices of Milbank, 55 Hudson Yards, New York, New York 10001, at 10:00 a.m., New York City time, on the date on which all of the conditions set forth in Article VII shall have been satisfied or waived in accordance with this Agreement (other than conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions).  The date on which the Closing actually occurs shall be referred to herein as the "**Closing Date**".

(b)      At the Closing, the funds held in the Backstop Funding Account (and any amounts paid to a Rights Offering Subscription Agent bank account pursuant to the last sentence of Section 2.4(b)) shall, as applicable, be released and utilized in accordance with the Plan.

(c)      At the Closing, issuance of the Unsubscribed Shares will be made by the Company to each Equity Backstop Party (or to its designee in accordance with Section 2.6) against payment of the aggregate Per Share Purchase Price for the Unsubscribed Shares purchased by such Equity Backstop Party, in satisfaction of such Equity Backstop Party's Rights Offering Backstop Commitment.  The entry of any Unsubscribed Shares to be delivered pursuant to this Section 2.5(c) into the account of an Equity Backstop Party pursuant to the Company's book entry procedures and delivery to such Equity Backstop Party of an account statement reflecting the book entry of such Unsubscribed Shares shall be deemed delivery of such Unsubscribed Shares for purposes of this Agreement.  Notwithstanding anything to the contrary in this Agreement, all Unsubscribed Shares will be delivered with all issue, stamp, transfer, sales and use, or similar transfer Taxes or duties that are due and payable (if any) in connection with such delivery duly paid by the Company on behalf of the Company.

Section 2.6      Designation and Assignment Rights.

(a)      Each Equity Backstop Party shall have the right to require, by written notice to the Company no later than two (2) Business Days prior to the Closing Date, that all or any portion of its (x) Subscription Rights or (y) Rights Offering Backstop Commitment, in each case be issued in the name of, and delivered to one or more of its Related Purchasers, which notice of designation shall (i) be addressed to the Company and signed by such Equity Backstop Party and each such Related Purchaser, (ii) specify the number of Convertible Series A Preferred Shares to be delivered to or issued in the name of each such Related Purchaser and (iii) contain a confirmation by each such Related Purchaser of the accuracy of the representations made by each Equity Backstop Party under this Agreement as applied to such Related Purchaser; provided that no such designation shall relieve such Equity Backstop Party from any of its obligations under this Agreement.

(b)      Each Equity Backstop Party shall have the right to Transfer all or any portion of its (x) Subscription Rights or (y) Rights Offering Backstop Commitment, in each case to any other Equity Backstop Party or a creditworthy Related Purchaser to such other Equity Backstop Party (each, an "**Existing Equity Backstop Party Purchaser**"); provided, that (i) such Existing Equity Backstop Party Purchaser shall have been an Equity Backstop Party or its Related Purchaser as of immediately prior to such Transfer and (ii) if applicable, such Existing Equity Backstop Party Purchaser shall deliver to the Company a joinder to this Agreement, in a form reasonably acceptable to the Company and the Requisite Consenting Parties, that contains a confirmation of the accuracy of the representations made by each Equity Backstop Party under this Agreement as applied to such Person.

(c)      Other than as expressly set forth in this Section 2.6,, no Equity Backstop Party shall be permitted to Transfer all or any portion of its Subscription Rights or Rights Offering Backstop Commitment.  Any Transfer made (or attempted to be made) in violation of this Agreement shall be deemed null and void *ab initio* and of no force or effect, regardless of any prior notice provided to the Company or any Equity Backstop Party, and shall not create (or

17

4820-3711-3559 v.8

be deemed to create) any obligation or liability of any other Equity Backstop Party or any Debtor to the purported transferee or limit, alter or impair any agreements, covenants, or obligations of the proposed transferor under this Agreement.  After the Closing Date, subject to any transfer restrictions under U.S. federal and state securities laws which may be applicable, including the restrictions described in Section 6.3,, nothing in this Agreement shall limit or restrict in any way the ability of any Equity Backstop Party (or any permitted transferee thereof) to Transfer any of the Convertible Series A Preferred Shares or any interest therein.

**ARTICLE III**

**EXPENSE REIMBURSEMENT**

Section 3.1    Expense Reimbursement.

(a)    In accordance with and subject to the EBA Approval Order and the Confirmation Order, the Debtors will pay, in accordance with Section 3.1(b) below, (i) all reasonable and documented out-of-pocket fees and expenses (including travel costs and expenses) of all of the attorneys, accountants, other professionals, advisors, and consultants incurred on behalf of the Equity Backstop Parties, or their Affiliates, in connection with the Chapter 11 Cases and/or the Restructuring Transactions (whether incurred before or after the Petition Date), including the fees and expenses of (A) Milbank, as primary counsel to Oaktree and Centerbridge, (B) Houlihan Lokey, as financial advisor to Oaktree and Centerbridge, (C) Jones Day as primary counsel to each Additional Investor, (D) Rothschild & Co., as financial advisor to each Additional Investor, (E) Fried, Frank, Harris, Shriver & Jacobson LLP, as legal counsel to The Baupost Group, LLC, and (F) Ducera Partners LLC, as financial advisor to The Baupost Group, LLC and (ii) any applicable filing or other similar fees required to be paid in all applicable jurisdictions (such payment obligations in clauses (i) and (ii), the "**Expense Reimbursement**"); provided, that (x) amounts paid in respect of the Expense Reimbursement shall be subject to the Interim Cap pursuant to Section 11.01 of the Plan Support Agreement and (y) no amounts shall be payable in respect of the Expense Reimbursement to any Defaulting Equity Backstop Party or its Affiliates.  The Expense Reimbursement shall, pursuant to the EBA Approval Order, constitute allowed administrative expenses against each of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code.  For the avoidance of doubt, the amount payable pursuant to this Section 3.1 shall be determined without duplication of recovery under the Plan Support Agreement.

(b)    Subject to the Interim Cap (i) the Expense Reimbursement accrued through the date on which the EBA Approval Order is entered shall be paid in accordance with the EBA Approval Order as promptly as reasonably practicable after the date of the entry of the EBA Approval Order and (ii) the Expense Reimbursement shall thereafter be payable by the Debtors within three (3) Business Days from receipt of the applicable invoice in accordance with the EBA Approval Order; provided, that the Debtors' final payment shall be made contemporaneously with the Closing in accordance with the terms of the Plan or, if the Closing does not occur, upon the termination of this Agreement.

(c)    The provisions for the payment of the Expense Reimbursement, and the indemnification provided herein, are an integral part of the transactions contemplated by this

18

Agreement and without these provisions the Equity Backstop Parties would not have entered into this Agreement.

Section 3.2        Tax Treatment of Rights Offering Backstop Commitments. The Equity Backstop Parties and the Debtors hereto agree to treat, for federal income tax purposes, the entering into of the Rights Offering Backstop Commitments pursuant to this Agreement as the granting of a put option by the Equity Backstop Parties to the Company in connection with the Debtors' entry into the Plan Support Agreement. The Equity Backstop Parties and the Debtors shall not take any position or action inconsistent with such treatment and/or characterization.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except (a) as disclosed in the Company SEC Documents filed with the SEC and publicly available on the SEC's Electronic Data-Gathering, Analysis and Retrieval system on or after December 31, 2019 and prior to the date hereof (excluding any disclosures contained in the "Forward-Looking Statements" or "Risk Factors" sections thereof, or any other statements that are similarly predictive, cautionary or forward looking in nature), or (b) as disclosed in any filings made with the Bankruptcy Court in connection with the Chapter 11 Cases, and solely for the purposes of satisfying the conditions precedent to the obligations of the Equity Backstop Parties hereunder, the Company hereby represents and warrants to the Equity Backstop Parties (unless otherwise set forth herein, as of the date of this Agreement and as of the Closing Date) as set forth below. None of the representations or warranties set forth in this Article IV shall be deemed to be given with respect to any period prior to the Spin-Off Date.

Section 4.1        Organization and Qualification.  Each of the Company and its Subsidiaries (a) is a duly organized and validly existing corporation, limited liability company or other form of entity, as the case may be, and, if applicable, in good standing (or the equivalent thereof) under the Laws of the jurisdiction of its incorporation or organization, (b) has the corporate, limited liability company or other applicable power and authority to own its property and assets and to transact the business in which it is currently engaged and presently proposes to engage and (c) except where the failure to have such authority or qualification would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, is duly qualified and is authorized to do business and is in good standing in each jurisdiction where the conduct of its business as currently conducted requires such qualifications.

Section 4.2      Corporate Power and Authority.

(a)        The Company has, subject to entry of the EBA Approval Order and the Confirmation Order, the requisite corporate power and authority (i) (A) to enter into, execute and deliver this Agreement and to perform the EBA Approval Obligations and (B) to perform each of its other obligations hereunder and (ii) subject to entry of the Plan Solicitation Order, to consummate the transactions contemplated herein and in the Plan, to enter into, execute and deliver all agreements to which it will be a party as contemplated by this Agreement, the Plan Support Agreement, the Registration Rights Agreement, the DIP Facility, the Exit  Credit Facilities, and such other agreements and any Plan supplements or documents referred to herein or therein or

19

hereunder or thereunder, as they may from time to time be amended in accordance with their terms, collectively, the "**Transaction Agreements**") and to perform its obligations under each of the Transaction Agreements (other than this Agreement).  Subject to the receipt of the foregoing Orders, as applicable, the execution and delivery of this Agreement and each of the other Transaction Agreements and the consummation of the transactions contemplated hereby and thereby have been or will be duly authorized by all requisite corporate action on behalf of the Company, and no other corporate authorizations  or consents on the part of the Company are or will be necessary to authorize this Agreement or any of the other Transaction Agreements or to consummate the transactions contemplated hereby or thereby.

(b)     Subject to entry of the EBA Approval Order, the Plan Solicitation Order, and the Confirmation Order, each of the Debtors other than the Company has the requisite power and authority (corporate or otherwise) to enter into, execute and deliver each Transaction Agreement to which such other Debtor is contemplated to be a party and to perform its obligations thereunder.  Subject to entry of the EBA Approval Order, the Plan Solicitation Order, and the Confirmation Order, the execution and delivery of this Agreement and each of the other Transaction Agreements and the consummation of the transactions contemplated hereby and thereby have been or will be duly authorized by all requisite organizational action on behalf of each such other Debtor party thereto, and no other organizational authorizations or consents on the part of any such other Debtor party thereto are or will be necessary to authorize this Agreement or any of the other Transaction Agreements or to consummate the transactions contemplated hereby or thereby.

Section 4.3     Execution and Delivery; Enforceability.  This Agreement has been duly executed and delivered by the Company and each of the Debtors.  Subject to the entry of the EBA Approval Order, the Plan Solicitation Order, and the Confirmation Order, as applicable, each other Transaction Agreement will be, duly executed and delivered by the Company and each of the other Debtors party thereto.  Upon entry of the EBA Approval Order and assuming due and valid execution and delivery hereof by the Equity Backstop Parties, the EBA Approval Obligations will constitute the valid and legally binding obligations of the Company and, to the extent applicable, the other Debtors, enforceable against the Company and, to the extent applicable, the other Debtors in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, moratorium and other similar Laws now or hereafter in effect relating to creditor's rights generally and subject to general principles of equity. Upon entry of the EBA Approval Order, the Plan Solicitation Order, and the Confirmation Order, and assuming due and valid execution and delivery of this Agreement and the other Transaction Agreements by the Equity Backstop Parties and, to the extent applicable, any other parties hereof and thereof, each of the obligations of the Company and, to the extent applicable, the other Debtors hereunder and thereunder will constitute the valid and legally binding obligations of the Company and, to the extent applicable, the other Debtors, enforceable against the Company and, to the extent applicable, the other Debtors, in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, moratorium and other similar Laws now or hereafter in effect relating to creditor's rights generally and subject to general principles of equity.

Section 4.4     Authorized and Issued Equity Interests.

20

4820-3711-3559 v.8

(a)       As of the Closing Date, except as reserved in respect of the MIP, (i) the total issued equity interests of the Company will consist solely of (x) 75,813,634 shares of the common stock of the Company (less any shares of common stock of the Company canceled under the Plan and not including any additional shares of common stock of the Company issued pursuant to the Plan and in accordance with the Plan Support Agreement), (y) up to 1,250,800,000 Convertible Series A Preferred Shares, including Convertible Series A Preferred Shares issued under the Rights Offering and the Put Option, and (z) the Series B Preferred Stock issued pursuant to the Plan in accordance with the Plan Support Agreement, (ii) no equity interests will be held by the Company in its treasury, (iii) no equity interests will be reserved for issuance upon exercise of stock options or other rights to purchase or acquire equity interests granted in connection with any employment arrangement, except as reserved in respect of the MIP, and (iv) no warrants to purchase equity interests will be issued and outstanding. Except as set forth in the prior sentence, as of the Closing Date, no shares of capital stock or other equity securities or voting interest in the Company will have been issued, reserved for issuance or outstanding.

(b)       Except as described in this Section 4.4 and except as set forth in the Registration Rights Agreement, the Company Organizational Documents and this Agreement, as of the Closing Date, none of the Company or its Subsidiaries will be party to or otherwise bound by or subject to any outstanding option, warrant, call, right, security, commitment, Contract, arrangement or undertaking (including any preemptive right) that (i) obligates the Company or its Subsidiaries to issue, deliver, sell or transfer, or repurchase, redeem or otherwise acquire, or cause to be issued, delivered, sold or transferred, or repurchased, redeemed or otherwise acquired, any units or shares of the capital stock of, or other equity or voting interests in, the Company or its Subsidiaries or any security convertible or exercisable for or exchangeable into any capital stock of, or other equity or voting interest in, the Company or its Subsidiaries, (ii) obligates the Company or its Subsidiaries to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, Contract, arrangement or undertaking, (iii) restricts the Transfer of any units or shares of capital stock of the Company (other than any restrictions, subject to the approval of the Equity Backstop Parties, included in the Exit Credit Facilities or any corresponding pledge agreement) or (iv) relates to the voting of any equity interests in the Company or its Subsidiaries.

Section 4.5      Issuance. The Convertible Series A Preferred Shares to be issued pursuant to the Plan, including the Convertible Series A Preferred Shares to be issued in connection with the consummation of the Rights Offering and the Put Option and pursuant to the terms hereof, will, when issued and delivered on the Closing Date in exchange for the aggregate Per Share Purchase Price therefor, be duly and validly authorized, issued and delivered and shall be fully paid and non-assessable, and free and clear of all Liens (other than Transfer restrictions imposed hereunder or under the Company Organizational Documents or by applicable Law, including U.S. federal and state securities laws), preemptive rights, subscription and similar rights (other than any rights set forth in the Company Organizational Documents and the Registration Rights Agreement).

Section 4.6      No Conflict. Assuming the consents described in clauses (a) through (g) of Section 4.7 are obtained, the execution and delivery by the Company and, if applicable, any other Debtor, of this Agreement, the Plan and the other Transaction Agreements, the compliance by the Company and, if applicable, any other Debtor, with the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein will not (a)

21

conflict with, or result in a breach, modification or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, except to the extent specified in the Plan, in the acceleration of, or the creation of any Lien under, or cause any payment or consent to be required under any Contract (other than any Contract whose terms provide that such Contract automatically terminates upon, or that another party thereto has the right to terminate such Contract upon, the commencement of the Bankruptcy Cases and/or the entry of the Confirmation Order) to which any Debtor will be bound as of the Closing Date after giving effect to the Plan or to which any of the property or assets of any Debtor will be subject as of the Closing Date after giving effect to the Plan, (b) result in any violation of the provisions of any of the Debtors' organizational documents (other than, for the avoidance of doubt, a breach or default that would be triggered as a result of the Chapter 11 Cases or the Company's or any other Debtor's undertaking to implement the Restructuring Transactions through the Chapter 11 Cases), or (c) result in any violation of any Law or Order applicable to any Debtor or any of their properties, except in each of the cases described in clause (a) or (c) for any conflict, breach, modification, violation, default, acceleration or Lien which would not reasonably be expected to be, individually or in the aggregate, a Material Adverse Effect.

Section 4.7    Consents and Approvals.   No consent, approval, authorization, Order, registration or qualification of or with any Governmental Entity having jurisdiction over any of the Debtors or any of their properties (each, an "**Applicable Consent**") is required for the execution and delivery by the Company and, to the extent relevant, the other Debtors, of this Agreement, the Plan and the other Transaction Agreements, the compliance by the Company and, to the extent relevant, the other Debtors, with the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein, except for (a) the entry of the EBA Approval Order authorizing the Company to execute and deliver this Agreement and perform the EBA Approval Obligations, (b) the entry of the Plan Solicitation Order, (c) the entry by the Bankruptcy Court, or any other court of competent jurisdiction, of Orders as may be necessary in the Chapter 11 Cases from time-to-time, (d) the entry of the Confirmation Order, (e) filings, notifications, authorizations, approvals, consents, clearances or termination or expiration of all applicable waiting periods under any Antitrust Laws in connection with the transactions contemplated by this Agreement, (f) such consents, approvals, authorizations, registrations or qualifications as may be required under state securities or "Blue Sky" Laws in connection with the purchase of the Unsubscribed Shares by the Equity Backstop Parties, the issuance of the Subscription Rights or the issuance of the Rights Offering Shares pursuant to the exercise of the Subscription Rights, and (g) any Applicable Consents that, if not made or obtained, would not reasonably be expected to be, individually or in the aggregate, material and adverse to the Debtors.

Section 4.8    Arm's-Length.  Each of the Debtors acknowledges and agrees that (a) each of the Equity Backstop Parties is acting solely in the capacity of an arm's-length contractual counterparty to the Debtors with respect to the transactions contemplated hereby (including in connection with determining the terms of the Rights Offering) and not as a financial advisor or a fiduciary to, or an agent of, the Debtors or any of their respective Subsidiaries and (b) no Equity Backstop Party is advising the Debtors or any of their respective Subsidiaries as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction.

Section 4.9    Company SEC Documents and Disclosure Statement.    The Company has filed with or furnished to the SEC all reports, schedules, forms, statements and other

22

4820-3711-3559 v.8

documents (including exhibits and other information incorporated therein) required to be filed or furnished by them since December 31, 2018 under the Exchange Act or the Securities Act. As of their respective dates, and, if amended, as of the date of the last such amendment, each of the Company SEC Documents, including any financial statements or schedules included therein, (a) did not contain any untrue statement of a material fact or omit to state a material fact required to be stated in such Company SEC Document or necessary in order to make the statements in such Company SEC Document, in light of the circumstances under which they were made, not misleading and (b) complied in all material respects with the applicable requirements of the Exchange Act, the Securities Act and the Sarbanes-Oxley Act of 2002 ("**SOX**"), as the case may be, and the applicable rules and regulations of the SEC under the Exchange Act, the Securities Act and SOX, as the case may be. The Disclosure Statement as approved by the Bankruptcy Court will contain "adequate information," as such term is defined in section 1125 of the Bankruptcy Code, and will otherwise comply in all material respects with section 1125 of the Bankruptcy Code.

Section 4.10   Absence of Certain Changes.   Since September 30, 2020 to and including the date of this Agreement, no Event has occurred or exists that has had or would be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.11   No Violation; Compliance with Laws.   (a) The Company is not in violation of its certificate of incorporation, charter or bylaws and (b) no other Debtor or any of its Subsidiaries is in violation of its respective certificate of incorporation or formation, charter, bylaws, limited liability company operating agreement or similar organizational document in any material respect. None of the Company or its Subsidiaries is or has been at any time since the Spin-Off Date in violation of any Law or Order, except for any such violations that have not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.12   Legal Proceedings.   Other than the Chapter 11 Cases and any adversary proceedings or contested motions commenced in connection therewith, there are no material legal, governmental, administrative, judicial or regulatory investigations, audits, actions, suits, claims, arbitrations, demands, demand letters, claims, notices of noncompliance or violations, or proceedings ("**Legal Proceedings**") pending or, to the Knowledge of the Company, threatened to which any of the Company or its Subsidiaries is a party or to which any property of any of the Company or its Subsidiaries is the subject which, if adversely determined, would be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.13   Tax Matters.

(a)   Each of the Debtors and their respective Subsidiaries has filed or caused to be filed all U.S. federal, state, provincial, local and non-U.S. income and other material Tax returns required to have been filed by it and each such Tax return is true and correct in all material respects;

(b)   Each of the Debtors and their respective Subsidiaries has timely paid or caused to be timely paid all Taxes shown to be due and payable by it on the returns referred to in clause (a) and all other material Taxes or assessments (or made adequate provision (in accordance with GAAP) for the payment of all such Taxes due) with respect to all periods or portions thereof ending on or before the date hereof;

23

(c)      As of the date hereof, with respect to the Debtors and their respective Subsidiaries, other than in connection with the Chapter 11 Cases and other than Taxes or assessments that are being contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP, (i) no claims have been asserted in writing with respect to any material Taxes, (ii) no presently effective waivers or extensions of statutes of limitation with respect to Taxes have been given or requested and (iii) no Tax returns are being examined or audited by, and no written notification of intention to examine or audit has been received from, the IRS or any other Governmental Entity.

(d)      None of the Debtors nor any of their respective Subsidiaries has been included in any "consolidated," "unitary" or "combined" Tax return provided for under any Law with respect to Taxes for any taxable period for which the statute of limitations has not expired (other than any such group the common parent of which is Honeywell, any Debtor or any of their current or past Subsidiaries (an "**Applicable Group**")).

(e)      None of the Debtors nor any of their respective Subsidiaries (i) has (x) agreed to or is required to make any adjustment pursuant to Section 481(a) of the Code or any similar provision of Law, (y) any knowledge that any Governmental Entity has proposed any such adjustment or (z) any application pending with any Governmental Entity requesting permission for any change in accounting method, (ii) has any liability pursuant or attributable to or as a result of Section 965 of the Code of any Person other than one or members of an Applicable Group, (iii) will be required to include any item of income in, or exclude any item of deduction from, taxable income for a taxable period (or portion thereof) ending after the Closing Date as a result of any (1) installment sale or open transaction disposition made or entered into on or prior to the Closing Date, or (2) prepaid amount received on or prior to the Closing Date.

(f)      The Debtors and each of their respective Subsidiaries have complied with all applicable laws, rules, and regulations relating to the payment and withholding of Taxes, and have, within the time and in the manner prescribed by law, withheld and timely paid over to the proper Governmental Entity all required amounts from amounts paid or owing to any employee, independent contractor, creditor, stockholder or other third party.

(g)      There are no material Liens for Taxes on any asset of any of the Company or its Subsidiaries other than Liens for Taxes not yet delinquent or for Taxes being contested in good faith by appropriate proceedings and for which adequate reserves have been made with respect thereto.

(h)      None of the Debtors nor any of their respective Subsidiaries has any liability for any material amount of Taxes of any Person other than the one or members of an Applicable Group, either by operation of Law, by Contract or as a transferee or successor.  None of the Debtors nor any of their respective Subsidiaries is a party to any material Tax allocation or Tax sharing agreement with any third party (other than an agreement entered into in the ordinary course of business consistent with past practice (such as a lease or a license) or the principal purpose of which is not the sharing, assumption or indemnification of Tax).

Section 4.14   No Unlawful Payments.  Since the Spin-Off Date, none of the Company or its Subsidiaries, nor, to the Knowledge of the Company, any of their respective

24

directors, officers or employees has: (a) used any funds of any of the Company or its Subsidiaries for any unlawful contribution, gift, entertainment or other unlawful expense, in each case relating to political activity; (b) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (c) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder, or the UK Bribery Act of 2010; or (d) made any bribe, rebate, payoff, influence payment, kickback or other similar unlawful payment, in each case in violation of any applicable Anti-Corruption Law.

Section 4.15    Compliance with Money Laundering and Sanctions Laws.

(a)    The operations of the Company and its Subsidiaries are and, since the Spin-Off Date have been at all times, conducted in compliance in all material respects with applicable financial recordkeeping and reporting requirements of the U.S. Currency and Foreign Transactions Reporting Act of 1970, USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), the money laundering statutes of all jurisdictions in which the Company or its Subsidiaries operate (and the rules and regulations promulgated thereunder) and any related or similar Laws (collectively, the "**Money Laundering Laws**") and no material Legal Proceeding by or before any Governmental Entity or any arbitrator involving any of the Company or its Subsidiaries with respect to Money Laundering Laws is pending or, to the Knowledge of the Company, threatened.

(b)    None of the Company or its Subsidiaries nor, to the Knowledge of the Company, any of their respective directors, officers, employees or other Persons acting on their behalf with express authority to so act is currently (i) subject to any U.S. sanctions administered by the U.S. government (including the Office of Foreign Assets Control of the U.S. Treasury Department), the European Union or any of its member states, the United Nations Security Council or the United Kingdom (including by the Office of Financial Sanctions Implementation of Her Majesty's Treasury) (collectively, "**Sanctions**") or (ii) domiciled, organized or resident in any country or territory that is, or whose government is, the subject or target of country-wide or territory-wide U.S. sanctions broadly prohibiting or restricting dealings in, with or involving such country or territory.  The Company will not directly or indirectly use the proceeds of the Rights Offering or the exercise of the Put Option, or lend, contribute or otherwise make available such proceeds to any other Debtor, its Subsidiaries, joint venture partner or other Person, for the purpose of financing the activities of any Person that, to the Knowledge of the Company, is the subject or target of any Sanctions in violation of applicable Sanctions or other applicable Law, or in any manner that would constitute or give rise to a violation of Sanctions by any Party hereto (including the Equity Backstop Parties).

Section 4.16    No Broker's Fees.  None of the Company or its Subsidiaries is a party to any Contract with any Person (other than this Agreement) that would give rise to a valid claim against the Equity Backstop Parties for a brokerage commission, finder's fee or like payment in connection with the Rights Offering or the sale of the Unsubscribed Shares.

Section 4.17    Investment Company Act.  None of the Company or its Subsidiaries is, or immediately after giving effect to the Restructuring Transactions will be, an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

25

Section 4.18    <u>Internal Control Over Financial Reporting</u>. Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the Company has established and maintains a system of internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) promulgated under the Exchange Act) that complies with the requirements of the Exchange Act and has been designed to provide reasonable assurances regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP and to the Knowledge of the Company, there are no material weaknesses in the Company's internal control over financial reporting as of the date hereof.

Section 4.19    <u>Disclosure Controls and Procedures</u>. Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the Company maintains disclosure controls and procedures (within the meaning of Rules 13a-15(e) and 15d-15(e) promulgated under the Exchange Act) designed to ensure that information required to be disclosed by the Company in the reports that it files and submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, including that information required to be disclosed by the Company in the reports that it files and submits under the Exchange Act is accumulated and communicated to management of the Company as appropriate to allow timely decisions regarding required disclosure.

Section 4.20    <u>No Other Representations or Warranties</u>    Except for the representations and warranties contained in this <u>Article IV</u> or in any certificate delivered with respect to this Agreement, none of the Company, the Debtors or any other Person makes any other express or implied representation or warranty on behalf of the Company or the Debtors.  For the avoidance of doubt, none of the Company, the Debtors nor any other Person gives or makes any warranty or representation as to the accuracy or reasonableness of any forecasts, estimates, projections, statements of intent or statements of opinion provided to the Equity Backstop Parties or any of their Affiliates or any of their respective Representatives, including in any information memorandum, any management presentations and any other information made available to the Equity Backstop Parties or any of their Affiliates or any of their respective Representatives.  Except as provided in this <u>Article IV</u>, the other Transaction Agreements or in any certificate delivered with respect to this Agreement, no Person makes any representation or warranty to the Equity Backstop Parties or any of their Affiliates or any of their respective Representatives regarding the probable success or profitability of the Business.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF THE EQUITY BACKSTOP PARTIES

Each Equity Backstop Party, severally (in accordance with its Equity Backstop Percentage) and not jointly, represents and warrants as to itself only (unless otherwise set forth herein, as of the date of this Agreement and as of the Closing Date) as set forth below.

Section 5.1    <u>Organization</u>.  Such Equity Backstop Party is a legal entity duly organized, validly existing and, if applicable, in good standing (or the equivalent thereof) under the Laws of its jurisdiction of incorporation or organization.

26

Section 5.2    Organizational Power and Authority.  Such Equity Backstop Party has the requisite power and authority (corporate or otherwise) to enter into, execute and deliver this Agreement and each other Transaction Agreement to which such Equity Backstop Party is contemplated to be a party and to perform its obligations hereunder and thereunder and has taken all necessary action (corporate or otherwise) required for the due authorization, execution, delivery and performance by it of this Agreement and the other Transaction Agreements.

Section 5.3    Execution and Delivery; Enforceability.  This Agreement and each other Transaction Agreement to which such Equity Backstop Party is a party (a) has been, or prior to its execution and delivery will be, duly and validly executed and delivered by such Equity Backstop Party and (b) upon entry of the EBA Approval Order, the Plan Solicitation Order, and the Confirmation Order, and assuming due and valid execution and delivery of this Agreement and the other Transaction Agreements by the Company and the other Debtors (as applicable), will constitute valid and legally binding obligations of such Equity Backstop Party, enforceable against such Equity Backstop Party in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization or other similar Laws limiting creditors' rights generally or by equitable principles relating to enforceability.

Section 5.4    No Conflict.  Assuming that the consents referred to in clauses (a) and (b) of Section 5.5 are obtained, the execution and delivery by such Equity Backstop Party of this Agreement and each other Transaction Agreement to which such Equity Backstop Party is a party, the compliance by such Equity Backstop Party with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein (a) will not conflict with, or result in a breach, modification, termination or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time or both), or result in the acceleration of, or the creation of any Lien under, any Contract to which such Equity Backstop Party is party or is bound or to which any of the property or assets of such Equity Backstop Party are subject, (b) will not result in any violation of the provisions of the certificate of incorporation or bylaws (or comparable constituent documents) of such Equity Backstop Party and (c) will not result in any material violation of any Law or Order applicable to such Equity Backstop Party or any of its properties, except in each of the cases described in clauses (a) or (c), for any conflict, breach, modification, termination, violation, default, acceleration or Lien which would not reasonably be expected, individually or in the aggregate, to prohibit or materially and adversely impact such Equity Backstop Party's performance of its obligations under this Agreement.

Section 5.5    Consents and Approvals.  No consent, approval, authorization, Order, registration or qualification of or with any Governmental Entity having jurisdiction over such Equity Backstop Party or any of its properties is required for the execution and delivery by such Equity Backstop Party of this Agreement and each other Transaction Agreement to which such Equity Backstop Party is a party, the performance of and compliance by such Equity Backstop Party with the provisions hereof and thereof and the consummation of the transactions (including the purchase by such Equity Backstop Party of its Backstop Shares or its portion of the Rights Offering Shares) contemplated herein and therein, except (a) any consent, approval, authorization, Order, registration or qualification which, if not made or obtained, would not reasonably be expected, individually or in the aggregate, to prohibit or materially and adversely impact such Equity Backstop Party's performance of its obligations under this Agreement and each other Transaction Agreement to which such Equity Backstop Party is a party and (b) filings,

27

4820-3711-3559 v.8

notifications, authorizations, approvals, consents, clearances or termination or expiration of all applicable waiting periods under any Antitrust Laws in connection with the transactions contemplated by this Agreement.

Section 5.6    No Registration.  Such Equity Backstop Party understands that (a) the issuance of the Unsubscribed Shares has not been registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends on, among other things, the bona fide nature of the investment intent and the accuracy of such Equity Backstop Party's representations as expressed herein or otherwise made pursuant hereto, and (b) the Unsubscribed Shares cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available.

Section 5.7    Purchasing Intent.  Such Equity Backstop Party is acquiring its Backstop Shares for its own account or accounts or funds over which it holds voting discretion, not otherwise as a nominee or agent, and not otherwise with the view to, or for resale in connection with, any distribution thereof not in compliance with applicable securities Laws, and such Equity Backstop Party has no present intention of selling, granting any other participation in, or otherwise distributing the same, except in compliance with applicable securities Laws.

Section 5.8    Sophistication; Investigation.  Such Equity Backstop Party has such knowledge and experience in financial and business matters such that it is capable of evaluating the merits and risks of its investment in the Unsubscribed Shares.  Such Equity Backstop Party is either a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act or an "accredited investor" within the meaning of Rule 501(a)(1), (2), (3), (7) or (8) of the Securities Act.  Such Equity Backstop Party further represents that it (i) has the knowledge, skill and experience in business, financial and investment matters so that such Equity Backstop Party is capable of evaluating the merits, risks and consequences of an investment in the Unsubscribed Shares, (ii) fully understands the limitations on transfer and restrictions on sales and other dispositions set forth in this Agreement and understands and (iii) is able to bear any economic risks associated with such investment (including the necessity of holding such shares for an indefinite period of time or the complete loss of such investment).  Such Equity Backstop Party has independently evaluated the merits and risks of its decision to enter into this Agreement and, except for the representations and warranties expressly set forth in this Agreement or any other Transaction Agreement, disclaims reliance on any representations or warranties, either express or implied, by or on behalf of any of the Debtors.

Section 5.9    No Broker's Fees.  Such Equity Backstop Party is not a party to any Contract with any Person (other than the Transaction Agreements and any Contract giving rise to the Expense Reimbursement hereunder) that would give rise to a valid claim against any of the Debtors for a brokerage commission, finder's fee or like payment in connection with the Rights Offering or the sale of the Unsubscribed Shares.

Section 5.10    Sufficiency of Funds.  Such Equity Backstop Party will have sufficient immediately available funds to perform all of its obligations under this Agreement, including the ability to make and complete the payment of the aggregate purchase price for such Equity Backstop Party's Backstop Shares on the Funding Date.

28

Section 5.11    <u>Sanctions</u>.  Such Equity Backstop Party is not (i) a person or entity named on the OFAC List, or a person or entity prohibited by any OFAC sanctions program, (ii) a Designated National as defined in the Cuban Assets Control Regulations, 31 C.F.R. Part 515 or (iii) a non-U.S. shell bank or providing banking services indirectly to a non-U.S. shell bank. Such Equity Backstop Party agrees to provide law enforcement agencies, if requested thereby, such records as required by applicable law, provided that such Equity Backstop Party is permitted to do so under applicable law. Such Equity Backstop Party represents that if it is a financial institution subject to the BSA/PATRIOT Act and that such Equity Backstop Party maintains policies and procedures reasonably designed to comply with applicable obligations under the BSA/PATRIOT Act. Such Equity Backstop Party also represents that, to the extent required, it maintains policies and procedures reasonably designed for the screening of its investors against the OFAC sanctions programs, including the OFAC List. Such Equity Backstop Party further represents and warrants that, to the extent required, it maintains policies and procedures reasonably designed to ensure that the funds held by such Equity Backstop Party and used to purchase the Backstop Shares were legally derived.

Section 5.12    <u>No Prohibited Transactions</u>.  Such Equity Backstop Party represents and warrants that its acquisition and holding of the Backstop Shares will not constitute or result in a nonexempt prohibited transaction under Section 406 of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), Section 4975 of the Code, or any applicable similar Law.

Section 5.13    <u>ERISA</u>.  If such Equity Backstop Party is an employee benefit plan that is subject to Title I of ERISA, a plan, an individual retirement account or other arrangement that is subject to section 4975 of the Code or an employee benefit plan that is a governmental plan (as defined in section 3(32) of ERISA), a church plan (as defined in section 3(33) of ERISA), a non-U.S. plan (as described in section 4(b)(4) of ERISA) or other plan that is not subject to the foregoing but may be subject to provisions under any other federal, state, local, non-U.S. or other laws or regulations that are similar to such provisions of ERISA or the Code, or an entity whose underlying assets are considered to include "plan assets" of any such plan, account or arrangement (each, an "**ERISA Plan**") subject to the fiduciary or prohibited transaction provisions of ERISA or section 4975 of the Code, such Equity Backstop Party represents and warrants that neither Company, nor any of its Affiliates has acted as the ERISA Plan's fiduciary, or has been relied on for advice, with respect to its decision to acquire and hold the Backstop Shares and neither the Company nor any of its Affiliates shall at any time be relied upon as the ERISA Plan's fiduciary with respect to any decision to acquire, continue to hold or transfer the Backstop Shares.

Section 5.14    <u>No Other Representations or Warranties</u>. Except for the representations and warranties contained in this Article V or in any certificate delivered with respect to this Agreement, neither such Equity Backstop Party nor any other Person makes any other express or implied representation or warranty on behalf of the Equity Backstop Parties.

4820-3711-3559 v.8

## ARTICLE VI

## ADDITIONAL COVENANTS

Section 6.1    Blue Sky.  The Company shall, on or before the Closing Date, take such action as the Company shall reasonably determine is necessary in order to obtain an exemption for, or to qualify the offer and sale of the Unsubscribed Shares to the Equity Backstop Parties pursuant to this Agreement under applicable securities and "Blue Sky" Laws of the states of the United States (or to obtain an exemption from such qualification), and shall provide evidence of any such action so taken to the Equity Backstop Parties on or prior to the Closing Date.  The Company shall timely make all filings and reports relating to the offer and sale of the Unsubscribed Shares issued hereunder required under applicable securities and "Blue Sky" Laws of the states of the United States following the Closing Date.  The Company shall pay all fees and expenses in connection with satisfying its obligations under this Section 6.1.

Section 6.2    Use of Proceeds.  The Debtors will apply the proceeds from the exercise of the Subscription Rights and the sale of the Unsubscribed Shares for the purposes consistent with the Disclosure Statement and the Plan.

Section 6.3    Securities Law Matters.

(a)    The Backstop Shares shall be offered and sold, without registration under the Securities Act in reliance on the exemption provided in Section 4(a)(2) of the Securities Act under the Securities Act and shall be "restricted securities" (within the meaning of Rule 144 under the Securities Act) subject to certain transfer restrictions under the U.S. federal securities laws unless sold pursuant to an exemption or a registration statement. Each Equity Backstop Party agrees that the Backstop Shares acquired by such Equity Backstop Party pursuant to this Agreement shall not be offered for sale, sold or otherwise transferred by such Equity Backstop Party (or, if applicable, any Related Purchaser of such Equity Backstop Party) except pursuant to an effective registration statement under the Securities Act or in a transaction exempt from or not subject to registration under the Securities Act and any applicable state securities laws.

(b)    Each book-entry statement in the share ledger or other appropriate records maintained by the Company or agent evidencing Unsubscribed Shares issued hereunder shall be stamped or otherwise imprinted with a legend (the "**Legend**") in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS BOOK ENTRY WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

The Company shall remove the Legend set forth above from the share register or other appropriate Company records upon request, at any time after the restrictions described in such Legend cease to be applicable, including, as applicable, when such shares may be sold under Rule 144 of the

30

4820-3711-3559 v.8

Securities Act. The Company may reasonably request such opinions, certificates or other evidence that such restrictions no longer apply as a condition to removing the Legend.

Section 6.4 <u>Antitrust Approval</u>.

(a) Each Party agrees to use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary to consummate and make effective the transactions contemplated by this Agreement, the Plan and the other Transaction Agreements, including (i) if applicable, filing, or causing to be filed, no later than thirty (30) days following the date hereof, the Notification and Report Form pursuant to the HSR Act with respect to the transactions contemplated by this Agreement with the Antitrust Division of the United States Department of Justice and the United States Federal Trade Commission and any filings, notifications, notices or submissions (or, if required by any Antitrust Authority, any drafts thereof) under any other Antitrust Laws that are necessary to consummate and make effective the transactions contemplated by this Agreement as soon as reasonably practicable and (ii) promptly furnishing any documents or information reasonably requested by any Antitrust Authority.

(b) The Company and each Equity Backstop Party subject to an obligation pursuant to the Antitrust Laws to notify or make any filing with respect to any transaction contemplated by this Agreement, the Plan or the other Transaction Agreements and that has notified the Company in writing of such obligation (each such Equity Backstop Party, a "**Filing Party**") agree to reasonably cooperate with each other in the preparation of and as to the appropriate time of filing such notification and its content. The Company and each Filing Party shall, to the extent permitted by applicable Law: (i) promptly notify each other of, and if in writing, furnish each other with copies of (or, in the case of material oral communications, advise each other orally) of any material communications from or with an Antitrust Authority; (ii) consult with each other Filing Party and the Company, and take into account reasonable comments made by a Filing Party and the Company before submitting any filings, briefs or any other material correspondence with the any Antitrust Authority; (iii) not participate in any meeting with an Antitrust Authority unless it consults with each other Filing Party and the Company, as applicable, in advance and, to the extent permitted by the Antitrust Authority and applicable Law, give each other Filing Party and the Company, as applicable, a reasonable opportunity to attend and participate thereat; (iv) furnish each other Filing Party and the Company, as applicable, with copies of all material correspondence and communications between such Filing Party or the Company and the Antitrust Authority; (v) furnish each other Filing Party with such necessary information and reasonable assistance as may be reasonably necessary in connection with the preparation of necessary filings or submission of information to the Antitrust Authority; and (vi) not withdraw its filing, if any, under the HSR Act or under the Antitrust Laws of Austria and Germany without the prior written consent of the Requisite Consenting Parties and the Company.

(c) Should a Filing Party be subject to an obligation under the Antitrust Laws to jointly notify with one or more other Filing Parties (each, a "**Joint Filing Party**") any transaction contemplated by this Agreement, the Plan or the other Transaction Agreements, such Joint Filing Party shall promptly notify each other Joint Filing Party of, and if in writing, furnish each other Joint Filing Party with copies of (or, in the case of material oral communications, advise each other Joint Filing Party orally of) any communications from or with an Antitrust Authority.

31

(d)    The Company and each Filing Party shall use their commercially reasonable efforts to obtain all authorizations, approvals, consents, or clearances under any applicable Antitrust Laws, or to cause the termination or expiration of all applicable waiting periods under any Antitrust Laws in connection with the transactions contemplated by this Agreement, in each case at the earliest possible date after the date of this Agreement.  The communications contemplated by this Section 6.4 may be made by the Company or a Filing Party on an outside counsel-only basis or subject to other agreed upon confidentiality safeguards.  The obligations in this Section 6.4 shall not apply to filings, correspondence, communications or meetings with Antitrust Authorities unrelated to the transactions contemplated by this Agreement, the Plan or the other Transaction Agreements and shall not apply to any Filing Party that is not a party to the notified transaction.

Section 6.5    Registration Rights Agreement; Company Organizational Documents.

(a)    The Plan will provide that from and after the Effective Date, in the event that the Company is then a registrant pursuant to the terms of the Securities Exchange Act of 1934, each Equity Backstop Party shall be entitled to registration rights that are customary for a transaction of this nature, pursuant to a registration rights agreement to be entered into as of the Effective Date, which agreement shall be in form and substance consistent with the terms of the Plan Support Agreement and otherwise reasonably acceptable to the Requisite Consenting Parties and the Company (the "**Registration Rights Agreement**").  A form of the Registration Rights Agreement shall be filed with the Bankruptcy Court as part of the Plan Supplement or an amendment thereto.

(b)    The Plan will provide that, on the Effective Date, the Company Organizational Documents will be duly authorized, approved, adopted and in full force and effect. Forms of the Company Organizational Documents shall be filed with the Bankruptcy Court as part of the Plan Supplement or an amendment thereto.

Section 6.6    Access to Information. Subject to any limitations imposed by the Bankruptcy Code or the Bankruptcy Court, any applicable Laws and the COVID-19 Measures, during the Pre-Closing Period, the Company shall, subject to the Confidentiality Agreements, furnish promptly to a designated Representative of the Equity Backstop Parties which is subject to a Confidentiality Agreement all reasonable information concerning the Debtors' business, properties and personnel as may reasonably be requested, provided that the foregoing shall not require the Company (i) to permit any inspection, or to disclose any information, that in the reasonable judgment of the Company, would cause any of the Debtors to violate any of their respective obligations with respect to confidentiality to a third party if the Company shall have used its commercially reasonable efforts to obtain, but failed to obtain, the consent of such third party to such inspection or disclosure, (ii) to disclose any legally privileged information of any of the Company or any of its Subsidiaries or (iii) to violate or create any liability under any applicable Laws or Orders. All requests for information made in accordance with this Section 6.6 shall be directed to an executive officer of the Company or such Person as may be designated by the Company's executive officers. All information received pursuant to this Section 6.6 shall be governed by the terms of the Confidentiality Agreements.

32

## ARTICLE VII

## CONDITIONS TO THE OBLIGATIONS OF THE PARTIES

Section 7.1    Conditions to the Obligations of the Equity Backstop Parties.  The obligations of each Equity Backstop Party to consummate the transactions contemplated hereby shall be subject to the satisfaction or waiver in accordance with Section 7.2 of the following conditions prior to or at the Closing:

(a)    Rights Offering.  The Rights Offering shall have been conducted, in all material respects, in accordance with the Plan Solicitation Order, the Rights Offering Procedures and this Agreement, as applicable.

(b)    Effective Date.  The Effective Date shall have occurred, or shall be deemed to have occurred, concurrently with the Closing, as applicable, in accordance with the terms and conditions in the Plan and in the Confirmation Order.

(c)    Registration Rights Agreement; Company Organizational Documents.

(i)    The Registration Rights Agreement shall have been executed and delivered by the Company, shall otherwise have become effective with respect to the Equity Backstop Parties and the other parties thereto, and shall be in full force and effect.

(ii)    The Company Organizational Documents shall have been duly approved and adopted and shall be in full force and effect.

(d)    Required Antitrust Clearances; No Prohibition.

(i)    The waiting periods applicable to the consummation of the transactions contemplated by this Agreement and the Plan Support Agreement under the HSR Act shall have expired or been terminated.

(ii)    All of the Required Foreign Antitrust Clearances shall have been obtained.

(iii)    No court or other Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Prohibition.

(e)    Representations and Warranties. The representations and warranties of the Company contained in this Agreement shall be true and correct (disregarding all materiality or Material Adverse Effect qualifiers) on and as of the Closing Date after giving effect to the Plan with the same effect as if made on and as of the Closing Date after giving effect to the Plan (except for such representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), except where the failure to be so true and correct does not constitute, individually or in the aggregate, a Material Adverse Effect.

4820-3711-3559 v.8

(f)      Covenants.  The Debtors shall have performed and complied, in all material respects, with all of their respective covenants and agreements contained in this Agreement and the Plan Support Agreement that contemplate, by their terms, performance or compliance prior to the Closing Date.

(g)      Material Adverse Effect. Since the date of this Agreement, there shall not have occurred, and there shall not exist, any Event that has had or would be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

(h)      Officer's Certificate.  The Equity Backstop Parties shall have received on and as of the Closing Date a certificate of the chief executive officer or chief financial officer of the Company confirming that the conditions set forth in Section 7.1(e) (*Representations and Warranties*) and Section 7.1(f) (*Covenants*) have been satisfied.

(i)      Funding Notice.  The Equity Backstop Parties shall have received the Funding Notice in accordance with the terms of Section 2.4. (and, if applicable, the written notice of the Company described in Section 2.3(a)).

(j)      Expense Reimbursement.   The Debtors shall have paid all Expense Reimbursements accrued through the Closing Date pursuant to  Section 3.1; provided, that invoices for such Expense Reimbursement must have been received by the Debtors at least three (3) Business Days prior to the Closing Date in order to be required to be paid on the Closing Date.

(k)      EBA Approval Order.  The Bankruptcy Court shall have entered the EBA Approval Order in form and substance consistent with the Plan Support Agreement, and such Order shall not have been stayed, modified, or vacated on appeal.

Section 7.2     Waiver of Conditions to Obligations of Equity Backstop Parties.  All or any of the conditions set forth in Section 7.1 may only be waived in whole or in part with respect to all Equity Backstop Parties by a written instrument executed by the Requisite Consenting Parties in their sole discretion and if so waived, all Equity Backstop Parties shall be bound by such waiver.

Section 7.3     Conditions to the Obligations of the Company.  The obligations of the Company to consummate the transactions contemplated hereby with the Equity Backstop Parties is subject to the satisfaction or waiver of each of the following conditions:

(a)      Effective Date.  The Effective Date shall have occurred, or shall be deemed to have occurred, concurrently with the Closing, in accordance with the terms and conditions in the Plan and in the Confirmation Order.

(b)      Required Antitrust Clearances; No Prohibition.

(i)      The waiting periods applicable to the consummation of the transactions contemplated by this Agreement and the Plan Support Agreement under the HSR Act shall have expired or been terminated.

(ii)      All of the Required Foreign Antitrust Clearances shall have been obtained.

4820-3711-3559 v.8

(iii)    No court or other Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Prohibition.

(c)    Representations and Warranties.  The representations and warranties of the Equity Backstop Parties shall be true and correct in all material respects on and as of the Closing Date with the same effect as if made on and as of the Closing Date (except for such representations and warranties made as of a specified date, which shall be true and correct in all material respects only as of the specified date), except where the failure to be so true and correct would not, individually or in the aggregate, prevent or materially impede the Equity Backstop Parties from consummating the transactions contemplated by this Agreement.

(d)    Covenants.  The Equity Backstop Parties shall have performed and complied, in all material respects, with all of their covenants and agreements contained in this Agreement and in any other document delivered pursuant to this Agreement.

(e)    Officer's Certificate.  The Debtors shall have received on and as of the Closing Date a certificate of an officer of each of the Equity Backstop Parties confirming that the conditions set forth in Section 7.3(c) (*Representations and Warranties*) and Section 7.3(d) (*Covenants*) have been satisfied with respect to such Equity Backstop Party.

## ARTICLE VIII

## INDEMNIFICATION AND CONTRIBUTION

Section 8.1    Indemnification Obligations.  Following the entry of the EBA Approval Order, the Company and the other Debtors (the "**Indemnifying Parties**" and each, an "**Indemnifying Party**") shall, jointly and severally, indemnify and hold harmless each Equity Backstop Party and its Affiliates, equity holders, members, partners, general partners, managers and its and their respective Representatives and controlling persons (each, an "**Indemnified Person**") from and against any and all losses, claims, damages, liabilities and costs and expenses (other than Taxes of the Equity Backstop Parties except to the extent otherwise provided for in this Agreement) (collectively, "**Losses**") (but not including any fees and expenses that would be reimbursable by the Debtors as Expense Reimbursement pursuant to Article III if the Interim Cap were disregarded) actually sustained, incurred or suffered by any Indemnified Person arising out of or in connection with this Agreement, the Plan, the Rights Offering Procedures or the transactions contemplated hereby and thereby, including the Rights Offering Backstop Commitment, the Rights Offering or the use of the proceeds of the Rights Offering, or any claim, challenge, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, whether or not such proceedings are brought by the Company, the other Debtors, their respective equity holders, Affiliates, creditors or any other Person, and reimburse each Indemnified Person upon demand for reasonable documented (with such documentation subject to redaction to preserve attorney client and work product privileges) legal (including attorneys' fees and expenses) or other third-party expenses incurred in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuit, investigation, claim or other proceeding relating to any of the foregoing (including in connection with the enforcement of the indemnification obligations set forth herein), irrespective of whether or not the transactions

35

4820-3711-3559 v.8

contemplated by this Agreement or the Plan are consummated or whether or not this Agreement is terminated; provided, that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses (a) as to a Defaulting Equity Backstop Party, its Related Parties or any Indemnified Person related thereto, to the extent caused by an Equity Backstop Party Default by such Equity Backstop Party or (b) to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the bad faith, willful misconduct or gross negligence of such Indemnified Person.

Section 8.2    Indemnification Procedure.    Promptly after receipt by an Indemnified Person of notice of the commencement of any claim, challenge, litigation, investigation or proceeding (an "**Indemnified Claim**"), such Indemnified Person will, if a claim is to be made hereunder against the Indemnifying Party in respect thereof, notify the Indemnifying Party in writing of the commencement thereof; provided, that (a) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have hereunder except to the extent it has been materially prejudiced by such failure and (b) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have to such Indemnified Person otherwise than on account of this Article VIII. In case any such Indemnified Claims are brought against any Indemnified Person and the Indemnified Person notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party will be entitled to participate therein, and, at its election by providing written notice to such Indemnified Person, the Indemnifying Party will be entitled to assume the defense thereof, with counsel reasonably acceptable to such Indemnified Person; provided, that if the parties (including any impleaded parties) to any such Indemnified Claims include both such Indemnified Person and the Indemnifying Party and based on advice of such Indemnified Person's counsel there are legal defenses available to such Indemnified Person that are different from or additional to those available to the Indemnifying Party, such Indemnified Person shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Indemnified Claims.  Upon receipt of notice from the Indemnifying Party to such Indemnified Person of its election to so assume the defense of such Indemnified Claims with counsel reasonably acceptable to the Indemnified Person, the Indemnifying Party shall not be liable to such Indemnified Person for expenses incurred by such Indemnified Person in connection with the defense thereof or participation therein (other than reasonable costs of investigation) unless (i) such Indemnified Person shall have employed separate counsel (in addition to any local counsel) in connection with the assertion of legal defenses in accordance with the proviso to the immediately preceding sentence (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one separate counsel representing the Indemnified Persons who are parties to such Indemnified Claims (in addition to one local counsel in each jurisdiction in which local counsel is required)), (ii) the Indemnifying Party shall not have employed counsel reasonably acceptable to such Indemnified Person to represent such Indemnified Person within a reasonable time after the Indemnifying Party has received notice of commencement of the Indemnified Claims from, or delivered on behalf of, the Indemnified Person, (iii) after the Indemnifying Party assumes the defense of the Indemnified Claims, the Indemnified Person determines in good faith that the Indemnifying Party has failed or is failing to defend such claim and provides written notice of such determination and the basis for such determination, and such failure is not reasonably cured within ten (10) Business Days of receipt of such notice by the Indemnifying Party, or (iv) the Indemnifying Party shall have authorized in writing the employment of counsel for such Indemnified Person.

36

Section 8.3     Settlement of Indemnified Claims.   In connection with any Indemnified Claim for which an Indemnified Person is assuming the defense in accordance with this Article VIII, the Indemnifying Party shall not be liable for any settlement of any Indemnified Claims effected by such Indemnified Person without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld, conditioned or delayed).  If any settlement of any Indemnified Claims is consummated with the written consent of the Indemnifying Party or if there is a final judgment for the plaintiff in any such Indemnified Claims, the Indemnifying Party agrees to indemnify and hold harmless each Indemnified Person from and against any and all Losses by reason of such settlement or judgment to the extent such Losses are otherwise subject to indemnification by the Indemnifying Party hereunder in accordance with, and subject to the limitations of, this Article VIII.  The Indemnifying Party shall not, without the prior written consent of an Indemnified Person (which consent shall be granted or withheld, conditioned or delayed in the Indemnified Person's sole discretion), effect any settlement of any pending or threatened Indemnified Claims in respect of which indemnity or contribution has been sought hereunder by such Indemnified Person unless (i) such settlement includes an unconditional release of such Indemnified Person in form and substance satisfactory to such Indemnified Person from all liability on the claims that are the subject matter of such Indemnified Claims and (ii) such settlement does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

Section 8.4     Contribution.   If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless from Losses that are subject to indemnification pursuant to Section 8.1, then the Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Person as a result of such Loss in such proportion as is appropriate to reflect not only the relative benefits received by the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, but also the relative fault of the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, as well as any relevant equitable considerations.  The Indemnifying Parties also agree that no Indemnified Person shall have any liability based on their comparative or contributory negligence or otherwise to the Indemnifying Parties, any Person asserting claims on behalf of or in right of any of the Indemnifying Parties, or any other Person in connection with an Indemnified Claim.

Section 8.5     Treatment of Indemnification Payments.   All amounts paid by an Indemnifying Party to an Indemnified Person under this Article VIII shall, to the extent permitted by applicable Law, be treated as adjustments to the Per Share Purchase Price for all Tax purposes. The provisions of this Article VIII are an integral part of the transactions contemplated by this Agreement and without these provisions the Equity Backstop Parties would not have entered into this Agreement.  The EBA Approval Order shall provide that the obligations of the Debtors under this Article VIII shall constitute allowed administrative expenses of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code and are payable without further Order of the Bankruptcy Court, and that the Debtors may comply with the requirements of this Article VIII without further Order of the Bankruptcy Court.

37

Section 8.6    No Survival.  The representations and warranties set forth in Article IV and Article V of this Agreement shall terminate at, and shall not survive, the termination of this Agreement or Closing Date, as applicable, and neither the Debtors nor the Equity Backstop Parties shall have any Liability with respect to a breach thereof. The respective covenants and agreements of the Debtors and the Equity Backstop Parties set forth in this Agreement shall terminate at, and shall not survive, the Closing Date, and neither the Debtors nor the Equity Backstop Parties shall have any Liability with respect to a breach thereof, except for covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms.

## ARTICLE IX

## TERMINATION

Section 9.1    Consensual Termination.  This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date by mutual written consent of the Company and the Requisite Consenting Parties.

Section 9.2    Automatic Termination.  This Agreement shall terminate automatically if the Plan Support Agreement terminates with respect to the rights and obligations of the Debtors prior to the occurrence of the Effective Date in accordance with its terms.

Section 9.3    Termination by the Equity Backstop Parties.

(a)    Notwithstanding the automatic stay imposed by section 362 of the Bankruptcy Code, this Agreement may be terminated by the Requisite Consenting Parties upon written notice to the Company upon the occurrence of any of the following Events:

(i)    any Law or final and non-appealable Order shall have been enacted, adopted or issued by any Governmental Entity that prohibits the implementation of the Plan or the Rights Offering or the transactions contemplated by this Agreement or the other Transaction Agreements; or

(ii)    (A) the Company or the other Debtors shall have breached any representation, warranty, covenant or other agreement made by the Company or the other Debtors in this Agreement or any such representation or warranty shall have become inaccurate and such breach or inaccuracy would, individually or in the aggregate, cause a condition set forth in Section 7.1(e) (*Representations and Warranties*) or Section 7.1(f) (*Covenants*) not to be satisfied, (B) the Equity Backstop Parties shall have delivered written notice of such breach or inaccuracy to the Company, (C) such breach or inaccuracy is not cured by the Company or the other Debtors by the tenth (10th) Business Day after receipt of such notice, and (D) as a result of such failure to cure, any condition set forth in Section 7.1(e) (*Representations and Warranties*) or Section 7.1(f) (*Covenants*) is not capable of being satisfied; provided, that, the Requisite Consenting Parties may not terminate this Agreement pursuant to this Section 9.3(b) if any Equity Backstop Party is then in breach of any representation, warranty, covenant or agreement under this

38

Agreement, such that the conditions set forth in <u>Section 7.3(c)</u> or <u>Section 7.3(d)</u> would not be satisfied.

(b)     Notwithstanding the automatic stay imposed by section 362 of the Bankruptcy Code, this Agreement may be terminated by an Equity Backstop Party if this Agreement is amended, restated, modified, or changed in circumstances requiring the consent of such Equity Backstop Party in accordance with <u>Section 10.7</u> without the written consent of such Equity Backstop Party.

(c)     Notwithstanding the automatic stay imposed by section 362 of the Bankruptcy Code, this Agreement may be terminated, upon written notice to the Company, (i) by Centerbridge (with respect only to the rights and obligations of Centerbridge hereunder) upon termination of the rights and obligations of Centerbridge under the Plan Support Agreement, (ii) by Oaktree (with respect only to the rights and obligations of Oaktree hereunder) upon termination of the rights and obligations of Oaktree under the Plan Support Agreement, or (iii) by the Equity Backstop Parties constituting the Additional Investors (with respect only to the rights and obligations of such Additional Investors hereunder) upon the termination of the rights and obligations of the Additional Investors under the Plan Support Agreement; <u>provided</u>, that if (A) the EBA Approval Order has been entered by the Bankruptcy Court in respect of this Agreement, (B) the EBA Approval Order has not been entered by the Bankruptcy Court in respect of the Plan Support Agreement and (C)  any Party (or group of Parties) would have the right to terminate pursuant to one of the foregoing clauses (i) through (iii) had the EBA Approval Order been entered by the Bankruptcy Court in respect of the Plan Support Agreement, then such Party (or group of Parties) shall have the right to terminate this Agreement pursuant to this <u>Section 9.3(c)</u>.

Section 9.4     <u>Termination by the Company</u>.

This Agreement may be terminated by the Company upon written notice to each Equity Backstop Party upon the occurrence of any of the following Events, subject to the rights of the Company to fully and conditionally waive, in writing, on a prospective or retroactive basis the occurrence of such Event:

(a)     any Law or final and non-appealable Order shall have been enacted, adopted or issued by any Governmental Entity that prohibits the implementation of the Plan or the Rights Offering or the transactions contemplated by this Agreement or the other Transaction Agreements in a way that cannot be remedied by the Company in a manner reasonably acceptable to the Company; or

(b)     subject to the right of the Equity Backstop Parties to arrange an Equity Backstop Party Replacement in accordance with <u>Section 2.3(a)</u> (which will be deemed to cure any breach by the replaced Equity Backstop Party pursuant to this subsection (b)), (i) any Equity Backstop Party shall have breached any representation, warranty, covenant or other agreement made by such Equity Backstop Party in this Agreement or any such representation or warranty shall have become inaccurate and such breach or inaccuracy would, individually or in the aggregate, cause a condition set forth in <u>Section 7.3(c)</u> (*Representations and Warranties*) or <u>Section 7.3(d)</u> (*Covenants*) not to be satisfied, (ii) the Company shall have delivered written notice of such breach or inaccuracy to such Equity Backstop Party, (iii) such breach or inaccuracy is not

39

cured by such Equity Backstop Party by the tenth (10th) Business Day after receipt of such notice, and (iv) as a result of such failure to cure, any condition set forth in Section 7.3(c) (*Representations and Warranties*) or Section 7.3(d) (*Covenants*) is not capable of being satisfied; provided, that the Company shall not have the right to terminate this Agreement pursuant to this Section 9.4(b) if the Company is then in breach of any representation, warranty, covenant or agreement under this Agreement, such that the conditions set forth in Section 7.1(e), Section 7.1(f) or Section 7.1(g) would not be satisfied.

Section 9.5    Effect of Termination.    Upon termination of this Agreement pursuant to this Article IX,, this Agreement shall forthwith become void and there shall be no further obligations or liabilities on the part of the Parties; provided, that (i) the obligations of the Debtors to pay the Expense Reimbursement pursuant to Article III and to satisfy their indemnification obligations pursuant to Article VIII shall survive the termination of this Agreement and shall remain in full force and effect until such obligations have been satisfied, (ii) the provisions set forth in Article VIII, this Section 9.5 and Article X shall survive the termination of this Agreement in accordance with their terms and (iii) subject to Section 10.10 (*Damages*), nothing in this Section 9.5 shall relieve any Party from liability for its gross negligence or any willful or intentional breach of this Agreement.  For purposes of this Agreement, "**willful or intentional breach**" means a breach of this Agreement that is a consequence of an act undertaken by the breaching Party with the knowledge that the taking of such act would, or would reasonably be expected to, cause a breach of this Agreement.

## ARTICLE X

## GENERAL PROVISIONS

Section 10.1    Notices.    All notices and other communications in connection with this Agreement shall be in writing and shall be deemed given if delivered personally, sent via electronic facsimile (with confirmation), mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the parties hereto at the following addresses (or at such other address for a Party as may be specified by like notice):

(a)    If to the Company or any of the other Debtors:

Garrett Motion Inc.
La Piéce 16
1180 Rolle, Switzerland
Attn:  Sean Deason
      Jerome P. Maironi
Email:  Sean.Deason@garrettmotion.com
      Jerome.Maironi@garrettmotion.com

*with copies (which shall not constitute notice) to:*

40

Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004
United States
Tel: (212) 558-3830
Attn: Scott Miller
        Andrew Dietderich
Email: millersc@sullcrom.com
        dietdericha@sullcrom.com

Sullivan & Cromwell LLP
1 New Fetter Lane
London EC4A 1AN
United Kingdom
Tel: +44 (0) 20 7959 8426
Attn: Evan S. Simpson
Email: simpsone@sullcrom.com

(b)    If to the Equity Backstop Parties:

To each Equity Backstop Party at the addresses or e-mail addresses set forth below the Equity Backstop Party's signature in its signature page to this Agreement.

*with a copy (which shall not constitute notice) to*:

Milbank LLP
Attn: Dennis F. Dunne, Andrew M. Leblanc,
Matthew Brod and Andrew C. Harmeyer
55 Hudson Yards
New York, NY 10001
Tel: (212) 530-5000
Fax: (212) 530-5219
Email: ddunne@milbank.com
        aleblanc@milbank.com
        mbrod@milbank.com
        aharmeyer@milbank.com

and

Jones Day
250 Vesey Street
New York, New York 10281

41

Attention: Anna Kordas
E-mail address: akordas@jonesday.com

-and-

Jones Day
555 S. Flower St.
50th Floor
Los Angeles, CA 90071
Attention: Bruce Bennett
Joshua M. Mester
James O. Johnston
E-mail address: bbennett@jonesday.com; jmester@jonesday.com;
jjohnston@jonesday.com

Section 10.2    Assignment; Third Party Beneficiaries.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned by any party hereto (whether by operation of Law or otherwise) without the prior written consent of the Company and the Requisite Consenting Parties, other than an assignment by an Equity Backstop Party expressly permitted by Section 2.6 and any purported assignment in violation of this Section 10.2 shall be void *ab initio*.  Except as provided in Article VIII with respect to the Indemnified Persons, this Agreement (including the documents and instruments referred to in this Agreement) is not intended to and does not confer upon any Person any rights or remedies under this Agreement other than the Parties.

Section 10.3    Prior Negotiations; Entire Agreement.

(a)    This Agreement (including the Annexes and Schedules attached to and the documents and instruments referred to in this Agreement), the Plan Support Agreement and the Confidentiality Agreements constitute the entire agreement of the parties hereto and supersede all prior agreements, arrangements or understandings, whether written or oral, among the parties hereto with respect to the subject matter of this Agreement, except that the parties hereto acknowledge that any confidentiality agreements heretofore executed among the parties hereto will each continue in full force and effect.

(b)    Notwithstanding anything to the contrary in the Plan (including any amendments, supplements or modifications thereto) or the Confirmation Order (and any amendments, supplements or modifications thereto) or an affirmative vote to accept the Plan submitted by any Equity Backstop Party, nothing contained in the Plan (including any amendments, supplements or modifications thereto) or Confirmation Order (including any amendments, supplements or modifications thereto) shall alter, amend or modify the rights of the Equity Backstop Parties under this Agreement unless such alteration, amendment or modification has been made in accordance with Section 10.7.

Section 10.4   Governing Law; Venue.   THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE

42

STATE OF NEW YORK, WITHOUT REGARD TO SUCH STATE'S CHOICE OF LAW PROVISIONS WHICH WOULD REQUIRE OR PERMIT THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.  BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES FOR ITSELF THAT ANY LEGAL ACTION, SUIT, OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER ARISING UNDER, ARISING OUT OF, OR IN CONNECTION WITH THIS AGREEMENT OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT, OR PROCEEDING, SHALL BE BROUGHT IN THE BANKRUPTCY COURT, OR IF THE BANKRUPTCY COURT DOES NOT HAVE JURISDICTION TO HEAR SUCH ACTION, SUIT OR PROCEEDING, ANY STATE OR FEDERAL COURT LOCATED IN NEW YORK COUNTY, NEW YORK, AND BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH OF THE PARTIES HERETO IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING. THE PARTIES HERETO HEREBY AGREE THAT MAILING OF PROCESS OR OTHER PAPERS IN CONNECTION WITH ANY SUCH ACTION OF PROCEEDING TO AN ADDRESS PROVIDED IN WRITING BY THE RECIPIENT OF SUCH MAILING, OR IN SUCH OTHER MANNER AS MAY BE PERMITTED BY LAW, SHALL BE VALID AND SUFFICIENT SERVICE THEREOF AND HEREBY WAIVE ANY OBJECTIONS TO SERVICE ACCOMPLISHED IN THE MANNER HEREIN PROVIDED.

Section 10.5    Waiver of Jury Trial.  EACH PARTY HERETO HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY JURISDICTION IN ANY ACTION, SUIT OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE AMONG THE PARTIES HERETO UNDER THIS AGREEMENT, WHETHER IN CONTRACT, TORT OR OTHERWISE.

Section 10.6    Counterparts.  This Agreement may be executed by way of electronic signature and delivery or in any number of counterparts, all of which will be considered one and the same agreement and will become effective when counterparts have been signed by each of the parties hereto and delivered to each other party hereto (including via facsimile, portable document format (pdf) or other electronic transmission), it being understood that each party hereto need not sign the same counterpart.

Section 10.7    Waivers and Amendments; Rights Cumulative; Consent.  This Agreement may be amended, restated, modified, or changed only by a written instrument signed by the Company and the Requisite Consenting Parties; provided that, in addition, each Equity Backstop Party's prior written consent shall be required for any amendment that would have the effect of:  (a) directly or indirectly modifying such Equity Backstop Party's Equity Backstop Amount other than in accordance with Section 2.3(a); (b) increasing the Per Share Purchase Price to be paid in respect of the Rights Offering Shares (except to the extent resulting from a proportionate decrease in the number of Convertible Series A Preferred Shares to be offered in the Rights Offering); (c) increasing the Rights Offering Amount without each Equity Backstop Party having the opportunity (but not the obligation) to participate pro rata in such increase (for the avoidance of doubt, this clause shall only apply to the Rights Offering Shares to be issued pursuant to this Agreement and shall not apply to any subsequent issuance of Convertible Series A Preferred

43

4820-3711-3559 v.8

Shares, it being agreed that no Equity Backstop Party shall be required to purchase such Convertible Series A Preferred Shares); (d) amending any of the following: (i) Section 2.6 (*Designation and Assignment Rights*), (ii) this Section 10.7, (iii) the definition of "Requisite Consenting Parties"; or (e) otherwise having a materially adverse and disproportionate (as compared to other Equity Backstop Parties) effect on such Equity Backstop Party; provided, further, that a written instrument signed by the Company and the Requisite Consenting Parties shall be required to amend, restate, modify or change any provision that gives the Requisite Consenting Parties consent rights with respect to any matter.  The terms and conditions of this Agreement may be waived (i) by the Debtors only by a written instrument executed by the Company and (ii) by the Equity Backstop Parties only by a written instrument executed by the Requisite Consenting Parties (provided that each Equity Backstop Party's prior written consent shall be required for any waiver having the effects referred to in the first proviso of this Section 10.7). Notwithstanding the foregoing or anything to the contrary in this Agreement, following the termination of the rights and obligations of an Equity Backstop Party pursuant to Section 9.3(c), the Company and one or more remaining Equity Backstop Parties may, without the consent of the Requisite Consenting Parties, agree to amend this Agreement to increase the Equity Backstop Percentages of such agreeing Equity Backstop Party or Parties such that, following such increase, the sum of all Equity Backstop Percentages equals one hundred percent (100%). No delay on the part of any Party in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver on the part of any Party of any right, power or privilege pursuant to this Agreement, nor will any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement.  Except as otherwise provided in this Agreement, the rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any Party otherwise may have at law or in equity. For the avoidance of doubt, nothing in this Agreement shall affect or otherwise impair the rights, including consent rights, of the Equity Backstop Parties under the Plan Support Agreement or any other Definitive Document.

Section 10.8    Headings.    The headings in this Agreement are for reference purposes only and will not in any way affect the meaning or interpretation of this Agreement.

Section 10.9    Specific Performance.    The parties hereto agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to an injunction or injunctions without the necessity of posting a bond to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity.  Unless otherwise expressly stated in this Agreement, no right or remedy described or provided in this Agreement is intended to be exclusive or to preclude a Party from pursuing other rights and remedies to the extent available under this Agreement, at law or in equity.

Section 10.10 Damages.    Notwithstanding anything to the contrary in this Agreement, none of the parties hereto will be liable for, and none of the parties hereto shall claim or seek to recover, any punitive, special, indirect or consequential damages or damages for lost profits.

44

Section 10.11 <u>No Reliance</u>. No Equity Backstop Party or any of its Related Parties shall have any duties or obligations to the other Equity Backstop Parties in respect of this Agreement, the Plan or the transactions contemplated hereby or thereby, except those expressly set forth herein. Without limiting the generality of the foregoing, (a) no Equity Backstop Party or any of its Related Parties shall be subject to any fiduciary or other implied duties to the other Equity Backstop Parties, (b) no Equity Backstop Party or any of its Related Parties shall have any duty to take any discretionary action or exercise any discretionary powers on behalf of any other Equity Backstop Party, (c) no Equity Backstop Party or any of its Related Parties shall have any duty to the other Equity Backstop Parties to obtain, through the exercise of diligence or otherwise, to investigate, confirm, or disclose to the other Equity Backstop Parties any information relating to the Company, the other Debtors or any of their respective Subsidiaries that may have been communicated to or obtained by such Equity Backstop Party or any of its Affiliates in any capacity, (d) no Equity Backstop Party may rely, and each Equity Backstop Party confirms that it has not relied, on any due diligence investigation that any other Equity Backstop Party or any Person acting on behalf of such other Equity Backstop Party may have conducted with respect to the Company, the other Debtors or any of their respective Affiliates or any of their respective securities, and (e) each Equity Backstop Party acknowledges that no other Equity Backstop Party is acting as a placement agent, initial purchaser, underwriter, broker or finder with respect to its Unsubscribed Shares or Equity Backstop Percentage of its Rights Offering Backstop Commitment.

Section 10.12 <u>No Recourse</u>. Notwithstanding anything that may be expressed or implied in this Agreement, and notwithstanding the fact that certain of the Parties may be partnerships or limited liability companies, each party hereto covenants, agrees and acknowledges that no recourse under this Agreement or any documents or instruments delivered in connection with this Agreement shall be had against any Party's Affiliates, or any of such Party's Affiliates' or respective Related Parties in each case other than the Parties to this Agreement and each of their respective successors and permitted assignees under this Agreement (including any applicable Related Purchaser), whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any applicable Law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any of the Related Parties (other than any applicable Related Purchaser), as such, for any obligation or liability of any Party under this Agreement or any documents or instruments delivered in connection herewith for any claim based on, in respect of or by reason of such obligations or liabilities or their creation; provided, however, nothing in this <u>Section 10.12</u> shall relieve or otherwise limit the liability of any party hereto or any of their respective successors or permitted assigns for any breach or violation of its obligations under this Agreement or such other documents or instruments. For the avoidance of doubt, prior to the Effective Date, none of the parties hereto will have any recourse, be entitled to commence any proceeding or make any claim under this Agreement or in connection with the transactions contemplated hereby except against any of the parties hereto or their respective successors and permitted assigns (including the applicable Related Purchasers), as applicable.

Section 10.13 <u>Severability</u>. In the event that any one or more of the provisions contained in this Agreement is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions contained herein will not be in any way impaired thereby, it being intended

45

that all of the rights and privileges of the parties hereto will be enforceable to the fullest extent permitted by law.

[*Signature Page Follows*]

4820-3711-3559 v.8

IN WITNESS WHEREOF, the undersigned Parties have duly executed this Agreement as of the date first above written.

**DEBTORS:**

GARRETT MOTION INC.

By: _____

    Name:  Jerome Maironi
    Title:  SVP General Counsel & Corporate Secretary

BRH LLC

By: _____

    Name:  Jerome Maironi
    Title:  Authorized Signatory

CALVARI LIMITED

By: _____

    Name:  Jerome Maironi
    Title:  Authorized Signatory

FRICTION MATERIALS LLC

By: _____

    Name:  Jerome Maironi
    Title:  Authorized Signatory

GARRETT ASASCO INC.

By: _____

    Name: Jerome Maironi
    Title: Authorized Signatory


GARRETT BORROWING LLC

By: _____

    Name: Jerome Maironi
    Title: Authorized Signatory


GARRETT HOLDING COMPANY SÀRL

By: _____

    Name: Jerome Maironi
    Title: Authorized Signatory


GARRETT LX I S.À R.L.

By: _____

    Name: Jerome Maironi
    Title: Authorized Signatory


GARRETT LX II S.À R.L.

By: _____

    Name: Jerome Maironi
    Title: Authorized Signatory


GARRETT LX III S.À R.L.

By: _____

    Name: Jerome Maironi
    Title: Authorized Signatory

GARRETT MOTION AUSTRALIA PTY LIMITED

By: _____
    Name:  Jerome Maironi
    Title:  Authorized Signatory

GARRETT MOTION AUTOMOTIVE RESEARCH
MEXICO S. DE R.L. DE C.V.

By: _____
    Name:  Jerome Maironi
    Title:  Authorized Signatory

GARRETT MOTION HOLDINGS INC.

By: _____
    Name:  Jerome Maironi
    Title:  Authorized Signatory

GARRETT MOTION HOLDINGS II INC.

By: _____
    Name:  Jerome Maironi
    Title:  Authorized Signatory

GARRETT MOTION INTERNATIONAL SERVICES
S.R.L.

By: _____
    Name:  Jerome Maironi
    Title:  Authorized Signatory

GARRETT MOTION IRELAND A LIMITED

By: _____
    Name:  Jerome Maironi
    Title:  Authorized Signatory

GARRETT MOTION IRELAND B LIMITED

By: _____
     Name:  Jerome Maironi
     Title:  Authorized Signatory


GARRETT MOTION IRELAND C LIMITED

By: _____
     Name:  Jerome Maironi
     Title:  Authorized Signatory


GARRETT MOTION IRELAND LIMITED

By: _____
     Name:  Jerome Maironi
     Title:  Authorized Signatory


GARRETT MOTION ITALIA S.R.L.

By: _____
     Name:  Jerome Maironi
     Title:  Authorized Signatory


GARRETT MOTION JAPAN INC.

By: _____
     Name:  Jerome Maironi
     Title:  Authorized Signatory


GARRETT MOTION LLC

By: _____
     Name:  Jerome Maironi
     Title:  Authorized Signatory

GARRETT MOTION MÉXICO, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE

By: _____
    Name: Jerome Maironi
    Title: Authorized Signatory


GARRETT MOTION ROMANIA S.R.L.

By: _____
    Name: Jerome Maironi
    Title: Authorized Signatory


GARRETT MOTION SÀRL

By: _____
    Name: Jerome Maironi
    Title: Authorized Signatory


GARRETT MOTION SLOVAKIA S.R.O.

By: _____
    Name: Jerome Maironi
    Title: Authorized Signatory


GARRETT MOTION SWITZERLAND HOLDINGS SÀRL

By: _____
    Name: Jerome Maironi
    Title: Authorized Signatory


GARRETT MOTION UK A LIMITED

By: _____
    Name: Jerome Maironi
    Title: Authorized Signatory

GARRETT MOTION UK B LIMITED

By: _____
    Name:  Jerome Maironi
    Title:  Authorized Signatory

GARRETT MOTION UK C LIMITED

By: _____
    Name:  Jerome Maironi
    Title:  Authorized Signatory

GARRETT MOTION UK D LIMITED

By: _____
    Name:  Jerome Maironi
    Title:  Authorized Signatory

GARRETT MOTION UK LIMITED

By: _____
    Name:  Jerome Maironi
    Title:  Authorized Signatory

GARRETT TRANSPORTATION I INC.

By: _____
    Name:  Jerome Maironi
    Title:  Authorized Signatory

GARRETT TRANSPORTATION SYSTEMS LTD

By: _____
    Name:  Jerome Maironi
    Title:  Authorized Signatory

GARRETT TRANSPORTATION SYSTEMS UK II LTD

By: _____

    Name:  Jerome Maironi
    Title:  Authorized Signatory


GARRETT TS LTD

By: _____

    Name:  Jerome Maironi
    Title:  Authorized Signatory


GARRETT TURBO LTD

By: _____

    Name:  Jerome Maironi
    Title:  Authorized Signatory

**EQUITY BACKSTOP PARTIES:**

CENTERBRIDGE SPECIAL CREDIT PARTNERS
III-FLEX, L.P.

By:     Centerbridge Special Credit Partners
        General Partner III, L.P.
Its:    General Partner

By:     CSCP III Cayman GP, Ltd.
Its:    General Partner

By:     _____
Name:  Vivek Melwani
Title:   Senior Managing Director


Notice Information

c/o Centerbridge Partners, LP.

375 Park Avenue

New York, New York 10152

Facsimile: (212) 672-5001

Email: legalnotices@centerbridge.com

Attention: The Office of the General Counsel

[*Signature page to Equity Backstop Commitment Agreement*]

**EQUITY BACKSTOP PARTIES:**

Oaktree Opportunities Fund Xb Holdings
(Delaware), L.P.

By:    Oaktree Fund GP, LLC
Its:    General Partner

By:    Oaktree Fund GP I, L.P.
Its:    Managing Member

By:    _____
  Name:    Kaj Vazales
  Title:    Authorized Signatory

By:    _____
  Name:    Ross Rosenfelt
  Title:    Authorized Signatory

Notice Information

333 S. Grand Avenue, 28th Floor, Los Angeles CA  90071
Attn: Corporate Actions Team

jmikes@oaktreecapital.com; kvazales@oaktreecapital.com;
rrosenfelt@oaktreecapital.com;pkaganas@oaktreecapital.com

[*Signature page to Equity Backstop Commitment Agreement*]

Oaktree Opportunities Fund XI Holdings (Delaware), L.P.

By:    Oaktree Fund GP, LLC
Its:    General Partner

By:    Oaktree Fund GP I, L.P.
Its:    Managing Member

By:   _____
  Name:  Kaj Vazales
  Title:   Authorized Signatory

By:  _____
  Name:  Jordan Mikes
  Title:   Authorized Signatory


Notice Information

333 S. Grand Avenue, 28th Floor, Los Angeles CA  90071
Attn: Corporate Actions Team

jmikes@oaktreecapital.com; kvazales@oaktreecapital.com;
rrosenfelt@oaktreecapital.com;pkaganas@oaktreecapital.com

[*Signature page to Equity Backstop Commitment Agreement*]

ATTESTOR VALUE MASTER FUND LP

By: _____

Acting by: Attestor Limited

By: F.S. Andreae
Title: Authorized Attorney

Notice Information:

c/o Attestor Limited
7 Seymour Street
London W1H 7JW

Email address:

friedrich.andreae@attestorcapital.com

ops@attestorcapital.com

legal@attestorcapital.com

Attention to: F.S. Andreae

Doc ID: 8701863c909d7cc9671c554c0386835852db3814

DocuSign Envelope ID: 6B390D84-5B79-4A70-958C-ACE342E49E14

THE BAUPOST GROUP, L.L.C.

By: _____

Name:  Joshua A. Greenhill

Title:  Partner


Notice Information:
The Baupost Group, L.L.C.
10 St. James Ave., Suite 1700
Boston, MA 02116
legal@baupost.com
Jag@baupost.com
Attention:  Joshua Greenhill & Legal Dept.

CYRUS CAPITAL PARTNERS, L.P., in its capacity as investment manager to and on behalf of certain managed funds and accounts

By: _Jennifer M. Pulick_____
Name:  Jennifer M. Pulick
Title:   Authorized Signatory

Notice Information:

65 East 55th Street, 35th Floor, New York, New York 10022

ops@cyruscapital.com / jmah@cyruscapital.com / jpulick@cyruscapital.com

Attn:  General Counsel and Operations Dept

FIN CAPITAL PARTNERS LP
BY:  FINN MANAGEMENT GP LLC,
ITS GENERAL PARTNER


By:  _____

    Name:    Brian Finn
    Title:    Manager


Notice Information

336 West 37th Street, Suite 200
New York, NY 10018

Attention:    Brian Finn
Email:    brian.finn@fincap.us

HAWK RIDGE CAPITAL MANAGEMENT LP

By: _____

Name:  David Bradley
Title:  COO/CFO/CCO

Notice Information:

Address:           12121 Wilshire Blvd. Suite 900
                   Los Angeles, CA 90025

Email address:     dbradley@hawkridgellc.com

Attention to:      David Bradley

[*Signature page to Equity Backstop Commitment Agreement*]

KEYFRAME CAPITAL PARTNERS, L.P., in its capacity
as investment manager to and on behalf of certain
managed funds and accounts

By: *Jennifer M. Pulick*
    Name:  Jennifer M. Pulick
    Title:   Authorized Signatory

Notice Information:

65 East 55th Street, 35th Floor, New York, New York 10022

ops@cyruscapital.com / jr@keyframecapital.com

Attn:  John Rapaport and Operations Dept

[*Signature page to Equity Backstop Commitment Agreement*]

NEWTYN MANAGEMENT, LLC

By: _____

Name: Eugene Dozortsev

Title: Managing Member


Notice Information

60 East 42nd Street

9th Floor

New York, NY 10165

edozortsev@newtyn.com

Attn: Eugene Dozortsev

SESSA CAPITAL IM, L.P.

By: _____

Name: Jae Hong
Title: President & COO

Notice Information

888 Seventh Avenue, 30th Floor

New York, NY 10019

Jae.Hong@sessacapital.com

Attention to: Jae Hong

WHITEBOX MULTI-STRATEGY PARTNERS, L.P.

By: _____

Name:   Luke Harris

Title: General Counsel - Corporate, Transactions and Litigation


Notice Information: Whitebox Advisors LLC, 3033
te 500, Minneapolis, MN 55416

AThau@whiteboxadvisors.com

Attention: Andrew Thau

**Annex A**

**Commitment Schedule**

| Equity Backstop Party | Equity Backstop Percentage |
|---|---|
| Oaktree Opportunities Fund Xb Holdings (Delaware), L.P. | |
| Oaktree Opportunities Fund XI Holdings (Delaware), L.P. | |
| Centerbridge Special Credit Partners III-Flex, L.P. | |
| Attestor Value Master Fund LP | |
| The Baupost Group, L.L.C. | |
| Cyrus Capital Partners, L.P. | |
| FIN Capital Partners LP | |
| Hawk Ridge Capital Management LP | |
| Keyframe Capital Partners, L.P. | |
| Newtyn Management, LLC | |
| Sessa Capital (Master), L.P. | |
| Whitebox Multi-Strategy Partners, L.P. | |
| Total | 100.000% |

4820-3711-3559 v.8

## EXHIBIT D

**Mendelsohn Declaration**

4846-5437-1798 v.7

Andrew G. Dietderich
Brian D. Glueckstein
Alexa J. Kranzley
Benjamin S. Beller
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Counsel to the Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| ——————————————————— x | | |
| | : | |
| In re | : | Chapter 11 |
| | : | |
| | : | |
| GARRETT MOTION INC., *et al.*,[1] | : | Case No. 20-12212 (MEW) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |
| | : | |
| ——————————————————— x | | |

**DECLARATION OF BRUCE MENDELSOHN IN SUPPORT OF DEBTORS' MOTION**
**FOR AN ORDER (I) AUTHORIZING THE DEBTORS TO ENTER INTO AND**
**PERFORM UNDER (A) THE PLAN SUPPORT AGREEMENT AND (B) THE EQUITY**
**BACKSTOP COMMITMENT AGREEMENT AND (II) GRANTING RELATED RELIEF**

Bruce Mendelsohn hereby declares and says:

1.      I am a Partner and the Head of Global Restructuring at Perella Weinberg

Partners L.P. ("PWP"), a financial advisory firm that maintains an office at 767 5th Avenue, New

York, New York 10153.  I submit this declaration (this "Declaration") in support of the D*ebtors'*

*Motion for an Order (I) Authorizing the Debtors to Enter into and Perform Under (A) the Plan*

---

[1]    The last four digits of Garrett Motion Inc.'s tax identification number are 3189. Due to the large number of debtor entities in these Chapter 11 Cases, which are being jointly administered, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at http://www.kccllc.net/garrettmotion. The Debtors' corporate headquarters is located at La Pièce 16, Rolle, Switzerland.

4815-4497-4808 v.4

*Support Agreement and (B) the Equity Backstop Commitment Agreement and (II) Granting*

*Related Relief* (the "Motion") filed by Garrett Motion Inc. ("GMI") and its affiliated debtors and

debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases.[2]

2.    I am not being compensated separately for this testimony other than

through payments received by PWP as the investment banker to the Debtors.  Except as

otherwise indicated herein, all of the facts set forth in this Declaration are based upon my

personal knowledge, my review of relevant documents, information provided to me by PWP

professionals involved in advising the Debtors in these chapter 11 cases, or information provided

to me by the Debtors.  If called upon to testify, I could and would testify to the facts set forth

herein on that basis.  I am authorized to submit this Declaration on behalf of the Debtors.

## I.    The Debtors' Competitive Auction

3.    Since the entry of the Bid Procedures Order, the Debtors have engaged in

extensive and hard-fought negotiations with several potential transaction counterparties.

Pursuant to the Bid Procedures, the Debtors' leading alternatives were eventually narrowed and

the Debtors identified three Qualified Bids to participate in the Auction.  The Auction was

commenced on December 21, 2020, and continued for several rounds.  Each of the three

Qualified Bids had financing commitments and each of the bidders had committed to legally-

binding documentation at the time of the commencement of the Auction.

4.    The Initial COH Proposal was one of the three Qualified Bids.  Prior to the

Auction, the Debtors and their advisors engaged with the COH Group and sought improvements

to the terms of the transaction offered through the Coordination Agreement.

5.    The COH Group did not participate in the first round of the Auction, but

---

[2]    Capitalized terms not otherwise defined herein shall be given the meanings ascribed to them in the Motion.

-2-

the Debtors continued discussions with the COH Group and announced to the COH Group and Auction participants that the Debtors would consider proposals from the COH Group concurrently with the other bids submitted at the Auction.  On January 4, 2021, the Debtors held the second round of the Auction, where representatives of the COH Group attended and continued discussions with the Debtors, but did not make a further bid on the record.

6.      After further discussions with the bidders at the Auction and the Consulting Professionals, the Debtors determined to solicit final and best bids from all participants in the competitive process by January 5, 2021.  At the conclusion of the Auction, after consideration of all written bids received, the Debtors determined that the final and improved written bid submitted by the Stalking Horse Purchaser was the highest and best offer, however, the Debtors believed that, if the most recent verbal offer from the COH Group could be memorialized, then the COH Group proposal could prevail.  As a result, the Debtors continued to consider and work to memorialize the most recent verbal proposal made by the COH Group.

7.      Following the Debtors' further negotiations with the COH Group, the GMI Board of Directors deliberated at length and unanimously determined that the Final COH Group Proposal was higher and better than the final bid from the Stalking Horse Purchaser, and approved proceeding with the transaction and the beneficial settlement and compromises embodied therein.  The Final COH Group Proposal was also independently considered and approved by the Boards of Directors of ASASCO and GMHI, including their independent directors.  On January 11, 2021, the Debtors entered into the Plan Support Agreement with the COH Group to effectuate the transactions contemplated by the Final COH Group Bid.  In connection with the Plan Support Agreement, the Debtors entered into the Equity Backstop Commitment Agreement on January 22, 2021.

-3-

8.    During the Auction, the Debtors consulted with a large group of

Consulting Professionals regarding the Qualified Bids and the COH Group Proposal.  The

Debtors had eight formal conference calls relating to the Auction, which all of the Consulting

Professionals were invited to join, and countless individual discussions with Consulting

Professionals who were invited to—and did—provide feedback as deal terms were negotiated

and the Qualified Bids reviewed by the Debtors.

9.    I believe that the transactions contemplated by the Plan Support

Agreement and the Equity Backstop Commitment Agreement offer significant benefits to the

Debtors' estates.  The Plan Support Agreement and Equity Backstop Commitment Agreement

are the culmination of a lengthy and exhaustive competitive process over a period of more than

three months.  The Plan Support Agreement and the Equity Backstop Commitment Agreement

are the product of vigorous and arms'-length negotiations between the Debtors and the COH

Group.  Consistent with the GMI Board of Directors' conclusion, my view is that the

transactions contemplated by the Plan Support Agreement and the Equity Backstop Commitment

Agreement represent the highest and best offer available for the Debtors' businesses.

II.    **Entry Into the Plan Support Agreement and the Equity Backstop Commitment Agreement is a Reasonable Exercise of the Debtors' Sound Business Judgment**

10.    I believe that the Debtors' entry into the Plan Support Agreement and the

Equity Backstop Commitment Agreement, and the Debtors' performance of their obligations

thereunder, represent a sound exercise of the Debtors' business judgment and will significantly

benefit the Debtors' estates by locking-in the terms of the Final COH Proposal, and the

commitment of the COH Group to support those terms, pending the Court's consideration of the

Debtors' Plan.  The Plan Support Agreement and the Equity Backstop Commitment Agreement

are the product of extensive arms' length, good faith negotiations among the Debtors and many

-4-

4815-4497-4808 v.4

of their key stakeholders.  The Debtors' agreement to the Plan Support Agreement and the Equity Backstop Commitment Agreement were undertaken only after an exhaustive competitive process that culminated in a public auction that stretched nearly a month, at which the Debtors considered in parallel two other proposed transactions.  Ultimately, after careful consideration by the Debtors' management and lengthy deliberations by the GMI Board of Directors, in consultation with their advisors, the GMI, ASASCO and GMHI Boards of Directors each determined that the restructuring transactions contemplated by the Plan Support Agreement and the Equity Backstop Commitment Agreement represent the highest and best available transaction to maximize recoveries for all stakeholders.

11.     Furthermore, it is my view that the Plan Support Agreement and the Equity Backstop Commitment Agreement are essential to facilitate the Debtors' pursuit of confirmation and consummation of the Plan and the Debtors' emergence from chapter 11.

**III.     Payment of the Expense Reimbursement and Indemnification Claims is a Reasonable Exercise of the Debtors' Business Judgment**

12.     The Debtors, in their business judgment as approved by the Board of Directors, have determined that the payment of the Expense Reimbursement and Indemnification Claims is reasonable and appropriate.  Without the ability to pay the Expense Reimbursement and Indemnification Claims, I believe that the Debtors would be unable to secure the commitments of the parties to the Plan Support Agreement and the Equity Backstop Commitment Agreement.  At this juncture, I believe that such a result would jeopardize the Debtors' ability to confirm the Plan and emerge from chapter 11 in a timely manner.

13.     I believe that payment of the Expense Reimbursement up to an aggregate amount of $25 million prior to emergence and any Indemnification Claims is appropriate because of the extensive efforts undertaken by the COH Group to provide binding financing

4815-4497-4808 v.4

commitments and negotiate the Plan Support Agreement and the Equity Backstop Commitment

Agreement, as well as their continued participation in connection with the formulation and

pursuit of confirmation of the Plan.  Moreover, it is my view that the Expense Reimbursement

and Indemnification Claims are reasonable in light of the benefits that the Debtors and their

estates will receive from confirmation and consummation of the Plan.

14.    Absent the Debtors' agreement to pay such amounts, I do not believe that

the COH Group would have been willing to execute the Plan Support Agreement or the Equity

Backstop Parties would have been willing to provide the Rights Offering Backstop Commitment,

thereby threatening the Debtors' ability to consummate the transactions contemplated by the Plan

Support Agreement and pursue confirmation of the Plan for the benefit of all stakeholders..  I

believe that the Debtors' agreement to pay the Expense Reimbursement and the Indemnification

Claims was necessary to induce the COH Group to enter into the Plan Support Agreement and

the Equity Backstop Parties to commit to backstop the Rights Offering.

I, the undersigned Partner at Perella Weinberg Partners, declare under penalty of

perjury that the foregoing is true and correct.

Dated: January 22, 2021

/s/ Bruce Mendelsohn
Bruce Mendelsohn
Partner
Perella Weinberg Partners

-6-

4815-4497-4808 v.4